IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SOUTHWEST AIRLINES CO., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>THE CITY OF SAN ANTONIO, TEXAS and )<br>JESUS SAENZ, in his official capacity as )<br>Director of Airports for the City of San )<br>Antonio, Texas )<br>)<br>Defendants. )<br>_____ ) | Civil Action No. 5:24-cv-1085 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Southwest Airlines Co. ("Plaintiff" or "Southwest") states as follows for its Complaint for Declaratory and Injunctive Relief against the City of San Antonio, Texas ("City"), and Jesus Saenz, in his official capacity as the Director of Airports for the City of San Antonio, Texas ("Director Saenz") (collectively, "Defendants").

**INTRODUCTION**

1. Southwest brings this action pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2, and the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b) ("Airline Deregulation Act") to obtain declaratory and injunctive relief with regard to the City's unlawful use of subjective evaluation criteria, as owner and operator of the San Antonio International Airport ("SAT" or "Airport"), resulting in the exclusion of Southwest, which is the largest air carrier at SAT by passenger volume, from the new passenger terminal gates being constructed at SAT – which is referred to as "Terminal C." *See* Proposed Terminal Map, at **Exhibit 1** hereto.  As set forth below, Defendants' allocation of terminal space was fundamentally flawed, and made based on an

array of factors which the City was not lawfully permitted to consider, including, without limitation, the nature of the "services" and air carrier "routes" offered by Southwest, and the City's subjective perception that Southwest's "fit" with San Antonio made it less eligible than other airlines for accommodation at the new Terminal C.  Federally-funded airports such as SAT cannot use subjective preferences to favor one airline over another in the assignment of terminal gates.

2. Municipal governments that own and operate airports cannot apply subjective, discretionary factors to pick "winners and losers" among the airlines competing for space at the airport.  Defendants may not refuse to permit Southwest to move to the new Terminal C merely because Defendants prefer airlines that have more or different international routes and provide premium service and airline lounges.  There are no "first-class and second-class citizens" when it comes to airlines serving the Airport.

3. Defendants must be required to evaluate any airline's request for space within the airport based on criteria that are agnostic to the nature of the service offered or the routes served and must thus withdraw their current prohibition against Southwest moving to the new Terminal C in favor of a neutral, non-subjective set of standards and criteria that does not penalize Southwest for its predominantly domestic service and lack of premium seating or an airline lounge.

4. Time is of the essence for the relief sought by Southwest because although Terminal C is not yet constructed and available for air service, the City is planning to enter into a new airline use and lease agreement ("AULA" or "Lease") with seven airlines serving SAT effective October 1, 2024, which will create vested legal rights that may significantly complicate the ability of Southwest to move its operations to the new Terminal C.  In addition, the City's publicly-stated intention to exclude Southwest from Terminal C based on its impermissible, subjective assessment that Southwest's services and/or routes are not as good of a "fit" with San Antonio as other airlines

is actively harming Southwest's brand reputation and goodwill within the community.

5. It is therefore imperative that the Defendants be ordered to maintain the status quo by holding over the current leases and refraining from entering into new Leases with airlines for Terminal C and the other Terminals until after the Court has declared the rights of the parties as requested herein.

## JURISDICTION AND VENUE

6. Jurisdiction in this Court exists under 28 U.S.C. §§1331 and 2201 because Southwest seeks declaratory and injunctive relief under the Supremacy Clause of the U.S. Constitution, art. VI, cl. 2, and under federal law with regard to the Defendants' improper refusal to allow Southwest to move to the new Terminal C based on factors that are prohibited by the Airline Deregulation Act, 49 U.S.C. § 41713(b).

7. Southwest is entitled to pursue this action for declaratory and injunctive relief regardless of whether there exists a private right of action under the Airline Deregulation Act because it "is entitled to pursue its preemption challenge through its Supremacy Clause claim." *Air Transport Ass'n of America, Inc. v. Cuomo*, 520 F.3d 218, 221 (2d Cir. 2008). "'A claim under the Supremacy Clause that a federal law preempts a state regulation is distinct from a claim for enforcement of that federal law.'" *Id*. (citing *Western Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222, 225-26 (2d Cir. 1987)).

8. "A claim under the Supremacy Clause simply asserts that a federal statute has taken away local authority to regulate a certain activity. In contrast, an implied private right of action is a means of enforcing the substantive provisions of a federal law. It provides remedies, frequently including damages, for violations of federal law by a government entity or by a private party. The mere coincidence that the federal law in question in this case contains its own preemption language

3

does not affect this distinction." *Cuomo*, at 221 (citing *Western Air*, at 225-226). *See Cuomo*, at 221 ("Air Transport's complaint asserts a claim under the Supremacy Clause and a claim that the [challenged state law] violates § 41713(b)").

9. Venue in this Court exists under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District, and all of the property that is the subject of this action is situated in this District.

## PARTIES

10. Plaintiff Southwest Airlines Co. is a major airline in the United States that operates on a low-cost carrier model. It has scheduled service to approximately 117 destinations in the United States and in ten other countries. It carries more domestic passengers than any other airline in the United States. It is currently the third largest airline in the world based on passengers flown.

11. Southwest was established in 1967 by Herb Kelleher and Rollin King in San Antonio as Air Southwest Co. and adopted its current name in 1971, when it began operating as an intrastate airline wholly within the State of Texas, first flying between Dallas, Houston and San Antonio. It began regional interstate service in 1979, expanding nationwide in the following decades. Southwest currently serves airports in 42 states and multiple near international destinations.

12. Since Southwest commenced passenger service in 1971, it has valued its relationship with the City of San Antonio and SAT. It is deeply proud of the fact that Southwest is the largest air carrier at SAT, with a 38% share of passengers in 2023.

13. Defendant City of San Antonio is the owner and operator of SAT. It is in the

process of developing a new Terminal C at the Airport. *See* Proposed Terminal Map at **Exhibit 1** hereto.

14. Defendant Saenz, who is sued in his official capacity, is the Director of Airports for the City of San Antonio, and has taken a lead role in developing and implementing the City's legally flawed evaluation criteria that ultimately resulted in the exclusion of Southwest from the new Terminal C or equally comparable facilities, while simultaneously entering into new Leases with other airlines which are being permitted to move to Terminal C.

## STATEMENT OF FACTS

### San Antonio International Airport and its Two Existing Terminals A and B

15. San Antonio International Airport is located on property within the City of San Antonio that the City acquired in 1941. In 1944, the airfield was officially named as the San Antonio International Airport and regular flights began. Several renovations and upgrades were carried out during the early 1950s, including a new terminal in 1953 (which became the terminal that ultimately was replaced by what is now Terminal B). A large expansion project took place during the latter part of the 1960s, when gates were added in a "banjo" design, to accommodate the high passenger numbers expected at the Airport for the forthcoming World's Fair, which occurred in 1968.

16. The existing Terminal A (sometimes referred to as "Terminal 1" or "Concourse A") at SAT was commissioned in 1984 and has 16 gates. Its total area is 397,634 square feet. It is in severe need of reconstruction, and even if the City follows through with tentative plans to renovate Terminal A, it will still be much more narrow and less functional than Terminal C.

17. The existing Terminal B (sometimes referred to as "Terminal 2" or "Concourse B")

was constructed in 2010 and has approximately 247,099 square feet of space. It replaced an older terminal but is not nearly as modern or useful to airlines as the new Terminal C will be.

### The City's Plan to Construct and Operate the New Terminal C

18. The new Terminal C is to be built at an approximate cost of $1.4 billion and will be situated next to the existing Terminal B on the northwest end of the Airport's current footprint. It is slated to feature 17 gates and when it opens in 2028 will have approximately 850,000 square feet, which is more than 30% larger than the combined existing Terminals A and B. *See* Exhibit 1 hereto. According to the City, the new Terminal C will have "[l]arger gate hold rooms for enhanced passenger comfort," a "Riparian Paseo entry and indoor courtyard to enhance sense of place and River Walk feel," a "[n]ew central passenger screening area" to provide an "all-access pass to retail and concessions," a "[n]ew, modern Federal Inspection Station for expanded international air service," and the City has designated "29,000+ sq. ft. club lounge space." Source: https://flysanantonio.com

### The Airport's Lease Negotiations

19. Negotiations for the new Lease began in mid-2022. Over the course of two years, and on repeated occasions, Airport Director Saenz verbally committed to Southwest that Southwest would have all or the majority of its 10 gates located in the new Terminal C. Based on these assurances, prior to the end of May 2024, Southwest rightfully believed it was going to be able to move its operations to the new Terminal C, and therefore did not focus on what might happen with Terminal A, or how the City would pay for renovations to that Terminal.

20. Specifically, throughout the negotiations for new Lease space, Southwest took negotiating positions based on its good faith belief that it would be moving to Terminal C, which Southwest believed was critical for its future objectives for the SAT market and its passengers.

Had Southwest been timely informed that Defendants were not actually planning to offer Terminal C to Southwest, the airline would have adopted a different bargaining position and would not have assumed that it was not remaining in Terminal A.

21.     During a meeting on May 29, 2024 between Southwest's Airport Affairs and the City, despite having been repeatedly assured of its position in Terminal C, Southwest was informed for the first time that the City had decided to instead require Southwest to remain in Terminal A. The tactic was an unfair "bait and switch" that precluded Southwest from pursuing various opportunities in the Lease negotiations, including material terms related to the capital improvement plan that are prejudicial to Southwest should Southwest remain in Terminal A, and that Southwest had no prior reason to negotiate based on assurances Southwest would be located in Terminal C. In the same meeting, and in two follow-up emails, Southwest requested that the City provide the underlying methodology it used to arrive at a gate allocation plan that resulted in the exclusion of Southwest from Terminal C. Although the City verbally committed to disclosing its methodology, it did not in fact do so.

22.     Instead, at a meeting on June 7, 2024, held at Southwest's request, the City provided general information as to how Southwest would be accommodated in Terminal A, but largely ignored the operational concerns raised by Southwest that would result from its placement in Terminal A, including that Terminal A's facilities were not sufficient to support Southwest's passenger volume or operational needs. This includes deficiencies with respect to the security checkpoint ("SSCP"), baggage screening, Ticket Lobby, Curb Front, Holdroom Configuration, Concourse Circulation Constraints, Restrooms, Technology, and finish upgrades. There also are deficiencies in mechanical, electrical, and plumbing items that were identified in a previous City-commissioned facility study.

### The Terminal Gate Assignment Methodology

23. Approximately two weeks after the June 7 meeting, on June 20, 2024, the City finally provided Southwest and other airlines at SAT - for the first time - a document titled "Summary of Decision-Making Process for Post-DBO Gate and Club Locations" (hereafter the "SAT Gate Assignment Criteria"), **Exhibit 2** hereto. This document sets forth the criteria applied by the City in deciding where to locate airlines at SAT. The City's SAT Gate Assignment Criteria was never shared with Southwest before its release on June 20, 2024, and specifies:

> "**Factors [For Gate Assignment] Considered Included:**
>
> ☐ Number of preferential gates requested by airline
> ☐ **Whether an airline club was requested**
> ☐ **Whether airline operates or commits to operating international routes**
> ☐ Whether airline has relevant code share arrangement(s)
> ☐ Current level of enplaned passengers @ SAT
> ☐ **The airline's "fit" into San Antonio**
> ☐ **The airline's service, growth, and experience**
> ☐ **The existence of a written commitment by airline to city pairs, specific flights, or minimum levels of enplaned passengers**
> ☐ Potential need by airline for appurtenant City Gates (for expansion)
> ☐ Terminal load-balancing considerations"

(Emphasis added)

24. According to the City, the Airport decided that Southwest was not entitled to move to the new Terminal C, whereas other competing airlines were invited to do so, based on the above-listed factors. Remarkably, the City expressly acknowledges that in deciding which airlines to allow to move to the new Terminal C, the City has weighed and *first* "considered certain non-quantifiable considerations" such as (1) "Whether an airline club was requested," (2) the geographic nature of the routes served by the air carrier, (3) "the carriers' 'fit' into San Antonio (relating to desirability of passenger profile (business, leisure, mix, etc.) and airline brand position (network, ULCC, established, start-up, etc.)," and (4) "the airlines 'service, growth and experience' (which included an analysis of the airline's overall reasonable growth potential and

8

commitment to SAT, aspirations for international flights, and any differentiation of product or technology used that would enhance customer experience)." (Emphasis added).

25. Even more remarkably, the City eliminated Southwest as a potential occupant of Terminal C by concluding that "[N]otably that airline (WN) does not have an airline club as part of its offerings." "SAT Gate Assignment Criteria," Ex. 2, at p. 1.

26. The City was well aware that requiring Southwest to remain in Terminal A would present significant obstacles to Southwest but brushed aside these concerns, stating that the "airport could partner with [Southwest] to 'make the most' out of the airlines' substantial and focused use of Terminal A." Exhibit 2, at p. 2. This was further evidence that the City recognized that it was treating Southwest as a second-class citizen at SAT.

27. Despite repeated requests by Southwest, the City has refused to provide Southwest with the modeling reflecting the City's application of the above-factors that led to Southwest's exclusion from Terminal C.

28. In a letter dated June 20, 2024, Denise McElroy, Sr. Manager – Airport Affairs at Southwest, told Defendant Saenz that Southwest was "extremely concerned with [his] decision, which [Director Saenz] just shared a few weeks [before], to keep Southwest Airlines in Concourse A." Southwest explained that the decision "will preclude [Southwest] from being able to operate [its] long-term commercial plan for San Antonio (SAT). Southwest further stated:

> "Our original plan, shared with you two years ago, was to lease up to 10 gates. However, we currently do not have confidence that Concourse A can meet those needs. This is a huge 11th hour change, and we must immediately validate whether modifications can be made to meet all the elements of our operation. I recognize your desire to complete negotiations quickly. We shared your goal and, until earlier this month, we believed we were getting very close to a business deal based on our understanding that Southwest would relocate from Concourse A and a pre-approved [Capital Improvement Plan (CIP)] would incorporate a $200M placeholder for Concourse A infrastructure and finish improvements."

9

29. In a letter to Defendant Saenz dated August 12, 2024, Southwest's McElroy stated that "Southwest continues to fervently maintain its desire to be located in the new terminal and remains extremely disappointed at the City's decision to keep Southwest and what will likely be nearly 50% of the passengers flying through San Antonio International Airport (SAT) in Terminal A." The letter added:

> "We met with Corgan [an architectural and design firm] and your staff three times to evaluate Terminal A's deficiencies with respect to the security checkpoint (SSCP), baggage screening, Ticket Lobby, Curb Front, Holdroom Configuration, Restrooms, Technology, and finish upgrades. We also understand there are deficiencies in mechanical, electrical, and plumbing items that were identified in a previous City-commissioned facility study. The Corgan analysis provided thus far does not consider the full utilization of 10 gates as we requested because it restricts peak demand. As a result, we remain extremely concerned that arriving passengers will continue to overwhelm the curb front, ticket lobby and SSCP.
>
> Also, the issue remains open as to what it will cost to modify Terminal A as will be required to accommodate our 10-gate commercial plan. Regardless of the potential investment to improve Terminal A, there are significant customer experience items that cannot be mitigated. Terminal A concourse is too narrow and doesn't meet today's design criteria. Increasing the hold rooms sizes as you propose will not alleviate overcrowding in the concourse circulation area. Southwest's international operations will also be negatively impacted due to the relocation of the Federal Inspection Station (FIS) facility from Terminal A to Terminal C. Splitting our operation between two terminals will introduce operational complexity and significantly increase passenger connection times. The customer experience for our Customers will also suffer due to the potential relocation of the rideshare and taxi area from its current location to a new Transportation Center which will dramatically increase walk times for what will be over 50% of the total passengers using SAT. The allocation of space types (valet, disabled) in the existing garages when the new garage opens, e.g., if valet service is relocated to new garage, the number of disabled spots is adjusted. Furthermore, access to the USO for those Terminal A customers with military affiliations will be impacted with the relocation of the existing USO to the new Terminal C. The cumulative effect of these items certainly points to a degraded customer experience for Terminal A passengers flying on the City's largest air carrier. Southwest simply will not accept the diminished experience for our Customers and Employees and the risk of facility constraints to our future commercial plan by remaining in the airport's oldest facility. We look forward to further engagement with respect the aforementioned issues.

10

30. On August 26, 2024, Southwest Executives Jason Van Eaton, Sherri Hull and Steve Sisneros met with City officials to reiterate Southwest's concern that the City had not presented a viable solution for Terminal A. Follow up emails further emphasized that Southwest could not sign a new Lease until it received that critical information regarding how necessary capital expenditures for Terminal A were to be funded, which the City has still not provided.

31. The City has stated its plan to enter into new Leases with those air carriers at SAT that the City has approved to move to the new Terminal C and the other Terminals, and is planning to execute those new Leases effective October 1, 2024. The new Leases contain a capital improvement funding plan that is both underfunded and places Southwest at the mercy of its competitors' agreement to expend funds to improve Terminal A.

32. The City refuses to allow Southwest to enter into a new Lease for Terminal C. According to the City, if Southwest wants to remain a "signatory airline" at SAT, it must agree to remain at Terminal A, despite its inferior condition compared to Terminal C and despite the City's unlawful allocation methodology which prefers one airline over another based on "non-quantifiable considerations" related to routes and services.

33. Southwest had no realistic option but to decline to sign a new Lease at SAT because of its strong objection to the City's unfair treatment of Southwest. Southwest could not agree to conditions that would harm its ability to compete on an even playing field against other airlines.

34. In addition, if the City executes Leases with the other airlines at SAT it will be nearly impossible for Southwest to be able to obtain the necessary renovations at Terminal A to be able to operate its airline as planned, and to compete effectively against other airlines at SAT. This is because the Leases contain a Majority-in-Interest ("MII") clause that allows the signatory airlines to block new capital expenditures that benefit their competitor(s).

35.     Despite the unlawfulness of how the City selected airlines to move to Terminal C, the San Antonio City Council approved the new Lease terms on September 12, 2024 over Southwest's repeated and strenuous objections. This new, decade-long Lease is set to commence on October 1, 2024, and seven airlines are already prepared to sign the Lease, without participation by Southwest.

36.     Requiring Southwest to remain in the old Terminal A will result in a diminished experience for Southwest's customers, will place Southwest on unequal footing with competing airlines, and will preclude Southwest from being able to operate its long-term commercial plan for SAT. Moreover, the selection process undertaken by the City for allocating gate space at the new Terminal C is grounded in a publicly-disseminated gate assignment policy that is highly unlawful on its face.

37.     As the owner and operator of SAT, the City is not free to use subjective criteria to choose one airline over another based on the preferences of the municipal government decision makers. Airports are not legally entitled to pick "winners and losers" among the airlines that choose to serve the airport. Yet that is precisely what the City has done in this case.

38.     As set forth below, Defendants are violating the Airline Deregulation Act, by using their airline selection criteria to improperly involve themselves with air carrier "services" and "routes."

39.     Because Southwest is not able to sign the new Lease without acquiescing to the City's wrongful allocation process, the City intends to treat Southwest as a "non-signatory airline," which enables the City to charge Southwest more than the rents to be paid by the favored airlines that are being allowed to execute new Leases for Terminal C. It also precludes Southwest from being able to benefit from the revenue-sharing provisions in the Lease, or to have a voice in

amounts spent by the City on capital improvements (including whether and how to make improvements in Southwest's assigned Terminal A), despite the fact that Southwest will be forced to pay rates and charges to fund those projects.

40. On September 20, 2024, Southwest sent Defendants a letter which set forth the basis for its claim that the Defendants are violating the Supremacy Clause and the Airline Deregulation Act, and requested that Defendants "immediately rescind [the] unlawful SAT Gate Assignment Policy and either move [Southwest] to Terminal C or establish a viable plan for Terminal A that resolves the issues [that Southwest has] raised and puts [Southwest] on equal ground with the rest of the carriers at SAT." Copy attached as **Exhibit 3** hereto, at p. 5.

41. The letter added that "[b]ecause the new lease is set to take effect on October 1, 2024, time is very much of the essence," and Southwest requested that Defendants "take corrective action no later than Wednesday, September 25, 2024." *Id*.

42. Although Defendants did respond to Plaintiff's letter, they did not grant Plaintiff's request and reiterated the City's intention to enter into a new Lease with seven airlines on October 1, and to simultaneously force Southwest to accept inferior facilities as a result of the City's flawed Gate Assignment Criteria.

## CLAIM FOR RELIEF

43. Plaintiff restates and incorporates herein the allegations set forth above.

44. Defendants' use of the Gate Assignment Criteria to deny Southwest the ability to execute a Lease for gate space at Terminal C violates the Supremacy Clause, U.S. Const. art. VI, cl. 2, and the Airline Deregulation Act, 49 U.S.C. § 41713(b), because it bases the allocation of terminal gate space on subjective preferences and criteria that are prohibited by the Act.

45. Congress enacted the Airline Deregulation Act in 1978, loosening economic

13

regulation of the airline industry after determining that "maximum reliance on competitive market forces" would best "further efficiency, innovation, and lower prices." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384-87 (1992). Congress' "overarching goal" with regard to the Airline Deregulation Act was to help assure that transportation prices, routes and services reflected "maximum reliance on competitive market forces," thereby stimulating not only efficiency, innovation and low prices, but also variety and quality in transportation services. *Morales*, at 378.

46. Under the Airline Deregulation Act, a local government that operates an airport may not apply a provision which relates to an air carrier "route" or "service." The statute provides:

> "Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, r**egulation, or other provision having the force and effect of law related to a** price, **route, or service** of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1) (emphasis added)

47. "A majority of the circuits to have construed 'service' have held that the term refers to the provision or anticipated provision of labor from the airline to its passengers and encompasses matters such as boarding procedures, baggage handling, and food and drink – matters incidental to and distinct from the actual transportation of passengers." *Cuomo*, at 223. *See Hodges v. Delta Air Lines, Inc.*, 44 F.3d 334, 336-38 (5th Cir. 1995) (en banc). The term "services" "extend[s] beyond prices, schedules, origins and destinations." *Id*.

48. The SAT Gate Assignment Criteria document clearly relates to airline "services." The Policy expressly states that one of the relevant factors is airline "service": "The airline's service, growth, and experience." Exhibit 2 hereto. This is on its face a violation of the Airline Deregulation Act, which does not allow the Airport to consider the nature of the "service" in deciding how to accommodate the airline at the Airport.

49. In addition, giving priority or a better terminal space to an airline because it offers First Class or airport lounges - or is deemed to be a superior "fit" with the locality - is a local

provision that relates to air carrier "service." The SAT Gate Assignment Policy states that a key factor in gate allocation is: "The airline's 'fit' into San Antonio."

50. This "fit" factor is an especially blatant violation of the Airline Deregulation Act. Airports may not give better terminal space because of a subjective belief that the favored carrier is a better "fit" with the community.

51. Nor may an airport afford priority or a better terminal space to an airline because they offer more international flights, or to further away international destinations, as that is a local provision that relates to air carrier "routes."

52. At its core, the manner in which an airline is accommodated at a federally-funded airport cannot be predicated on the airport operator's subjective perception as to the carrier's "fit" into San Antonio, the nature of the passenger population ("business, leisure, mix, etc."), or the "airline brand position."

53. As the owner and operator of SAT, the City is not free to use subjective criteria to choose one airline over another based on the desire of the municipal government decision makers. Airports are not legally entitled to pick "winners and losers" among the airlines that serve to choose the Airport. *See New York Airlines, Inc. v. Dukes County*, 623 F. Supp. 1435 (D. Mass. 1985) (allowing claims to proceed against airport for refusing to permit air carrier to provide service that other airlines were able to provide). Yet that is exactly what Defendants have done here. *See Southwest Airlines' future at San Antonio International up in the air*, www.kens5.com ("'We want to create an environment where everyone is competitive and we understand that **not everyone can win** every time,' said Jesus Saenz, director of SAT") (emphasis added); Page 2 of Ex. 2 (describing how all other carriers' requests and needs were accommodated but telling Southwest to "make the most" of what it was given).

54. Finally, the City cannot avail itself of the narrow "proprietary powers" exception to the Airline Deregulation Act's prohibition, in 49 U.S.C. § 41713(b)(3). "Courts have . . . recognized that local proprietors play an extremely limited role in the regulation of aviation." *Arapahoe County Public Airport Authority v. FAA*, 242 F.3d 1213, 1222 (10th Cir. 2001). *See also Am. Airlines, Inc. v. DOT*, 202 F.3d 788, 806 (5th Cir. 2000) ("courts have recognized that local proprietors play an 'extremely limited' role in the regulation of aviation").

55. The City's application of subjective criteria to deny Southwest access to Terminal C is not the sort of "regulatory conduct related to safety and civil aviation needs [that] may fall under the 'proprietary powers' umbrella . . . ." *Id.* at 1214 (airport authority "failed to demonstrate that [its] ban" on passenger service was "necessary for the safe operation of the airport" or was "necessary to satisfy the public's civil aviation needs"). Under no circumstances can the limited "proprietary powers exception" be construed to authorize the City to make gate assignment decisions based on its subjective perception of the nature of the "service" offered by an airline or the "fit" between the airline and the City of San Antonio, or similar considerations. *See Legend Airlines, Inc. v. City of Ft. Worth*, 23 S.W.3d 83, 94-95 (Tex. App. 2000) (city's enforcement of regional airport bond ordinance restricting routes and services at Dallas Love Field to protect Dallas-Fort Worth Airport's competitive position was not a valid exercise of the city's "proprietary powers" and therefore was preempted by the Airline Deregulation Act).

56. It is imperative that the Court issue a preliminary injunction preventing the Defendants from entering into leases with other air carriers for space in Terminal C and the other Terminals so as to preserve the status quo while the Court considers Southwest's request for a judgment declaring that the Gate Assignment Criteria used by Defendants' to bar Southwest from Terminal C violates the Supremacy Clause and the Airline Deregulation Act. At this time, no

Leases are yet operative for Terminal C or the other Terminals but that is poised to change as soon as October 1, 2024.

## **PRAYER FOR RELIEF**

For the reasons set forth above, Plaintiff Southwest Airlines Co. respectfully requests that the Court:

1. Pursuant to 28 U.S.C. § 2201, issue a judgment declaring that the Defendants' use of their Gate Assignment Criteria (Ex. 2) to deny Southwest the ability to execute a Lease for gate space at Terminal C violates the Supremacy Clause, U.S. Const. art. VI, cl. 2, and the Airline Deregulation Act, 49 U.S.C. § 41713(b), because it bases the allocation of terminal gate space on subjective preferences and criteria that are prohibited by the Act;

2. Pursuant to Rule 65, Fed. R. Civ. P., issue a temporary restraining order and preliminary injunction, and ultimately issue a permanent injunction against Defendants, enjoining them from continuing to violate the Supremacy Clause, U.S. Const. art. VI, cl. 2, and the Airline Deregulation Act, 49 U.S.C. § 41713(b), entering into, recognizing as effective or otherwise acting in furtherance of new Leases with airlines that are based on Defendants' unlawful gate allocation policy at SAT; and

3. Award Plaintiff all other relief to which it is entitled under the law.

| | |
|---|---|
| Dated: September 26, 2024 | Respectfully submitted: |
| **THE MORALES FIRM, P.C.** | **CLARK HILL PLC** |

/s/ Lawrence Morales II
**Lawrence Morales II**
State Bar No. 24051077
6243 West Interstate 10
Suite 132
San Antonio, Texas 78201
Tel. (210) 225-0811
Email: Lawrence@themoralesfirm.com

/s/ Mark G. Sessions
**Mark G. Sessions**
State Bar No. 18039500
**Forest M. "Teo" Seger III**
State Bar No. 24070587
**Charlie Hayes**
State Bar No. 24116496
2301 Broadway Street
San Antonio, TX 78215
Tel. (210) 250-6162
Email: msessions@clarkhill.com
tseger@clarkhill.com
chayes@clarkhill.com

**M. Roy Goldberg**
1001 Pennsylvania Avenue, N.W.
Suite 1300 South
Washington, D.C. 20004
Tel. (202) 552-2388
Email: rgoldberg@clarkhill.com
(Application to be Admitted Pro Hac Vice Forthcoming)

COUNSEL FOR PLAINTIFF SOUTHWEST AIRLINES CO.