# Exhibit 1





# Exhibit 2

=====================================================
*Summary of Decision-Making Process for*
*Post-DBO Gate & Club Locations*
=====================================================

**Teams Involved:**

- COSA ESC
- SAT Finance Team
- SAT AULA Team
- SAT TDP Team
- SAT Legal Team
- Executive Program Manager (EPM)
- Master Architect (MA)

**Factors Considered Included:**

- Number of preferential gates requested by airline
- Whether an airline club was requested
- Whether airline operates or commits to operating international routes
- Whether airline has relevant code share arrangement(s)
- Current level of enplaned passengers @ SAT
- The airline's "fit" into San Antonio
- The airline's service, growth, and experience
- The existence of a written commitment by airline to city pairs, specific flights, or minimum levels of enplaned passengers
- Potential need by airline for appurtenant City Gates (for expansion)
- Terminal load-balancing considerations

**Process Employed:**

Each airline with a significantly large market share at SAT was assessed utilizing a "Gating Placement Analysis Worksheet" which considered a variety of relevant factors. The scoring worksheet was reviewed by member(s) of the SAT Finance Team, the SAT AULA Team, the EPM, and the SAT Legal Team. A score was assigned to each large airline and the airlines were ranked (*i.e.*, 1-4).

The EPM, the MA, and a member from each of the SAT AULA team and the SAT TDP team reviewed and considered certain non-quantifiable considerations, among which were the carriers' "fit" into San Antonio (relating to desirability of passenger profile (business, leisure, mix, etc.) and airline brand position (network, ULCC, established, start-up, etc.); the airlines "service, growth and experience" (which included an analysis of the airline's overall reasonable growth potential and commitment to SAT, aspirations for international flights, and any differentiation of product or technology used that would enhance customer experience); and the possible need for appurtenant City Gates (consideration included the potential for a carrier to grow incrementally beyond its preferential gates and/or for the use of City Gates for RON aircraft, and the availability of usable City Gates for IROPs).

The analysis then turned to broad-based terminal load balancing considerations. In assessing such matters, the reviewers assessed the airport's operations as a whole and determined what was advisable from an airport-wide balancing viewpoint. Among the areas for consideration were impacts upon baggage make up area, the BHS, the airport roadway system, the passenger and commercial curbs, and the ticketing lobby.



**Summary of Decision:**

The first component of the decision-making process was to examine airline club requests, as the requests for airline clubs were valuable to the airport/city for potential customer experience, represent a fixed financial commitment by the airline, and are a unique challenge with respect to available space/siting options.  The two largest club requests (AA and DL) could only reasonably be accommodated by siting within new Terminal C. Those two airlines (AA and DL) combined requested 11 preferential gates.  One of those two airlines had potential need to be placed next to an FIS-connected gate (DL) due to a relevant code share arrangement.  Assigning those two airlines (AA and DL) to Terminal C took 11 of 11 domestic gates to be constructed within the new Terminal and left the 6 FIS-equipped gates in the new Terminal available for international operations and/or iterant (per turn) use by other airlines (with international arrivals receiving priority).

Another airline requested a club but with a smaller footprint than the other two airlines (UA). That airline (UA) requested 6 gates.  With no space left in C to locate a club, it was analyzed whether it was more reasonable to leave that airline (UA) in Terminal B where its existing club is located or move it to Terminal A where a new club would have to be constructed. Relocating that airline and constructing a new club in Terminal A would be costly.  It was estimated that it would cost approximately $2m for relocating the gates and offices and another $7m for construction of the club itself.  In addition, it was estimated that it would cost another $20m for "bumping out" the structure to accommodate the club. Therefore, it was determined that the most reasonable approach was to leave that airline (UA) in Terminal B. Since such airline (UA) requested 6 preferential gates, hat left 2 of the 8 gates available in Terminal B.  Given Spirit Airlines' (NK) request for one preferential gate and its expected growth, it was reasonable to assign NK to 1 preferential gate in Terminal B with the expectation that it could grow incrementally and potentially use the 1 remaining gate which is to remain as a City Gate.

As noted, when the two airlines that requested large clubs (AA and DL) were sited in Terminal C, 11 of the 17 gates were assigned.  Further, the 6 remaining gates are to be FIS-equipped and it would be inadvisable to assign such gates to an airline that has a high utilization rate of their gates. Thus, the 6 FIS-gates are planned to be used primarily as international arrival gates and, potentially, for incremental growth for the other airlines in Terminal C or for IROPs.

The fourth large airline (WN) requested 10 preferential post-DBO gates.  Notably that airline (WN) does not have an airline club as part of its offerings.

When scenarios were assessed with having WN either on Terminal C or Terminal B, given its high level of passenger throughput, concerns arose over terminal load balancing. One such scenario was siting WN on Terminal B (8 gates) with some utilization of Terminal C gates.  With DL and AA in Terminal C, adding WN to that side of the airport would overload the Terminal C baggage system, the terminal roadway/curb and security checkpoint.  Further, concerns existed regarding WN's utilization of FIS-equipped gates and the potential for disruption of their schedule/operation with international flights (which would necessarily have priority over WN's domestic operations).

Thus, the most reasonable overall solution was to site WN in Terminal A.  It was acknowledged that the width of Terminal A was less than ideal. However, the holdrooms in Terminal A are to be substantially enlarged to accommodate the aircraft that use them (*e.g.*, 737-800s), and the interior is to be refurbished to match the look and feel of the new terminal facilities.  Of note is that a large number of RON spaces will be a part of the post-DBO Terminal A which should aid WN's morning and late-night operations.  Further, it was thought that the airport could partner with WN to "make the most" out of the airlines' substantial and focused use of Terminal A.

Low frequency and/or non-signatory airlines are to be assigned to Terminal A as well (noting that the GLF gate will be fully operational at DBO as well.

2







3

# Exhibit 3

Southwest Airlines Co.
Jeff Novota
Vice President, General Counsel and Corporate Secretary
2702 Love Field Drive
Dallas, TX 75235-1611
Jeff.Novota@wnco.com



September 20, 2024

Via Email: Jesus.Saenz@sanantonio.gov
& U.S. Mail

Mr. Jesus H. Saenz, Jr., IAP
Director of Airports
City of San Antonio, Texas
9800 Airport Blvd.
San Antonio, TX 78216

Re:     Unlawful Allocation of Terminal Space at San Antonio International Airport

Dear Director Saenz:

From our beginning in 1971, Southwest Airlines has valued its relationship with the City of San Antonio (the "City") and the San Antonio International Airport ("SAT" or the "Airport"). It is deeply proud of the fact that Southwest is the largest air carrier at SAT, with a 38% share of passengers in 2023.

After almost two years of negotiations over the terms of a new airline use and lease agreement ("AULA" or "Lease"), Southwest was disappointed to learn that the City is not allowing Southwest to lease gates in the new Terminal C. As stated previously, requiring Southwest to remain in the old Terminal A under the current plan will result in a diminished experience for our Customers and preclude Southwest from operating our long-term commercial plan for SAT. Moreover, the selection process undertaken by the City for allocating gate space at the new Terminal C is grounded in a publicly-disseminated gate assignment policy that is highly unlawful on its face.

As the owner and operator of SAT, the City is not free to use subjective criteria to choose one airline over another based on the desire of the municipal government decision makers. Airports are not legally entitled to pick "winners and losers" among the airlines that choose to serve the airport. *See New York Airlines, Inc. v. Dukes County*, 623 F. Supp. 1435 (D. Mass. 1985) (allowing claims to proceed against airport for denying air carrier access to protect service provided by other airlines). Yet, that is precisely what the City has done in this case. *See Southwest Airlines' future at San Antonio International up in the air,* www.kens5.com ("'We want to create an environment where everyone is competitive and we understand that **not everyone can win** every time,' said Jesus Saenz, director of SAT.") (Emphasis added). *See also* Page 2 of SAT's Summary of Decision-Making Process for Post-DBO Gate and Club Locations (describing how all other carriers' requests and needs were accommodated but telling Southwest to "make the most" of what it was given).

Mr. Saenz, Jr., IAP
September 20, 2024
Page 2

Not only is the City unlawfully discriminating against Southwest – in violation of federal Grant Assurance 22 – but it is also violating the Airline Deregulation Act, 49 U.S.C. 41713(b) ("Airline Deregulation Act"), by using its airline selection criteria to improperly involve itself with air carrier "services" and "routes."

### The SAT Gate Assignment Policy

The City's document titled "Summary of Decision-Making Process for Post-DBO Gate and Club Locations" (the "SAT Gate Assignment Policy") sets forth the following criteria applied by the City in deciding where to locate airlines at SAT:

> "**Factors Considered Included:**
>
> Number of preferential gates requested by airline
> **Whether an airline club was requested**
> **Whether airline operates or commits to operating international routes**
> Whether airline has relevant code share arrangement(s)
> Current level of enplaned passengers @ SAT
> **The airline's "fit" into San Antonio**
> **The airline's service, growth, and experience**
> **The existence of a written commitment by airline to city pairs, specific flights, or minimum levels of enplaned passengers**
> Potential need by airline for appurtenant City Gates (for expansion)
> Terminal load-balancing considerations"

(Emphasis added).

In addition to the above-listed factors, the Airport decided that Southwest was not entitled to move to the new Terminal C, whereas other competing airlines were invited to do so, based on the following analysis:

> "The EPM, the MA, and a member from each of the SAT AULA team and the SAT TDP team reviewed and considered certain non-quantifiable considerations, among which were **the carriers' "fit" into San Antonio (relating to desirability of passenger profile (business, leisure, mix, etc.) and airline brand position (network, ULCC, established, start-up, etc.); the airlines "service, growth and experience" (which included an analysis of the airline's overall reasonable growth potential and commitment to SAT, aspirations for international flights, and any differentiation of product or technology used that would enhance customer experience);** and the possible need for appurtenant City Gates (consideration included the potential for a carrier to grow incrementally beyond its preferential gates and/or for the use of City Gates for RON aircraft, and the availability of usable City Gates for IROPs)."

Mr. Saenz, Jr., IAP
September 20, 2024
Page 3

(Emphasis added).

In sum, the City expressly acknowledges that in deciding where to locate airlines, the City has weighed and considered factors such as (1) the geographic nature of the routes served by the air carrier, (2) the "fit" of the airline into San Antonio, and (3) the "airline's service." Moreover, the City shockingly acknowledged that Southwest would be denied access to Terminal C because "that airline (WN) does not have an airline club as part of its offerings." "SAT Gate Assignment Policy," at 1.

### 1. The Gate Assignment Policy Violates the Airline Deregulation Act by Basing Terminal Allocation on Airline "Services" and "Routes."

Under the Airline Deregulation Act and the U.S. Constitution's Supremacy Clause, a local government that operates an airport may not apply a provision which relates to an air carrier "route" or "service." The statute provides:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, r**egulation, or other provision having the force and effect of law related to a** price, **route, or service** of an air carrier that may provide air transportation under this subpart. 49 USC 41713(b)(1) (Emphasis added).

The SAT Gate Assignment Policy states that one of the relevant factors is the airline's "service, growth, and experience." This is on its face a violation of the Airline Deregulation Act, which does not allow the Airport to consider the nature of the "service" in deciding how to accommodate the airline at the Airport.

In addition, giving priority or a better terminal space to an airline because it offers First Class or airport lounges -- or is deemed to be a superior "fit" with the locality -- is a local provision that relates to air carrier "service." The SAT Gate Assignment Policy states that a key factor in gate allocation is: "The airline's 'fit' into San Antonio."

This "fit" factor is an especially blatant violation of the Airline Deregulation Act. Airports may not give better terminal space because of a subjective belief that the favored carrier is a better "fit" with the community. Nor may an airport afford priority or a better terminal space to an airline because they offer more international flights, or to further away international destinations, as that is a local provision that relates to air carrier "routes."

At its core, the manner in which an airline is accommodated at a federally-funded airport cannot be predicated on the airport operator's subjective perception as to the carrier's "fit" into San Antonio, the nature of the passenger population ("business, leisure, mix, etc."), or the "airline brand position."

Finally, the City cannot avail itself of the "proprietary powers" exception to the Airline Deregulation Act's prohibition. "Courts have . . . recognized that local proprietors play an

Mr. Saenz, Jr., IAP
September 20, 2024
Page 4

extremely limited role in the regulation of aviation." *Arapahoe County Public Airport Authority v. FAA*, 242 F.3d 1213, 1222 (10th Cir. 2001). *See also Am. Airlines, Inc. v. DOT*, 202 F.3d 788, 806 (5th Cir. 2000) ("courts have recognized that local proprietors play an 'extremely limited' role in the regulation of aviation"). The City's decision to deny Southwest access to Terminal C is not the sort of "regulatory conduct related to safety and civil aviation needs [that] may fall under the 'proprietary powers' umbrella . . . ." *Id.* at 1214 (airport authority "failed to demonstrate that [its] ban" on passenger service was "necessary for the safe operation of the airport" or was "necessary to satisfy the public's civil aviation needs"). Under no circumstances can the limited "proprietary powers exception" be construed to authorize the City to make gate assignment decisions based on its subjective perception of the nature of the "service" offered by an airline or the "fit" between the airline and the City of San Antonio, or similar considerations.

    **2.  The City's Refusal to Allow Southwest to Move to the New Terminal Also Unreasonably Discriminates against Southwest in Violation of 49 U.S.C. 47107(a) and Grant Assurance 22(a) and (b)1.**

In addition to violating the Airline Deregulation Act, the City's treatment of Southwest violates 49 U.S.C. 47107(a) and Grant Assurance 22(a) because it improperly discriminates against Southwest for no proper basis. Section 41707(a) states that DOT may not approve federal grants to an airport unless that airport agrees to make "the airport . . . available for public use on reasonable conditions and without unjust discrimination." Similarly, Grant Assurance 22(a) states that the airport "will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport."

Even a small discount to Southwest for remaining in the old terminal is not sufficient to mitigate the significant harm to Southwest's competitive position in comparison to the airlines, which the City is favoring by allowing them to move to the new terminal. As stated in an August 12, 2024 letter to you from Southwest:

> "Regardless of the potential investment to improve Terminal A, there are significant customer experience items that cannot be mitigated. Terminal A concourse is too narrow and doesn't meet today's design criteria. Increasing the hold rooms sizes as you propose will not alleviate overcrowding in the concourse circulation area. Southwest's international operations will also be negatively impacted due to the relocation of the Federal Inspection Station (FIS) facility from Terminal A to Terminal C. Splitting our operation between two terminals will introduce operational complexity and significantly increase passenger connection times.
>
> The customer experience for our Customers will also suffer due to the potential relocation of the rideshare and taxi area from its current location to a new Transportation Center which will dramatically increase walk times

> for what will be over 50% of the total passengers using SAT. The allocation of space types (valet, disabled) in the existing garages when the new garage opens, e.g., if valet service is relocated to new garage, the number of disabled spots is adjusted. Furthermore, access to the USO for those Terminal A customers with military affiliations will be impacted with the relocation of the existing USO to the new Terminal C.
>
> The cumulative effect of these items certainly points to a degraded customer experience for Terminal A passengers flying on the City's largest air carrier.
>
> Southwest simply will not accept the diminished experience for our Customers and Employees and the risk of facility constraints to our future commercial plan by remaining in the airport's oldest facility."

To date, the City has not provided a viable plan that would address these Customer experience issues or rectify the impact to our long-term commercial plan by requiring Southwest to remain in the old Terminal A.

It is also improper to constructively deny Southwest signatory status under the new lease based on the City's improper refusal to permit Southwest to utilize Terminal C. Pursuant to Section 47107(a)(3), "the airport operator will not withhold unreasonably the classification or status of tenant or signatory from an air carrier that assumes obligations substantially similar to those already imposed on air carriers of that classification or status."

### Request for Action by the City

Southwest respectfully requests that the City immediately rescind its unlawful SAT Gate Assignment Policy and either move us to Terminal C or establish a viable plan for Terminal A that resolves the issues we have raised and puts us on equal ground with the rest of the carriers at SAT. Because the new lease is set to take effect on October 1, 2024, time is very much of the essence. We request that the City take corrective action no later than Wednesday, September 25, 2024.

Sincerely,

SOUTHWEST AIRLINES CO.

Jeff Novota
Vice President and General Counsel

Mr. Saenz, Jr., IAP
September 20, 2024
Page 6

Copy:

Denise McElroy, Sr. Manager – Airport Affairs, Southwest Airlines Co.
Paul Cullen, Vice President – Real Estate, Southwest Airlines
John Zuzu, Vice President – Corporate Facilities, Southwest Airlines
Steve Sisneros, Vice President – Airport Affairs, Southwest Airlines
Andrea Goodpasture, Managing Director – Airport Affairs, Southwest Airlines
Sherri Hull, Director – Governmental Affairs, Southwest Airlines
Kenneth Gregg, Regional Manager – Airport Affairs, Southwest Airlines
Tim O'Krongley, Aviation Deputy Director – Development, San Antonio International Airport