IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SOUTHWEST AIRLINES CO., *Plaintiff* <br><br> –vs– <br><br> CITY OF SAN ANTONIO, TEXAS AND JESUS SAENZ, In His Official Capacity as Director of Airports for the City of San Antonio, Texas; *Defendants* | § § § § § § § § § § § § §    SA–24–CV–01085–XR |

## ORDER DENYING TEMPORARY RESTRAINING ORDER

On September 26, 2024, Plaintiff Southwest Airlines Co. ("SWA") filed its Complaint against the City of San Antonio (the "City") and Jesus Saenz, its Director of Airports. ECF No. 1. Thereafter, SWA filed a Motion for Preliminary Injunction and Emergency Request for Temporary Restraining Order, and the City responded. ECF Nos. 2, 11. After careful consideration of the motion and response, and the parties' arguments at the September 30, 2024 hearing, the Court issues the following order.

I.  BACKGROUND

A.  <u>San Antonio Airport and Terminal C</u>

The San Antonio International Airport is a city owned and operated facility. ECF No. 1 at ¶ 13. It currently has two terminals (A and B). Terminal A was commissioned in 1984. *Id.* at ¶ 16. Terminal A has sixteen gates with a total area of 397,634 square feet. *Id.* at ¶ 14. In 2010, Terminal B was constructed and has about 247,099 square feet of space. *Id.* at ¶ 17. Because of population growth and increased use of the current airport facilities at some point the City began developing

1

concepts for a new Terminal C to be constructed, which would contain 17 gates and 850,000 square feet. ECF No. 11–1 at ¶ 18. It is anticipated that Terminal C will be occupied sometime in 2028. *Id.*

SWA currently operates out of Terminal A and has a lease that expired on September 30, 2024. *See id.* at ¶ 13. SWA refused to sign a new lease because it was not allocated gates in Terminal C. But not signing a new lease does not remove SWA from the San Antonio airport. Instead, they are treated as a "non-signatory," continue to operate from Terminal A, but will pay higher rates than they currently pay, and higher rates than "signatories."

This case arises from the lease negotiations related to Terminal C. Over the past two-and-a-half years, the City, SWA, and other airlines have been involved in negotiations over the Airline Use and Lease Agreement ("AULA") that, in part, allocates gate assignments in Terminal A, B, and C. *See id.* at ¶ 12. The AULA includes a provision for a pre–approved $200 million in funding for capital improvements in Terminal A and $100 million for Terminal B. *Id.* at ¶ 24. SWA wants to move their gates from Terminal A to Terminal C. SWA alleges that during the negotiations, it was told several times that it would be assigned gates at the new Terminal C. ECF No. 1 at ¶ 19. SWA claims it learned on May 29, 2024, for the first time, that the City would not be leasing them gates at Terminal C. *Id.* at ¶ 21. Instead, the City would leave SWA in Terminal A. *Id.*

SWA states that it voiced objections to the decision to keep SWA gates at Terminal A and began to inquire into the City's methodology for making its decision. *Id.* at ¶ 21. SWA claims that Terminal A space is inferior, and that the capital improvements the City had planned for Terminal A are insufficient because they "will not allow [SWA] to implement its growth plans for SAT." ECF No. 2–1 at ¶ 26. That said, SWA continued to meet and negotiate with the City about capital improvements for Terminal A, and a reduced terminal rental rate for a three-year period for airlines

2

(like SWA) that would operate from Terminal A after Terminal C opens. ECF No. 12–1 at ¶¶ 35, 37.

Despite SWA's objections, the City negotiated and reached a new AULA with other carriers for ten-year leases that became effective October 1, 2024, and the City Council has approved those agreement. ECF No. 1 at ¶ 4. SWA has chosen not to sign a new AULA. *Id.* at ¶ 42. Under the new AULAs, there are provisions that permit the City to change the gate allocations to comply with federal law. *See* ECF No. 11 at 16-17. The new AULAs create revenue sharing between "signatory airlines"[1] and has a Majority-in-Interest ("MII") clause that may affect future capital expenditures in Terminal A. The new AULAs also change the existing ratemaking methodology under which the City will recoup approximately $1.2 million per month compared to the existing agreements. ECF No. 11–1 at ¶ 37. This money can be used for new parking structures and roadway improvements. *Id.* at ¶ 38.

### B. The City's Methodology to Allocate Airline Gates

In determining what airlines would be assigned to what gates (either Terminal A, B, or C), the City solicited information from the airlines about their future operational plans and developed evaluation criteria. *See* ECF No. 12 at 5. This information was reviewed by the Master Architect, multiple City teams, and approved by an Executive Steering Committee. *See* ECF No. 12–2 at ¶¶ 12–13. The City claims that it made the gate allocations in the best interests of the City and by balancing the operational needs of the airlines. *See id.* At issue here is the evaluation criteria, or the Gate Assignment Criteria ("GAC"). ECF No. 1 at ¶ 23; ECF No. 1–2. According to the GAC,

---

[1] SWA, at present, will not be treated as a "signatory airline" because it has not signed the new lease.

the City considered a variety of factors in determining how to place airlines at gates. These include the:

- Number of preferential gates requested by airline;
- **Whether an airline club was requested;**[2]
- **Whether airline operates or commits to operating international routes**;
- Whether airline has relevant code share arrangement(s);
- Current level of enplaned passengers @ SAT;
- **The airline's "fit" into San Antonio**;
- **The airline's service, growth, and experience**;
- **The existence of a written commitment by airline to city pairs, specific flights, or minimum levels of enplaned passengers**;
- Potential need by airline for appurtenant City Gates (for expansion); and
- Terminal load–balancing considerations.

*See* ECF No. 1–2.

After the City arrived at its decision to leave SWA in Terminal A, the City provided SWA (and the other airlines) with a memorandum explaining its decision. First, each airline with a significantly large market share was assessed according to certain quantifiable factors, and a score was assigned to each large airline. Then, the City reviewed the airline brand position, the airlines "service, experience, and growth," and the possible need for further gates. *Id.* Finally, the analysis turned to "broad–based terminal load considerations," including the future needs of the airlines and the need to balance passenger loads to avoid overloading curb, baggage, and security screening areas. *See id.*; ECF No. 11–2 at ¶¶ 23–26.

---

[2] Items in bold are criteria that SWA contends are impermissible factors under the Airline Deregulation Act.

In this memorandum, the City stated:

> The first component of the decision-making process was to examine airline club requests, as the requests for airline clubs were valuable to the airport/city for potential customer experience, represent a fixed financial commitment by the airline, and are a unique challenge with respect to available space/siting options. The two largest club requests (AA and DL) could only reasonably be accommodated by siting within new Terminal C. Those two airlines (AA and DL) combined requested 11 preferential gates. One of those two airlines had potential need to be placed next to an FIS–connected gate (DL) due to a relevant code share arrangement. Assigning those two airlines (AA and DL) to Terminal C took 11 of 11 domestic gates to be constructed within the new Terminal and left the 6 FIS-equipped gates in the new Terminal available for international operations and/or iterant (per turn) use by other airlines (with international arrivals receiving priority).
>
> Another airline requested a club but with a smaller footprint than the other two airlines (UA). That airline (UA) requested 6 gates. With no space left in C to locate a club, it was analyzed whether it was more reasonable to leave that airline (UA) in Terminal B where its existing club is located or move it to Terminal A where a new club would have to be constructed. Relocating that airline and constructing a new club in Terminal A would be costly. It was estimated that it would cost approximately $2m for relocating the gates and offices and another $7m for construction of the club itself. In addition, it was estimated that it would cost another $20m for "bumping out" the structure to accommodate the club. Therefore, it was determined that the most reasonable approach was to leave that airline (UA) in Terminal B. Since such airline (UA) requested 6 preferential gates, that left 2 of the 8 gates available in Terminal B. Given Spirit Airlines' (NK) request for one preferential gate and its expected growth, it was reasonable to assign NK to 1 preferential gate in Terminal B with the expectation that it could grow incrementally and potentially use the 1 remaining gate which is to remain as a City Gate.
>
> As noted, when the two airlines that requested large clubs (AA and DL) were sited in Terminal C, 11 of the 17 gates were assigned. Further, the 6 remaining gates are to be FIS–equipped and it would be inadvisable to assign such gates to an airline that has a high utilization rate of their gates. Thus, the 6 FIS–gates are planned to be used primarily as international arrival gates and, potentially, for incremental growth for the other airlines in Terminal C or for IROPs.
>
> The fourth large airline (WN)[3] requested 10 preferential post–DBO gates. Notably that airline (WN) does not have an airline club as part of its offerings.
>
> When scenarios were assessed with having WN either on Terminal C or Terminal B, given its high level of passenger throughput, concerns arose over terminal load balancing. One such scenario was siting WN on Terminal B (8 gates) with some utilization of Terminal C gates. With DL and AA in Terminal C, adding WN to that side of the airport would overload the Terminal C baggage system, the terminal

---

[3] It is uncontested that WN is a reference to SWA.

> roadway/curb and security checkpoint. Further, concerns existed regarding WN's utilization of FIS–equipped gates and the potential for disruption of their schedule/operation with international flights (which would necessarily have priority over WN's domestic operations).
>
> Thus, the most reasonable overall solution was to site WN in Terminal A. It was acknowledged that the width of Terminal A was less than ideal. However, the holdrooms in Terminal A are to be substantially enlarged to accommodate the aircraft that use them (e.g., 737-800s), and the interior is to be refurbished to match the look and feel of the new terminal facilities. Of note is that a large number of RON spaces will be a part of the post–DBO Terminal A which should aid WN's morning and late–night operations.
>
> Further, it was thought that the airport could partner with WN to "make the most" out of the airlines' substantial and focused use of Terminal A.
>
> Low frequency and/or non-signatory airlines are to be assigned to Terminal A as well (noting that the GLF gate will be fully operational at DBO as well.
>
> *Id.*

Thus, while the GAC references routes and services, the actual decision process that allocated gates in Terminal C appears to not be based on the "softer" factors like "fit," but instead space accommodations or concerns about the distance between international gates and U.S. Customs and Border Patrol authorities.[4]

Despite efforts by both sides to reach some agreement on a new lease, efforts have not been successful. This lawsuit followed.

### C. This Action

SWA claims that the City's methodology—the GAC—used to allocate airlines to gates in Terminal C is preempted by the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(B) ("ADA"). Under its view, because the GAC is improper and uses subjective criteria related to rates and services to assign gates, the City's final decision allocating gates cannot stand.[5] SWA insists that

---

[4] At the Hearing, SWA did not put on testimony that demonstrated otherwise.

[5] At the Hearing, SWA analogized this to the "fruit of the poisonous tree" doctrine. But this doctrine contains myriad exceptions, two of which are particularly apt: the good faith exception and the doctrine of inevitable discovery. SWA

the City must rely on a neutral methodology which does not consider routes or services at all in allocating gate space in the airport. While SWA admits the end–result may be the same, it wants a do–over of the process.

SWA claims it will suffer irreparable injury if the leases with other carriers are executed as-is on October 1, 2024 because it will lose the opportunity to lease gates at the new Terminal C and suffer reputational harm. SWA also appears to argue that it will suffer harm because since it has not signed a new AULA, it is precluded from participating in revenue-sharing provisions due to its status as a "Non–Signatory Airline," and that a MII clause in the other carriers' AULAs will allow the signatory airlines to block new capital expenditures that would benefit SWA if it was forced to remain in Terminal A. In short, SWA claims it cannot "unscramble the egg" once the new lease agreements with the other carriers are signed.

## II.   STANDARD FOR INJUNCTIVE RELIEF

"The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). A temporary restraining order is an "extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). The party moving for a temporary restraining order must establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the temporary restraining order is denied; (3) that the threatened injury outweighs any damage that the temporary restraining

---

admits that the process might turn out the same even under revised criteria. Thus, SWA may end up in Terminal A "by lawful means." *United States v. Jackson*, 596 F.3d 236, 241 (5th Cir. 2010) (inevitable discovery). Moreover, the City's own memorandum reveals that the process appears to be "objectively reasonable and made in good faith." *United States v. Massi*, 761 F.3d 512, 525 (5th Cir. 2014) (good faith).  SWA did not show that the process was motivated by any desire other than to reach the best outcome for Terminal C.

order might cause the defendant; and (4) that the temporary restraining order will not disserve the public interest. *See Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). "The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or a preliminary injunction can be granted." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). "Otherwise stated, if a party fails to meet *any* of the four requirements, the court cannot grant the TRO or preliminary injunction." *Speed v. America's Wholesale Lender*, 3:14–CV–3425–L, 2014 WL 4755485 (N.D. Tex. 2014).

## III. ANALYSIS

### A. The Airline Deregulation Act

In 1978, Congress enacted the ADA, which largely deregulated domestic air transport. *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995). "'To ensure that States would not undo federal deregulation with regulation of their own,' the ADA included a preemption clause,'" *id.* (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992)), which provides that the City "may not [1] enact or enforce a law, regulation, or other provision having the force and effect of law [2] related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(B)(1). The ADA also includes an exception which does not limit the City "from carrying out its propriety powers." *Id.* § 41713(B)(3); *see American Airlines, Inc. v. DOT*, 202 F.3d 788, 805 (5th Cir. 2000) ("When enacting the ADA, however, Congress also recognized that airport proprietors—the majority of which are municipalities—were best equipped to handle local problems arising at and around their facilities.") (citation omitted).[6]

---

[6] *See also Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 96–97 (2d Cir. 1986) ("The relevant inquiry therefore is whether the Town of East Hampton was exercising its proprietary rights as owner of the Airport when it

**Force and Effect of Law.** The ADA "draws a rough line between a government's exercise of regulatory authority and its own contract–based participation in a market." *Am. Trucking Assns. v. City of Los Angeles*, 569 U.S. 641, 649 (2013). A "law, rule, regulation, standard, or other provision" refers to "official, government–imposed policies." *Wolens*, 513 U.S. at 223 n.5. A provision "having the force and effect of law" refers to "binding standards of conduct that operate irrespective of any private agreement." *Id.*; *Am. Trucking Assns.*, 569 U.S. at 649–50 (same). Thus, for a municipalities actions to be subject to ADA preemption, it must regulate private actors or impose some type of "substantive standards" of conduct. *Wolens*, 513 U.S. at 232.

In contrast, where a municipality is acting as a market participant and not a regulator, "contractual commitment[s] voluntarily undertaken" are proprietary actions. *Am. Trucking Assns.*, 569 U.S. at 649; *id.* ("When a State acts as a purchaser of services, 'it does not "regulate" the workings of the market . . . ; it exemplifies them'") (quoting *Building & Const. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 233 (1993)). "The law has traditionally recognized a distinction between regulations and actions a state takes in a proprietary capacity—that is to say, actions taken to serve the government's own needs rather than those of society as a whole. The distinction is most readily apparent when the government purchases goods and services its operations require on the open market." *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 691 (5th Cir. 1999). Thus, "[t]he 'force and effect of law' language"

---

refused to modify the ten-year lease to which the parties agreed in 1979. We find no authority to support appellant's claim that the Town of East Hampton, as owner of the Airport, must allow appellant to serve as a fixed-base operator at the East Hampton Airport year-round. Nor do we find support for appellant's claim that the Town is compelled to lease to appellant the necessary equipment and services that would permit such year-round air service. Absent such authority, the leases are valid exercises of the Town's proprietary rights granted under N.Y. Gen. Mun. Law § 352. The preemption statute, § 1305, reserves to the states and local government this power.").

9

therefore "excludes such everyday contractual arrangements from the clause's scope." *Id.*[7] The Fifth Circuit has developed a two-step framework to assess whether a municipality's conduct qualifies as market participation.

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?
>
> *Cardinal Towing*, 180 F.3d at 693.[8]

In this case SWA has not shown that the criteria used for gate allocations (the GAC) is a "law, rule, regulation, standard, or other provision" that refers to "official, government–imposed policies." True, the GAC was relied upon in the City entering into new lease agreements (AULAs), but these are contracts, not governmental laws or regulations or standards.

**Related to Price, Route, or Service.** A law is "related to" a price, route or service if it has "[1] a connection with, or [2] reference to" a price, route or service. *Wolens*, 513 U.S. at 223. A law "may relate to a [price, route, or service], and thereby be pre-empted, even if the law is not specifically designed to affect such [price, route, or service]." *Morales,* 504 U.S. at 386. "Related to," however, "does not mean the sky is the limit." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). A "reference to" occurs "[w]here a State's law acts *immediately and exclusively* upon [price, route or service] . . . or where the existence of [a price, route or service] is *essential* to the law's operation." *Air Transp. Ass'n of America v. City of San Francisco*, 266 F.3d 1064, 1071 (9th Cir. 2001) (quoting *Cal. Div. of Lab. Standards Enforcement v. Dillingham Constr., N.A.*

---

[7] While action being "propriety" makes it not have the "force and effect of law," it also would fit within the ADA's "proprietary exception" and thus not preempted either.

[8] The Fifth Circuit has yet to indicate whether it would use *Cardinal Towing's* framework disjunctively or conjunctively.

10

*Inc.*, 519 U.S. 316, 235 (1997)) (emphasis added). A "connection with" a price, route or service is met "if the law binds the air carrier to a particular price, route or service and thereby interferes with competitive market forces within the air carrier industry." *Id.*; *see also Day v. SkyWest Airlines*, 45 F.4th 1181, 1186 (10th Cir. 2022) (same). If a law has "the forbidden significant effect" on prices, routes, or services, the ADA preempts that provision. *Morales*, 504 U.S. at 388. But a state law is not preempted if it "has only a 'tenuous, remote, or peripheral' connection with [airline prices, routes, or services]." *Id.* (quoting *District of Columbia v. Greater Wash. Bd.*, 506 U.S. 125, 130 n.1 (1992)).

### B. Is San Antonio's GAC Preempted?

As stated above, the Court concludes that SWA has not established that the AULAs are some form of law. Nevertheless, the Court will continue an analysis to determine if there nonetheless exists some form of preemptive effect.

Numerous cases have addressed whether an airport proprietor, such as the City of San Antonio, can charge certain fees, enact noise control ordinances that affect flight patterns, times, or generally impose substantive requirements on airline prices, routes, or services.[9] The answer is generally no. The Court, however, has been unable to locate any federal law, regulation, or caselaw that address how the § 41713(b) preemption clause may apply to lease agreements that allocate gate assignments.

---

[9] *See* e.g., *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008) (New York Passenger Bill of Rights requiring airlines to furnish fresh air, sanitation facilities, water, and food to passengers on flights delayed on ground for more than three hours was preempted by federal law).

11

The Court finds that because SWA has not established a substantial likelihood of success on the merits of whether the GAC is a "law, regulation, or other provision having the force and effect of law," its request for a TRO must be denied.[10]

### C. **SWA Has Not Established a Reasonable Probability of Success on the Merits of its Preemption Claim**

It appears that the GAC nor the AULA "have the force and effect of law." The GAC was merely criteria used to determine what AULA was to be offered by each carrier. The GAC nor the AULA do impose any "substantive standards," *Wolens*, 513 U.S. at 232, on SWA or any of the airlines. They are merely contracts. And even if they were an "official, government–imposed policy," *Id* at 233 n.5, they do not impose a "binding standard of conduct [on SWA] that operate[s] irrespective of any private agreement." *Id*. SWA fails to offer a single case explaining why the GAC or AULA rise to the level of an "official, government-imposed policy." Instead, SWA argues that because the City Charter delegates responsibility to an official to develop the GAC, it is a de facto "official, government–imposed policy." But officials take a wide range of action, and not everything they do has the "force and effect of law."

The Court is also not convinced that the ADA was intended to prohibit this type of municipal action—one that aligns with the City's proprietary role as a market participant in the airline terminal construction space. Merely considering the routes and services of an airline operator in allocating gate space does not "impose [the City's] own public policies or theories of competition or regulation on the operations of an airline carrier." *Wolens*, 513 U.S. at 229 n.5. Nor

---

[10] Thus, the Court does not consider whether the GAC "relates to a price, route, or service." The Court notes, however, that the GAC nor AULA do bind SWA to any specific price, route, or service. SWA does not contend that the City's decision to leave it in Terminal A caused it to change its routes or services, but merely that Terminal A requires more money to be expended for SWA's "growth plans for SAT." ECF No. 2-1 at 10-11.

does it take away from "maximum reliance on competitive market forces." *Morales,* 504 U.S. at 378.

The Court views the City as a market-participant because it is negotiating and privately contracting with airlines based on its "own interest in its efficient procurement of needed goods and services," *Cardinal Towing*, 180 F.3d at 693, namely specific airlines that meet its requirements for Terminal C (and Terminal B and A). *See Airline Serv. Providers Ass'n v. v. L.A. World Airports*, 873 F.3d 1074, 1078 (9th Cir. 2017) (finding the city, as the operator of an airport, to "participate directly in the market for goods and services" as "'[a]irports are commercial establishments . . . [that] must provide services to the marketplace'") (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 682 (1992)). That is uses the GAP to assist it does not turn the GAP into a policy with the "force and effect of law." Furthermore, that the City considers routes and services in its "purchase[ ] of services," *Am. Trucking Assns.*, 569 U.S. at 649, does not take the City's actions out of the market-participant. Instead, the City appears to be procuring "needed goods and services," namely airline operators for Terminal C, using similar considerations a "private part[y] in similar circumstances" would use. *Cardinal Towing*, 180 F.3d at 693. These are the costs and benefits of the decision, which would be a difficult task if the routes and services the airlines offer could not be considered.

Of course, a City cannot impose substantive standards on the routes or services by procuring the services. The City cannot tell an airline to offer certain routes or certain services. But the City, by allocating gates to certain airlines, is not attempting to "encourage a general policy rather than address a specific proprietary problem." *Cardinal Towing*, 180 F.3d at 693. Here, the specific proprietary problem is how to fit the airlines, with all their offerings, into a set number of slots in Terminal C—a "zero-sum" game.

### D. SWA Has Not Established Irreparable Harm

The dispute between SWA and the City boils down to a contract dispute. The Court is not persuaded by SWA's claims that there is irreparable harm based on exclusion from Terminal C and a hit to its brand. SWA has 38% of the market share in San Antonio, *see* ECF 1 at ¶ 12, and it will not be kicked out of the airport due to its non–renewed lease. In fact, business will continue to operate as usual. No one appears to be canceling flights based on this action, and SWA remains the dominant airline in San Antonio. Moreover, Terminal C will not open until sometime in 2028 and the AULAs have provisions that relate to changes to the gate allocation if the current set-up conflicts with federal law. *See* ECF No. 11 at 16-17 (AULAs are subordinate to federal law). And even if relegated to Terminal A, it is speculative to determine what Terminal A will look like once renovations are completed or if it will somehow harm SWA's brand.

Permitting the AULAs to be signed by committed signatories does not spell doom for SWA, much less *irreparable* injury. Rather, SWA will continue to litigate this action and presumably continue to negotiate with the City. Not till sometime in 2028 will any airline operate in Terminal C. Any suggestion that SWA's "brand" is taking a hit based on SWA's exclusion from Terminal C has nearly four years before that may be realized. Furthermore, the City has *already revealed* its decision not to allocate gates in Terminal C to SWA. To the extent SWA contends that the "currently existing status quo itself is causing" the irreparable injury (the leases being executed without SWA), the proper route, if any, would be to "return[] to the *last uncontested status quo* between the parties." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (emphasis, ellipsis, and alteration added) (citation omitted). Here, that would not be to enjoin the agreement that has already committed signatories (with one already finalized). It would be to let SWA

continue to operate out of Terminal A—just as it has done for years at San Antonio International Airport.[11] Because that will not change, there is no irreparable injury.

IV. **CONCLUSION**

SWA's request for a temporary restraining order (ECF No. 2) is **DENIED**.

The parties are **DIRECTED** to inform the Court on an agreed-upon briefing schedule for SWA's preliminary injunction.

It is so **ORDERED**

**SIGNED** this October 1, 2024.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[11] To the extent the only difference is the higher fees SWA pays as a "non-signatory," that relief is monetary and not a proper basis for irreparable harm. *See Janvey v. Alguire*, 547 F.3d 585, 600 (5th Cir. 2011) ("In general, harm is irreparable where there is no adequate remedy at law, such as monetary damages.").