IN THE UNITED STATES DISTRCT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SOUTHWEST AIRLINES CO., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE CITY OF SAN ANTONIO, TEXAS and ) <br> JESUS SAENZ, in his official capacity as ) <br> Director of Airports for the City of San ) <br> Antonio, Texas, ) <br> ) <br> Defendants. ) <br> _____ ) | Civil Action No. 5:24-cv-01085-XR |

**PLAINTIFF'S DESIGNATION OF TESTIFYING EXPERT KIRK SHAFFER, ESQ.**

Pursuant to the Court's Order at ECF No. 22 (and the parties' subsequent agreement on timing), Plaintiff Southwest Airlines Co. ("Plaintiff" or "Southwest") hereby respectfully submits this Designation of Testifying Expert Kirk Shaffer, Esq.:

1. **DESIGNATION OF PLAINTIFF'S TESTIYING EXPERT**

Plaintiff designates Kirk Shaffer, Esq., Principal, D. Kirk Shaffer PLLC – Mr. Shaffer's CV is attached as **Exhibit 1** hereto.

2. **SUBJECT MATTER OF EXPERT TESTIMONY**

The Airline Deregulation Act's prohibition against state and local governments enforcing provisions relating to air carrier routes and services applies to the criteria adopted by the City of San Antonio for choosing the air carriers that have been selected to move into the new Terminal C at SAT, and the application of the subjective, discretionary criteria adopted by the City for selecting air carriers for Terminal C had the force and effect of law because satisfaction of such criteria was the only means by which an air carrier could have access to the new gates at Terminal C, and the competitive advantage that the carrier will have as a result of such access.

3. **SUMMARY OF THE FACTS AND OPINIONS TO WHICH THE EXPERT IS EXPECTED TO TESTIFY**

**[This document is subject to supplementation and revision based on additional facts uncovered during an ongoing investigation.]**

# KIRK SHAFFER NOVEMBER 8, 2024
# DESIGNATION
# EXHIBIT 1

D. Kirk Shaffer, C.M.
4790 Old Dominion Drive, Arlington, Virginia 22207
Telephone: 615-587-4242 Email: kirk@dkirkshaffer.com

**Professional Profile**

**Leader with almost 40-year record of success providing strategic vision and counsel as an entrepreneurial airport executive, advocate, and regulator. "Go to" business adviser to the world's largest airline, rental car company, aviation trade association, helicopter trade association, defense contractor, airport retail concessionaire, private hospital operator, and airports nationwide, from large hubs to designated relievers. Expert at establishing and exceeding business performance goals and objectives (profit, nonprofit, and governmental), building highly effective and collaborative teams, providing substantive advice on technical and policy issues, and inspiring people in highly performing organizations. Two-time Presidential appointee at the Federal Aviation Administration (FAA), managing the systematic and political issues driving domestic and international civil aviation as they relate to airports. Recognized for innovative and adaptive leadership of national organizations to surpass goals and expectations. Plain-spoken, engaging, authoritative communicator. Well-known for identifying and promoting diverse human talent. Expert at identifying strategic issues, formulating policies to address them, and building consensus amongst aviation stakeholders with competing priorities to successfully implement industry change. Broadly experienced with Congressional testimony and effectively interacting with other senior executives, elected officials, and the media.**

Significant Aviation Accomplishments

**Principal** **2022 to present**
**D. Kirk Shaffer, PLLC, Washington, DC**

- Expert witness successfully supporting an aviation stakeholder in the Top 50 of the Forbes 400 Wealthiest People in the US in preventing the illegal closure of a regionally important general aviation airport: <u>East End Hangars, Inc., et al, v. Town of East Hampton, New York</u> in the Supreme Court of the State of New York, Part XXXVI, Suffolk County, Index 602799/2022
- Expert witness successfully supporting a regionally important general aviation airport in federal litigation and before the Federal Aviation Administration: <u>Joliet Avionics, Inc. v. Luminair, Inc. and City of Aurora</u> in the United States District Court for the Northern District of Illinois, Eastern Division, No. 19 - CV - 08507 and yet undocketed action pursuant to Title 14 CFR Part 16 before the FAA
- Expert witness successfully supporting the Nashville, Tennessee, city government in challenging unconstitutional takeover legislation passed by the Tennessee Legislature: <u>The Metropolitan Government of Nashville and Davidson County v. Bill Lee, Governor of Tennessee, et al, and the Metropolitan Nashville Airport Authority</u> in the Chancery Court for the State of Tennessee, Twentieth Judicial District, Davidson County, No. 23 - 0778 - II
- National counsel to MiillionAir, Inc. and American Jet International, Inc. at several of its fixed base operations in the US
- Expert witness successfully supporting a thriving fixed base operation in state court and before the Federal Aviation Administration in requiring the FAA to bring a federally-obligated airport sponsor into grant assurance compliance against the best efforts of a powerful local

newcomer to the airport industry: *ProJet Aviation, LLC v. Town of Leesburg, et al* in the Circuit Court for Loudon County, Virginia, No. CL 22003512 - 00, and before the FAA pursuant to Title 14 CFR Part 13
- Strategic advisor to the private owner of a large general aviation airport in the nation's busiest, most complex, most congested airspace with a view toward infrastructure expansion, environmental remediation, and multi-modal leadership

**Senior Advisor to the Assistant Administrator**                     **January 2021 to January 2022**
**для Civil Rights**
**Federal Aviation Administration, Washington, DC**

- Establishing closer relationships between the Office of Civil Rights and federally-obligated airport sponsors across the US system
- Broadening the understanding of airport sponsors' civil rights obligations
- Enhancing the implementation of the Disadvantaged Business Enterprise and Airport Concessions Disadvantaged Business Enterprise Programs

**Associate Administrator for Airports (Presidential Appointment)    2007-2009, 2018-2021**
**Federal Aviation Administration, Washington, DC**

- Member of FAA executive leadership reporting directly to FAA Administrator and US Secretary of Transportation
- Only two-time Associate Administrator for Airports in FAA history
- Received Distinguished Service Award from Secretary Elaine Chao for leading the FAA response to the COVID-19 national emergency
- Led the invention of the CARES Act airport grant program in only 18 calendar days after statutory enactment and commenced disbursing $15 billion in airport grants across the nation, an increase of 447% in financial support over any prior year
- Set the previously unheard of pace for the deployment of CARES Act airport grants and increased the production of individual grants by 906% (77 grants per day v. 8.5 grants per day)
- Continuously administered the multi-billion dollar Airport Improvement Program, Letter of Intent Financing Program, and Passenger Facility Charge Program supporting over 3,300 airports systemwide while achieving no adverse audit findings from the General Accounting Office
- Authored a precedent-setting decision finding the largest, most complex airport sponsor in the system in violation of airport revenue diversion statutes and financial transparency requirements
- Continued to drive authority and responsibility down through the organization to the 22 Airports District Office Managers across the system while setting the example of being Fast, Accurate, Comprehensive, Concise, and Candid
- Accelerated the digital transformation of many of our essential programs (AIP grants, Airport Master Record data, Airport Certification Manuals, Airport Layout Plans, etc.) during a national emergency
- Insured the personal well-being and continued outstanding performance of the Airports Team while transitioning to full telework in 8 calendar days, notwithstanding the added burdens of closed schools and childcare facilities, restricted access to vital records and reference materials, suspended official travel, at risk family members, and short supplies of essential materials

- Managed the real-time response to over 500 CARES Act inquiries to wide-ranging stakeholders including Members of Congress, Governors, and local elected officials nationwide
- Insured the safety of over 2,000 aircraft unexpectedly parked on runways and taxiways of 113 airports across the country at the onset of the COVID-19 national emergency
- Led 560+ employees in 22 offices nationwide and managed an annual operating budget of $116 million
- Completed the nation's first One Federal Decision aviation project —the LaGuardia AirTrain— while cutting the regulatory burden and environmental processing schedule down to 2 years from a national average of 41/2 years
- Refocused and motivated our Compliance Team, subject to intense external political and legal pressure, on achieving substantial rather than incremental progress toward achieving strict airport revenue use compliance by airport sponsors across the system
- Broke a years-long bureaucratic logjam at the state and local level to achieve a permanent agreement which will insure that the construction of the Jefferson Parkway around the City of Denver does not impair the Runway Protection Zones at Rocky Mountain Metro Airport
- Broke another years-long bureaucratic logjam to approve a new regional airport for Thomasville, Alabama
- Recruited a talented, highly experienced executive to substantially enhance the Airports Organization's standing in Safety Management Systems, Cybersecurity, and Commercial Space Transportation
- Responsible for the safety, planning, financing, design standards, performance, and statutory compliance of thousands of airports nationwide
- Responsible for certification, inspection, and safety compliance of 528 Part 139 commercial service airports
- Repeatedly produced the National Plan of Integrated Airports Systems, the basis for Congressional appropriations for over 3,200 airports nationwide
- Routinely testified before Congress, its professional staff, state and local elected officials, and aviation industry groups and provided voluminous, detailed technical assistance to Congressional authorizers and appropriators on a constant basis
- Received FAA Award for Excellence for leading a team of certification safety inspectors in assessing the condition and international compliance of numerous airports in Iraq
- Received the DOT Team Award from Secretary Mary Peters for co-chairing the National Task Force on Customer Service During Irregular Operations and avoiding a federal regulation which would have been an unfunded federal mandate on airports and airlines
- Instrumental in developing and executing the FAA's Flight Plan 2008-2012 and Flight Plan 2009-2013
- Concluded and implemented the US's first Aviation Cooperation Program with the Government of India
- Published over 300 Wide Area Augmentation System approaches in one year benefitting airport of all sizes
- Achieved 99.8% sustained operational availability (the highest possible) for the 35 largest airports in the US system
- Complete a record seven Engineered Material Arresting Systems (EMAS) in one year
- Upgraded forty critical Runway Safety Areas in one year, exceeding a Congressional mandate, by identifying new ways to expedite environmental impact statements, approve more forward-looking means of financing, and overcome neighborhood opposition in 2008
- Commissioned three air carrier runways (IAD, ORD, SEA) in one day, a national first in 2008

- Delivered nine additional runway/taxiway projects to increase the annual service volume at the nation's 35 largest airports by over 1% in one year
- Reduced runway incursions caused by vehicle/pedestrian deviations by 16+% in one year through the development of Enhanced Taxiway Centerline Markings
- Achieved a rating of "no deficiencies" in the International Civil Aviation Organization Universal Safety Oversight Audit Program
- Expedited the deployment of Airport Surface Detection Equipment - Model X and tripled the number of installations at major airports in one year
- Authored a record annual number of decisions pursuant to 14 CFR Part 16, all of which were upheld in federal circuit courts of appeal

**Additional Professional Experience and Accomplishments**

**Principal**                                                                                      **2013 to 2018**
**D. Kirk Shaffer, PLLC, Washington, DC**

- Expert Witness: Friends of East Hampton Airport, Inc., Helicopter Association International, Inc., et al v. Town of East Hampton in regard to airport noise and access restrictions - unanimous decision of the US Court of Appeals for the Second Circuit adopting my position, November 4, 2016. Writ of certiorari denied by the US Supreme Court, 2017. Now national law.
- Delta Air Lines, Inc. et al, Southwest Airlines Co. v. United States Department of Transportation and Delta Air Lines, Inc., and In Re Compliance With Federal Obligations by The City of Dallas, Texas in regard to airport competition plans and gate usage by new entrants - ongoing before the US Court of Appeals for the Fifth Circuit
- Lead counsel: Construction, zoning approval, certification, and registration of numerous heliports for Hospital Corporation of America
- Sale of Olive Branch, Mississippi airport - busiest airport in the State of Mississippi - from a private sponsor to The City of Olive Branch.


**Senior Counsel**                                                                                 **2009 to 2013**
**Crowell & Moring, LLP, Washington, DC**

Senior counsel at AmLaw 100 international firm, representing and counseling a wide variety of leading aviation stakeholders.
- Created business-based Customs and Border Protection Service documentation eliminating bureaucratic requirements and facilitating the first-ever public-private partnership airport/land international border crossing between Tijuana, Mexico and Otay Mesa, California
- Co-authored comments on behalf of the Air Transport Association (ATA, now Airlines for America or A4A) opposing the FAA's proposed pilot flight/duty time rules (Docket FAA-2009-1093), garnering unanimous support among ATA members, substantially achieving their objectives, and avoiding protracted federal litigation and expense
- In the absence of applicable federal regulations and as an exception to policy, persuaded the FAA to permit client to fly multiple unmanned aerial systems in Lower Manhattan as part fo a product promotion
- Successfully fought National Park Service on behalf of Helicopter Association International, Inc. and its members to prevent further modifications to the definition of "natural quiet" over the Grand Canyon National Park

- Counseled the Metropolitan Washington Airports Authority on procurement and regulatory matters
- Secured a long-term fixed-base operator lease for Executive Air Transport, Inc. at Grand Rapids, Michigan, airport notwithstanding opposition of several competitors
- Guided the Association of Unmanned Vehicle Systems International (AUVSI) Board of Directors and Advocacy Committee on integration of unmanned aerial systems into the National Airspace System
- Won FAA and Florida Department of Transportation approval for Hospital Corporation of America in regard to construction and registration of numerous vigorously opposed trauma center heliports
- Secured ground water remediation plan for Lockheed Martin consistent with airport runway approach surfaces and obstruction minimums, Sarasota-Bradenton International Airport, Florida
- Directed The Paradies Shops on successful airport concession disadvantaged business enterprise (ACDBE) audits
- Counseled Enterprise Rent-A-Car in revenue use and diversion matters including the current Nevada class action suit targeting McCarran International and Reno-Tahoe International

**Special Counsel to the Managing Director**                                     2006-2007
**Federal Communications Commission, Washington, DC**

- Laid groundwork for substantial improvements in federal procurement speed and accuracy

**Chief Operating Officer**                                                                     2004-2006
**HyVee Equipment, LLC, Clarksville, TN**

- Increased orders for start-up aviation defense contractor by over 200%

**Partner**                                                                                                    1986-2004
**Stokes, Bartholomew, Evans & Petree, P.A. (now Adams & Reese), Nashville, TN**

- Executive Assistant to the President, General Counsel to the Board of Commissioners, Metropolitan Nashville (TN) Airport Authority, an independent, business-based governmental entity
- Headed all MNAA departments on a transitional basis, offered the position permanently
- Instrumental in developing the Airport Authority's first-ever strategic plan with comprehensive goals and objectives in support of accomplishing its mission and performance based compensation for Authority management
- Consistently met budgets and beat schedules
- Co-authored the Airport Noise Reduction Reimbursement Act of 1989 permitting the first advance funding of airport noise mitigation projects in the nation
- Co-authored and persuaded FAA to be directly involved in production of an air carrier runway Environmental Impact Statement, now mandated as environmental streamlining in Vision 100 — Century of Aviation Reauthorization Act (Public Law 108-176)
- Authored the nation's first Letter of Intent securing federal funding commitment for an airport construction project in advance of appropriations, thus inventing an airport infrastructure finance system which now yields approximately $7 billion in safety, security, and capacity investment annually

- Senior member, construction team on over $500 million in public facilities, including two air carrier runways and the major extension of a third
- Personally concluded all related land acquisition and condemnation, zoning, obstruction evaluation, noise mitigation, relocation assistance, and utility relocation and successfully defended all court challenges
- As MNAA Director of Properties, negotiated all concession agreements for the operation of a 44-gate air carrier passenger terminal and managed all non-aeronautical commercial real estate
- Instrumental in accelerating, by 25 years, the construction of an air carrier runway
- Negotiated agreement with Tennessee Department of Transportation permitting 97-day, start-to-finish realignment of federal highway through tunnel under air carrier runway

**Earlier Career**

**US Army, Judge Advocate General's Corps**
**1976-1986**

- Prosecutor, Chief of Legal Assistance, and Senior Defense Counsel, 101st Airborne Division (Air Assault), Fort Campbell, KY — received Meritorious Service Medal
- Regional Counsel, US Army Criminal Investigation Command, Seoul, Republic of South Korea — received Army Commendation Medal
- Led a team of six defense counsel which achieved acquittals at trial on a weekly basis in a jurisdiction of over 22,000 soldiers – received Meritorious Service Medal
- Led the Legal Services Center producing all judicial, non-judicial, and administrative discharge documentation for the largest division in the US Army while continuing as the sole prosecutor for three combat brigades – received Meritorious Service Medal

**US Army, Infantry 1973-1976**

- Rifle, Weapons, and Heavy Mortar Platoon Leader in the 82d Airborne Division, Fort Bragg, NC, commanding over fifty soldiers with an 18-hour worldwide deployability mission — received Army Commendation Medal
- Turned around a heavy mortar platoon "that couldn't shoot straight" and, in less than a year, led it to achieve an "outstanding" rating on its annual evaluation
- Devised a way to lawfully feed four meals a day to an Infantry company in the field on a 24-hour per day mission when others said only three meals were authorized by Army regulation – received Army Commendation Medal

**Education and Background**

- Bachelor of Science, United States Military Academy at West Point, 1973, Dean's List, 1969-1973, graduated top 15% of class, exchange student to Nicaragua, 1971
- Doctor of Jurisprudence, The University of Texas at Austin, 1979, one of 25 active duty Army officers selected worldwide to study law while receiving full pay and tuition
- Graduate, Officers' Graduate Course (ABA recognized Master of Laws curriculum), The Judge Advocate General's School of the US Army, 1983
- Ranger, Airborne, Jumpmaster, and Air Assault Qualified
- Certified Member, American Association of Airport Executives, 1993

- Chairman and Vice Chairman, Legal Affairs Committee, Airports Council International - North America, 1997-1999
- Member, Disciplinary Hearing Committee, Board of Professional Responsibility of the Tennessee Supreme Court, 1992-2002
- First President of The Heart Gala, Inc. in Nashville to raise over $1 million for the American Heart Association in one year, 1998
- Eagle Scout, 1965
- Bachelor of Boy Scout Science Degree, The University of Scouting, 2012
- Order of the Arrow Vigil Honor and District Award of Merit, 2013
- National Outstanding Eagle Scout Award, 2015
- Doctor of Boy Scout Science Degree, The University of Scouting, 2016
- Boy Scouts of America Silver Beaver Award for Distinguished Service to Youth, 2017
- Numerous other Scouting awards including
    - Order of the Arrow Founder's Award
    - Order of the Arrow Lodge Key Three Certificate of Excellence
    - God and Service Award
    - Unit Leader Award of Merit
    - Scoutmaster's Key
    - District Committee Key
    - Wood Badge for the 21st Century
- Private pilot

1. The federal Airline Deregulation Act (hereinafter ADA), signed into law by President Jimmy Carter in 1978, was intended to phase out the Civil Aeronautics Board ("CAB") and promote a competitive air transportation system governed by market forces. The CAB had for decades determined which airports air carrier airlines could serve; what routes they could fly and how often; the rates and charges the airlines could charge the traveling public; and what services the air carriers could offer. That ended with the ADA.

2. The ADA was originally codified at Pub. L. No. 95-504, 92 Stat. 1705 (1978), H.R. Rep. No. 95-1211. The statute included provisions from the outset aimed at precluding federally-obligated airport owners/operators/sponsors at the State and local levels from imposing their own laws, regulations, or provisions impacting air carrier routes, services, and charges. Like many statutes, the ADA has been amended and re-codified over the years, and the preemptive provisions of the statute now appears at Title 49 U.S.C. § 41713(b)(1).

3. The preemptive language's current form is, "a State, political subdivision of a State, or political authority of at least two States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to price, route, or service of an air carrier . . . ." As stated, the clear intent of Congress in passing the ADA was to remove State and local entities from regulating air carrier's rates, routes, and services so that the competitive marketplace can operate freely. The current form of the preemptive language varies stylistically, but not substantively from the original statute which stated, "no State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or service of any air carrier having authority under title IV of the Act to provide interstate air Transportation . . . ."

4. Reported federal decisions have established that the current omission of the words "rule" and/or "standard" from the ADA preemptive language does not change the effect of the ADA nor stray from Congress's clear intent that no State or local entity assume the CAB's former, now ancient role as a regulator of air carriers' rates, routes, and services. As intended by Congress, the air carrier airline industry is deregulated, and that includes deregulated from local political entities whose regulations, conditions, restrictions, and ordinances impact rates, routes, and service, which since 1978 have fallen into the sole purview of the certificated air carrier airlines like those serving San Antonio. In a competitive marketplace, they alone get to decide where they will fly, what they will charge, and which services they will offer, free from the desires or objectives of any federally-obligated airport owner/operator/sponsor.

5. In that context it appears from the documents I have reviewed thus far (including the Airline Use and Lease Agreement ("AULA") presented to the air carriers serving San Antonio and responses to various discovery, and which was attached to the City's opposition to the motion for temporary restraining order), that the City of San Antonio

2

has crossed the line, both in its process and decision making in formulating the AULA, into territory which is preempted at the federal level.

6. The bottom line here is that in 1978 the Congress made it clear that market forces, rather than government actors, would get to decide the nature of the air service and routes at a particular airport. However, the City's adoption of the subjective, discretionary factors selected for choosing air carriers to move to Terminal C once again causes government actors to take it on themselves to select air carriers for Terminal C based on impermissible considerations relating to air carrier service and routes. This is precisely the kind of government interference that the ADA was intended to abolish.

7. This is most apparent in the use of subjective selection criteria in San Antonio's gate assignment decisions. The record thus far reflects San Antonio's consideration of various carriers routes (domestic v. international, for example), level of service (legacy including first class v. low cost or ultra-low cost), and "fit" in the local community and airport catchment area. Such subjective considerations are inappropriate because they directly impact the rates, routes, and services of certificated air carrier airlines serving San Antonio. Violations of the ADA can occur when the airlines' cost of doing business in San Antonio is increased and those added expenses get added to the ticket prices charged to the traveling public. It can also occur when air carriers providing airport clubs or proposed clubs are preferred over carriers for which clubs find no place in their business model. It can occur when certain carriers are preferred over its competitors in order grow a carrier's market share at the airport. And the list goes on.

8. All of this is not to say that a federally-obligated airport owner/operator/sponsor cannot have a vision for what they want their airport to be in the future, what role they want their airport to play in the local community and economy, or what presently unserved destinations can be added to better serve the traveling public. In fact, setting that vision and establishing objectives to achieve that vision is exactly the role of the airport sponsor, whether that's a state, city, county, or airport authority; but, the sponsor cannot use selection criteria which impinge on an air carrier's rates, routes, or services in achieving its vision and supporting objectives. It is not the sponsor's job, nor within the sponsor's authority, to operate an air carrier with local rules, regulations, and ordinances when Congress has prohibited it. Rather, federally-obligated airport sponsors must employ objective, quantifiable criteria in evaluating air carrier participation in an airport's operations and its infrastructure development, such as:

    a. The size of the aircraft,
    b. The weight of the aircraft,
    c. The existing and planned scheduled service,
    d. The amount of gate turns expected on a daily basis for the airline,
    e. The scope of the need for baggage handling services, and

3

    f. The need for access to the Federal Inspection Service for aircraft arriving from foreign countries without pre-clearance facilities for the passengers flying to the United States.

9. This objective, neutral process is clearly reflected in current Federal Aviation Administration guidance on the subject. Specifically, FAA Advisory Circular 150/5360-13A, *Airport Terminal Planning,* dated July 13, 2018, provides detailed guidance on passenger terminal design including the wide variety of factors which airports across our system utilize in planning for and developing terminal infrastructure for their communities.

10. To be clear, an FAA advisory circular is not legally binding, as it is a non-regulatory document. It is also clear, however, that many stakeholders in the aviation industry consider them as binding due to the massive amount of effort which is invested in developing them and the detail which is contained in the finished product. This certainly appears to be the case with AC 150/53260-13A which not only goes on for a hundred pages detailing a wide variety of neutral factors which communities might consider in their terminal planning processes along with suggested mechanisms for evaluating pertinent facts but also provides the reader with a multitude of references, not the least of which are a variety of research projects funded by the Federal Aviation Administration and performed by the Airports Cooperative Research Program of the National Academies of Science.

11. Likewise, the FAA refers airports to the International Air Transport Association's *Airport Development Reference Manual,* which IATA bills as "the industry's most important guide for airport planning and development." The ADRM appears to be just as detailed and just as data-focused as the guidance produced by the FAA and the National Academy.

12. A review of these learned references reflects consideration of such factors as those listed in paragraph 8 above plus many, many other neutral factors. To the City of San Antonio's credit, it too has considered many of these neutral factors in its terminal planning. The City's analysis and evaluation did not, however, end with the consideration of neutral factors but included specific consideration of subjective factors which impermissibly impact the routes, rates, and services of non-regulated air carrier airlines.

13. Only by adhering to rules and focusing on neutral facts can each airport fulfill its role within our national system of airports. In the United States at the federal level, no airport is viewed in a vacuum. Rather, we have a national system of airports substantially funded through federal aviation excise taxes and the revenue which each airport can generate for itself. Most of the approximately 3,300 federally-obligated airports in the system do not receive state or local funding, thus further highlighting that the focus should remain at the federal, systemic level. Operating and developing

4

a national system of airports also serves to emphasize that transportation is a fundamental government function and crucial to our national economy.

14. It is thus especially important that City of San Antonio play by long-established rules at all levels in negotiating and forming airline use and lease agreements from time to time. The AULA specifically defines "Rules and Regulations" as " . . . the lawful rules and regulations governing the conduct and operation of the Airport promulgated from time to time by the City or the Director, including without limitation the City's duly adopted and generally applicable policies, operating directives, standard procedures, and the Airport Security Plan, in each case as such may be in force and amended from time to time." So at the same time the City clearly acknowledges that its policies and operating procedure rise to the level of rules and regulations which must be obeyed by those using and operating on San Antonio International Airport, it must also acknowledge that there are federal authorities which also govern its business with airport users like air carrier airlines.

15. The selection criteria adopted by the City had the force and effect of law because they were adopted for the purpose of determining which air carriers would obtain the significant competitive advantage of being able to operate from the fancy new terminal at SAT, and there are zero alternatives in San Antonio that would provide the same competitive advantage to any airline that was not able to be selected for inclusion in Terminal C.

16. It is therefore my opinion to a reasonable degree of certainty and based on facts presently known to me that the City of San Antonio is not presently in compliance with its statutory obligations to the air carrier airlines serving San Antonio. The City has taken on for itself the consideration of factors, some subjective, which directly impact the routes and services of certificated air carrier airlines serving the City. Its attempt to do so is preempted by federal statute.

Respectfully Submitted,
**THE MORALES FIRM, P.C.**

6243 W. Interstate 10, Suite 132
San Antonio, Texas 78201
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821

By: /s/ Lawrence Morales II
Lawrence Morales II
State Bar No. 24051077
lawrence@themoralesfirm.com
Allison S. Hartry
State Bar No. 24083149
ahartry@themoralesfirm.com

5

        **CLARK HILL PLC**
Mark Sessions
Texas Bar No.18039500
Forest M. "Teo" Seger III
Texas Bar No.24070587
Charles Hayes
Texas Bar No. 24116496
2301 Broadway Street
San Antonio, TX 78215
Tel. (210) 250-6162
Email: msessions@clarkhill.com
tseger@clarkhill.com
chayes@clarkhill.com


M. Roy Goldberg
1001 Pennsylvania Avenue N.W.
Suite 1300 South
Washington, D.C. 20004
Tel. (202) 552-2388
Email: rgoldberg@clarkhill.com
(Admitted *Pro Hac Vice*)

**Counsel for Plaintiff Southwest Airlines Co.**

Dated: November 8, 2024

## CERTIFICATE OF SERVICE

    I hereby certify that on November 8, 2024, I caused a true and accurate copy of the foregoing Plaintiff's Designation of Testifying Expert Kirk Shaffer, Esq. to the City of San Antonio, Texas to be served via email (pursuant to agreement of the parties) on the counsel who have appeared for the Defendants as listed on the docket on Pacer for this matter.

                              */s/ Roy Goldberg*
                              Roy Goldberg