IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SOUTHWEST AIRLINES CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 5:24-cv-01085-XR |
| | ) |
| THE CITY OF SAN ANTONIO, TEXAS and | ) |
| JESUS SAENZ, in his official capacity as | ) |
| Director of Airports for the City of San | ) |
| Antonio, Texas | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

## INTRODUCTION

1.     Now that the City has finally produced the documents ordered by this Court, three things are clear. Under First, the City's documents reveal that Defendants made numerous misrepresentations to this Court, which the Court relied on when denying Southwest's application for a temporary restraining order. Contrary to Defendants' previous statements to this Court, the City's documents and witnesses confirm that Defendants designed and assigned gates in the new terminal at the San Antonio International Airport ("SAT") based on their preference for certain airline services, and on their subjective belief as to which airlines would be a better "fit" for the new terminal. Under Second, the City's documents establish that Defendants similarly misled City Council and taxpayers concerning the process Defendants used to assign gates in the new terminal. Under And third, the City's documents demonstrate that, during negotiations over the new lease at SAT, the City deliberately concealed from Southwest its plan to keep Southwest in Terminal A to prevent Southwest from insisting on additional funds in the lease for renovations to Terminal A that would be needed if Southwest remained there.

**Defendants Made Misrepresentations to this Court,**
**Which the Court Relied on When Denying Southwest's TRO**

2.      Defendants have repeatedly represented to this Court that when they selected the airlines that would be permitted to use the new terminal, they did not consider subjective factors such as whether they believed the routes and services of one airline were a better fit compared to another airline for its vision of the new terminal. To support this narrative, Defendants submitted the sworn declaration from Deputy Aviation Director Timothy O'Krongley, wherein he states, "in making its final decision regarding where to place airlines within SAT's facilities, the City did not weigh or factor in an airline's 'fit' into San Antonio." *See* DKT. NO. 11-2, O'KRONGLEY DECLARATION. Defendants' counsel made the same representation during the temporary restraining order hearing, stating, "the factors such as fit – the softer factors, really, they didn't play into it. They weren't factors. They weren't applied. They weren't used." *See* TRO 9/30/2024 HEARING TRANSCRIPT, P. 33 (ERIC PILSK). The Court relied on Defendants' representations in denying Plaintiff's request for a temporary restraining order, finding that "the actual decision process that allocated gates in Terminal C appears to not be based on the 'softer' factors like 'fit,' but instead on space accommodations or concerns about the distance between international gates and U.S. Customs and Border Patrol authorities." *See* DKT. NO. 17, ORDER DENYING TRO. Consequently, the City was able to proceed with the execution of the leases.

3.      The City's internal documents demonstrate that Defendants' representations to this Court were false. The City's documents confirm that, contrary to Defendants' representations, Defendants based their gating decision on, among other unlawful standards and factors, their perception of each airline's "fit" into SAT, including on the desirability of each airline's passenger profiles (*i.e.*, business or leisure), and whether the airline was a low-cost provider or provided first/business class service or a VIP club experience. *See* EXHIBIT 1

(GATING SCORECARD WORKSHEET) AND EXHIBIT 2 (Gating Scorecards).

## Gating Scorecard Worksheet

| Factor | Possible Points | American Data | American Awarded Points | Delta Data | Delta Awarded Points | Southwest Data | Southwest Awarded Points | United Data | United Awarded Points |
|---|---|---|---|---|---|---|---|---|---|
| **Number of Preferred Gates Requested** | | | | | | | | | |
| 1-2 gates: 2pts, 3-4 gates: 3pts, 4-5 gates: 4 pts, 6+ gates: 5 pts | 5 | 6 | 5 | 5 | 4 | 10 | 5 | 6 | 5 |
| **Airline Club Requested** | | | | | | | | | |
| yes: 7 pts, no: 0 pts | 7 | yes | 7 | yes | 7 | no | 0 | yes | 7 |
| **International Flights** | | | | | | | | | |
| yes: 5 pts, no: 0 pts | 5 | no | 0 | no | 0 | yes | 5 | no | 0 |
| **Relevant International Code Share(s)** | | | | | | | | | |
| yes: 4 pts, no: 0 pts | 4 | no | 0 | yes | 4 | no | 0 | no | 0 |
| **Current Epax Levels** | | | | | | | | | |
| 4th quartile: 2 pts, 3rd quartile: 3 pts, 2nd quartile: 4 pts, 1st quartile: 5 pts | 5 | | 4 | | 3 | | 5 | | 3 |
| **Fit into SAT** | | | | | | | | | |
| Relates to desirability of passenger profile (business, leisure, mix, etc) and airlines brand position (network, ULCC, established, start-up, etc) | 7 | | 7 | | 7 | | 5 | | 5 |
| **Service, Growth, Experience** | | | | | | | | | |
| Split cabin, club experience, hub feed, growth potential viewed in light of HQ visit and commitment to club. | 7 | | 7 | | 6 | | 6 | | 6 |
| **Total** | 40 | | 30 | | 31 | | 26 | | 26 |

4.     Airport Assistant Director Michael Garnier admitted under oath that, after objective load balancing considerations resulted in an impasse as to which airlines would be assigned to the new terminal, the City relied on the Gating Scorecard above when making its final gating decisions:

Q.  If that's the case, then why was this [the Gating Scorecard] created at all?

A.  This [the Gating Scorecard] **was created to, as I said, kind of a gut check, how do we -- how do we get past this impasse of not being able to finalize the gates?**  So, it's – Does this -- Does this match this (indicating) Does this customer experience match the operational recommendation? And if they do, then we should have a winner.

MICHAEL GARNIER DEPOSITION, 58:16-24 (emphasis added). The factors outlined in the City's Gating Scorecard directly and unequivocally demonstrate the City's preference for certain airline routes and services, and Defendants subjectively scored each airline in a manner that discriminated against low-cost airlines like Southwest. The City's documents confirm that it gave preference to airlines that catered to business travelers and that offered first class service and VIP lounges, and penalized Southwest, which has the largest market share at SAT, because it only offers "single cabin" service and offers a "leisure travel product more than business." *See* EXHIBIT 2, GATING SCORECARDS. This plainly violates the Airline Deregulation Act.



**The City Also Misled City Council and Taxpayers Concerning the Process Defendants Used to Assign Gates in the New Terminal**

5.      In addition to their misrepresentations to this Court, Defendants also misled City Council and taxpayers concerning the process they used when assigning gates in the new terminal. For example, the City is now trying to blame its unlawful reliance on airline services on the taxpayers, claiming that it was merely satisfying the taxpayers' desire for VIP airline clubs.

Q. I take it to mean that some people within the City or with COSA, et cetera, thought that it was important that there be an airline lounge in the new terminal; is that fair to say?

A. Certainly. Yes. And I think our customers have indicated that, our – our community has indicated that, as well.

MICHAEL GARNIER DEPOSITION, 39:18-24.

6.      However, before designing the new terminal, the City commissioned a survey, which asked taxpayers about the airport amenities that were most important to them. According to the survey, "the amenities that ranked the lowest . . . were a shoeshine [vendor], live music, and an airline club." According to the City's survey, interest in VIP airline clubs ranked lower than pet relief stations, artwork for local artists, and even outdoor garden areas.

seating area, wheelchair [availability], rental car location, and fast food restaurants. The amenities that ranked the lowest in this question were a shoeshine [vendor], live music, and an airline club.

 

[1]

7.      Even though VIP airline clubs rank near the bottom of the list of airport amenities that are important to taxpayers, the City's documents reveal that Defendants prioritized VIP clubs above everything else when designing and assigning gates in the new terminal. First, the City instructed the master architect of the new terminal, Corgan, to begin by including tens of thousands of square feet of VIP clubs in its initial design and also instructed Corgan to provide designs that retain ultra low-cost carriers that do not offer VIP clubs to the outdated and functionally obsolete Terminal A. *See* COSA 59, Corgan 40151, COSA 1008; 000001_Original049768. By insisting that the new terminal include substantial space for VIP

lounges, Defendants stacked the deck against low-cost carriers that do not offer VIP lounges, like Southwest, effectively preventing them from being assigned to the new terminal. Second, with that flawed premise, the City then instructed Corgan to make a gating recommendation based on its insistence that the new terminal have large VIP lounges. *See* COSA 1324. Third, and confirming its bias, the City agreed to assign Delta to the new terminal only if Delta agreed to build a VIP club. *See* COSA 3200, 3671, 1830, 3347, 45152. In fact, Mr. Garnier noted in an Executive Steering Committee Meeting that, if "Delta can not commit to a club, gating assignments will be easier." *See* COSA 3203. And finally, the City is contemplating reassigning $25 million in grants to free up funds to help Delta build its VIP club. *See* COSA 45153.



8. Although the City's documents unequivocally show that Defendants' gating decision was based on subjective considerations like whether Defendants believed an airline and its luxurious VIP clubs were a good fit for the new terminal and whether the Defendants believed an airline's passenger profile was desirable, Defendants concealed from City Council that their gating decision was ultimately based on their preference for certain airline services. For example, on June 6, 2024, Defendants gave a briefing to the San Antonio City Council, during which Defendants represented that gating at the new terminal was based on "all technical data and a

keen focus on ensuring [the airport] provide the best level of service possible and balancing all terminal operations." *See* COSA 6532. Defendants made similar representations in a briefing to the San Antonio business community on October 1, 2024, during which City Manager Erik Walsh represented that the gating assignments in the new terminal were based on "objective, industry-standard methodology that resulted in a configuration that best balanced the overall airport and level of service." *See* COSA 11989.

9.     However, Defendants and Mr. Walsh did not disclose to City Council or taxpayers that Defendants only used Corgan's balancing recommendation so the City would "have ammunition to negotiate with the airlines" to provide the services Defendants wanted in the new terminal. *See* COSA46322 (Executive Program Manager Dave Brandenburg says, "Please keep Corgan laser focused on the 'balancing' of the Terminals so we have ammunition to negotiate with the airlines."). Defendants and Mr. Walsh also did not disclose to City Council or taxpayers that, after Corgan's balancing recommendation failed to result in a consensus on gating assignments, Defendants unilaterally decided to make the coveted new terminal available only to airlines that cater to business class and affluent passengers, rather than to low-cost carrier Southwest that caters to value-minded passengers.

10.     Notably, in addition to concealing from City Council and taxpayers the real reasons for its gating assignments in the new terminal, Defendants also made disparaging and false claims to City Council intended to harm Southwest's reputation. For example, during the June 6, 2024 briefing to City Council, Defendants represented that Southwest's request for additional airport gates was a "play to block their competitors from growing." However, every witness for Defendants that has been deposed thus far has testified that they are unaware of any evidence to support this "blocking" statement. Defendants' unsupported disparaging statement

to City Council concerning Southwest demonstrates that Defendants' gating assignments were anything but "airline agnostic" (as the City now claims).

**The City Deliberately Concealed Its Plan to Keep Southwest in Terminal A
to Prevent Southwest From Insisting on Funds to Renovate It**

11.    In addition to misleading this Court, City Council, and taxpayers, the City's documents also confirm that Defendants took steps to deliberately conceal from Southwest their plan to keep Southwest in Terminal A. As fully described below in Paragraph 30, Defendants repeatedly represented to Southwest during lease negotiations that Southwest would be assigned gates in the new terminal. Although the City mentioned in passing to Southwest that Corgan had modeled a terminal layout placing Southwest in Terminal A, in the same breath, Defendants characterized that potential outcome to Southwest as a "non-starter." Similarly, Mr. Garnier represented to Southwest that, "regardless of the drawing showing [Southwest] in [Terminal A], my angle is that we can probably do something else (better?) . . . between part of the new terminal and terminal B – something I really think would be great for both Southwest and its passengers." *See* COSA 25021-25022.  Following these conversations, Airport employee Ryan Hall prepared a draft presentation for an April 2, 2024 meeting between the City and Southwest which originally included a slide discussing a scenario in which Southwest would occupy "nearly all of Terminal A." *See* COSA 6125-6151; COSA 6139. Mr. Hall forwarded the draft to Defendant Saenz and other SAT officials and asked if they had any edits. *See* COSA 6125. When Defendants gave the presentation to Southwest several days later, Defendants deleted the Terminal A slide and did not disclose to Southwest that they were considering assigning Southwest to Terminal A. See COSA 5508-5533.

12.    By intentionally keeping Southwest in the dark on their plans to assign Southwest to Terminal A until the eleventh hour, Defendants were able to prevent Southwest from

negotiating for the new airport lease to include all the funds necessary to renovate Terminal A to accommodate Southwest's future operations. Defendants then rushed to have City Council approve the new lease with only $200 million to renovate Terminal A over Southwest's strenuous objections, which is woefully inadequate to complete the necessary renovations. Once the new lease was executed, Southwest became powerless to seek modifications unless all other airlines consented, thereby solidifying the lease (and its ADA violation) as the only "take-it-or-leave-it" means to secure access to the airport. The City acknowledges that its actions will prevent Southwest from obtaining any additional funds for Terminal A renovations without its competitors' approval. Indeed, Assistant City Manager Jeffrey Coyle recently made this very point to the media—"Asking for more money beyond the initial $200 million isn't realistic and would require a majority approval from the signatory airlines." *See* COSA 14007. Upon reviewing Mr. Coyle's remarks, Defendant Saenz had but one word: "Excellent!" *See* COSA 14002.

13.    Southwest brings this action pursuant to the Supremacy Clause of the U.S Constitution, 42 U.S.C. § 1983, the equitable powers of this Court, and the Airline Deregulation Act to obtain declaratory relief, injunctive relief, and damages regarding the City's use of unlawful subjective factors related to airline rates and services. The City's unlawful acts resulted in the exclusion of Southwest from the new terminal and Southwest being forced to pay fees that exclusively benefit its competitors. Southwest also sues for promissory estoppel because Defendants repeatedly made misrepresentations to Southwest that the City would assign Southwest gates in the new terminal; misrepresentations that the evidence now confirms Defendants made to prevent Southwest from engaging in a full and fair negotiation for gate space at the airport and to prevent Southwest from obtaining funds needed to improve the "functionally

obsolete" Terminal A to which Southwest was intentionally relegated during lease negotiations.

## JURISDICTION AND VENUE

14.    The Court has jurisdiction over Southwest's claims because Southwest seeks injunctive and declaratory relief from state or local acts based on federal preemption. Claims for such relief fall within the federal courts' equity jurisdiction and present a federal question under 28 U.S.C. § 1331. Specifically, Southwest seeks declaratory and injunctive relief because Defendants' use of unlawful subjective factors related to airline routes and services is preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b) and the Supremacy Clause of the U.S. Constitution, art. VI, cl. 2.

15.    Southwest is entitled to pursue its claims for declaratory and injunctive relief regardless of whether there exists a private right of action under the Airline Deregulation Act. Southwest's "preemption claim presents a federal question, that establishes jurisdiction," and the absence of a private right of action "does not override [Southwest's] ability to bring a preemption claim." *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 433 (5th Cir. 2023); *see also Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507 (5th Cir. 2017) (finding federal jurisdiction for claim that workers' compensation statute was preempted by the Airline Deregulation Act). Under *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, n.14 (1983), "a plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."

16.    In suits against state or local officials for declaratory and injunctive relief, a plaintiff may invoke the jurisdiction of the federal courts by asserting a claim of preemption,

even absent an explicit statutory cause of action. *Verizon Maryland, Inc. v. Public Service Commission*, 535 U.S. 635, 642 (2002); *Gillis v. Louisiana*, 294 F.3d 755, 760 (5th Cir. 2002) (citation omitted); *see also Local Union No. 12004, United Steelworkers of Am. v. Massachusetts*, 377 F.3d 64, 75 (1st Cir. 2004).

17.     The City and its officials are not entitled to Eleventh Amendment sovereign immunity, because "state sovereign immunity does not protect a *political subdivision* of the State." *Cutrer v. Tarrant Cty. Local Workforce Dev. Bd.*, 943 F.3d 265, 269 (5th Cir. 2019) (quoting *Lincoln County v. Luning*, 133 U.S. 529, 10 S. Ct. 363, 33 L. Ed. 766 (1890)) (emphasis in original). "The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (internal citations omitted). However, even if the City could claim immunity under the Eleventh Amendment (which it cannot), Southwest would still be able to pursue its claims against Defendant Saenz in his official capacity under *Ex parte Young* because Southwest identifies an ongoing violation of federal law, enacted when the City passed the ordinance approving the AULAs, and because Southwest seeks prospective declaratory and injunctive relief.

18.     This Court also has supplemental jurisdiction over Southwest's promissory estoppel claim pursuant to 28 U.S.C. § 1367.

19.     Venue in this Court exists under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District, and all of the property that is the subject of this action is situated in this District.

**PARTIES**

20.    Plaintiff Southwest Airlines Co. is a major airline in the United States that operates on a low-cost carrier model. It has scheduled service to approximately 117 destinations in the United States and in ten other countries. It carries more domestic passengers than any other airline in the United States. It is currently the third largest airline in the world based on passengers flown.

21.    Southwest was established in 1967 by Herb Kelleher and Rollin King in San Antonio as Air Southwest Co. and adopted its current name in 1971, when it began operating as an intrastate airline wholly within the State of Texas, first flying between Dallas, Houston and San Antonio. It began regional interstate service in 1979, expanding nationwide in the following decades. Southwest currently serves airports in 42 states and multiple near-international destinations.

22.    Since Southwest commenced passenger service in 1971, it has valued its relationship with the City of San Antonio and SAT. It is deeply proud of the fact that Southwest is the largest air carrier at SAT, with a 37% share of passengers in 2024.

23.    Defendant City of San Antonio is the owner and operator of SAT. It is in the process of developing a new Terminal C at the Airport.

24.     Defendant Saenz, who is sued in his official capacity, is the Director of Airports for the City of San Antonio and is responsible for developing and implementing the City's unlawful gate assignment criteria and for the airport leases that reflect its implementation.

**STATEMENT OF FACTS**

**San Antonio International Airport and its Two Existing Terminals A and B**

25.    San Antonio International Airport is located on property within the City of San

Antonio that the City acquired in 1941. In 1944, the airfield was officially named as the San Antonio International Airport and regular flights began. Several renovations and upgrades were carried out during the early 1950s, including a new terminal in 1953 (which became the terminal that ultimately was replaced by what is now Terminal B). A large expansion project took place during the latter part of the 1960s, when gates were added in a "banjo" design, to accommodate the high passenger numbers expected at the Airport for the forthcoming World's Fair, which occurred in 1968.

26.     The existing Terminal A at SAT was commissioned in 1984 and has 16 gates. Its total area is 397,634 square feet. It is in severe need of reconstruction, and even if the City follows through with tentative plans to renovate Terminal A, it will still be much more narrow and less functional than Terminal C. In fact, the City has described Terminal A as "functionally obsolete" and Defendant Jesus Saenz has reported to the media that, "we feel like we can get another five to eight years out of [Terminal A], but after that, it's a demolition." *See* SAN ANTONIO REPORT, FEBRUARY 15, 2023, NEW TERMINAL DESIGN SIGNALS MAJOR, BILLION-DOLLAR CHANGES AT SAN ANTONIO AIRPORT.

27.     The existing Terminal B was constructed in 2010 and has approximately 247,099 square feet of space.  It replaced an older terminal but is not nearly as modern or useful to airlines as the new Terminal C will be.

### The City Instructs Architect to Include VIP Clubs In the Design of New Terminal

28.     The new Terminal C is to be built at an approximate cost of $1.4 billion and will be situated next to the existing Terminal B on the northwest end of the Airport's current footprint. It is slated to feature 17 gates and when it opens in 2028 will have approximately 850,000 square feet, which is more than 30% larger than the combined existing Terminals A and B.  According

to the City, the new Terminal C will have "[l]arger gate hold rooms for enhanced passenger comfort," a "Riparian Paseo entry and indoor courtyard to enhance sense of place and River Walk feel," a "[n]ew central passenger screening area" to provide an "all-access pass to retail and concessions," a "[n]ew, modern Federal Inspection Station for expanded international air service," and the City has designated "29,000+ sq. ft. club lounge space." Source: https://flysanantonio.com

29.    Although the City's survey revealed that taxpayers had very little interest in VIP airline clubs, the City heavily prioritized VIP airline clubs in the planning and design of Terminal C. Indeed, from the outset, Defendants instructed the Terminal C Master Architect Corgan to include nearly 30,000 sq. feet of VIP airline lounges into the design of Terminal C, even before any airline had committed to building or operating a club. *See* CORGAN_040151. The City's internal communications reveal that the City in turn used Corgan's inclusion of VIP airline clubs into Terminal C's design as "a bit of a sales package showing what [the airlines] have today vs. what they can have tomorrow (e.g. club space)…." in order to engineer the type of service that the City felt should be offered in the new Terminal C. *See* Corgan_02534.  In contrast, however, Corgan's documents reveal that it did not believe the clubs were even necessary. *See* 000001_Original049768 ("If the airline clubs are really needed, need to find a way to build them closer to their gates once we figure out their gate assignments."). Nonetheless, Corgan incorporated its client's demand for VIP airline clubs into its planning and design of Terminal C. As a result, Corgan's Program Definition Manual states, "the concourse [for Terminal C] includes spacious holdrooms, airline clubs, and a robust concession area." *See* COSA59.

**Defendants Promise Southwest That It Will Be Assigned Gates in Terminal C**

30.    Formal negotiations for the new Lease began in mid-2022. On repeated

occasions, Airport Director Saenz verbally committed to Southwest that Southwest would have

all or the majority of its 10 gates located in the new Terminal C:

   a.   On or about June 16, 2021, SAT Airport Director Jesus Saenz and Assistant City
        Manager Jeff Coyle had dinner with Southwest's Paul Cullen and Denise McElroy
        at the St. Anthony Hotel in San Antonio. During the dinner, Mr. Saenz asked if
        Southwest would complete the new terminal project at SAT similar to its
        completion of the new terminal at Houston Hobby Airport. Throughout the dinner,
        Mr. Saenz stated that Southwest would occupy gates in the new SAT terminal.

   b.   On or about September 8, 2022, SAT Airport Director Jesus Saenz had dinner with
        Southwest's Steve Sisneros and Paul Cullen during the Future Travel Experience
        Conference in Las Vegas. During dinner, Mr. Saenz represented that Southwest
        would have gates in the new SAT terminal.

   c.   On or about January 10, 2023, SAT Airport Director Jesus Saenz met with Jason
        Van Eaton and Paul Cullen at the AAAE Conference in Hawaii. Mr. Saenz assured
        Mr. Van Eaton and Mr. Cullen that Southwest Airlines would occupy gates at the
        new SAT terminal.

   d.   On or about November 9, 2023, SAT Airport Director Jesus Saenz and Assistant
        Aviation Director/Chief Financial and Administrative Officer Michael Garnier
        had a meeting with Denise McElroy and Kenneth Gregg in Mr. Saenz's office in
        San Antonio. Mr. Saenz informed Ms. McElroy and Mr. Gregg that Corgan had
        recommended that Southwest remain in Terminal A, but that he advised Corgan
        that was a "non-starter." During this meeting, Mr. Saenz committed to Ms.
        McElroy and Mr. Gregg that the majority of Southwest's gates at SAT would be
        in the new terminal.

   e.   On November 14, 2023, Assistant Aviation Director/Chief Financial and
        Administrative Officer Michael Garnier sent an email to Kenneth Gregg that
        attached Corgan's drawing that showed Southwest occupying gates in Terminal
        A. Mr. Garnier stated, "[a]s we discussed the other day, regardless of the drawing
        showing WN[1] on A, my angle is that we can probably do something else (better?)
        for WN via some creative sighting of its gates between part of the new terminal
        and Terminal B – something I really think would be great for both Southwest and
        its passengers."

   f.   On or about December 13, 2023, SAT Airport Director Jesus Saenz and Assistant
        Aviation Director/Chief Financial and Administrative Officer Michael Garnier
        met with Kenneth Gregg and Denise McElroy in San Antonio. During this
        meeting, Mr. Saenz told Mr. Gregg and Ms. McElroy, "I give you my word" that

---

[1] "WN" is the International Air Transport Association code for Southwest and is frequently used in the
parties' documentation.

Southwest will have a presence in the new terminal, but that he could not commit that all ten gates that Southwest had requested would be in the new terminal. Mr. Saenz then showed Mr. Gregg and Ms. McElroy a diagram of Southwest occupying eight gates in the new terminal.

g.  On or about January 9, 2024, SAT Airport Director Jesus Saenz had a meeting with Steve Sisneros and Paul Cullen at the AAAE Conference in Hawaii. During this meeting, Mr. Saenz assured Mr. Sisneros and Mr. Cullen that Southwest would occupy gates in the new terminal.

h.  On or about April 2, 2024, Assistant City Manager Jeff Coyle, SAT Airport Director Jesus Saenz, and City of San Antonio Executive Manager Dave Brandenburg met with Steve Sisneros at Southwest Headquarters in Dallas. Although the City's draft presentation to Southwest disclosed the possibility that Southwest would remain in Terminal A, the City chose not to disclose its plans to Southwest. Instead, Mr. Saenz stated to Mr. Sisneros that Southwest will be in the new terminal, but may also have some gates in Terminal B.

i.  On or about June 7, 2024, there was a meeting in SAT Airport Director Jesus Saenz's office in San Antonio that was attended by Mr. Saenz, Assistant City Manager Jeff Coyle, Denise McElroy, Andrea Goodpasture, Dave Brandenburg, Tim O'Krongley, and John Trupiano. During that meeting, Ms. McElroy and Ms. Goodpasture told Mr. Saenz that Southwest remaining in Terminal A was not what he had repeatedly promised Southwest. Mr. Saenz did not dispute that he had promised that Southwest would be allocated gates in Terminal C.

31.    Southwest justifiably relied on these repeated assurances by Defendants, and prior to the end of May 2024, believed the City was going to permit Southwest to move at least some of its operations to the new Terminal C. Southwest engaged in lease negotiations with the City based on that understanding and reasonable reliance. In fact, the City's internal documents reveal that Defendants purposefully concealed from Southwest even the possibility that the City would require Southwest to remain in Terminal A. For example, on March 28, 2024, SAT Aviation Principal Planner Ryan Hall drafted a presentation for an upcoming meeting with Southwest that included a slide discussing the possibility of Southwest remaining in Terminal A. *See* COSA 6125-6151. Mr. Hall asked Director Saenz and other airport officials whether they had any edits to the presentation. *See* COSA 6125. When the City gave this presentation to Southwest

several days later on April 2, 2024, the City deleted the Terminal A slide, and only disclosed to Southwest the possibility that it would split its operations between Terminal B and the new adjoining Terminal C. *See* COSA 5508-5533. Suspiciously, none of the City's witnesses have been able to explain why the City concealed the Terminal A slide from Southwest.

32.    Because of Defendants' repeated promises that Southwest would be permitted to move most of its operations into the new Terminal C and because Defendants concealed from Southwest the possibility that it would remain in Terminal A, Southwest was unaware that the lease terms related to Terminal A, including how the City would pay for Terminal A renovations, would impact Southwest. Specifically, throughout the negotiations for new Lease space, Southwest took negotiating positions based on its reasonable and good faith belief that it would be moving to Terminal C, which Southwest believed was critical to meet its future growth objectives for the SAT market and its passengers. Had Defendants timely informed Southwest and not actively concealed from Southwest the possibility it would remain in Terminal A, Southwest would have adopted a different bargaining position during lease negotiations and the City would have been unable to force Southwest into a "take-it-or-leave-it" lease for inferior space at unjust rates.

### Defendants Based Their Gate Assignments on Unlawful Subjective Factors Directly Related to Luxury Airline Services that Cater to Affluent and Business Passengers

33.    The City's internal documents confirm that Defendants intended all along to give preference to airlines that catered to business and affluent passengers by providing VIP lounges and first class/business services, and to exclude low-cost providers that catered to value-minded travelers to Terminal A. Indeed, the City's documents confirm that it was the airport's "original recommendation" to its architect to keep Southwest in Terminal A, not the other way around. *See* CORGAN 22402. As early as June 2023, the Master Architect's planning documents reveal the

City's interest in isolating ultra low-cost carriers in Terminal A. *See* COSA 1008. Similarly, the City's Executive Steering Committee ("ESC") discussed their intention of excluding Southwest from Terminal C because it did not operate VIP clubs. *See* COSA 1199, COSA 1333.

34.    On October 31, 2023, the Master Architect Corgan issued a gating recommendation excluding Southwest from the new terminal that was heavily based on the City's insistence that the new terminal include VIP clubs. *See* COSA 1324. Indeed, Corgan explained in a presentation to the City that the benefits of its gating recommendation included "large club spaces" in Terminal C and that Delta would be permitted to provide direct access to some of its gates from its VIP club. *See* COSA 1324. Notably, when Delta expressed concerns about its ability to build a VIP club at SAT, Airport Assistant Director Michael Garnier responded, "if Delta cannot commit to a club, gating assignments will be easier." *See* COSA 3203. Because Delta was unable to commit to building a VIP club as of February 2024, the City departed from Corgan's recommendation by stating that Delta was "likely staying in [Terminal A]." *See* COSA 5967. However, just a few months later in May 2024, Delta informed Defendants that it received approval to build a SkyClub, but only if it was assigned to Terminal C. *See* COSA 3671. Consequently, Defendants assigned Delta to Terminal C. Put simply, if an airline was willing to build a VIP club in Terminal C, the City would give it preference for space in Terminal C; however, if an airline did not agree to build a VIP club in Terminal C, the airline would receive no preference and would be relegated to inferior space.

35.    Despite Corgan's recommendation, some City officials disagreed that Southwest should remain in Terminal A. For example, in December 2023, Executive Program Manager Dave Brandenburg explained to other airport officials that "the Airport's Recommendation ([Southwest] on Term. A) . . . may no longer be an option." *See* Corgan 27539. Similarly, in

January 2024, the City's aviation consultant, Pranav Trivedi, informed Defendant Saenz and other airport officials that Southwest would be "getting 6-8 gates in the new terminal." *See* COSA 5718.

36.      As the Director of Airports, Defendant Saenz was responsible for resolving the disagreement among the City's officials and making the final recommendation concerning which airlines would be selected for Terminal C. *See* CORGAN 22429. During a meeting on May 29, 2024 between Southwest's Airport Affairs and the City, despite having been repeatedly assured of its position in Terminal C, Defendants informed Southwest for the first time that the City had decided to instead require Southwest to remain in Terminal A and that Southwest could "make the most of it." The tactic was an unfair "bait and switch" that precluded (and was intended to preclude) Southwest from pursuing various opportunities in the lease negotiations, including material terms related to the capital improvement plan that are prejudicial to Southwest were Southwest to remain in Terminal A, and that Southwest had no prior reason to negotiate based on assurances Southwest would be located in Terminal C. In the same meeting, and in two follow-up emails, Southwest requested that the City provide the underlying methodology it used to arrive at a gate allocation plan that resulted in the exclusion of Southwest from Terminal C. Although the City verbally committed to disclosing its methodology, it did not do so.

37.      Instead, at a meeting on June 7, 2024 held at Southwest's request, the City provided general information as to how Southwest would be accommodated in Terminal A, but largely ignored the operational concerns raised by Southwest that would result from its placement in Terminal A, including that Terminal A's facilities were not sufficient to support Southwest's passenger volume or operational needs. This includes deficiencies with respect to the security checkpoint ("SSCP"), baggage screening, Ticket Lobby, Curb Front, Holdroom Configuration, Concourse Circulation Constraints, Restrooms, Technology, and finish upgrades. There also are

deficiencies in mechanical, electrical, and plumbing items that were identified in a previous City-commissioned facility study. During the June 7th meeting and thereafter, the City refused to revisit or discuss the lease terms to address the consequences of its decision to mislead Southwest and exclude Southwest from Terminal C—namely, that Southwest would remain in a facility that does not meet its operational needs, and results in Southwest funding the construction of a new terminal that it and its passengers will not be permitted to use.

### The City Confirms That It Relied on Unlawful Factors Related to Airline Routes and Services in its Terminal Gate Assignment Methodology

38.     Approximately two weeks after the June 7 meeting, on June 20, 2024, the City finally provided Southwest and other airlines at SAT, *post hoc* and for the very first time, a document titled "Summary of Decision-Making Process for Post-DBO Gate and Club Locations" (hereafter the "SAT Gate Assignment Criteria"), Exhibit 3 hereto. This document sets forth the criteria applied by the City in deciding where to locate airlines at SAT. The City's SAT Gate Assignment Criteria was never shared with Southwest before its release on June 20, 2024, and specifies:

> "**Factors [For Gate Assignment] Considered Included:**
>
> ☐ Number of preferential gates requested by airline
> ☐ **Whether an airline club was requested**
> ☐ **Whether airline operates or commits to operating international routes**
> ☐ Whether airline has relevant code share arrangement(s)
> ☐ Current level of enplaned passengers @ SAT
> ☐ **The airline's "fit" into San Antonio**
> ☐ **The airline's service, growth, and experience**
> ☐ **The existence of a written commitment by airline to city pairs, specific flights, or minimum levels of enplaned passengers**
> ☐ Potential need by airline for appurtenant City Gates (for expansion)
> ☐ Terminal load-balancing considerations"

(Emphasis added)

39.     According to the City, the Airport decided that Southwest was not entitled to

move to the new Terminal C, whereas other competing airlines were invited to do so, based on the above-listed factors. Remarkably, the City expressly acknowledges that in deciding which airlines to allow to move to the new Terminal C, the City weighed and *first* "considered certain non-quantifiable considerations" such as (1) "Whether an airline club was requested," (2) the geographic nature of the routes served by the air carrier, (3) "the carriers' 'fit' into San Antonio (relating to desirability of passenger profile (business, leisure, mix, etc.) and airline brand position (network, ULCC, established, start-up, etc.)," and (4) "the airlines 'service, growth and experience' (which included an analysis of the airline's overall reasonable growth potential and commitment to SAT, aspirations for international flights, and any differentiation of product or technology used that would enhance customer experience)." (Emphasis added).

40.     Even more remarkably, the City eliminated Southwest as a potential occupant of Terminal C by concluding, "Notably that airline (WN) does not have an airline club as part of its offerings" and by penalizing Southwest for its lack of "fit" into San Antonio and its single cabin service (*i.e.* no first class offering). *See* EXHIBIT 3, SAT GATE ASSIGNMENT CRITERIA.

41.     The City was well aware that requiring Southwest to remain in Terminal A would present significant obstacles to Southwest (which are explained below in Paragraphs 44-45) but brushed aside these concerns, stating that the "airport could partner with [Southwest] to 'make the most' out of the airlines' substantial and focused use of Terminal A." *See* EXHIBIT 3, at p. 2. This is further evidence that the City recognized that it was treating Southwest as a second-class citizen at SAT and attempting to force Southwest to accept inferior space and inequitable lease terms, despite Southwest funding the lion's share of the Terminal C improvement cost.

42.     Despite repeated requests by Southwest, the City refused to provide Southwest with the modeling reflecting the City's application of the above-factors that led to Southwest's

exclusion from Terminal C until it was ordered to so in this lawsuit. The City's Gating Scorecards demonstrate that the City relied on unlawful factors directly related to airline routes and services when making its gating assignment in Terminal C. For example, the Gating Scorecards reveal that the City awarded American and Delta an additional seven points—which represented 17.5% of the total potential points—because they requested a VIP club. *See* EXHIBITS 1 and 2. The City also awarded American and Delta extra points because they catered to business travelers and offered first and business class service, and awarded American extra points because it committed to offering a non-stop route to Washington, D.C. *See* EXHIBITS 1 and 2. The Gating Scorecards also demonstrate that the City penalized Southwest for its low-cost service, including its "single cabin" service, "different boarding experience," and "leisure travel product [rather] than business." *See* EXHIBITS 1 and 2. After the City scored its unlawful factors related to airline routes and services, Delta received 31 points, American received 30 points, and Southwest and United received 26 points. Had the City not allocated 7 points to airline club requests and other unlawful factors related to routes and services, Southwest would have had more points than any other airline and been the frontrunner for placement in Terminal C.

43.    Notably, the City's internal documents also reveal pretextual reasons for excluding Southwest from Terminal C. For example, ESC meeting minutes state that Southwest was not a good fit for Terminal C because it does not have international flights, when in fact, Southwest is the only domestic airline at SAT that directly provides international flights. *See* COSA 1333. Furthermore, when trying to justify its decision to exclude Southwest from Terminal C to the San Antonio City Council, Defendants represented that Southwest did not provide the City with any formal or written commitments for additional flights and that it was concerned that Southwest was attempting to block other airlines from growing by requesting more gates than it

needed. *See* COSA 6531-6534. However, the City has conceded in depositions that it did not receive any formal or written commitments for additional flights from any other airlines and that there is no basis to support its representation to City Council that Southwest's gate request was an attempt to block other airlines.

### The City Races To Have City Council Ratify Its Unlawful Gate Assignment Methodology By Approving Airline Use and Lease Agreements Despite Southwest's Objections

44.    In a letter dated June 20, 2024, Denise McElroy, Senior Manager – Airport Affairs at Southwest, told Defendant Saenz that Southwest was "extremely concerned with [his] decision, which [Director Saenz] just shared a few weeks [before], to keep Southwest Airlines in Concourse A." Southwest explained that the decision "will preclude [Southwest] from being able to operate [its] long-term commercial plan for San Antonio (SAT). Southwest further stated:

> "Our original plan, shared with you two years ago, was to lease up to 10 gates. However, we currently do not have confidence that Concourse A can meet those needs. This is a huge 11th hour change, and we must immediately validate whether modifications can be made to meet all the elements of our operation. I recognize your desire to complete negotiations quickly. We shared your goal and, until earlier this month, we believed we were getting very close to a business deal based on our understanding that Southwest would relocate from Concourse A and a pre-approved [Capital Improvement Plan (CIP)] would incorporate a $200M placeholder for Concourse A infrastructure and finish improvements."

45.    In a letter to Defendant Saenz dated August 12, 2024, Southwest's McElroy stated that "Southwest continues to fervently maintain its desire to be located in the new terminal and remains extremely disappointed at the City's decision to keep Southwest and what will likely be nearly 50% of the passengers flying through San Antonio International Airport (SAT) in Terminal A." The letter added:

> "We met with Corgan [an architectural and design firm] and your staff three times to evaluate Terminal A's deficiencies with respect to the security checkpoint (SSCP), baggage screening, Ticket Lobby, Curb Front, Holdroom Configuration, Restrooms, Technology, and finish upgrades. We also understand there are deficiencies in mechanical, electrical, and plumbing items that were identified in

a previous City-commissioned facility study. The Corgan analysis provided thus far does not consider the full utilization of 10 gates as we requested because it restricts peak demand. As a result, we remain extremely concerned that arriving passengers will continue to overwhelm the curb front, ticket lobby and SSCP.

Also, the issue remains open as to what it will cost to modify Terminal A as will be required to accommodate our 10-gate commercial plan. Regardless of the potential investment to improve Terminal A, there are significant customer experience items that cannot be mitigated. Terminal A concourse is too narrow and doesn't meet today's design criteria. Increasing the hold rooms sizes as you propose will not alleviate overcrowding in the concourse circulation area. Southwest's international operations will also be negatively impacted due to the relocation of the Federal Inspection Station (FIS) facility from Terminal A to Terminal C. Splitting our operation between two terminals will introduce operational complexity and significantly increase passenger connection times. The customer experience for our Customers will also suffer due to the potential relocation of the rideshare and taxi area from its current location to a new Transportation Center which will dramatically increase walk times for what will be over 50% of the total passengers using SAT. The allocation of space types (valet, disabled) in the existing garages when the new garage opens, e.g., if valet service is relocated to new garage, the number of disabled spots is adjusted. Furthermore, access to the USO for those Terminal A customers with military affiliations will be impacted with the relocation of the existing USO to the new Terminal C. The cumulative effect of these items certainly points to a degraded customer experience for Terminal A passengers flying on the City's largest air carrier. Southwest simply will not accept the diminished experience for our Customers and Employees and the risk of facility constraints to our future commercial plan by remaining in the airport's oldest facility. We look forward to further engagement with respect the aforementioned issues.

46.    On August 26, 2024, Southwest Executives Jason Van Eaton, Sherri Hull and Steve Sisneros met with City officials to reiterate Southwest's concern that the City had not presented a viable solution for Terminal A and was seeking to force its largest tenant to "take-it-or-leave-it." Southwest emphasized that it could not sign a new lease until the City provided critical information regarding how necessary capital expenditures for Terminal A were to be funded, which the City has not provided. Notwithstanding Southwest's objections to the inadequate funding of Terminal A improvements, the City raced to have City Council approve Airline Use and Lease Agreements ("Lease" or "AULAs") that memorialized the results of the

City's unlawful gate allocation methodology, including the exclusion of Southwest from Terminal C, relegating Southwest to a "functionally obsolete" Terminal A without adequate funding to make the necessary improvements, and forcing Southwest to fund the lion's share of the Terminal C development cost.

### The Approval, Execution, and Enforcement of the AULAS Over Southwest's Objections Irreparably Harm Southwest

47.    City Council's approval of the AULAs and the subsequent execution and enforcement of the AULA, when they lacked adequate funding for Terminal A improvements is irreparably harming Southwest. The "AULAs" are ten-year agreements (with a five-year extension) between SAT and the signatory airlines that include the terms and conditions in which the airlines lease gates and other space at SAT. Airlines that do not sign an AULA do not enjoy certain benefits of signatory status—which include input into capital development decisions, preferential rights on designated gate assignments and revenue sharing—and also pay premium rates compared to signatory airlines. Although each signatory airline signs a separate AULA, the AULAs are identical, and each signatory airline pays the same rate under the AULAs for each landing and takeoff of its aircraft. Consequently, the airline with the most flights at SAT (*i.e.* Southwest) pays the most fees under the AULAs. Because capital improvements at SAT are funded by fees that the City collects from the airlines, Southwest will pay the largest share of the construction of Terminal C, regardless of whether Southwest signs the AULA or proceeds as a non-signatory. In other words, as a result of Defendants' actions, Southwest will pay the largest share of a $1.4 billion new terminal at SAT, which Defendants are not permitting Southwest or its passengers to use.

48.    To make matters worse, the AULAS contain a majority-in-interest ("MII") provision that governs when airline fees can be used for new capital improvements projects that

are not included in the AULAs. Under the MII, each signatory airline has the right to vote on whether to approve or reject new capital projects because they will increase the rates paid by each airline. Because Defendants obtained approval of the AULAS without adequate funding for Terminal A renovations and proceeded with execution of the AULAs (over Southwest's objections), and because the City has forced Southwest into non-signatory status, Southwest has no ability to seek funds above the inadequate $200 million in the AULA to make the needed improvements to Terminal A. To access additional funds above the $200 million in the AULA, Southwest's competitors must vote in favor of capital improvements in Terminal A, which they have no incentive to do. Indeed, as Assistant City Manager Jeffrey Coyle recently stated, Southwest "[a]sking for more money beyond the initial $200 million isn't realistic and would require a majority approval from the signatory airlines." *See* COSA 14007.

49.    The City's ongoing treatment of Southwest in connection with the new AULA also causes irreparable harm. The City presented to Southwest a draft new AULA that embodies the City's improper gate allocation methodology in violation of the ADA. Southwest has understandably refused to sign pending resolution of this dispute. Southwest has held Signatory status at the Airport since 1971, is prepared to hold such status again upon resolution of this dispute, but should not be forced to waive its rights or to sign an unlawful agreement. Having thus boxed Southwest into a corner where it is unable to sign the AULA, the City has insisted on treating Southwest as a non-signatory airline since October 1, 2024. Such treatment penalizes Southwest through significantly higher rates and strips it of its right to share in certain revenues and to vote on capital projects. Thus, the City's new AULA reflects a "heads you win, tails I lose" choice for Southwest that causes it irreparable harm unless the Court grants injunctive relief.

**The AULAs Have the Force and Effect of Law**

50.    The City's selection of the air carriers that are permitted to move into Terminal C and the rules governing Southwest's future operations at Terminal A have the force and effect of law because the City is acting under color of legal authority to set the terms (including gate placement and financial costs) by which air carriers must abide in order to provide scheduled commercial passenger service at SAT, and air carriers (including Southwest) have no viable alternative to SAT to offer scheduled commercial passenger air service in the San Antonio community.

51.    The City, in presenting the AULAS to City Council for a vote on Ordinance 2024-09-12-0681 in September 2024, described the AULAs as "govern[ing] the airport/airline business relationship (rates and charges) and specifies the terms and conditions for use of airfield and terminal facilities." The AULAs "include provisions governing rates and charges, performance guarantees, security, insurance, environmental compliance and indemnification . . . ."

52.    The City's Code of Ordinances further codifies "City gate policy." In particular, "permit and policy procedures for the use of city gates shall be as authorized by city council from time to time," subject to the Council-approved lease then in place or "the approved rates and charges ordinance." (Ord. No. 2015-04-09-0289, 1(Att. I), 4-9-15). Commercial agreements reflecting the terms upon which airport access is granted, including gate assignments and accompanying rates are authorized and implemented by City Council under color of local law and regulation.

53.    Moreover, the City has used police powers and other penalties in implementing and enforcing the: (1) the AULAs; (2) the AULAs' implementing ordinance; and (3) the Code of Ordinances itself. The AULAs grant Director Saenz the "authori[ty] to enforce the Rules and

Regulations [including the City's Code of Ordinances, Chapter 3, Airports] and promulgate other rules, regulations, and policies . . . ." (Lease Section 14.2(b).) The Code of Ordinances, in turn, permits the Director or his designee to enforce all ordinances, including Ordinance 2024-09-12-0681, through "suspension and/or revocation of permit(s) to conduct activities at the airport, and/or being cited with a Class C misdemeanor . . . ." Ord. No. 2015-04-09-0289, 1(Att. I), 4-9-15.

54.    In addition, beginning in approximately April 2024 and continuing through the commencement of this litigation, the City represented to Southwest and other airlines that, if AULA negotiation were not completed to the City's satisfaction, the City would implement rates by ordinance. The City represented that any "Rate Ordinance' must be passed by City Council" and codified in Chapter 3 of the City Code. It would "contain[s] substantive operating terms and conditions in addition to actual rates and charges." This negotiating tactic is not available to private parties, nor do private parties have the ability to avoid the Rate Ordinance if is passed by the City.

**The Unlawful AULAs Isolate Southwest to Functionally Obsolete Facilities, While Using Southwest's Rates to Fund the New Terminal for the Exclusive Benefit of its Competitors**

55.    The AULAs approved by City Council not only isolate Southwest to the "functionally obsolete Terminal A," but also require Southwest to pay fees to build, operate, and maintain the new Terminal C for the sole and exclusive benefit of its competitors. Despite the obvious inequity, the City refuses to allow Southwest to enter into a new lease for Terminal A and Southwest must consequently pay increased fees to operate at SAT on a non-signatory basis. According to the City, if Southwest wants to remain a "signatory airline" at SAT, it must agree to remain at Terminal A on unfair and discriminatory economic terms, and accept both Terminal A's inferior condition compared to Terminal C and the City's unlawful gate allocation

methodology which prefers one airline over another based on "non-quantifiable considerations" related to routes and services.

56.     Requiring Southwest to fund the lion's share of a superior new terminal for the exclusive benefit of its competitors while being isolated to the "functionally obsolete" Terminal A will result in a diminished experience for Southwest's customers, will place Southwest on unequal footing with competing airlines, and will preclude Southwest from being able to operate its long-term commercial plan for SAT.  Unless the Court grants injunctive relief concerning the enforcement and recognition of the new AULAs, Southwest will continue to suffer irreparable harm. The new AULAs create vested legal rights that prevent Southwest from leasing gates in the new Terminal C and require Southwest to fund Terminal C's construction and use for the benefit of its competitors. Moreover, the new AULAs grant the other airlines MII rights, which empower them to oppose funding for capital expenditures to renovate Terminal A.

57.     The harm to Southwest is also irreparable because it will be impossible to make Terminal A and its terminal and gate facilities suitable for Southwest's intended operations because this would require the expenditure of hundreds of millions of dollars for the necessary improvement (over and above the $200 million referenced in the AULAs), but none of the other airlines are likely to support that expenditure to assist their competitor. Rather, the other airlines are likely to all exercise the MII clause to oppose such expenditures at Terminal A, thereby leaving Southwest at a permanent and significant disadvantage in the marketplace. Further, the City has indicated that the size of the investment needed to make Terminal A suitable for Southwest's operations could lead the City to demolish the terminal, resulting in significant irreparable harm to Southwest.

58.     Defendants' actions have inflicted—and will continue to inflict—irreparable

harm on Southwest's brand image in San Antonio and other communities, as it will be considered a secondary citizen and less worthy than its competing airlines. For example, the announcement by the City, widely publicized in local and national media, that Southwest is barred from moving into Terminal C has already inflicted harm on Southwest's brand and will continue to do so unless the Court enjoins enforcement and recognition of the new AULAs. To be clear, requiring Southwest to stay in the depleted Terminal A will result in a loss of customers and damage to Southwest's reputation and goodwill.

59.    Defendants' decision to permit unlawful criteria to contaminate its AULA negotiation and the AULA language subjects Southwest to the subjective demands and criteria of the City, rather than being required to comply only with federal laws and regulations as required by the ADA. This causes irreparable injury by depriving Southwest of a federally-protected right to have only one regulator in matters pertaining to rates, routes, and services.

60.    Defendants' actions have also meant that Southwest could not execute the AULA effective October 1, 2024 without potentially waiving Southwest's claims against Defendants in this litigation. Even if Southwest ultimately prevails in this litigation and the City is required to renegotiate the AULAs without consideration of unlawful criteria, Southwest may be unable to recover the extra costs associated with being a non-signatory from October 1, 2024 until the AULAs are corrected, because Southwest anticipates that the City will attempt to invoke sovereign immunity to avoid paying financial damages. Southwest will also be barred from participating in decision-making processes available only to signatories.

61.    As the owner and operator of SAT, the City is not free to use subjective criteria to choose one airline over another based on the preferences of the municipal government decision makers.  Airports are not legally entitled to pick "winners and losers" among the airlines that

choose to serve the airport.  Yet that is precisely what the City has done in this case.

## CLAIM FOR RELIEF

### FIRST CAUSE OF ACTION:
### Request for Declaratory Judgment

62.     Plaintiff restates and incorporates herein the allegations set forth above.

63.     The Court should issue a judgment declaring that the AULAs, or alternatively, all provisions in the AULAs that relate to gate assignments in Terminal C, are void and/or enforceable because Defendants violated the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b), by applying subjective factors relating to air carrier "routes" and "services" – such as perceived air carrier "fit," the offering of first class (split-cabin) service, the promise to provide a VIP airline lounge, and the commitment to a specific international route – in resolving the self-described "impasse" as to which air carriers would be allowed to occupy the brand new Terminal C at SAT.

64.     The laws that apply to a federally funded public airport are materially different than the laws that apply to other publicly accessible properties, such as an office building or a mall. For example, the Airline Deregulation Act of 1978 expressly prohibits an airport owner from giving preferential treatment based on the owner's desire for certain rates, routes, or services at its airport. Indeed, the Supreme Court has stated that the Airline Deregulation Act "is most sensibly read, in light of the [it]'s overarching deregulatory purpose, to mean 'States may not seek to impose their own public policies or theories of competition on regulation on the operations of an air carrier.'" *Am. Airlines v. Wolens*, 513 U.S. 219, 229 n.5 (1995). To prevent airport owners from disguising their regulation of airline rates, routes, and services, the Airline Deregulation Act requires airport owners to apply only reasonable, nonarbitrary, and nondiscriminatory standards, policies, practices, factors and rules. *See* 49 U.S.C. § 41713; *Am. Airlines v. DOT*, 202 F.3d 788

(5th Cir. 2000).

65.    Defendants' use of the Gate Assignment Criteria and Gate Scoring Worksheets to prefer one airline over another and establish the terms and conditions upon which an airline can serve SAT violates the Airline Deregulation Act, 49 U.S.C. § 41713(b) because it bases the allocation of terminal gate space on subjective preferences and criteria that are prohibited by the Act. Thus, under the Supremacy Clause, U.S. Const. art. VI, cl. 2, those acts are preempted.

66.    Congress enacted the Airline Deregulation Act in 1978, loosening economic regulation of the airline industry after determining that "maximum reliance on competitive market forces" would best "further efficiency, innovation, and lower prices." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384-87 (1992). Congress' "overarching goal" with regard to the Airline Deregulation Act was to help assure that transportation prices, routes and services reflected "maximum reliance on competitive market forces," thereby stimulating not only efficiency, innovation and low prices, but also variety and quality in transportation services. *Morales*, at 378.

67.    Under the Airline Deregulation Act, a local government that operates an airport may not apply a provision which relates to an air carrier "route" or "service." The statute provides:

> "Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, **regulation, or other provision having the force and effect of law related to a** price, **route, or service** of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1) (emphasis added)

68.    The Texas Legislature has deemed that executing airport leases are governmental acts. When City Council passed Ordinance 2024-09-12-0681 directing the City Manager to execute the AULAs, the AULAs acquired the force and effect of law. The AULAs incorporate, effect, ratify and implement the City's Gate Assignment Criteria and Gate Scorecards, which

violate the Airline Deregulation Act. Further the AULAs force Southwest to accept inferior airport facilities and prejudicial terms (regardless of whether Southwest is a AULA signatory) based on the City's unlawful preference for its competitors' services and routes.

69.    The Supreme Court in *Ginsburg* held that "rules" and "standards" should be considered along with laws, regulations, and other provisions having the force and effect of law. "While 'rule[s]' and 'standard[s]' are not mentioned in the current version of the statute, this omission is the result of a recodification that was not meant to affect the provision's meaning. Those additional terms were deleted as part of a wholesale recodification of Title 49 in 1994, but Congress made it clear that this recodification did not affect any 'substantive change.'" *Ginsberg*, 572 U.S. at 282.[2] Because removing the word "standard" was a non-substantive change, this Court—just as the *Ginsberg* Court did—should consider the City's "standards" in the Gate Allocation Criteria to be preempted to the same extent as other laws, regulations, or other provisions having the force and effect of law.

70.    In "operating an airport," a municipality may enter into a "contract, lease, or other arrangement" with a third party for a term not exceeding forty years, granting the third party the "privilege of using or improving the airport . . . ." Tex. Transp. Code § 22.021(a)(1). In entering the lease, the municipality "may establish the terms and fix the charges, rentals, or fees for the

---

[2] The prior version of the preemption clause provided that:

> No State or political subdivision . . . shall enact or enforce any ***law, rule, regulation, standard, or other provision having the force and effect of law*** relating to rates, routes, or services of any air carrier having authority under title IV of this Act to provide air transportation.

49 U.S.C. § 1305(a) (emphasis added). "In subsection (b)(1), the word 'rule' is omitted as being synonymous with 'regulation'. The words 'standard' and 'having authority' are omitted as surplus." 49 U.S.C. § 41713 (Pub. L. 103-272).

privileges . . . ." Id. § 22.021(b). The Legislature "specifically indicated **that a municipality's operation of an airport, including its entry into a lease agreement of that airport, is a governmental function**." *Hale v. City of Bonham*, 477 S.W.3d 452, 457 (Tex. App.—Texarkana 2015, pet. denied) (emphasis added); *see also City of Cleburne v. RT Gen., LLC*, 2020 Tex. App. LEXIS 9917, at *10 (Tex. App.—Waco Dec. 16, 2020, no pet.) ("[B]ecause the lease here involved the operation, construction, and maintenance of a hangar at the City's municipal airport, we hold that the City was performing a governmental function when it entered into the lease with RT General.").

71.     "A majority of the circuits to have construed 'service' have held that the term refers to the provision or anticipated provision of labor from the airline to its passengers and encompasses matters such as boarding procedures, baggage handling, and food and drink – matters incidental to and distinct from the actual transportation of passengers." *Cuomo*, at 223. *See Hodges v. Delta Air Lines, Inc.*, 44 F.3d 334, 336-38 (5th Cir. 1995) (en banc).  The term "services" "extend[s] beyond prices, schedules, origins and destinations."  *Id*. Moreover, Defendant Saenz and other city officials have all testified that airline VIP lounges are a service provided by the airlines.

72.     The City's application of the SAT Gate Assignment Criteria and Gating Scorecards (which are ultimately embodied in the AULA) to prefer Delta and American over Southwest clearly relates to airline "services" and resulted in a discriminatory set of terms imposed on Southwest as a condition for access to the airport.  The SAT Gate Assignment Criteria and Gating Scorecards expressly assess and weigh airline "service" in order to reach a binding decision on gate placement and economic terms: "The airline's service, growth, and experience." This is on its face a violation of the Airline Deregulation Act, which does not allow the Airport

to consider the nature of the "service" in deciding how to accommodate an airline at the Airport.

73.      In addition, giving priority or a better terminal space to an airline because it offers first class or airport lounges - or is deemed to be a superior "fit" with the locality - is a local provision that also relates to air carrier "service."  The SAT Gate Assignment Criteria states that a key factor in gate allocation is: "The airline's 'fit' into San Antonio."

74.      This "fit" factor is an especially blatant violation of the Airline Deregulation Act. Airports may not exercise their local authority in a way that gives better terminal space because of a subjective belief that the favored carrier is a better "fit" with the community.

75.      Nor may an airport afford priority or a better terminal space to an airline because they offer more international flights or flights to a specific destination, or to further away international destinations, as that is a local provision that relates to air carrier "routes."

76.      At its core, the manner in which an airport exercises its local authority to determine whether and how an airline is accommodated at a federally-funded airport cannot be predicated on the airport operator's subjective perception as to the carrier's "fit" into San Antonio, the nature of the passenger population ("business, leisure, mix, etc."), or the "airline brand position."

77.      As the owner and operator of SAT, the City is not free to use subjective criteria to choose one airline over another based on the desire of the municipal government decision makers.  Airports are not legally entitled to pick "winners and losers" among the airlines that serve to choose the Airport.  *See New York Airlines, Inc. v. Dukes County*, 623 F. Supp. 1435 (D. Mass. 1985) (allowing claims to proceed against airport for refusing to permit air carrier to provide service that other airlines were able to provide).  Yet that is exactly what Defendants have done here.  *See Southwest Airlines' future at San Antonio International up in the air*,

www.kens5.com ("'We want to create an environment where everyone is competitive and we understand that **not everyone can win** every time,' said Jesus Saenz, director of SAT") (emphasis added); Page 2 of Ex. 2    (describing how all other carriers' requests and needs were accommodated but telling Southwest to "make the most" of what it was given).

78.    Finally, the City cannot avail itself of the narrow "proprietary powers" exception to the Airline Deregulation Act's prohibition, in 49 U.S.C. § 41713(b)(3). "Courts have . . . recognized that local proprietors play an extremely limited role in the regulation of aviation." *Arapahoe County Public Airport Authority v. FAA*, 242 F.3d 1213, 1222 (10th Cir. 2001). *See also Am. Airlines, Inc. v. DOT*, 202 F.3d 788, 806 (5th Cir. 2000) ("courts have recognized that local proprietors play an 'extremely limited' role in the regulation of aviation").

79.    The City's application of subjective criteria is not the sort of "regulatory conduct related to safety and civil aviation needs [that] may fall under the 'proprietary powers' umbrella . . . ." *Id.* at 1214 (airport authority "failed to demonstrate that [its] ban" on passenger service was "necessary for the safe operation of the airport" or was "necessary to satisfy the public's civil aviation needs"). Under no circumstances can the limited "proprietary powers exception" be construed to authorize the City to make gate assignment decisions and set lease terms based on its subjective perception of the nature of the "service" offered by an airline or the "fit" between the airline and the City of San Antonio, or similar considerations. *See Legend Airlines, Inc. v. City of Ft. Worth*, 23 S.W.3d 83, 94-95 (Tex. App. 2000) (city's enforcement of regional airport bond ordinance restricting routes and services at Dallas Love Field to protect Dallas-Fort Worth Airport's competitive position was not a valid exercise of the city's "proprietary powers" and therefore was preempted by the Airline Deregulation Act). Moreover, even if the proprietary powers exception could apply (which it doesn't), "federal courts have repeatedly held that an

airport proprietor can issue only 'reasonable, nonarbitrary, and nondiscriminatory rules that advance local interest.'" *See Am. Airlines, Inc. v. DOT*, 202 F.3d 788, 806 (5th Cir. 2000). For the reasons stated above, Defendants used unreasonable, arbitrary, and discriminatory rules, standards, factors, and policies in violation of the Airline Deregulation Act when making its gate allocations in Terminal C.

80.    It is imperative that the Court issue a preliminary and permanent injunction preventing the enforcement of the current AULAs to preserve the status quo of the last peaceful state of affairs between the parties before the dispute while the Court considers Southwest's request for a judgment declaring that the Gate Assignment Criteria and Gating Scorecards used by Defendants and the resulting AULAs are preempted by the Airline Deregulation Act.

**SECOND CAUSE OF ACTION:**
**<u>Section 1983 Equal Protection Claim Against the City of San Antonio</u>**

81.    The Equal Protection Clause of the Fourteenth Amendment protects individuals from state governmental action that results in similarly situated individuals being treated differently. *John Corp. v. City of Houston*, 214 F.3d 573, 586 (5th Cir. 2000).

82.    Section 1983 "creates a private right of action for redressing violations of federal law by those acting under color of state law." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999)."[A] violation of equal protection occurs only when the government treats someone differently than others similarly situated; if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action—even if irrational—does not deny them equal protection of the laws." *Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988).

83.    Southwest is a member of a class of low-cost carrier airlines that cater to value-minded customers. The City's own documentation has stressed this difference and penalized

Southwest for its "single class cabin," "leisure travel product more than business," and "different boarding experience," compared with American's and Delta's split cabin, "club experience," and "commitment to club." No low-cost carrier airlines other than Southwest requested gate space in Terminal C.

84.    Alternatively, Plaintiff is a "class of one." The Supreme Court has recognized successful equal protection claims brought by a "class of one" where a plaintiff does not allege membership in a class or group, but rather alleges that, individually, it has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Here, other similarly situated airlines, and in particular American Airlines and Delta Airlines, were treated differently in the gating scorecard analysis, in defining "fit" into the City of San Antonio, and prioritizing luxury airline clubs and services.

85.    The Fifth Circuit "has rejected the argument that all 'class of one' equal protection claims require a showing of vindictive animus." *Mikeska v. City of Galveston*, 451 F.3d 376, 381 n. 4 (5th Cir. 2006). But even if animus is required, Defendants have demonstrated vindictive animus against Southwest by its well-documented decision to prioritize business travelers, split cabins, and airline clubs, and by its defamatory statements to City Council concerning Southwest.

86.    "The great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for naked transfers of wealth." *St. Joseph Abbey v. Castille*, 700 F.3d 154, 165 (5th Cir. 2012). Additionally, "although rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly

plausible basis for the law by adducing evidence of irrationality." *Id.* at 162.

87.    The City did not act rationally when excluding Southwest from Terminal C; therefore, its decision cannot pass rational basis review. Because the Airline Deregulation Act forbids the consideration of services and routes for all the reasons addressed above, the City's decision to bar Southwest from Terminal C is irrational and unlawful, denying Southwest equal protection of law.

88.    For the same reasons, Defendants' actions at issue in this litigation are not governmental decisions that by their nature involve discretionary decision-making based on subjective, individualized assessment. Rather, the Airline Deregulation Act lists criteria that is not amenable to subjective, individualized assessment, and Defendants' decisions exceeded their statutory authority.

89.    The City is liable to suit under Section 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Hampton Co. Nat'l Sur., LLC v. Tunica Cnty.*, 543 F.3d 221, 224 (5th Cir. 2008). The City Ordinance adopting the AULAs is an official action or imprimatur that establishes *Monell* liability. City Council is the official policymakers that had actual knowledge of the official action and affirmatively approved it. The official action violated Southwest's constitutional rights, causing Southwest damages.

### THIRD CAUSE OF ACTION:
### Promissory Estoppel Against the City of San Antonio and Defendant Saenz

90.    The City, by and through its agents, and Defendant Saenz repeatedly promised Southwest that it would be placed in Terminal C.

91.    Southwest reasonably and substantially relied on the promise to its detriment. Had Southwest known that the City would not keep its promise, Southwest would have negotiated for lease terms that would account for the funds necessary to revitalize Terminal A

and to ensure that Southwest would not shoulder the cost of a new terminal that it would not be allowed to use.

92.     Defendants knew that Southwest relied to its detriment on the promise that Southwest would be assigned gates in Terminal C. In fact, the City intentionally kept Southwest in the dark about its true plans so that Southwest would not interfere with AULA negotiations and would be forced to fund its competitors' use of Terminal C and accept inferior terminal facilities at unjust rates. Moreover, Southwest is further harmed by Defendants' conduct by having to pay increased non-signatory rates as it contests the validity and enforcement of the AULAs.

93.     The City has waived its immunity to suit by conduct. *Tex. S. Univ. v. State St. Bank & Trust Co.*, 212 S.W.3d 893, 908 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). Here, Defendants lured Southwest into believing that it would be placed in Terminal C for the City's own negotiating benefit, and to ensure that fees paid by Southwest could be used to fund Terminal C and to incentivize other airlines to operate VIP lounges, and is now is claiming that its own Director of Airports had no authority to do so.

94.     Southwest has also uncovered evidence that the City decided in the Summer of 2023 that Southwest would not be placed in Terminal C. Despite this decision, Defendants continued to promise Southwest until April 2024 that it would be placed in Terminal C for the City's own benefit. This egregious conduct is further evidence that Defendants have waived its immunity by its conduct.

## <u>PRAYER FOR RELIEF</u>

For the reasons set forth above, Plaintiff Southwest Airlines Co. respectfully requests that the Court:

1.      Pursuant to 28 U.S.C. § 2201, issue a judgment declaring that Defendants' use of their Gate Assignment Criteria and Gate Scoring Worksheets to deny Southwest the ability to execute a Lease for gate space at Terminal C is preempted under the Airline Deregulation Act, 49 U.S.C. § 41713(b) and are therefore void and/or unenforceable, because they base the allocation of terminal gate space on subjective preferences and criteria that are prohibited by the Act;

2.      Pursuant to 28 U.S.C. § 2201, issue a judgment declaring that Defendants' AULAs, which ratify, effectuate and implement the Gate Assignment Criteria and Gating Scorecards are preempted under the Airline Deregulation Act, 49 U.S.C. § 41713(b) and are therefore void and/or unenforceable, because they base the allocation of terminal gate space on subjective preferences and criteria that are prohibited by the Act;

3.      Alternatively, pursuant to 28 U.S.C. § 2201, issue a judgment declaring that the following Sections, Articles, and Exhibits of Defendants' AULAs, which ratify, effectuate, implement, and are affected by the Gate Assignment Criteria and Gating Scorecards are preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b) and are therefore void and/or unenforceable, because they base the allocation of terminal gate space on subjective preferences and criteria that are prohibited by the Act:

   a.   Sections 3.1 – 3.3

   b.   Section 3.14

   c.   Section 3.15

   d.   Exhibit G-1.3

   e.   Exhibit H

   f.   Article 8

g. Exhibit G

h. Section 8.2

i. Section 8.7

j. Article 5

k. Exhibit F

14. Pursuant to Rule 65, Fed. R. Civ. P., issue a preliminary injunction, and ultimately issue a permanent injunction against Defendants, enjoining them recognizing and enforcing the AULAs which are based on the Gate Assignment Criteria, the Gating Scorecards, and impermissible subjective preferences that are preempted by the Airline Deregulation Act;

15. Alternatively, pursuant to Rule 65, Fed. R. Civ. P., issue a preliminary injunction, and ultimately issue a permanent injunction against Defendants, enjoining them from recognizing and enforcing the following Sections, Articles, and Exhibits of the AULAs that are preempted by the Airline Deregulation Act:

a. Sections 3.1 – 3.3

b. Section 3.14

c. Section 3.15

d. Exhibit G-1.3

e. Exhibit H

f. Article 8

g. Exhibit G

h. Section 8.2

i. Section 8.7

j. Article 5

   k. Exhibit F

26. Damages suffered by Southwest due to Defendants' constitutional violations and false promises;

27. Attorneys' fees and costs; and

28. Award Plaintiff all other relief to which it is entitled under the law.

Dated: February 27, 2025

       Respectfully Submitted,


       **THE MORALES FIRM, P.C.**

       6243 W. Interstate 10, Suite 132
       San Antonio, Texas 78201
       Telephone No. (210) 225-0811
       Facsimile No. (210) 225-0821


       By: /s/ Lawrence Morales II
       Lawrence Morales II
       State Bar No. 24051077
       lawrence@themoralesfirm.com
       Allison S. Hartry
       State Bar No. 24083149
       ahartry@themoralesfirm.com


       **CLARK HILL PLC**

       Mark Sessions
       Texas Bar No.18039500
       Forest M. "Teo" Seger III
       Texas Bar No.24070587
       Charles Hayes
       Texas Bar No. 24116496
       2301 Broadway Street
       San Antonio, TX 78215
       Tel. (210) 250-6162
       Email: msessions@clarkhill.com
       tseger@clarkhill.com
       chayes@clarkhill.com

M. Roy Goldberg
1001 Pennsylvania Avenue N.W.
Suite 1300 South
Washington, D.C. 20004
Tel. (202) 552-2388
Email: rgoldberg@clarkhill.com
(Admitted *Pro Hac Vice*)

**Counsel for Plaintiff Southwest Airlines Co.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 27 2025, I caused a true and accurate copy of this document to be served on all counsel by filing it through the court's electronic filing system

*/s/ Lawrence Morales II*
Lawrence Morales II