=======================================================
**Summary of Decision-Making Process for
Post-DBO Gate & Club Locations**
=======================================================

### Teams Involved:

- COSA ESC
- SAT Finance Team
- SAT AULA Team
- SAT TDP Team
- SAT Legal Team
- Executive Program Manager (EPM)
- Master Architect (MA)

### Factors Considered Included:

- Number of preferential gates requested by airline
- Whether an airline club was requested
- Whether airline operates or commits to operating international routes
- Whether airline has relevant code share arrangement(s)
- Current level of enplaned passengers @ SAT
- The airline's "fit" into San Antonio
- The airline's service, growth, and experience
- The existence of a written commitment by airline to city pairs, specific flights, or minimum levels of enplaned passengers
- Potential need by airline for appurtenant City Gates (for expansion)
- Terminal load-balancing considerations

### Process Employed:

Each airline with a significantly large market share at SAT was assessed utilizing a "Gating Placement Analysis Worksheet" which considered a variety of relevant factors. The scoring worksheet was reviewed by member(s) of the SAT Finance Team, the SAT AULA Team, the EPM, and the SAT Legal Team. A score was assigned to each large airline and the airlines were ranked (*i.e.*, 1-4).

The EPM, the MA, and a member from each of the SAT AULA team and the SAT TDP team reviewed and considered certain non-quantifiable considerations, among which were the carriers' "fit" into San Antonio (relating to desirability of passenger profile (business, leisure, mix, etc.) and airline brand position (network, ULCC, established, start-up, etc.); the airlines "service, growth and experience" (which included an analysis of the airline's overall reasonable growth potential and commitment to SAT, aspirations for international flights, and any differentiation of product or technology used that would enhance customer experience); and the possible need for appurtenant City Gates (consideration included the potential for a carrier to grow incrementally beyond its preferential gates and/or for the use of City Gates for RON aircraft, and the availability of usable City Gates for IROPs).

The analysis then turned to broad-based terminal load balancing considerations.  In assessing such matters, the reviewers assessed the airport's operations as a whole and determined what was advisable from an airport-wide balancing viewpoint.  Among the areas for consideration were impacts upon baggage make up area, the BHS, the airport roadway system, the passenger and commercial curbs, and the ticketing lobby.



**Exhibit 3**

**Summary of Decision:**

The first component of the decision-making process was to examine airline club requests, as the requests for airline clubs were valuable to the airport/city for potential customer experience, represent a fixed financial commitment by the airline, and are a unique challenge with respect to available space/siting options. The two largest club requests (AA and DL) could only reasonably be accommodated by siting within new Terminal C. Those two airlines (AA and DL) combined requested 11 preferential gates. One of those two airlines had potential need to be placed next to an FIS-connected gate (DL) due to a relevant code share arrangement. Assigning those two airlines (AA and DL) to Terminal C took 11 of 11 domestic gates to be constructed within the new Terminal and left the 6 FIS-equipped gates in the new Terminal available for international operations and/or iterant (per turn) use by other airlines (with international arrivals receiving priority).

Another airline requested a club but with a smaller footprint than the other two airlines (UA). That airline (UA) requested 6 gates. With no space left in C to locate a club, it was analyzed whether it was more reasonable to leave that airline (UA) in Terminal B where its existing club is located or move it to Terminal A where a new club would have to be constructed. Relocating that airline and constructing a new club in Terminal A would be costly. It was estimated that it would cost approximately $2m for relocating the gates and offices and another $7m for construction of the club itself. In addition, it was estimated that it would cost another $20m for "bumping out" the structure to accommodate the club. Therefore, it was determined that the most reasonable approach was to leave that airline (UA) in Terminal B. Since such airline (UA) requested 6 preferential gates, hat left 2 of the 8 gates available in Terminal B. Given Spirit Airlines' (NK) request for one preferential gate and its expected growth, it was reasonable to assign NK to 1 preferential gate in Terminal B with the expectation that it could grow incrementally and potentially use the 1 remaining gate which is to remain as a City Gate.

As noted, when the two airlines that requested large clubs (AA and DL) were sited in Terminal C, 11 of the 17 gates were assigned. Further, the 6 remaining gates are to be FIS-equipped and it would be inadvisable to assign such gates to an airline that has a high utilization rate of their gates. Thus, the 6 FIS-gates are planned to be used primarily as international arrival gates and, potentially, for incremental growth for the other airlines in Terminal C or for IROPs.

The fourth large airline (WN) requested 10 preferential post-DBO gates. Notably that airline (WN) does not have an airline club as part of its offerings.

When scenarios were assessed with having WN either on Terminal C or Terminal B, given its high level of passenger throughput, concerns arose over terminal load balancing. One such scenario was siting WN on Terminal B (8 gates) with some utilization of Terminal C gates. With DL and AA in Terminal C, adding WN to that side of the airport would overload the Terminal C baggage system, the terminal roadway/curb and security checkpoint. Further, concerns existed regarding WN's utilization of FIS-equipped gates and the potential for disruption of their schedule/operation with international flights (which would necessarily have priority over WN's domestic operations).

Thus, the most reasonable overall solution was to site WN in Terminal A. It was acknowledged that the width of Terminal A was less than ideal. However, the holdrooms in Terminal A are to be substantially enlarged to accommodate the aircraft that use them (*e.g.*, 737-800s), and the interior is to be refurbished to match the look and feel of the new terminal facilities. Of note is that a large number of RON spaces will be a part of the post-DBO Terminal A which should aid WN's morning and late-night operations. Further, it was thought that the airport could partner with WN to "make the most" out of the airlines' substantial and focused use of Terminal A.

Low frequency and/or non-signatory airlines are to be assigned to Terminal A as well (noting that the GLF gate will be fully operational at DBO as well.

2

