**IN THE UNITED STATES DISTRCT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| SOUTHWEST AIRLINES CO., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:24-cv-01085-XR |
| | ) | |
| THE CITY OF SAN ANTONIO, TEXAS and | ) | |
| JESUS SAENZ, in his official capacity as | ) | |
| Director of Airports for the City of San | ) | |
| Antonio, Texas, | ) | |
| Defendants. | ) | |

_____ )

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

The laws that apply to a government-owned airport are different than the laws that apply to other publicly accessible properties, such as an office building or a mall. While most property owners may consider a potential tenant's prices or services when deciding to whom it will lease its property, the Airline Deregulation Act of 1978 (the "ADA") limits when a government-owned airport may give preferential treatment based on its desire for certain airline prices, routes, or services. Indeed, the Supreme Court has stated that the ADA "is most sensibly read, in light of the [Act]'s overarching deregulatory purpose, to mean 'States may not seek to impose their own public policies or theories of competition on regulation on the operations of an air carrier." *Am. Airlines v. Wolens*, 513 U.S. 219, 229 n.5 (1995). Consequently, while a mall owner may decide to lease its most coveted property exclusively to luxury brands that cater to wealthy customers, a government-owned airport may not enact or enforce a provision having the force and effect of law that prefers airlines that offer luxury services or international routes over airlines that do not. *See* 49 U.S.C. § 41713(b)(1).

It is hardly surprising that Defendants do not contest whether the standards in their Gate

Assignment Criteria and Worksheets (*see* DKT. NO. 57-1, 57-2, and 57-3) "relate to" air carrier routes and services. They quite obviously do. On their face, the standards reward American and Delta because they offer certain luxury services and aspire to offer certain routes, and punish Southwest because it does not offer these services or routes. *Id.* Yet, Defendants claim that their application of the standards in the Gate Assignment Criteria and Worksheets are not preempted because they do not have the "force and effect of law" and because the City was exercising its proprietary powers when it applied those standards. If that were true, government airports could easily regulate rates, routes, and services in contravention of the ADA. Let us walk through a few scenarios that demonstrate the absurdity of Defendants' arguments:

- Suppose the City passed an ordinance that required airlines, as a condition of operating at the airport, to offer VIP lounges, first/business-class cabins, and non-stop flights to Washington, D.C. (the "Government-Preferred Services and Routes"). Would the ADA preempt the ordinance? Certainly.[1]

- Now, suppose the City passed an ordinance that required airlines, as a condition of being assigned gates in the coveted new terminal at the airport, to offer the Government-Preferred Services and Routes. Would the ADA preempt the ordinance? Again, certainly.[2] It makes no difference that the ordinance conditions access to a new terminal, rather than to the entire airport, to airlines that offer the Government-Preferred Services and Routes.

- Now, suppose the City tried to accomplish the same result as the two ordinances above (*i.e.*, getting airlines to offer the Government-Preferred Services and Routes) by—instead of passing an ordinance—applying "factors" that reward airlines to such an extent that an airline can only be assigned gates in the new terminal if it provides the Preferred Services and Routes. Does the City escape ADA preemption simply by enacting and enforcing factors, rather than an ordinance, that accomplish the same goal of favoring the Government-Preferred Services and Routes? Of course not.[3]

---

[1] *See Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641(2013) (holding that the preemption clause in the Federal Aviation Administration Authorization Act of 1994—which is nearly identical to the ADA's preemption clause—preempted an ordinance requiring motor carriers to display placards on their trucks and submit a parking plan as a condition of offering trucking services to the Port of Los Angeles).

[2] *See id.*

[3] *See Cardinal Towing v. City of Bedford*, 180 F.3d 686, 692 (5th Cir. 1999) ("Thus, attempts by government entities to punish labor and benefits practices they disfavor by withholding contract work have been found preempted by the NLRA and ERISA."); *see also Morales v. TWA*, 504 U.S. 374, 391 (1992) (holding that the ADA preempted "guidelines" of the National Association of Attorneys General); *American Airlines, Inc. v. DOT*, 202 F.3d 788, 811

If the Court accepts Defendants' arguments, government-owned airports would easily be able to circumvent the ADA's preemption clause simply by using "gatekeeping" standards, rather than ordinances, to regulate airline prices, routes, and services. Any such result would be inconsistent with the ADA and is foreclosed by binding precedent. Further, if the Court accepts Defendants' proprietary powers argument, the proprietary powers exception would swallow the general rule of ADA preemption. If a government-owned airport could escape ADA preemption simply by making a self-serving claim that it was using the otherwise-preempted standards to address any local concern (even though, as is the situation here, that claim is directly contradicted by documents showing the airport's real motivation is to encourage certain luxury airline routes and services), then government airports would have free rein to regulate airline routes and services in contravention of the ADA. This result is also foreclosed by binding precedent.

## <u>STANDARD OF REVIEW</u>

When evaluating a motion to dismiss, the Court's task is "to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success*." Lone Star Fund v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). A claim has facial plausibility when the pleaded facts allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Because this standard is so easily satisfied, motions to dismiss "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

---

(5th Cir. 2000) (holding that the ADA preempts airline use agreements because they were "an impermissible attempt to regulate in an area where the federal government has preempted state regulation").

## ARGUMENTS AND AUTHORITIES

**A.    The Court Should Deny Defendants' Motion Regarding Southwest's Claim for Declaratory Relief.**

Before the ADA, the Federal Aviation Act of 1958 employed the Civil Aeronautics Board to regulate the interstate airline industry. "Pursuant to this authority, the Board closely regulated air carriers, controlling, among other things, routes, rates, and services." *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 289 (2014). In 1978, Congress enacted the ADA to promote efficiency, innovation, and low prices in the airline industry through "maximum reliance on competitive market forces and on actual and potential competition." *See* 49 U.S.C. §§ 40101(a)(6), (12)(A). To ensure that states and localities "would not undo federal deregulation with regulation of their own," the ADA includes a preemption clause, which states that a state and a political subdivision of a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier…." *Id*. at 41713(b)(1).

Defendants do not even attempt to claim—nor could they—that the Gate Assignment Criteria and Worksheets do not "relate to" air carrier services and routes. *See Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 384 (1992) (broadly interpreting "relating to" in the ADA's preemption clause). Indeed, the factors applied by Defendants in the Gate Assignment Criteria and Worksheets expressly reference international and city-pair "routes," VIP airline lounges (which Defendants concede are an airline "service"),[4] and first/business-class cabins (which the Supreme Court has recognized are "services" under the ADA). *See Am. Airlines v. Wolens*, 513 U.S. 219, 226 (holding that "higher service categories" like flight upgrades are connected to airline services). Because the Gate Assignment Criteria and Worksheets are "connected to and reference" airline

---

[4] *See, e.g.*, Saenz Dep. 87:7-9 (Q: "Would you agree with me that airline clubs are a service that an airline offers to passengers?" A: "Yes, sir."); O'Krongley Dep. 77:11-78:3 (Q: "And you would agree – agree with me that Delta's Sky Club is a service that Delta provides to some of its passengers?" A: "Yes.").

routes and services, Defendants can only argue that the Gate Assignment Criteria and Worksheets do not have "the force and effect of law," and that even if they do, they fall within "the proprietary powers and rights exception" in 49 U.S.C. § 41713(b)(3). Defendants are wrong on both counts.

1.    **Defendants' Gate Assignment Criteria and Worksheets Are "Other Provisions" Having the Force and Effect of Law.**

When the ADA was first enacted in 1978, its preemption clause also expressly applied to "rule[s] and standard[s]." *See Northwest*, 572 U.S. at 282. Although "rules and standards" are not mentioned in the current version of the statute, the Supreme Court has held that "this omission is the result of recodification that was not meant to affect the provision's meaning." *Id*. "Congress made it clear that this recodification did not effect any 'substantive change.'" *Id*. Therefore, the ADA's preemption provision is not limited to laws enacted by a legislative body and regulations issued by a government agency. *Id*. The ADA's preemption clause also applies to other rules and standards that have the "force and effect of law." *Id*. at 283.

A provision has the "force and effect of law" if it is an official, government-imposed policy prescribing binding standards of conduct. *Id*. For example, in *Northwest*, the Supreme Court held that the ADA preempted a state common-law claim because the common law is a standard imposed on the parties without their agreement and "the ADA's deregulatory aim can be undermined just as surely by a state common-law rule as it can by a state statute and regulation." *Id*. In contrast to government-imposed policies, contractual commitments voluntarily undertaken generally do not have the "force and effect of law." *Wolens*, 513 U.S. at 219. The Fifth Circuit, however, has held that even contractual commitments in an airline use agreement are preempted by the ADA when they are "an impermissible attempt to regulate in an area where the federal government has preempted state regulation." *American Airlines, Inc. v. DOT*, 202 F.3d 788, 811 (5th Cir. 2000).

a.  **The Standards in the Gate Assignment Criteria and Worksheets Are Government-Imposed Standards, Not Contractual Commitments Voluntarily Undertaken.**

The Supreme Court first recognized the distinction between a "contractual commitment" and a "government-imposed policy" in *Wolens* when it held that the ADA did not preempt a customer's breach-of-contract claim because the claim was based on the terms of a Frequent Flyer Program, which "were contractual commitments voluntarily undertaken" by American Airlines and not "official government-imposed policies prescribing binding standards of conduct." *Id*. at 232-233.

Here, the standards in Defendants' Gate Assignment Criteria and Worksheets were not "contractual commitments voluntarily undertaken" by Southwest; indeed, Defendants did not disclose the standards in the Gate Assignment Criteria and Worksheets until after they used them to make their gating decision. *See* DKT. 57 at ¶ 38. Unlike in *Wolens*, where American claimed the ADA preempted enforcement of the terms of its own program, Southwest is claiming that the ADA preempts the standards in Defendants' Gate Assignment Criteria and Worksheets, which Defendants involuntarily imposed on Southwest. Southwest has refused to sign the AULAs that memorialize Defendants' gating decision, yet Southwest still suffers from the "official government-imposed policies" in Defendants' Gate Assignment Criteria and Worksheets that prescribed certain standards of conduct favoring airline services and routes preferred by Defendants. These standards undermine the ADA's deregulatory purpose just as surely as a statute that conditions access to the new terminal on an airline offering the services and routes preferred by Defendants. Because the standards in Defendants' Gate Assignment Criteria and Worksheets reflect "state-imposed regulation of air carriers" in an area where the federal government has preempted state regulation and are not "contract terms set by the parties themselves," they are

preempted by the ADA. *See Wolens*, 513 U.S. at 222; *see American Airlines*, 202 F.3d at 811.

### b. Southwest Alleges that Defendants' Application of the Standards in the Gate Assignment Criteria and Worksheets Is a Regulatory Act.

Defendants' reliance on *Cardinal Towing & Auto Repair Inc. v. City of Bedford* is misplaced and supports the denial of Defendants' Motion. *See* DKT. 58 at pp. 4-5. In *Cardinal Towing*, a city passed an ordinance that required all non-consensual tows be handled by the recipient of a city contract. *See* 180 F.3d 686, 689 (5th Cir. 1999). When Cardinal Towing was not awarded the contract, it sued the city requesting a declaratory judgment that the contract specifications constituted regulations related to the price, route, or service of a motor carrier, and were thus preempted under a preemption clause nearly identical to the ADA. The city moved for summary judgment, arguing that the ordinance and contract specifications were designed only to procure city-needed services (namely, the efficient towing of cars off city streets), not to regulate the conduct of others. *Id*. at 691. According to the city, "[s]uch innocuous market participation" did not have the force and effect of law. *Id*. The Fifth Circuit agreed, recognizing a "distinction between regulation and actions a state takes in a proprietary capacity—that is to say, actions taken to serve the government's own needs rather than those of society as a whole." *Id*.

In drawing the line between regulatory acts that have the force and effect of law and proprietary acts that do not, the Court explained, "States have methods of influencing private conduct unrelated to the state's proprietary functions—and thus potentially disrupting a congressional plan—at their disposal that extend beyond traditional overt regulation." *Id*. "One such method is deployment of a state's spending power in a manner calculated to encourage or discourage such private behavior." *Id*. Therefore, "attempts by government entities to punish . . . practices they disfavor by withholding contract work have been found preempted …." *Id*. at 692. Because the city passed the towing ordinance and created bid specifications to procure services

that the city itself needed—towing cars off streets—rather than serving societal goals, the ordinance and specifications were not preempted. *Id*. at 697.

Here, Defendants have apparently made a determination that it is better for the community "as a whole" if the new terminal is a first-class luxury experience complete with VIP lounges and that is limited to airlines that offer first-class cabins and that cater to business passengers. *See* DKT. 57 at ¶¶ 3-4, 7, 28-29, 33-35.[5] To accomplish their desired societal goal, Defendants crafted and applied the standards in their Gate Assignment Criteria and Worksheets that, on their face, reward airlines that offer luxury services and punish airlines that do not. *Id*. at ¶¶ 3-4, 7, 38-40; *see also* DKT. 57-1, 57-2, and 57-3. The Gate Assignment Worksheets award Delta and American extra points because they offer services and routes Defendants prefer (VIP lounges, appeal to business passengers, first-class/business cabins, and international routes), and deduct points from Southwest because it offers services deemed less desirable (appeal to leisure passengers, single-class cabins, and different boarding experience). *Id*. Defendants' efforts to use their gate assignment standards to encourage certain luxury airline services are not abstract or pedestrian; Defendants actually conditioned Delta's access to the new terminal on its commitment to build and operate a VIP lounge.[6]

Unlike the city in *Cardinal Towing*, Defendants here did not enact and apply the standards in their Gate Assignment Criteria and Worksheets to procure luxury services for its own city needs—the City of Bedford needed cars towed off its streets; Defendants cannot similarly claim that it needs luxury airline services in the new terminal for its own use. Rather, Southwest alleges

---

[5] Of course, whether the community's interests are actually served by Defendants' insistence on these luxury airline services is questionable because community surveys reveal the public has minimal interest in VIP airline lounges and Southwest—which does not offer these services—has earned the largest market share at SAT. *See id*. at ¶¶ 6-7, 22, 28-29.

[6] *See id*. at ¶ 7 ("[T]he City agreed to assign Delta to the new terminal only if Delta agreed to build a VIP club."); ¶ 34 ("Delta informed Defendants that it received approval to build a SkyClub, but only if it was assigned to Terminal C.").

Defendants applied the standards in their Gate Assignment Criteria and Worksheets to encourage airlines to provide luxury services based on Defendants' unsupported societal goal. Thus, the standards in Defendants' Gate Assignment Criteria and Worksheets fall comfortably on the regulatory side of the line drawn in *Cardinal* because they constitute deployment of the City's power "in a manner calculated to encourage or discourage . . . private behavior." *See Cardinal*, 180 F.3d. at 691. Therefore, Defendants' application of their gating standards is a regulatory act that has the force and effect of law. *See* 180 F.3d at 692.

### c. Alternatively, the Conflicts in Defendants' Gating Assignment Explanations Preclude Dismissal of Southwest's Preemption Claim.

Even if the Court is not persuaded that the standards in Defendants' Gate Assignment Criteria and Worksheets necessarily have the force and effect of law, Southwest's allegations concerning the conflicting explanations from Defendants regarding the rationale for their gating assignments preclude the dismissal of Southwest's declaratory judgment claim. Under *Cardinal Towing*, the first question in determining whether government action is proprietary or regulatory is whether the challenged action (here, the application of the standards in Defendants' Gate Assignment Criteria and Worksheets) reflects the City's own interest in efficient procurement of needed goods and services. *Id*. at 693. Defendants claim that the answer is "yes" because the "gating allocation decision was based on the future space needs that the airlines reported to the City and the need to balance passenger loads so as not to overload curb, baggage, and security screening areas." DKT. 58 at p.3. However, when evaluating a motion to dismiss, the Court does not accept as true Defendants' self-serving rationale for their gating decision; rather, the Court must accept as true the allegations of the non-moving party, Southwest. *Lormand*, 565 F.3d at 232.

Defendants have repeatedly contradicted themselves when explaining the basis for their gating decision. *See* DKT. 57 at ¶¶ 2-4. Defendants have represented that the factors in the Gate

Assignment Criteria and Worksheets "such as fit – the softer factors, really they didn't play into it. They weren't factors. They weren't applied. They weren't used." *See* DKT. 57 at ¶ 2. However, in its Complaint, Southwest identifies documents and testimony showing that Defendants indeed relied on the "softer" factors in the Gate Assignment Criteria and Worksheets, and that such factors were used to break an "impasse" among City officials concerning gate assignments in the new terminal. *Id*. at ¶¶ 3-4.

When the allegations in Southwest's Complaint are accepted as true, the answer to the first *Cardinal Towing* question is "no" because the challenged action (the application of the standards in the Gate Assignment Criteria and Worksheets) does not reflect or even support the City's own stated interests of load balancing. Unlike in *Cardinal*, the allegations in Southwest's Complaint raise a strong "indication" that, by applying the standards in the Gate Assignment Criteria and Worksheets, Defendants were intending to generally encourage certain luxury airline services and routes and were not addressing their own purported interest in achieving efficient balancing. Therefore, Southwest's factual allegations preclude dismissal of its declaratory judgment claim.

### 2. Defendants Cannot Meet Their Burden of Showing Entitlement to the Proprietary Powers and Rights Exception.

Defendants next argue that, even if their application of the standards in their Gate Assignment Criteria and Worksheets has the force and effect of law, there is still no preemption under the ADA because their gating decision falls within the proprietary powers and rights exception. *See* DKT. NO. 58 at p. 9-13. Notably, Defendants have the burden of establishing the applicability of the "proprietary powers and rights" exception based solely on the face of Southwest's Complaint. *See EEOC v. E. Airlines*, 645 F.2d 69, 69 (5th Cir. 1981) ("The one claiming the benefits of an exception to a statutory prohibition has the burden of proving the applicability of that exception."). Defendants do not meet this burden.

"Although dismissal under rule 12(b)(6) may be appropriate based on a successful affirmative defense, that defense must appear on the face of the complaint." *Kelly v. Nichamoff*, 868 F.3d 371, 374 (5th Cir. 2017). "Thus, a defendant seeking dismissal based on an affirmative defense bears the burden of establishing entitlement to the defense based solely on the facts of the complaint." *Id*. "If it is possible, based on the allegations in the complaint, that the defendant is not entitled to the affirmative defense then the defendant will fail to carry his heavy burden of establishing entitlement to the affirmative defense." *Id*.

Section 41713(b)(3) states that the ADA's preemption provision does not limit a political subdivision of a State "from carrying out its proprietary powers and rights." Although the statute does not define "proprietary powers and rights," the exception originates from an "airport operator's potential liability for—and, thus, right to mitigate—noise damage" and other potential sources of liability to its neighbors in its capacity as a landowner.[7] Therefore, courts have generally limited the exception to "reasonable rules pertaining to the permissible level of noise or other dangers which can be caused by aircraft using the airport." *See Western Air Lines, Inc. v. Port. Auth. of NY & NJ*, 658 F. Supp. 952, 957. (S.D.N.Y. 1986); *Am. Airlines*, 202 F.3d at 806 (stating "local proprietors play an 'extremely limited' role in the regulation of aviation.").

Defendants contend that the proprietary powers exception is, as a matter of law, broad enough to cover their application of gating standards that directly reflect their preference for certain air carrier routes and services. According to Defendants, because Southwest acknowledges that the City is the owner of the airport, the proprietary powers exception necessarily permits them to take any action whatsoever relating to airline prices, routes, and services, even if the action is

---

[7] *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 149 (2d Cir. 2016); *San Diego Unified Port Dist. v. Gianturco*, 651 F.2d 1306, 1316-17 (9th Cir. 1981) ("Since airport proprietors bear monetary liability for excessive aircraft noise . . . , fairness dictates that they must also have power to insulate themselves from that liability.").

unreasonable, arbitrary, and discriminatory. If the Court accepts Defendants' argument, the proprietary powers exception would swallow the ADA's general preemption rule because every government-owned airport could directly regulate airline prices, routes, and services under the guise of addressing some local concern. The Fifth Circuit has cautioned against interpreting the proprietary powers and rights exception so broadly. *See Am. Airlines*, 202 F.3d at 807 ("We fear that under the rationale of *Arapahoe*, virtually any regional regulation enacted by a proprietor would fall within the proprietary powers exception. This would expand the regulatory role of municipal owners far beyond the 'extremely limited role' envisioned by the ADA.'").[8]

The proprietary powers exception does not apply just because, as Defendants suggest, the City owns the San Antonio Airport, or because an out-of-circuit district court held, after a trial on the merits, that a government airport was permitted to enforce a perimeter rule when its purpose was to reduce ground congestion and balance flights in an area served by multiple airports owned by the same proprietor. *See* DKT. 58 at p. 10 (citing *W. Airlines Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222, 226 (2d Cir. 1987)) and p. 12. Contrary to Defendants' argument otherwise, *Western Airlines* does not support a universal holding that perimeter rules always fall within the proprietary powers exception; indeed, at least one other court has struck down a perimeter rule when there was no connection between nearby airports.[9]

Instead of allowing government airports to unilaterally opt into the proprietary powers exception as the City attempts to do here, the Fifth Circuit, in evaluating whether government

---

[8] Notably, the only court case that Defendants cite in support of their argument that the proprietary powers and rights exception applies to their gating assignments is an out-of-circuit district court case that is on appeal in which the airline did not contest that the challenged government actions were intended to address volume and access issues at the airport. *See* DKT. 58, MOTION TO DISMISS, at p. 12 (citing *Delux Public Charter, LLC v. County of Westchester* 2024 U.S. Dist. LEXIS 115642, at *4 (S.D.N.Y. 2024)).

[9] *See Houston v. FAA*, 679 F. 2d 1184 (5th Cir. 1982) (discussing *Pacific Southwest Airlines v. County of Orange*, No. CV 81-3248 (C.D. Cal. Nov. 30 1981) ("A local airport with no connection to nearby Los Angeles International or Ontario Airports, [the proprietor] could not blithely take such an action upon itself.")).

action is preempted, asks whether the government was acting as a regulator by advancing general societal goals or as a proprietor by addressing some local concern at the airport. *See Cardinal Towing*, 180 F.3d at 692. "Courts have found preemption when government entities seek to advance general societal goals rather than narrow proprietary interests through the use of their contracting power." *Id*. Therefore, to prevail on its "proprietary powers" affirmative defense at the motion to dismiss stage, Defendants must show that the allegations in Southwest's Complaint establish as a matter of law that the standards in their Gate Assignment Criteria and Worksheets were intended to address a narrow proprietary issue concerning load balancing rather than to advance their unsupported societal goal of limiting the new terminal to airlines that offer luxury services catered toward business passengers. *See Kelly v. Nichamoff*, 868 F.3d at 374. Defendants cannot meet this burden.

Southwest alleges that Defendants crafted and applied the standards in their Gate Assignment Criteria and Worksheets to further their goal of obtaining certain routes and luxury airline services at the new terminal, and not to address a local concern related to load balancing. *See* DKT. 57, at ¶¶ 3-4, 7. Southwest alleges, and cites supporting documents, that Defendants intended from the beginning to isolate low-cost carriers, like Southwest, to the functionally obsolete Terminal A. *See* DKT. 57, at ¶ 7. Southwest alleges that, even though community surveys reveal minimal interest in VIP lounges, Defendants prioritized lounges in their new terminal design and gate assignment process. *Id*. Southwest alleges that Defendants penalized Southwest because it offers a "leisure travel product more than business," single cabin service, and a different boarding experience, even though these services do not impact load balancing. *Id*. at ¶¶ 4, 40, 42-43. Because Defendants cannot show, based solely on the allegations in Southwest's Complaint, that

they are entitled to the proprietary powers exception as a matter of law, they fail to meet their heavy burden and their Motion should be denied. *See Kelly*, 868 F.3d at 374.

>    **3.    Even if the Proprietary Powers Exception Applies, the Court Should Still Deny the Motion Because Southwest's Allegations Plausibly Show That the City's Gating Standards Were Unreasonable, Arbitrary, and Unduly Discriminatory.**

Defendants ask this Court to declare that they have a free pass to make any decision they want at the airport so long as they state that they were acting pursuant to their proprietary powers when doing so. Although Southwest denies that Defendants' gating decision was proprietary, even if it is, the inquiry cannot end there. The Fifth Circuit—along with every other circuit court to consider the issue—has plainly held Defendants' position is contrary to law. "In defining the permissible scope of a proprietor's power to regulate under § 41713(b)(3), federal courts have repeatedly held that an airport proprietor can issue only 'reasonable, nonarbitrary, and nondiscriminatory rules that advance the local interest.'" *Am. Airlines*, 202 F.3d at 806 (citing *Nat'l Helicopter Corp. of Am. v. City of N.Y.*, 137 F.3d 81, 87 (2d Cir. 1998)); *British Airways Bd. v. Port Auth. of N.Y.*, 558 F.2d 75, 81 (2d Cir. 1977)). As the Tenth Circuit has succinctly held, a local government law can only get past preemption "if it is an exercise of proprietary powers" *and* if "such exercise is reasonable, nondiscriminatory, nonburdensome and not in conflict with the Airline Deregulation Act, and thus exempted from preemption by 49 U.S.C. § 41713(b)(3)." *Arapahoe Cty.*, 242 F.3d at 1222; *see also City & County of San Francisco v. FAA*, 942 F.2d 1391, 1395 (9th Cir. 1991), *cert. denied*, 503 U.S. 983 (1992).

Not only do Defendants invite this Court to ignore this binding authority, they also ask this Court to ignore federal regulations. 14 C.F.R. § 399.110(f) clarifies that the proprietary powers exception only applies "when such exercise is reasonable, nondiscriminatory, nonburdensome to interstate commerce, and designed to accomplish a legitimate State objective in a manner that does

not conflict with the provisions and policies of the Act."[10] *Id.* It is ironic that Defendants ignore this clear FAA directive while citing three FAA decisions in ostensible support of the City's unbridled ability to exercise its proprietary powers. Even more ironically, those three decisions also recognize that a proprietor cannot act discriminatorily or unreasonably. *See, e.g.*, *Santa Monica Airport Ass'n v. City of Santa Monica*, FAA Docket No. 16-99-21, Final Decision and Order, 2003 WL 1963858 *10 (F.A.A. Feb. 4, 2003) (noting that the FAA requires airports to "operate in a manner consistent with their Federal obligations and the public's investment in civil aviation," including "mak[ing] the facilities available on fair and reasonable terms without unjust discrimination"); *Ricks v. Greenwood-Leflore Airport*, FAA Docket No. 16-09-04, Director's Determination, 2011 FAA LEXIS 37 (Jan. 24, 2011) (requiring airports to act reasonably and avoid "unjust discrimination"); *JetAway Aviation, Inc. v. Montrose Cnty.*, FAA Docket No. 16-08-01, Director's Determination, 2009 FAA LEXIS 251 (July 2, 2009) (same). FAA regulations and decisions make clear that Defendants' position is flawed: even if Defendants acted within their proprietary powers, the exercising of those powers must be "reasonable, non-discriminatory, . . . and designed to accomplish a legitimate State objective in a manner that does not conflict with the provisions and policies of the Act." 14 C.F.R. § 399.110(f).

Because Defendants pretend these obligations do not exist, they do not even attempt to show that their actions were reasonable, non-discriminatory, and aligned with the requirements of the ADA. Southwest's Complaint asserts numerous factual allegations demonstrating that Defendants' Gate Assignment Criteria and Worksheets are unreasonable, unjustly discriminatory,

---

[10] Defendants do not cite this federal regulation at all in their Motion and therefore do not argue that the FAA's rulemaking is no longer entitled to deference. Such an argument would fail in any event, because the Supreme Court in overruling *Chevron* made clear that prior caselaw applying and interpreting agency rulemaking "are still subject to statutory stare decisis despite the Court's change in interpretive methodology." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) (citing *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984)).

and in violation of the ADA. Instead of relying on legitimate criteria, Defendants' Gate Assignment Criteria and Worksheets included the "desirability of passenger profile," "split cabin," and "club experience" (which they considered separately from the architectural need to plan for club space). Dkt. 57 ¶¶3-4. The City's Airport Assistant Director has also admitted under oath that these factors were outcome-determinative, getting the City past the "impasse" created when the City considered only objective factors. *Id.*

Even Defendants' preferred citation for proprietary powers decided the precise question Defendants claim does not exist: "whether the addition of the defined term in the 2005 Law was reasonable, nonarbitrary and non-discriminatory." *Delux*, 2024 U.S. Dist. LEXIS 115642, at *22. Unsurprisingly, given the court-ordered origin of the County's law in *Delux*, the objective evidence supporting the space allocation, and the prior determination by the FAA that the space-use criteria was legitimate and non-discriminatory, the *Delux* court had no difficulty concluding the County's law was reasonable, nondiscriminatory, nonburdensome, and not in conflict with the ADA. *Id.* As Southwest's Complaint, however, plainly alleges that the standards in Defendants' Gate Assignment Criteria and Worksheets were patently unreasonable, discriminatory, burdensome, and in direct contravention of the ADA.

*Delux* also demonstrates an example of a lawful gate allocation methodology. The Westchester airport used "a lottery system to determine allocation and flight capacity." *Id.* at *7. This lottery system is mandated by statute, which states, "[i]n order to reasonably and equitably allocate the available Terminal building and Terminal Ramp capacity, to ensure competition, and to promote orderly and efficient Airport operations, the County shall allocate available Terminal Ramp and Terminal building capacity by means of a lottery . . . ." Westchester, N.Y., Code of Ordinances § 712.462(5). *Delux* demonstrates that a reasonable, non-discriminatory method of

gate allocation that complies with the ADA *is* possible. But Defendants, because of their preference for luxury airline services and certain routes, chose instead to retain unlawful control over the process and thus invited this lawsuit.

Defendants misrepresent Southwest's "core" position. Southwest recognizes that the City must make gate assignments. Southwest's concern is not that the City picked winners or losers—instead, Southwest alleges Defendants violated the ADA by using unlawful, unreasonable, arbitrary, and discriminatory criteria when they assigned Southwest to Terminal A. Defendants seem to think that Southwest would be fine with subjective, discriminatory decisions as long as they benefited Southwest, DKT. 58 at 13, but this is precisely the kind of blatant yet completely unsupported animus toward Southwest that led to this lawsuit. There is nothing "subjective" about city officials' repeated promises to Southwest that it would be in Terminal C, particularly because Southwest has earned the largest market share at SAT, and indeed those promises have no relevance to the ADA claim. Defendants' argument based on 49 U.S.C. § 41706(f) concerning competition plans is another red herring. Southwest does not argue that Defendants lack the authority to make gating decisions; instead, Southwest argues that Defendants cannot base their gating decision on standards preempted by the ADA. Because this is exactly what Defendants did, the Court should deny Defendants' motion to dismiss Southwest's ADA preemption claim.

**B.    The Court Should Deny Defendants' Motion to Dismiss Southwest's Equal Protection Claim.**

Southwest's Equal Protection claim should also survive Defendants' Motion. The Equal Protection Clause protects individuals from state governmental action that results in similarly situated individuals being treated differently. *John Corp. v. City of Houston*, 214 F.3d 573, 586 (5th Cir. 2000). An equal protection claim requires either identification of a class or showing that the aggrieved party is a "class of one." *Gil Ramirez Grp., LLC v. Houston Indep. Sch. Dist.*, 786

F.3d 400, 419 (5th Cir. 2015). To establish a "class-of-one" claim, a plaintiff must show that (1) it was treated differently from others similarly situated and (2) there was no rational basis for the disparate treatment. *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 824 (5th Cir. 2007) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Under either a "class of one" theory or Southwest's status as a low-cost carrier that caters to value-minded customers, the City's actions do not pass the rational basis test.

The City first claims that no other airline is similarly situated to Southwest. But "'similarly situated' is not a requirement susceptible to rigid, mechanical application—'[t]here is no precise formula to determine whether an individual is similarly situated to comparators.'" *Lindquist v. City of Pasadena*, 669 F.3d 225, 233 (5th Cir. 2012). "In a case like this one, which involves the application of an ordinance or statute, the plaintiff's and comparators' relationships with the ordinance at issue will generally be a relevant characteristic for purposes of the similarly-situated analysis." *Id.* Here, Southwest, Delta, American, and United were all signatories to the previous lease, they all participated in the current AULA negotiations, and the City considered all of them for assignment to Terminal C. The City notes that Southwest requested the most gates and is the largest carrier at SAT—but neither of those factors played any role in the City's gate assignment criteria. *See e.g.*, Dkt. 57-1 and 57-2 (considering all gate requests over 6 gates as equivalent and not considering carrier market share). The minor differences the City identifies are not sufficient to make Southwest dissimilar from its competitors. In *Big Tyme Investors*, for example, bar owners sued under the equal protection clause because Covid-closure orders applied to them, but not to restaurants. *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 468 (5th Cir. 2021). The Fifth Circuit had no trouble concluding that bars and restaurants were similarly situated, despite the obvious differences between serving food and only alcohol. *Id.* The differences between Delta, American,

and United are not sufficient for this Court to hold as a matter of law that Southwest is not similarly situated.

Because the carriers are similarly situated for equal protection analysis, Southwest survives the motion to dismiss by pleading facts that demonstrate each of the City's stated rationales lack a legitimate purpose. "[A]though rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey v. Castille (Castille I)*, 700 F.3d 154, 162 (5th Cir. 2012). A "hypothetical rationale, even post hoc, cannot be fantasy" or be "betrayed by the undisputed facts." *St. Joseph Abbey v. Castille (Castille II)*, 712 F.3d 215, 223 (5th Cir. 2013).

This is exactly what the City is trying to do here by citing to fantastical rationales not supported by the evidence or testimony. Southwest's pleadings demonstrate that the City's load-balancing concerns and other potentially objective justifications were not, in fact, the City's actual motivation. Instead, Southwest alleges that the City's true justification was based on unlawful consideration of routes and services. Because the Court "must always conduct a fact-specific examination of the record to ensure that the ends-means connection is not 'fantasy,'" *Newell-Davis v. Phillips*, 2023 U.S. App. LEXIS 3335, at *12 (5th Cir. 2023), the City cannot ignore Southwest's well-pleaded facts that show each of the City's purported rationales are not legitimate. Accordingly, the City's explanation for its action "amounts to little more than an assertion that discrimination may be justified by a desire to discriminate" against Southwest based on its services and routes, which is not sufficient to survive rational basis scrutiny. *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores De Otero*, 426 U.S. 572, 605 (1976). Therefore, the Court should deny Defendants' motion to dismiss Southwest's Section 1983 claim.

**C.    The Court Should Deny Defendants' Motion to Dismiss Southwest's Promissory Estoppel Claim.**

Defendants' arguments concerning Southwest's promissory estoppel claims are not nearly as open-and-shut as the City claims. Texas appellate courts continue to recognize that extraordinary factual circumstances can waive immunity following the rulings the City cites.[11] Southwest's allegations closely track the allegations in *Tex. S. Univ. v. State St. Bank & Tr. Co.*, 212 S.W.3d 893, 908 (Tex. App.—Houston [1st Dist.] 2007, pet. denied), where the court found waiver by conduct. There, government officials lured the plaintiff into a purported contract with false promises that the contract would be valid. Then, after the plaintiff provided services, the government claimed it did not need to pay because the contract was not valid after all. Here, Southwest alleges that Defendants lured them with false assurances of being placed in Terminal C so that Southwest would not insist on more funding for renovations to Terminal A. Only when it was too late for these negotiations did the City reveal that it was assigning Southwest to Terminal A. Now the City is trying to rely on immunity to avoid the steep financial harm the City's misrepresentations have caused Southwest.

Moreover, the City's claim of immunity demonstrates its contradictory positions throughout this litigation. The very same Dallas Court of Appeals case the City cites in favor of immunity here establishes that its actions in implementing the AULA were governmental, not proprietary. DKT. 58, p.19 (citing *Dall./Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 366 (Tex. 2019), which held that airport contracts are inherently governmental, not proprietary, as a matter of law).

---

[11] *See, e.g., Alts. Unlimited, Inc. v. Raymondville Indep. Sch. Dist.*, No. 13-13-00363-CV, 2014 Tex. App. LEXIS 3042, at *13 (Tex. App.—Corpus Christi Mar. 20, 2014, no pet.); *Webb Cty. v. Khaledi Props., Ltd.*, 2013 Tex. App. LEXIS 9063 (Tex. App.—San Antonio July 24, 2013, no pet.); *Kaufman Cty. v. Combs*, 393 S.W.3d 336, 345 (Tex. App.—Dallas 2012, pet. denied).

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff Southwest respectfully requests that the Court deny Defendants' Motion to Dismiss and also requests such other and further relief for which Southwest has shown itself to be justly entitled.

Respectfully Submitted,

**THE MORALES FIRM, P.C.**
6243 W. Interstate 10, Suite 132
San Antonio, Texas 78201
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821
By: /s/ Lawrence Morales II
Lawrence Morales II
State Bar No. 24051077
lawrence@themoralesfirm.com
Allison S. Hartry
State Bar No. 24083149
ahartry@themoralesfirm.com

**CLARK HILL PLC**

M. Roy Goldberg
1001 Pennsylvania Avenue N.W.
Suite 1300 South
Washington, D.C. 20004
Tel. (202) 552-2388
Email: rgoldberg@clarkhill.com
(Admitted *Pro Hac Vice*)

**Counsel for Plaintiff Southwest Airlines Co.**

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2025, I caused a true and accurate copy of this document to be served on all counsel by filing it through the court's electronic filing system

*/s/ Lawrence Morales II*
Lawrence Morales II