IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SOUTHWEST AIRLINES CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:24-cv-01085-XR |
| | ) | |
| THE CITY OF SAN ANTONIO, TEXAS and | ) | |
| JESUS SAENZ, in his official capacity as | ) | |
| Director of Airports for the City of San | ) | |
| Antonio, Texas | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF SOUTHWEST AIRLINES CO.'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT[1]

Plaintiff Southwest Airlines Co. ("Southwest") files its Motion for Partial Summary

Judgment concerning its claim for declaratory relief.

## I.      INTRODUCTION

The Airline Deregulation Act of 1978 ("ADA") prevents a political subdivision of the

State, like the City of San Antonio, from enacting or enforcing a provision having the force and

effect of law that relates to the prices, routes, or services of an air carrier. *See* 49 U.S.C.

§ 41713(b)(1). Southwest sued Defendants seeking a declaration that Defendants' enactment and

enforcement of the standards in their Gate Assignment Criteria and Worksheets[2] are preempted by

the ADA, and thus, Defendants' gate assignments for the new terminal at the San Antonio

International Airport ("SAT") and the Airline Lease and Use Agreements ("AULAs") that

memorialize the gate assignments are void. Now that the parties have completed preliminary

---

[1] Southwest seeks summary judgment on its request for declaratory relief only, not on its 42 U.S.C. § 1983 and promissory estoppel claims.
[2] *See* Exhibit 1 (Gate Assignment Criteria) and Exhibit 2 (Gate Assignment Worksheets).

discovery, Southwest has evidence establishing the elements of its declaratory judgment claim and foreclosing Defendants' proprietary powers affirmative defense.

First, the summary judgment evidence establishes that the standards in Defendants' Gate Assignment Criteria and Worksheets "relate to" air carrier routes and services. Indeed, the standards applied by Defendants in the Gate Assignment Criteria and Worksheets expressly reference international and city-pair "routes," VIP airline lounges (which Defendants concede are an airline "service"), and first/business-class cabins (which the Supreme Court has recognized are "services" under the ADA). Because Delta and American offer, or aspired to offer, the routes and services Defendants deemed desirable, Defendants rewarded them with extra points in their gating analysis, while at the same time penalizing Southwest because it did not offer these routes and services. Defendants' application of these standards in their Gate Assignment Criteria and Worksheets easily satisfies the Supreme Court's broad interpretation of "relating to" in the ADA's preemption provision. *See Morales v. Trans World Airlines*, Inc., 504 U.S. 374, 383 (1992).

Second, the summary judgment evidence establishes that the standards in Defendants' Gate Assignment Criteria and Worksheets are provisions having the force and effect of law. Unlike contractual commitments voluntarily taken (which do not have the force and effect of law), the standards in Defendants' Gate Assignment Criteria and Worksheets are policies Defendants involuntarily imposed on Southwest.[3] The evidence is undisputed that Southwest did not agree to the standards in Defendants' Gate Assignment Criteria and Worksheets, and that Defendants did not even disclose the standards to Southwest until after Defendants enforced them to exclude Southwest from the new terminal. As an ordinance, regulation, and the common-law bind parties irrespective of their agreement, Defendants' enactment and enforcement of the standards in the

---

[3] *See Am. Airlines v. Wolens*, 513 U.S. 219, 229 n.5, (1995) ("[T]he phrase 'having the force and effect of law' is most naturally read to 'refer to binding standards of conduct that operate irrespective of any private agreement.").

Gate Assignment Criteria and Worksheets bind and exclude Southwest from occupying the new terminal even though Southwest did not agree to the standards or sign the AULAs that ratify Defendants' application of the standards. Because the standards in Defendants' Gate Assignment Criteria and Worksheets are government-imposed policies that seek to encourage certain airline routes and services, they have the force and effect of law. *See Northwest v. Ginsberg*, 572 U.S. 273, 289 (2014).

Third, Defendants cannot satisfy their burden of showing an entitlement to the "proprietary powers and rights" affirmative defense in 42 U.S.C. § 41713(b)(3). Defendants contend that because the City owns the airport, Defendants have unlimited proprietary power to take any action relating to air carrier prices, routes, and services, even if it is unreasonable, arbitrary, and discriminatory. *See* DKT. 58, MOTION TO DISMISS, at p. 9-16. If the Court accepts Defendants' argument, the proprietary powers exception would swallow the general rule of ADA preemption. The Fifth Circuit has cautioned against interpreting the proprietary powers exception so broadly. *See American Airlines, Inc. v. DOT*, 202 F.3d 788, 807 (5th Cir. 2000).

## II.    STATEMENT OF FACTS

### A.    The City Makes Its Gating Assignments Based on Standards Directly Related to Air Carrier Services and Routes.

The City is building a beautiful new terminal at SAT. However, the new terminal will not be large enough to accommodate all the airlines interested in using it. Therefore, the City had to decide which airlines would be assigned gates in the new terminal, and which airlines would remain in Terminal A, which Defendant Saenz has described as worthy of demolition.[4]

In May 2024, Defendants notified Southwest of its decision to assign Delta and American to the new terminal and Southwest to Terminal A. (EX. 4, GATING PRESENTATION). After

---

[4] *See* (EX. 3, SAENZ DEPOSITION, 61:17-62:4).

Defendants disclosed their gate assignments, at Southwest's request, Defendants circulated a memorandum summarizing the process they used to make their gating decision. (Ex. 1). Defendants' Gate Assignment Memorandum states that, when making their gating decision, Defendants first considered: (1) "whether an airline club was requested"; (2) "whether an airline operates or commits to operating international routes"; (3) "the airline's 'fit' into San Antonio"; (4) "the airline's service, growth, and experience; and (5) "the existence of a written commitment by airline to city pairs, specific flights, or minimum levels of enplaned passengers." *Id*.

Defendants' Gate Assignment Memorandum further stated that Defendants used a "Gating Placement Analysis Worksheet," which was not attached to the Gate Assignment Memorandum, to score each airline based on a variety of "relevant factors" and that Defendants ranked each airline based on their score. *Id*. The Gate Assignment Memorandum also explained that Defendants "reviewed and considered certain non-quantifiable considerations," which included the carriers' "fit" into San Antonio, the carrier's desirability of passenger profiles (business passengers versus leisure passengers), the carrier's brand position (legacy airlines versus low-cost airlines), the carriers' "service, growth, and experience" (airlines that offer first-class cabins versus airlines that only offer economy cabins), and the carriers' "aspirations for international flights." *Id*. Notably, Defendant Saenz concedes that airline passenger profiles, airline brand positions, and airline cabin offerings are inappropriate considerations for airports to consider when making gating decisions. (Ex. 3, SAENZ DEP., 125:14-19; 104:12-16; 123:03-09).[5] Moreover, Defendants' Executive Program Manager Dave Brandeburg admits that airline brand positions (*i.e.*, network airlines v.

---

[5] Ex. 3, SAENZ DEP., 125:14-19 (Q. What significance does the fact that it's a business traveler have as to the decision to put Delta into Terminal C, if it does? A. I don't know. Q. Would that be appropriate? A. No, sir.); 104:12-16 (A. Do you think that would have been a legitimate consideration for the ESC to consider, whether a carrier was low cost, ultra low cost, or legacy carrier? A. No, sir."); 123:03-09 (Q. This says split cabin, and I'm just asking you . . . do you think it's appropriate for the City to have decided that American can go to Terminal C, at least in part because it offers split cabin versus Southwest that offers a single cabin? A. No, sir.")

low-cost airlines) have no impact on terminal balancing at the airport. (EX. 5, BRANDEBURG DEP., 145:19-25). According to Defendants' Gate Assignment Memorandum, after Defendants considered these non-quantifiable considerations, Defendants' gating analysis "**then** turned to broad-based terminal load balancing considerations. (EX. 1 (emphasis added)).

During discovery, Defendants produced the Gating Placement Analysis Worksheets that are referenced in the Gate Assignment Memorandum. (EX. 2, GATING WORKSHEETS). Defendants' Gating Placement Analysis Worksheets provide additional explanations of the standards listed in the Gate Assignment Memorandum that confirm Defendants rewarded and penalized each airline based on their routes and services. For example, Defendants rewarded American and Delta with higher scores on "fit into San Antonio" and "service, growth, and experience" because they are "network carriers," have "business traveler appeal plus leisure appeal," offer "split cabin" service, offer a "top-tier club experience, and because American has a known "commitment" to offer non-stop service to Washington D.C. *Id*. In contrast, Defendants deducted points from Southwest's scores on "fit into San Antonio" and "service, growth, and experience" because it offers only single-cabin service, has a "leisure travel product more than business," has a "different boarding experience," and "only seasonal" international service. *Id*.

After Defendants tallied each airline's score in their Gating Placement Analysis Worksheets, Delta had 31 points, American had 30 points, and Southwest and United had 26 points. (EX. 6, GATING SCORECARD). Defendants then used the point rankings to decide which airlines would be allocated space in the new terminal. (Ex. 7, GANIER DEP. 58:9-24). Defendants' allocation of points for a top-tier club experience, international routes, and carrier services was outcome-determinative because Southwest only received 4-5 less points than Delta and American. *Id.;* (EX. 6). Had Defendants' criteria excluded airline club requests and other factors related to

routes and services, Southwest would have ranked highest among carriers eligible for placement in the new terminal. *Id*.

In May 2024, Defendants held an Executive Steering Committee ("ESC") Meeting to discuss and make a final gating decision. (EX. 8, ESC PRESENTATION). During the meeting, Executive Program Manager Dave Brandenburg gave a presentation that included a tally of Defendants' Gating Placement Analysis Worksheets showing Delta and American with the highest number of points. *Id*. at p. 17. At the end of the meeting, the ESC "provided approval to move forward with the Airline Gating Assignment as presented," which included American and Delta in the new Terminal and Southwest in Terminal A. (EX. 9, ESC MINUTES).

**B.      San Antonio City Council Ratifies the City's Gate Assignment Standards By Passing An Ordinance Approving the AULAs Despite Southwest's Objections.**

After obtaining ESC approval, Defendants proceeded to brief members of City Council on their gate assignments and the AULAs. (EX. 10, SPEAKING POINTS FOR CITY COUNCIL BRIEFINGS). Defendants' Speaking Points to City Council make clear that the AULA "is heavily regulated by the Feds," requires City Council approval, and is "one of the major tools used at commercial airports throughout the United States to set the rates and regulations." (*Id*. at 1, 3). Defendants presented the AULA (which included Defendants' gate assignments) to City Council for a vote on Ordinance 2024-09-12-0681 in September 2024. (EX. 11, ORDINANCE PACKET FOR COUNCIL at 3). The Council unanimously approved the Ordinance. (EX. 12, ORDINANCE, at 1-3).

### III.      STANDARD OF REVIEW

Summary judgment is warranted when "there is no genuine dispute as to any material fact," and only questions of law remain. Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007). Once a movant

submits a properly supported motion, the burden shifts to the non-movant to show that the Court

should not grant the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321-25 (1986). The non-

movant's burden "is not satisfied with some metaphysical doubt as to the material facts, by

conclusory allegations, by unsubstantial assertions, or by only a scintilla of evidence." *Willis v.*

*Roche Biomedical Labs, Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

## IV.    <u>LEGAL ANALYSIS</u>

**A.    The Summary Judgment Evidence Establishes that the ADA Preempts Defendants'
Gate Assignments.**

Before the ADA, the Federal Aviation Act of 1958 employed the Civil Aeronautics Board

to regulate the interstate airline industry. "Pursuant to this authority, the Board closely regulated

air carriers, controlling, among other things, routes, rates, and services." *Northwest, Inc. v.*

*Ginsberg*, 572 U.S. 273, 289 (2014). In 1978, Congress enacted the ADA to promote efficiency,

innovation, and low prices in the airline industry through "maximum reliance on competitive

market forces and on actual and potential competition." *See* 49 U.S.C. §§ 40101(a)(6), (12)(A).

To ensure that states and localities "would not undo federal deregulation with regulation of their

own," the ADA includes a preemption clause, which states that a state and a political subdivision

of a state "may not enact or enforce a law, regulation, or other provision having the force and effect

of law related to a price, route, or service of an air carrier…." *Id*. at 41713(b)(1). The ADA's

preemption provision, however, does not limit a state or locality "from carrying out its proprietary

powers and rights." *Id*. at 41713(b)(3).

Therefore, to prevail on this Motion, Southwest must establish that: (1) the standards in

Defendants' Gate Assignment Criteria and Worksheets are provisions having the force and effect

of law; (2) the standards in Defendants' Gate Assignment Criteria and Worksheets "relate to" air

carrier routes and/or services; and (3) Defendants are unable to meet their burden of establishing

an entitlement to the proprietary powers affirmative defense. Southwest satisfies this burden.

**1.    The Summary Judgment Evidence Establishes that Defendants' Gate Assignment Standards Are Provisions Having the Force and Effect of Law.**

When the ADA was first enacted in 1978, its preemption clause expressly applied to "rule[s] and standard[s]" in addition to laws and regulations. *See Northwest*, 572 U.S. at 282. Although "rules and standards" are not mentioned in the current version of the statute, the Supreme Court has held that "this omission is the result of recodification that was not meant to affect the provision's meaning." *Id*. "Congress made it clear that this recodification did not effect any 'substantive change.'" *Id*. Therefore, the ADA's preemption provision is not limited to laws enacted by a legislative body and regulations issued by a state agency. *Id*. The ADA's preemption clause also applies to other rules and standards that have the "force and effect of law." *Id*. at 283.

A provision has the "force and effect of law" if it is an official, government-imposed policy prescribing binding standards of conduct. *Id*. For example, in *Northwest*, the Supreme Court held that the ADA preempted a state common-law claim because the common law is a standard imposed on the parties without their agreement and "the ADA's deregulatory aim can be undermined just as surely by a state common-law rule as it can by a state statute and regulation." *Id*. In contrast to government-imposed policies, contractual commitments voluntarily undertaken generally do not have the "force and effect of law." *Wolens*, 513 U.S. at 219. The Fifth Circuit, however, has held that even contractual commitments in an airline use agreement are preempted by the ADA when they are "an impermissible attempt to regulate in an area where the federal government has preempted state regulation." *American Airlines, Inc. v. DOT*, 202 F.3d 788, 811 (5th Cir. 2000).

Here, the standards in Defendants' Gate Assignment Criteria and Worksheets are not "contractual commitments voluntarily undertaken" by Southwest; indeed, Defendants did not disclose the standards until after they made their gating decision. (EX. 13, 2024_6_20 GARNIER

EMAIL). Unlike in *Wolens*, where American Airlines was claiming that the ADA preempted the terms of its own voluntary frequent flyer program, Southwest is claiming that the ADA preempts the standards in Defendants' Gate Assignment Criteria and Worksheets, which were involuntarily imposed on Southwest by Defendants. *Id*. Although Southwest has refused to sign the AULAs that memorialize Defendants' gating decision, Southwest still suffers from the "official government-imposed policies" in Defendants' Gate Assignment Criteria and Worksheets. (*Id.; see also* EXS. 1-2, 4, 6, & 12).

The standards in Defendants' Gate Assignment Criteria and Worksheets regulate airline routes and services just as surely as a state statute or regulation does. The Fifth Circuit has explained that "[s]tates have methods of influencing private conduct unrelated to the state's proprietary functions—and thus potentially disrupting a congressional plan—at their disposal that extend beyond traditional overt regulation." *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 691 (5th Cir. 1999)*.* One such method is deployment of a state's power in a manner calculated to encourage or discourage such private behavior. *Id*. Therefore, the Fifth Circuit noted that "attempts by government entities to punish . . . practices they disfavor by withholding contract work have been found preempted …." *Id*. at 692.

The standards in Defendants' Gate Assignment Criteria and Worksheets encouraged airline services and routes Defendants preferred—VIP lounges, appeal to business passengers, first-class/business cabins, and international routes—by awarding Delta and American extra points because they offer such services and routes, and discouraged certain airline services Defendants dislike—appeal to leisure passengers, single-class cabins, and different boarding experience—by deducting points from Southwest for such services. (EXS. 1, 2, 4, 6). Notably, the standards in Defendants' Gate Assignment Criteria and Worksheets did not just in theory encourage certain

luxury airline services; they actually encouraged and persuaded Delta to build and operate a SkyClub lounge in the new terminal at SAT. (EX. 15).

Defendants also considered the brand position of Delta, American, and Southwest—namely, whether they were legacy carriers or low-cost carriers. (EX. 2). Illustrating the inappropriateness of Defendants' evaluation standards, Defendant Saenz testified that it would be inappropriate to consider these factors when making a gating decision. (EX. 3, SAENZ DEP., 125:14-19; 104:12-16; 123:03-09). Moreover, Executive Program Manager Dave Brandenburg testified that the brand position of an airline (*i.e.*, whether the airline is a network carrier, an ultra low-cost carrier, a start-up carrier, etc.) has nothing to do with load balancing at the airport. (EX. 5, BRANDENBURG DEP., 145:19-25).

The summary judgment evidence confirms that the standards in Defendants' Gate Assignment Criteria and Worksheets are nothing more than regulatory acts deployed by Defendants "in a manner calculated to encourage or discourage" the behavior of air carriers at SAT. *See Cardinal*, 180 F.3d. at 691. Because the standards in Defendants' Gate Assignment Criteria and Worksheets are "state-imposed regulation of air carriers" in an area where the federal government has preempted state regulation and are not "contract terms set by the parties themselves," they have the force and effect of law. *See Wolens*, 513 U.S. at 222; *see American Airlines*, 202 F.3d at 811.

### 2. The Summary Judgment Evidence Establishes that Defendants' Gate Assignment Standards Relate to Air Carrier Routes and Services.

Southwest can also satisfy its burden of establishing that Defendants' Gate Assignment Standards "relate to" air carrier routes and services. The Supreme Court has interpreted "related to" in the ADA's preemption provision broadly and held that a law, regulation, or provision is "related to" a price, route or service if it has "[1] a connection with, or [2] reference to" a price,

route or service. *Morales*, 504 U.S. at 384; *Wolens*, 513 U.S. at 223. The Supreme Court has held, for example, that cabin upgrades from economy to first class are "services" under the ADA. *Wolens*, 513 U.S. at 226.

Here, the standards in Defendants' Gate Assignment Criteria and Worksheet have an obvious connection with air carrier routes and services because they expressly reference international and city-pair "routes," VIP airline lounges (which Defendants concede are an airline "service"),[6] and first/business-class cabins (which the Supreme Court has held are "services" under the ADA).[7] (Exs. 1-2, 4, & 6). Moreover, on their face, the standards reward American and Delta with extra points because they offer certain luxury services and aspire to offer certain routes, and punish Southwest by deducting points because it does not offer these services or routes. *Id*. Defendants' Gate Assignment Worksheets also demonstrate that air carrier routes and services were dispositive in Defendants' gate assignments. (Ex. 2, 4 & 6). Out of 40 possible points, America, Delta, and United each received seven points automatically because they requested a club, while Southwest received zero. *Id*. This deduction alone determined Southwest's fate; if Defendants had not assigned 7 points to American and Delta based on their VIP club requests, Southwest would have outscored every other airline. *Id.* Because the standards in Defendants' Gate Assignment Criteria and Worksheets plainly relate to air carrier services and routes, Southwest satisfies the second element of its ADA preemption claim.

---

[6] *See, e.g.*, Ex. 3, Saenz Dep. 87:7-9 (Q: "Would you agree with me that airline clubs are a service that an airline offers to passengers?" A: "Yes, sir."); Ex. 14, O'Krongley Dep. 77:11-78:3) (Q: "And you would agree – agree with me that Delta's Sky Club is a service that Delta provides to some of its passengers?" A: "Yes.").
[7] *See Am. Airlines v. Wolens*, 513 U.S. 219, 226 (holding that "higher service categories" like flight upgrades are connected to airline services).

3.    **Defendants Cannot Meet Their Burden of Establishing Their Entitlement to the Proprietary Powers Affirmative Defense.**

Defendants have argued that, even if their Gate Assignment Standards have "the force and effect of law" and "relate to" air carrier routes and services, they are still not preempted by the ADA because of the proprietary powers and rights exception in 49 U.S.C. § 41713(b)(3). *See* DKT. NO. 58, MOTION TO DISMISS at pp. 9-16.

As the moving party, Southwest bears the burden of proving that no genuine issues of material fact exist. *Latimer v. SmithKline & French Labs*., 919 F.2d 301, 303 (5th Cir. 1990). However, because Defendants bear the burden of demonstrating their entitlement to the proprietary powers affirmative defense at trial,[8] Southwest need not support its motion with evidence negating Defendants' proprietary powers affirmative defense. *Celotex*, 477 U.S. at 323-24. Rather, Southwest satisfies its burden by pointing to the mere absence of evidence supporting Defendants' proprietary powers affirmative defense. *Id*. Defendants must then point to specific evidence in the record and articulate precisely how that evidence supports their proprietary powers affirmative defense. *Ragas v. Tenn. Gas. Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). To meet their burden, Defendants must produce evidence such that a jury could reasonably base a verdict in Defendants' favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). If Defendants are unable to make such a showing, the court must grant summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Defendants cannot meet this burden.

Section 41713(b)(3) states that the ADA's preemption provision does not limit a political subdivision of a State "from carrying out its proprietary powers and rights." Although the statute does not define "proprietary powers and rights," the exception originates from an "airport

---

[8] *See EEOC v. E. Airlines*, 645 F.2d 69, 69 (5th Cir. 1981) ("The one claiming the benefits of an exception to a statutory prohibition has the burden of proving the applicability of that exception.").

operator's potential liability for—and, thus, right to mitigate—noise damage" and other potential sources of liability to its neighbors in its capacity as a landowner.[9] Therefore, courts have generally limited the proprietary powers exception to "reasonable rules pertaining to the permissible level of noise or other dangers which can be caused by aircraft using the airport." *See Western Air Lines, Inc. v. Port. Auth. of NY & NJ*, 658 F. Supp. 952, 957. (S.D.N.Y. 1986); *Am. Airlines*, 202 F.3d at 806 (stating "local proprietors play an 'extremely limited' role in the regulation of aviation.").

Defendants contend that the proprietary powers exception is broad enough to cover their application of gating standards that directly reflect their preference for certain air carrier routes and services. According to Defendants, because the City owns the airport, the proprietary powers exception necessarily permits Defendants to take any action whatsoever relating to airline prices, routes, and services, even if the action is unreasonable, arbitrary, and discriminatory. If the Court accepts Defendants' argument, the proprietary powers exception would swallow the ADA's general preemption rule because every government-owned airport could directly regulate airline prices, routes, and services under the guise of addressing some local concern. The Fifth Circuit has cautioned against interpreting the proprietary powers and rights exception so broadly. *See Am. Airlines*, 202 F.3d at 807 ("We fear that under the rationale of *Arapahoe*, virtually any regional regulation enacted by a proprietor would fall within the proprietary powers exception. This would expand the regulatory role of municipal owners far beyond the 'extremely limited role' envisioned by the ADA.'").

The proprietary powers exception does not apply just because, as Defendants suggest, the City owns the airport. Instead, the proprietary powers exception only applies if, when enacting and

---

[9] *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 149 (2d Cir. 2016); *San Diego Unified Port Dist. v. Gianturco*, 651 F.2d 1306, 1316-17 (9th Cir. 1981) ("Since airport proprietors bear monetary liability for excessive aircraft noise . . . , fairness dictates that they must also have power to insulate themselves from that liability.").

enforcing the standards in Defendants' Gate Assignment Criteria and Worksheets, the City was addressing some local concern at the airport that falls within the proprietary powers exception, and was not seeking to advance a general societal goal. *See Cardinal Towing*, 180 F.3d at 692 ("Courts have found preemption when government entities seek to advance general societal goals rather than narrow proprietary interests through the use of their contracting power."). As discussed below, the standards in Defendants' Gate Assignment Criteria and Worksheets were not limited to addressing local concerns that fall within the purpose of the proprietary powers exception, but instead furthered Defendants' interest in encouraging luxury airline services and certain routes. As a result, Defendants cannot meet their burden of establishing their entitlement to the proprietary powers affirmative defense as a matter of law. *See id*.

Defendants claim that the goal of its gate assignment analysis was to achieve "balancing of demand upon the facilities across all terminals, including the curbside facilities and baggage handling system, to prevent overloading of those facilities." *See* DKT. 11-2, O'KRONGLEY DECLARATION at ¶ 8. Defendants further claim that Master Architect Corgan recommended that Delta and American be assigned to the new terminal, and that Southwest be assigned to Terminal A, based on load balancing considerations, and that Defendants adopted Corgan's gating recommendation. *Id*. at ¶¶7, 12, 33; (EX. 4; EX. 12 at p. 133 (EXHIBIT G-1.3)). However, the evidence directly refutes Defendants' explanation of the goal and reasons for their gate assignment analysis. For example, Corgan's Principal Architect John Trupiano testified that, contrary to Defendants' claims, Corgan did not recommend that Delta and American should be in Terminal C:

```
4        Q.   Sure.  Did Corgan make a recommendation to the
5   City that Delta and American should be in Terminal C?
6        A.   No.
```

(EX. 16, TRUPIANO DEP., 190:4-6). In light of Mr. Trupiano's testimony, a jury could not reasonably base a verdict in Defendants' favor. *See Anderson*, 477 U.S. at 248.

Moreover, contrary to Defendants' claim, it is undisputed that the standards in Defendants' Gate Assignment Criteria and Worksheets were not limited to load balancing. Defendants' standards award and deduct points based on airline brand positions—namely, whether the airline is a network or low-cost carrier. (Exs. 2, 6). Executive Program Manager Dave Brandenburg testified, however, that an airline's brand position has nothing to do with load balancing. (EX. 5,, 145:19-25). Furthermore, when asked why American received the maximum number of points for its "fit into SAT," Airport Assistant Director of Finance and Administration Michael Garnier stated, "They have the split cabin, they offer the first class, they go to major hubs that have international connections." (EX. 7, 59:14-21). These considerations extend far beyond Defendants' purported proprietary "load balancing" concerns, and instead further Defendants' general societal goal of obtaining certain routes and luxury services in the new terminal that Defendants deem desirable. Therefore, Defendants cannot show that the standards in their Gate Assignment Criteria and Worksheets are limited to addressing their purported local interest, and thus, cannot demonstrate their entitlement to the proprietary powers affirmative defense.

**4.      Even if the Proprietary Powers Exception Applies, Defendants Cannot Meet Their Burden of Showing that Their Gating Standards Were Reasonable, Non-Arbitrary, and Non-Discriminatory**

"In defining the permissible scope of a proprietor's power to regulate under § 41713(b)(3), federal courts have repeatedly held that an airport proprietor can issue only 'reasonable,

nonarbitrary, and nondiscriminatory rules that advance the local interest.'" *Am. Airlines*, 202 F.3d at 806 (citing *Nat'l Helicopter Corp. of Am. v. City of N.Y.*, 137 F.3d 81, 87 (2d Cir. 1998); *British Airways Bd. v. Port Auth. of N.Y.*, 558 F.2d 75, 81 (2d Cir. 1977)). As the Tenth Circuit has succinctly held, a local government law can only get past preemption "if it is an exercise of proprietary powers" *and* if "such exercise is reasonable, nondiscriminatory, nonburdensome and not in conflict with the Airline Deregulation Act, and thus exempted from preemption by 49 U.S.C. § 41713(b)(3)." *Arapahoe Cty.*, 242 F.3d at 1222; *see also City & County of San Francisco v. FAA*, 942 F.2d 1391, 1395 (9th Cir. 1991), *cert. denied*, 503 U.S. 983 (1992). The undisputed facts prove the standards in Defendants' Gate Assignment Criteria and Worksheets are unreasonable, arbitrary, and discriminatory.

Among other things, the standards in Defendants' Gate Assignment Criteria and Worksheets consider whether an airline caters to business or leisure passengers, whether an airline is a legacy or low-cost carrier, and whether an airline offers first/business-class cabins. (EXS. 1-2). Defendant Saenz concedes that whether an airline is a legacy or low-cost carrier is not a legitimate consideration when determining gate assignments:

```
12     Q.    Do you think that would have been a
13 legitimate consideration for the ESC to consider,
14 whether a carrier was low cost, ultra low cost or
15 legacy carrier?
16     A.    No, sir.
```

(Ex. 3, 104:12-16). Defendant Saenz also admits that it would not be appropriate for an airport to consider whether an airline caters to business or leisure travelers or offers first-class cabins when making gating assignments. (*Id*. at 125:14-19; 123:03-09). Moreover, Executive Program Manager

Brandenburg acknowledges that airline brand positions have nothing to do with load balancing. (Ex. 5, 145:19-25). Because the summary judgment evidence conclusively establishes that these standards in Defendants' Gate Assignment Criteria and Worksheets are illegitimate and inappropriate, Defendants cannot create a fact issue that the standards are limited to reasonable, non-arbitrary, and non-discriminatory rules related to a legitimate proprietary concern.

> **5.    Because the ADA Preempts Defendants' Gate Assignment Standards, the Court Should Enter a Declaration Declaring the AULAs Void As a Matter of Law.**

Because Defendants' Gate Assignment Standards are preempted by the ADA as a matter of law, this Court should enter an order that declares, pursuant to the Declaratory Judgment Act, the standards in Defendants' Gate Assignment Criteria and Worksheets, the resulting AULAs implemented to "govern the airport/airline business relationship (rates and charges)," and Ordinance 2024-09-12-0681 are void. (Ex. 11 at 3); *Morales*, 504 U.S. at 391 (affirming lower court injunctive and declaratory relief following determination of preemption); *Snook v. City of Mo. City*, 2003 U.S. Dist. LEXIS 27256, at *73 (S.D. Tex. 2003) (after finding preemption, issuing declaratory judgment that ordinance has no force and effect and further ordering the city to provide the plaintiff with legally-compliant application); *Sw. Bell Tel. Co. v. Pub. Util. Com.*, 812 F. Supp. 706, 713 (W.D. Tex. 1993) (after finding FCC preemption, declaring utility regulations void). In *American Airlines*, the Fifth Circuit found the underlying contract was preempted by the ADA and affirmed a DOT Declaratory Order forbidding Fort Worth and Dallas from enforcing the preempted contract. *Am. Airlines, Inc.*, 202 F.3d at 795. This Court, similarly, should issue a declaratory judgment that the standards in Defendants' Gate Assignment Criteria and Worksheets, the AULAs, and Ordinance 2024-09-12-0681 are void because they are preempted by the ADA.

## <u>CONCLUSION</u>

Southwest respectfully requests that this Court grant Southwest's Motion and issue a declaratory judgment declaring Defendants' Gate Criteria and Worksheets, the AULAs, and Ordinance 2024-09-12-0681 void. Southwest also requests any other relief to which it is entitled.

Respectfully Submitted,


**THE MORALES FIRM, P.C.**

6243 W. Interstate 10, Suite 132
San Antonio, Texas 78201
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821


By: /s/ Lawrence Morales II
Lawrence Morales II
State Bar No. 24051077
lawrence@themoralesfirm.com
Allison S. Hartry
State Bar No. 24083149
ahartry@themoralesfirm.com


**CLARK HILL PLC**

M. Roy Goldberg
1001 Pennsylvania Avenue N.W.
Suite 1300 South
Washington, D.C. 20004
Tel. (202) 552-2388
Email: rgoldberg@clarkhill.com
(Admitted *Pro Hac Vice*)

**Counsel for Plaintiff Southwest Airlines Co.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 8, 2025, I caused a true and accurate copy of this document to be served on all counsel by filing it through the court's electronic filing system

*/s/ Lawrence Morales II*
Lawrence Morales II