KRH
09/12/2024
Item No. 6

ORDINANCE  2024-09-12-0681

**AUTHORIZING THE CITY MANAGER TO EXECUTE AN AIRLINE OPERATING AGREEMENT AND TERMINAL BUILDING LEASE, KNOWN AS THE AIRLINE USE AND LEASE AGREEMENT (AULA), FOR THE SAN ANTONIO INTERNATIONAL AIRPORT AND ALSO AUTHORIZING REVISIONS TO THE AIRPORT OPERATING PERMIT.**

\*  \*  \*  \*  \*

**WHEREAS**, airports and airlines typically enter into an airline use and lease agreement, which governs the airport/airline business relationship (rates and charges) and specifies the terms and conditions for use of airfield and terminal facilities; and

**WHEREAS**, representatives from the airlines and Aviation Department have been in negotiation on a new agreement since April 2022 to go into effect upon expiration of the current agreement on September 30, 2024; and

**WHEREAS**, air carriers that do not wish to commit to the terms of the AULA can operate at the airport by executing the revised Operating Permit which aligns the permit with the new AULA; and

**WHEREAS**, this ordinance approves, and authorizes the City Manager or designee to execute, the Airline Operating Agreement and Terminal Building Lease for San Antonio International Airport and the revised Non-Signatory Operating Permit; **NOW THEREFORE:**

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF SAN ANTONIO:**

**SECTION 1.**  The City Manager or designee is authorized to execute an Airline Operating Agreement and Terminal Building Lease for San Antonio International Airport in a form substantially similar to that set out in **EXHIBIT 1** and the Non-Signatory Airport Operating Permit, a copy of which is set out in **EXHIBIT 2.**

**SECTION 2.**  Funds generated by this ordinance will be deposited in fund 51001000 with Internal Orders and General Ledgers specific for the rents of terminal space, passenger loading bridges, apron fees and baggage handling.

**SECTION 3.**  The financial allocations in this Ordinance are subject to approval by the Deputy Chief Financial Officer, City of San Antonio. The Deputy Chief Financial Officer may, subject to concurrence by the City Manager or the City Manager's designee, correct allocations to specific Cost Centers, WBS Elements, Internal Orders, General Ledger Accounts, and Fund Numbers as necessary to carry out the purpose of this Ordinance.

KRH
09/12/2024
Item No. 6

**SECTION 4.**  This Ordinance is effective immediately upon the receipt of eight affirmative votes; otherwise, it is effective ten days after passage.

*PASSED and APPROVED* this 12th day of September 2024.

**MAYOR**
Ron Nirenberg

**ATTEST:**

Debbie Racca-Sittre, City Clerk

**APPROVED AS TO FORM:**

Katinka Howell for
Andrew Segovia, City Attorney



### City of San Antonio
### City Council Meeting
### September 12, 2024

**2024-09-12-0681**

6.  Ordinance authorizing the City Manager to execute an Airline Operating Agreement and Terminal Building Leases, also known as the Airline Use and Lease Agreements (AULA), for the San Antonio International Airport. The AULA governs the airport/airline business and operational terms for use of the airfield and the terminal facilities, including a new terminal. The AULA has an initial ten-year term with the option to extend for one additional five-year period for a potential total term of 15 years and is anticipated to generate annual revenue of $76,158,598 for the Airport Operating and Maintenance Fund. This ordinance also authorizes revisions to the Airport Operating Permit. [Jeff Coyle, Assistant City Manager; Jesus Saenz, Director, Aviation]

Councilmember Courage moved to Approve on the Consent Agenda. Councilmember Viagran seconded the motion The motion prevailed by the following vote:

**Aye:**   Nirenberg, Kaur, McKee-Rodriguez, Viagran, Rocha Garcia, Castillo, Cabello Havrda, Alderete Gavito, Pelaez, Courage, Whyte

KRH
09/12/2024
Item No. 6

## EXHIBIT 1
## AIRLINE OPERATING AGREEMENT AND TERMINAL BUILDING LEASE

*Final Draft 9.6.2024*

# AIRLINE OPERATING AGREEMENT

# AND

# TERMINAL BUILDING LEASE

by and between

THE CITY OF SAN ANTONIO, TEXAS

and

_____

*Final Draft 9.6.2024*

## TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS; INTERPRETATION ........................................................................1

ARTICLE 2 TERM...........................................................................................................................11

ARTICLE 3 AIRLINE PREMISES....................................................................................................13

ARTICLE 4 USE OF THE AIRPORT ..............................................................................................21

ARTICLE 5 AIRLINE RENTALS, FEES, AND CHARGES ........................................................28

ARTICLE 6 CALCULATION OF AIRLINE RENTALS, FEES, AND CHARGES .................34

ARTICLE 7 AIRLINE ACTIVITY REPORTS ...............................................................................37

ARTICLE 8 CAPITAL IMPROVEMENTS .....................................................................................37

ARTICLE 9 BOND ORDINANCE SUBORDINATION................................................................42

ARTICLE 10 MAINTENANCE AND OPERATING RESPONSIBILITIES...............................43

ARTICLE 11 SAN ANTONIO AIRLINE CONSORTIUM ..........................................................46

ARTICLE 12 DAMAGE OR DESTRUCTION...............................................................................46

ARTICLE 13 INSURANCE AND INDEMNIFICATION .............................................................47

ARTICLE 14 COMPLIANCE WITH LAWS ...................................................................................51

ARTICLE 15 ENVIRONMENTAL PROVISIONS ........................................................................53

ARTICLE 16 TERMINATION...........................................................................................................63

ARTICLE 17 ASSIGNMENT AND SUBLETTING.......................................................................66

ARTICLE 18 MISCELLANEOUS PROVISIONS..........................................................................67

*Final Draft 9.6.2024*

## PREAMBLE

## AIRLINE OPERATING AGREEMENT AND

## TERMINAL BUILDING LEASE

THE STATE OF TEXAS         )(

COUNTY OF BEXAR         )(

This AIRLINE OPERATING AGREEMENT AND TERMINAL BUILDING LEASE (this "***Agreement***") is made and entered into by and between the City of San Antonio, Texas, a municipal corporation and home-rule city principally situated in Bexar County (hereinafter defined and referred to as the "***City***") and _____, a corporation doing business in the State of Texas (hereinafter defined and referred to as "***Airline***") (the City and Airline each, a "***Party***" and collectively, the "***Parties***").

### WITNESSETH:

WHEREAS, the City is the owner of San Antonio International Airport (hereinafter defined and referred to as "***Airport***" and more completely identified on **Exhibit A** attached hereto and made a part hereof), which is located in the City of San Antonio, Bexar County, Texas; and

WHEREAS, Airline is engaged in the business of commercial air transportation of persons, property, cargo, or mail as a scheduled Air Carrier and is certificated or otherwise authorized by the United States Government to engage in such business; and

WHEREAS, Airline has requested that the City grant it certain rights, privileges, and services in connection with the use of said Airport and its facilities in the conduct of Airline's business as a scheduled Air Carrier; and

WHEREAS, the City is willing to grant Airline such rights, privileges, and services upon the terms and conditions and for the consideration hereinafter stated; and

WHEREAS, the City and Airline deem it desirable to enter into a written agreement setting forth the respective rights, privileges, obligations, and duties of the parties hereto and defining the rights, services, and privileges granted and the terms, conditions, and consideration on which they are granted;

NOW, THEREFORE, for and in consideration of Airline's use of the Airport and the Airline Premises and the mutual covenants herein contained and the rentals, fees, and charges to be paid by Airline, it is agreed and understood by and between the City and Airline as follows.

*Final Draft 9.6.2024*

## ARTICLE 1
## DEFINITIONS; INTERPRETATION

Section 1.1     Definitions.

"***Activity Report***" means the reporting form required to be submitted by Airline to the City each month pursuant to ARTICLE 7 and attached hereto as **Exhibit B**.

"***Affiliate***" means any Air Carrier that (i) is operating at the Airport for the benefit of Airline, under the same or substantially similar livery as Airline, and (A) is owned by Airline, or (B) is a subsidiary of, or under common control with the same corporate parent of, Airline, or (C) is under contract to Airline in respect of such operation; or (ii) if operating under its own livery, is not selling any seats on an aircraft in its own name and all seats on such aircraft are being sold in the name of Airline, subject to Section 4.5. For purposes of this Agreement, an Air Carrier shall only be deemed an Affiliate of Airline while operating at the Airport on behalf of that Airline.

"***Air Carrier***" means any air carrier or foreign air carrier, as defined in 49 U.S.C. § 40102, as amended, operating an Air Transportation Business from time to time at the Airport.

"***Air Transportation Business***" means the business operated by an Air Carrier to and from the Airport for the commercial transportation by air of persons, property, cargo, mail, or any combination thereof, as a common carrier for compensation or hire, in commerce, as defined in 49 U.S.C. § 40102, as amended.

"***Airline Premises***" means those areas in the Terminal Building leased and/or assigned to Airline as Exclusive Use Premises, Preferential Use Premises, and Joint Use Space, and City Gates assigned to Airline, in accordance with this Agreement, and as shown on **Exhibit C**, **Exhibit D-1** and **Exhibit D-2**, attached hereto; provided, however, that, in the case of City Gates and Joint Use Space, such areas will only constitute "Airline Premises" during the period of time for which Airline has the right to use such areas.

"***Airline***" means the Air Carrier identified in the preamble of this Agreement.

"***Airline Parties***" has the meaning given to it in Section 13.2.

"***Airport***" means San Antonio International Airport as it now exists, as shown on **Exhibit A**, attached hereto, or as it may be modified in the future.

"***Airport Budget***" means the Airport capital and operating budgets and allocated administrative costs as adopted by and periodically revised and updated by the City prior to commencement of the Fiscal Year in which such Airport Budget is to apply.

"***Airport Cost Centers***" means the direct cost centers to be used in accounting for Airport revenues and expenses and for calculating and adjusting certain rentals, fees, and other charges associated with various Airport areas or facilities as they now exist or as they may hereafter be reconstructed, modified, changed, or developed. The Airport Cost Centers include the following and are further defined in the Rates and Fees Schedule: Airfield Area Cost Center, Apron Area Cost Center, Baggage Handling System/Security Checkpoint Cost Center, Loading Bridge Cost

*Final Draft 9.6.2024*

Center, Other Building and Areas Cost Center, Parking Cost Center, Stinson Cost Center, and Terminal Building Cost Center.

"***Airport Revenue***" means all income and revenue derived by the City in connection with the operation of the Airport System, as the term "Revenue" is further defined, limited, and determined in accordance with the Bond Ordinance. The term "Airport Revenue" shall not include PFCs, Customer Facility Charges ("***CFCs***"), insurance proceeds, restricted land sale proceeds or any local, state, or federal assistance, or any interest earned thereon.

"***Airport Terminal Spend***" means the total amount owed to the City by all Air Carriers for the use of the Terminal Building in a given Fiscal Year pursuant to ARTICLE 5.

"***Airport System***" means all airport and aviation facilities, or any interest therein, now or from time to time hereafter owned, operated or controlled in whole or in part by the City, together with all properties, facilities and services thereof, and all additions, extensions, replacements and improvements thereto, and all services provided or to be provided by the City in connection therewith, but expressly excluding Special Facilities. The Airport System currently includes San Antonio International Airport and Stinson Municipal Airport.

"***Amortized Equipment and Capital Outlay***" means any Equipment and Capital Outlay with a net cost to the City in excess of Four Hundred Fifty Thousand Dollars ($450,000) net of grants-in-aid and/or PFC revenues.

"***Amortization***" means the amount to recover an Amortized Equipment and Capital Outlay that is funded from the Capital Improvement Fund. Such amounts shall be calculated based upon the useful life of the subject Equipment and Capital Outlay using the applicable amortization discount rate.

"***Applicable Laws***" means all laws, statutes, ordinances, rules, and regulations (including without limitation Environmental Laws) lawfully issued or promulgated by any Governmental Authority governing or otherwise applicable to Airline or the Airport, as any of the same may now exist or may hereafter be adopted or amended, modified, extended, re-enacted, re-designated, or replaced from time to time and judicial interpretations thereof.

"***Best Management Practices***" or "***BMPs***" means, for purposes of ARTICLE 15, the schedules of activities, prohibitions of practices, maintenance procedures, and other techniques to control, prevent or reduce the discharge of pollutants. BMPs shall include those environmental or operational standards or guidelines specifying common and accepted practices appropriate for Airline's and its representatives' use of the Airport, and such standards or guidelines as have been articulated by pertinent professional associations, or regulatory agencies, that Airline should be reasonably aware of or that the City has provided to Airline.

"***BHS/Security Checkpoint Fee***" has the meaning given to it in Section 5.4.

"***Bond Ordinance***" means the Master Ordinances and any Supplemental Ordinances, heretofore or hereafter adopted, amendatory, or supplemental thereto, authorizing the issuance of Bonds and Obligations that are payable from or secured by all or any part of the gross revenues of the Airport, grant funds, CFCs, or PFCs.

*Final Draft 9.6.2024*

"***Bond Rate Covenant***" means the agreement of the City with holders of Bonds regarding generating a specified amount of Gross Revenues in each Fiscal Year.

"***Bonds***" means any bonds or certificates of obligation issued in accordance with a Master Ordinance or any Supplemental Ordinance.

"***Capital Improvement Fund***" means the fund by that name established by the City for the Airport System. Amounts on deposit in the Capital Improvement Fund may be used for any legally permissible purpose, including, without limitation, to pay the costs of constructing, equipping, or otherwise acquiring any enlargements, extensions of, or any other improvements to the Airport System, or to provide for the early retirement of Bonds.

"***Capital Improvement***" means any expenditure made to acquire, purchase, or construct a single item or project to improve, maintain, preserve, enhance, or develop the Airport.

"***City Gate***" means a Gate in the Terminal Building that is not preferentially assigned and which may be assigned for use on a common use basis by the City in accordance with this Agreement and the Gate Use Procedures.

"***Common Use Passenger Processing System***" or "***CUPPS***" means City-owned systems and equipment provided, operated, or maintained by the City for use by Airline in common with other Air Carriers, including but not limited to systems and equipment for passenger processing, flight and baggage information display, and baggage handling.

"***Competitive Credit***" has the meaning given to it in Section 6.4.

"***Consumer Price Index***" or "***CPI***" means the consumer price index for all urban consumers (or "***CPI-U***") published by the U.S. Bureau of Labor Statistics for the most current 12-month period such data is available at the time of the applicable measurement or adjustment under this Agreement. If CPI is no longer calculated by the U.S. Bureau of Labor Statistics, the Director shall, in his or her reasonable judgement, select such other index as may be generally published that measures the increase in consumer costs, which index shall be substituted for CPI. Specific dollar amounts referenced in this Agreement as being increased by CPI shall be adjusted by multiplying such amounts by a factor of one (1) plus the percentage increase (but not decrease), if any, in CPI during the most recently ended twelve-month period for which such CPI is available.

"***Date of Beneficial Occupancy***" or "***DBO***" means the date when a project or a phased element of a project has been substantially completed, a certificate of occupancy has been received, if required, and the Director reasonably determines that it is available for use. For the sake of clarity, for purposes of Section 3.15, DBO shall specifically mean the date when all or a portion of the expanded Terminal Building facilities depicted in **Exhibit G**, including Gates, are substantially complete and available for Airline's use, as reasonably determined by the Director, and Airline has been given notice that it must relocate pursuant to the provisions of Section 3.15, if applicable.

"***Debt Service Coverage***" means twenty five percent (25%) of Debt Service in a Rate Setting Period.

*Final Draft 9.6.2024*

"***Debt Service Reserve Requirement***" has the meaning set forth in the Bond Ordinance.

"***Debt Service***" means with respect to any outstanding or contemplated Obligations, the amount of principal and interest on such Obligations accrued and expected to accrue during the Fiscal Year, excluding interest payable from capitalized interest.

"***Deplaned Passenger***" shall mean any revenue passenger disembarking an aircraft at the Terminal Building, including any such passenger that shall subsequently board another aircraft of the same or a different Air Carrier or the same aircraft, if previously operating under a different flight number.

"***Director***" means the person holding the position of Director of Airports of the City or any duly authorized designee.

"***Effective Date***" has the meaning given to it in Section 2.1.

"***Enplaned Passenger***" means any revenue passenger boarding an aircraft at the Terminal Building, including any such passenger that previously disembarked from another aircraft of the same or a different Air Carrier or from the same aircraft, if previously operating under a different flight number.

"***Environmental Audit***" means a systematic voluntary evaluation, review, or assessment of compliance with Environmental Laws, with any permit issued under an Environmental Law, and with the requirements of ARTICLE 15, conducted under ASTM Standard E2107-00 (Standard Practice for Environmental Regulatory Compliance Audits) or other standard relevant and appropriate to Airline's use of the Airport.

"***Environmental Costs***" means damages, fines, costs and fees arising from any violation of or noncompliance in any material respect with: (a) any applicable Environmental Laws; or (b) any of the environmental provisions of this Agreement, including but not limited to costs incurred in connection with immediate response, remediation, and restoration actions, natural resources damage, Self Help (defined in ARTICLE 15), oversight and participation costs of governmental agencies, including natural resource trustees; reasonable and documented fees and costs of project managers, attorneys, legal assistants, engineers, consultants, accountants, and experts, whether or not employees of the damaged party and whether or not taxable as costs, incurred prior to, at or after any administrative or judicial proceeding, including appeals and other forms of judicial review; and diminution in value, loss or restriction on use of the Airport.

"***Environmental Laws***" means all applicable federal, State of Texas, regional and local laws, regulations, rules, permit terms, codes, ordinances, and legally enforceable guidance documents, now or hereafter in effect, as the same may be amended from time to time, and applicable decisional law, which govern materials, substances, regulated wastes, emissions, pollutants, water, storm water, ground water, wellfield and wellhead protection, cultural resources protection, animals or plants, noise, or products and relate to the protection of health, safety or the environment and natural resources, including land, sediments, water, groundwater, and stormwater, and shall include, but not be limited to: the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. Section 136 *et seq.*; the Safe Drinking Water Act, 42 U.S.C. Section 300(f) *et seq.*; the Oil Pollution Control Act of 1990, 33 U.S.C. Section 2701 *et seq.*; the

*Final Draft 9.6.2024*

Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C., Section 9601 *et seq.*; and as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. Law No. 99-499, 100 Stat. 1613; the Toxic Substances Control Act, 15 U.S.C., Section 2601 *et seq.*; the Clean Air Act as amended, 42 U.S.C., Section 7401 *et seq.*; the Clean Water Act, 33 U.S.C., Section 1251, *et seq.*; the Hazardous Materials Transportation Act, 49 U.S.C., Section 5101 *et seq.*; the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C., Section 651-678; the Resource Conservation and Recovery Act, 42 U.S.C., Section 6901 *et seq.*; and their State counterparts.

"***Equipment and Capital Outlays***" means equipment purchases and capital outlays to maintain or rehabilitate the Airport. Any Equipment and Capital Outlays with a net cost to the City not in excess of Four Hundred Fifty Thousand Dollars ($450,000) net of grants-in-aid and/or PFC revenues shall be expensed in the Fiscal Year acquired or expended; provided, that the $450,000 amount shall be adjusted annually beginning the first day of the Fiscal Year after the Effective Date for the next succeeding Fiscal Year by multiplying the amount for the prior Fiscal Year by a factor of one (1) plus the percentage increase, if any, in the CPI during the most recently ended twelve month period for which CPI is available.

"***Estimated Date of DBO***" has the meaning given to it in Section 3.15(c)(i).

"***Exclusive Use Premises***" means the space in the Terminal Building assigned by the Director to Airline for its use and occupancy to the exclusion of all others, as further depicted in **Exhibit C**. Airline's Exclusive Use Premises may include ticket offices, operations space, baggage services offices, or passenger clubs or lounges.

"***Extended Term***" has the meaning given to it in Section 2.2.

"***Extended Term CIP***" has the meaning given to it in Section 2.2.

"***FAA***" means the Federal Aviation Administration of the United States Government or any successor federal agency or agencies.

"***Final Recapture Notice***" has the meaning given to it in Section 3.10.

"***FIS***" means the Federal Inspection Services facilities and spaces within the Terminal Building which are dedicated to processing arriving international passengers. FIS space includes sterile connectors from the aircraft to passport control, baggage control, and other federal agencies.

"***FIS Fee***" has the meaning given to it in Section 5.7.

"***Fiscal Year***" means the twelve- (12) month period beginning October 1 of any year and ending September 30 of the following year, or any other twelve- (12) month period adopted by the City for its financial affairs.

"***Gate***" means those portions of the Terminal Building consisting of an aircraft parking position and associated holdroom, apron area, Loading Bridge (if any), and other appurtenant space. Gates include City Gates and preferentially assigned Gates.

*Final Draft 9.6.2024*

"***Gate Use Procedures***" means the City's Gate Use Procedures that establish rules and regulations for the assignment and use of all Gates, including the assignment and use of City Gates and the accommodation of Air Carriers at another Air Carrier's preferentially assigned Gates and the use of the City's Common Use Passenger Processing System, as such may be amended from time to time, in each case provided that they do not contravene the terms of this Agreement.

"***Governmental Authority***" means any Federal, state, county, municipal, or other governmental entity (including the City in its governmental capacity), or any subdivision thereof, with authority over, as applicable, the Airport, Air Carriers, or Airline.

"***Grant Assurances***" has the meaning given to it in Section 18.24.

"***Hazardous Substances***" means any and all substances, materials, pollutants, oils, contaminants, materials or products defined, designated, or regulated as hazardous, toxic, radioactive, dangerous or regulated wastes or materials or any other similar term in or under any applicable Environmental Laws. Examples of Hazardous Materials include but are not limited to, asbestos and asbestos containing materials, petroleum products including crude oil or any fraction thereof, gasoline, aviation fuel, diesel fuel, lubricating oils and solvents, urea formaldehyde, flammable explosives, PCBs, radioactive materials or waste.

"***Hazardous Substance Release***" shall include the spilling, discharge, deposit, injection, dumping, emitting, releasing, placing, leaking, migrating, leaching, and seeping of any Hazardous Substance into the air or into or on any land, sediment or waters, except any release in compliance with Environmental Laws or specifically authorized by a current and valid permit issued under Environmental Laws with which Airline is in compliance at the time of such release, but not including within the exception any such release in respect of which the State of Texas has determined that application of the State of Texas' Hazardous Substance removal and remedial action rules might be necessary in order to protect public health, safety or welfare, or the environment.

"***Initial Recapture Notice***" has the meaning given to it in Section 3.10.

"***Joint Use Space***" means space managed by the City that may be made available to Airline from time to time for use in common with other Air Carriers, as assigned by the Director and as further depicted on **Exhibit D-1** and **Exhibit D-2**. Joint Use Space includes baggage claim areas, passenger screening areas, baggage makeup, tug lanes, and baggage handling systems.

"***Landing Fee***" has the meaning given to it in Section 5.6.

"***Landed Weight***" means the maximum gross certificated landed weight, in thousand (1,000) pound units, that an aircraft operated by an Air Carrier is authorized by the FAA to land at the Airport, as recited in each Air Carrier's flight manual governing that aircraft type. For all landing fee computations, said sum shall be rounded up to the nearest thousand (1,000) pound units.

"***Loading Bridge***" means an enclosed passenger loading bridge and any preconditioned air system(s), ground power supply unit(s) and other related equipment attached to the bridge or a concourse at a Gate.

*Final Draft 9.6.2024*

"***Loading Bridge Fee***" has the meaning given to it in Section 5.3.

"***Maintenance and Operating Expenses***" or "***O&M Expenses***" means the City's costs for the operation, maintenance and repair of the Airport System and shall include, but shall not be limited to, salaries and employee benefits, utility costs, ordinary maintenance, administrative and general expenses, security, and all such other expenses as defined and determined in accordance with the Bond Ordinance. Direct and indirect O&M Expenses shall be allocated by the City from time to time to the Airport Cost Center(s) to which those expenses relate.

"***Maintenance and Operating Reserve***" means an amount equal to twenty-five percent (25%) of the amount included in the annual Airport Budget for Maintenance and Operating Expenses that is required to be maintained in the Maintenance and Operating Reserve Account under the Bond Ordinance. The Maintenance and Operating Reserve is to be used to prevent deficiencies in the payment of Maintenance and Operation Expenses.

"***Majority-in-Interest of Airlines***" or "***MII***" means (1) for the Terminal Building Cost Center, more than fifty percent (50%) in number of the Signatory Airlines who together had greater than sixty percent (60%) of total Airport Terminal Spend, including that of the Signatory Airlines' Affiliates, during the immediately preceding Fiscal Year; and (2) for the Airfield Area Cost Center, more than fifty percent (50%) in number of the Signatory Airlines who together had greater than sixty percent (60%) of the total Airport Landed Weight, including the Landed Weight of the Signatory Airlines' Affiliates, during the immediately preceding Fiscal Year.

"***Net Project Costs***" means the total costs of a Capital Improvement minus any costs that do not directly impact the Airfield Area Cost Center or Terminal Building Cost Center including any costs expected to be paid for by any federal and state assistance, grants, PFCs, and donations from third parties.

"***Net Revenues***" means, for any period, Airport Revenues during such period less Maintenance and Operating Expenses during such period.

"***Non-Airline Revenues***" means any Airport Revenue except Apron Area Fees, Terminal Building Rentals, Per Use Fees – Gates, Per Use Fees – Ticket Counters, BHS/Security Checkpoint Fees, Loading Bridge Fees, Landing Fees, RON Parking Fees, FIS Fees and any other Airport Revenue derived from an Air Carrier.

"***Non-Signatory Airline***" means any Air Carrier providing service at the Airport that is not a Signatory Airline. Non-Signatory Airlines shall pay the Non-Signatory Airline rates, fees and charges presented in the Rates and Fees Schedule, which will include a fifteen percent (15%) premium over the rentals, fees, and charges charged to Signatory Airlines.

"***Obligations***" means any obligation of the Airport System, including any Bonds issued pursuant to the Bond Ordinance or other issuing instrument, as applicable.

"***Other Debt***" means any debt other than Bonds incurred by the City for Airport purposes including but not limited to Interim Financing.

*Final Draft 9.6.2024*

"***Passenger Facility Charges***" or "***PFCs***" means charges collected by Airline and other Air Carriers on behalf of the City in accordance with Section 5.17 and pursuant to the authority granted by 49 U.S.C. § 40117 and 14 CFR Part 158, as may be amended from time to time, in respect of any component of the Airport and interest earnings thereon, net of amounts that collecting Air Carriers are authorized to retain for collecting, handling, and remitting such PFC Revenues.

"***Performance Guarantee***" has the meaning given to it in Section 5.13.

"***Per Use Fees – Gates***" has the meaning given to it in Section 5.6.

"***Per Use Fees – Ticket Counters***" has the meaning given to it in Section 5.6.

"***Preferential Use Premises***" means those portions of the Terminal Building assigned to Airline, as shown in **Exhibit C**, attached hereto, to which Airline shall have priority over other users, subject to the terms and conditions of this Agreement. Airline's Preferential Use Premises may include Gates, ticketing space/counters, curbside baggage check-in, apron area, or Loading Bridges.

"***Prior Use and Lease Agreement***" means any agreement between the City and an Air Carrier under which the Air Carrier operated at the Airport and which governed the terms and conditions of such Air Carrier's air transportation operations at the Airport prior to the Effective Date.

"***Rates and Fees Schedule***" means the Rates and Fees Schedule attached hereto as **Exhibit F**.

"***Revenue Landing***" means any aircraft landing by Airline at the Airport for which Airline receives revenue and those non-revenue landings whenever the same aircraft subsequently departs the Airport as a revenue flight.

"***RON Parking Fee***" has the meaning given to it in Section 5.8.

"***Rules and Regulations***" means the lawful rules and regulations governing the conduct and operation of the Airport promulgated from time to time by the City or the Director, including without limitation the City's duly adopted and generally applicable policies, operating directives, standard procedures, and the Airport Security Plan, in each case as such may be in force and amended from time to time.

"***SAAC***" has the meaning given to it in ARTICLE 11.

"***Scheduled Expiration Date***" has the meaning given to it in Section 2.1.

"***Signatory Airline***" means either: (1) an Air Carrier that has the right to operate at the Airport pursuant to an agreement with the City substantially similar to this Agreement (a "***Signatory Airline Use and Lease Agreement***") and is obligated to pay the City a minimum of at least Seven Hundred Fifty Thousand Dollars ($750,000) per year; or (2) an all-cargo Air Carrier that has the right to operate at the Airport pursuant to a Signatory Airline Use and Lease Agreement

*Final Draft 9.6.2024*

with the City and has been granted leased premises by the City consisting of an air cargo building and apron and whose Landing Fees together with its rentals, fees, and charges under such air cargo building and apron lease amount to at least Seven Hundred Fifty Thousand Dollars ($750,000) per year; provided further that following DBO of the expanded Terminal Building facilities depicted in **Exhibit G**, the minimum commitment required of Air Carriers qualifying under section (1) of this provision shall be raised to One Million Five Hundred Thousand Dollars ($1,500,000) per year.

"***Special Facilities***" means any property, real or personal, incident or related to the Airport, which is financed by the issuance of Obligations that are not directly or indirectly secured or payable from Net Revenues.

"***TCEQ***" means the Texas Commission on Environmental Quality or any successor agency or agencies thereto.

"***TDP Airline Rate Base Elements***" means the Capital Improvements identified in **Exhibit G-1.1**.

"***TDP Non-Airline Rate Base Elements***" means the Capital Improvements identified in **Exhibit G-1.2**.

"***TDP Airline Rate Base Cap***" means the total amount of Net Project Costs associated with the TDP Airline Rate Base Elements, or, as of the Effective Date, $1,267,100,000. The TDP Airline Rate Base Cap is further described in **Exhibit G** and may be adjusted pursuant to Section 8.1.

"***TDP GARB Financing Cap***" means the total amount of the costs of the Terminal Development Program (including costs associated with the Capital Improvements identified in **Exhibit G-1.1** and **Exhibit G-1.2)** to be financed through GARBs, as capped pursuant to the terms hereof and which, as of the Effective Date, is $1,404,000,000. The TDP GARB Financing Cap is further described in **Exhibit G** and may be adjusted pursuant to Section 8.1.

"***Term***" has the meaning given to it in Section 2.1.

"***Terminal Building***" means the terminal building and connected concourses, as may be expanded from time to time, which serve Air Carriers and other terminal tenants and activities, all as currently indicated on **Exhibit A**, **Exhibit D-1** and **Exhibit D-2** as such exhibits may be amended from time to time.

"***Terminal Building Rentals***" has the meaning given to it in Section 5.1.

"***Terminal Development Program***" or "***TDP***" means the City's planned capital program for the expansion of the Terminal Building and certain other Capital Improvements, as further described in **Exhibit G**, and pre-approved by Airline by the execution of this Agreement, as further described in Section 8.1.

"***Ticket Counter***" means each two (2)-position ticket counter within the Terminal that may be assigned to Airline or another Air Carrier for its use for the processing of passengers and

*Final Draft 9.6.2024*

baggage for a departing flight, including the ticket counter itself, kiosks, queuing space, and space behind the ticket counter positions.

"***TSA***" means the Transportation Security Administration of the United States Government or any successor federal agency or agencies.

Section 1.2    Interpretation.

The terms used in this Agreement shall have the meanings indicated in this ARTICLE 1 unless expressly defined elsewhere in the Agreement or where the context clearly indicates otherwise. Words used in this Agreement in the present tense include the future as well as the present. Words used in this Agreement in the masculine gender include the feminine and neuter. The singular number includes the plural and the plural includes the singular. The word "person" means a business or corporation as well as a natural person. All references in the text of this Agreement to articles, sections, and exhibits pertain to articles, sections, and exhibits of this Agreement, unless otherwise specified.

Section 1.3    Exhibits.

The following exhibits are incorporated herein and a made a part of this Agreement:

| | |
|---|---|
| **Exhibit A** | Airport Map |
| **Exhibit B** | Airline Activity Report |
| **Exhibit C** | Airline Premises |
| **Exhibit D-1** | Terminal Building Space Exhibit |
| **Exhibit D-2** | Joint Use Space |
| **Exhibit E-1** | Springing Provisions Related to the Extended Term CIP |
| **Exhibit E-2** | Extended Term CIP |
| **Exhibit F** | Rates and Fees Schedule |
| **Exhibit G** | Terminal Development Program |
| **Exhibit H** | Future Premises Commitment |
| **Exhibit I** | Affiliate Designation Form |
| **Exhibit J** | Affiliate Operating Agreement |
| **Exhibit K** | Maintenance Schedule |
| **Exhibit L** | Required Federal Provisions |
| **Exhibit M** | Terminal A/B Renovations |
| **Exhibit N** | Conditional Cargo Taxiway Construction |

Any changes to the exhibits that occur from time to time consistent with and pursuant to the terms of this Agreement shall be reflected in revised exhibits provided by the City to Airline. Such revised exhibits shall be deemed to be effective without requiring a formal amendment to this Agreement or City Council action.

*Final Draft 9.6.2024*

## ARTICLE 2
## TERM

Section 2.1    Term; Effective Date.

The term ("***Term***") of this Agreement shall commence on October 1, 2024 (the "***Effective Date***") and shall end on September 30, 2034 (the "***Scheduled Expiration Date***"), unless extended or sooner terminated as hereinafter provided.

Section 2.2    Extended Term.

(a)    This Agreement shall be automatically extended for one (1) additional five- (5) year period beginning October 1, 2034 and ending September 30, 2039, provided that:

(i)    Airline is not then in default of any of the terms and conditions of this Agreement beyond the expiration of any applicable notice and cure period;

(ii)    The City has, no later than October 1, 2033, provided and consulted with Signatory Airlines on a revised six- (6) year Capital Improvement Program ("***Extended Term CIP***") that covers the extended Term of the Agreement and which City expects may total approximately Three Hundred Fifty Million Dollars ($350,000,000) in Net Project Costs;

(iii)    More than fifty percent (50%) in number of the Signatory Airlines operating at the Airport who together had greater than sixty percent (60%) of total Airport Terminal Spend, including that of the Signatory Airlines' Affiliates, during the immediately preceding Fiscal Year have not provided written notice to the City on or before March 1, 2034 of their intent to terminate their individual Signatory Airline Use and Lease Agreements with City; and

(iv)    The City has not provided written notice to all Signatory Airlines by January 1, 2034 of the City's intent to terminate this Agreement.

(b)    The automatic extension of the Term pursuant to this Section 2.2 shall constitute Airline's pre-approval of the Extended Term CIP on the terms and conditions set forth in **Exhibit E-1**, which shall become effective and incorporated herein as a new Section 8.9 upon such automatic extension and for the duration of the extended Term, and such Extended Term CIP shall be incorporated into **Exhibit E-2,** with no need for formal amendment to this Agreement.

(c)    If the Term is automatically extended pursuant to Section 2.2, and Airline provided notice to the City that it wishes to terminate its individual Signatory Airline Use and Lease Agreement with the City prior to March 1, 2034, this Agreement shall terminate with respect to Airline, and Airline shall be considered a Non-Signatory Airline for the remainder of the Term.

Section 2.3    Holding Over.

(a)    If Airline, at the request of or without objection by the City, shall continue to occupy the Airline Premises and conduct its Air Transportation Business beyond the Term of this

Agreement, such holding over shall not constitute a renewal of this Agreement, but shall be considered a month-to-month tenancy only, with or without the consent of the City. The month-to-month tenancy shall be subject to all terms and conditions of this Agreement. No such holding over shall be deemed to operate as a renewal or extension of the Term. Such month-to-month tenancy may be terminated by the City or Airline by giving thirty (30) days prior written notice of said termination to the other Party at any time.

(b)     If Airline shall hold over in any portion of the Airline Premises after the termination of this Agreement and the City objects or does not consent to such holdover, Airline shall occupy such portion of the Airline Premises as a tenant at will. The City may relocate Airline in such case without compliance with the provisions of ARTICLE 3 hereof. During such tenancy, Airline shall pay to the City Non-Signatory Airline rates for Airline rentals, fees, and charges. If Airline fails to vacate the Airline Premises within sixty (60) days after written notice of termination from the City, Airline shall pay the City one hundred twenty-five percent (125%) of Airline rentals, fees, and charges for each period beginning more than sixty (60) days after such notice, and the City reserves the right to determine Airline rentals, fees, and charges according to any methodology permitted under Applicable Law.

Section 2.4     Surrender.

Upon expiration or early termination of this Agreement, Airline shall surrender the Premises to the City in substantially the same condition as such Airline Premises were in at the time of the original occupancy by Airline, or, if improved, in substantially the same condition as of the completion date of the last improvement authorized by the City pursuant to this Agreement and made by Airline or the City to the Airline Premises, in each case excepting reasonable wear and tear (subject to, as applicable, ARTICLE 12). Airline shall provide the environmental demonstrations concerning the Airline Premises set out in ARTICLE 15 below.

Section 2.5     Airline Removal of Property.

(a)     Except as otherwise provided in this Article, all equipment, trade fixtures, and other personal property installed or placed by Airline in the Airline Premises or on or about the Airport and which can be removed without structural damage to the Airline Premises or any other City-owned property shall remain the property of Airline unless otherwise provided in subsequent written agreements between Airline and the City, and Airline shall have the right at any time during the Term and prior to its expiration or early termination to remove any and all of said property from the Airport provided Airline is not in default in its payments hereunder (beyond all applicable notices and opportunity to cure periods). Airline agrees to repair or pay for all damages, if any, resulting from such removal. All City property damaged by or as a result of the removal of Airline's property shall be restored at Airline's expense to the same condition as or better condition than, it was prior to such damage.

(b)     Any and all property not removed by Airline within thirty (30) days after the expiration or earlier termination of this Agreement and the cessation of operations from all or a portion of the Airline Premises is deemed to be abandoned property. Airline hereby authorizes the City to remove and dispose of its abandoned property. Airline agrees to reimburse the City for the cost of removing and disposing of its abandoned property.

*Final Draft 9.6.2024*

Section 2.6    Prior Agreement.

On the Effective Date, any Prior Use and Lease Agreement between the City and Airline shall terminate without further action required by either the City or Airline, provided that the termination of such prior agreement shall not be construed as a waiver, relinquishment, or release of any claims, damages, liability, rights of action, or causes of action that either of the parties hereto may have against the other under such prior agreement and that have accrued before the Effective Date of this Agreement. Airline's liability that survives the termination of the prior agreement shall not be terminated by the execution of this Agreement.  It is understood that for the purposes of this Agreement, Airline's cargo facility lease with the City, if any exists at the Effective Date, shall not be considered a Prior Use and Lease Agreement.

## ARTICLE 3
## AIRLINE PREMISES

Section 3.1    Exclusive Use Premises.

The City grants to Airline, subject to the terms and conditions of this Agreement, the exclusive right to use the Exclusive Use Premises (if any) identified in **Exhibit C**. **Exhibit C** may be updated and amended from time to time by the Director in accordance with the terms of this Agreement without need for formal amendment thereto.

Section 3.2    Preferential Use Premises.

The City grants to Airline, subject to the terms and conditions of this Agreement, the right to use, on a preferential basis, the Preferential Use Premises (if any) identified in **Exhibit C**. The preferential rights of Airline and other Air Carriers to use Gates shall be governed by the provisions hereof and in accordance with the Rules and Regulations, which includes the City's Gate Use Procedures.

Section 3.3    Joint Use Space.

The City grants to Airline, subject to the terms and conditions of this Agreement, the right to use, on a shared basis, the Joint Use Space identified in **Exhibit D-1** and **Exhibit D-2**.

Section 3.4    Gate Use Procedures.

Airline's use of Gates shall be subject to the City's Gate Use Procedures, as amended from time to time. The City shall provide at least thirty (30) days' notice to Airline of any proposed amendments to the Gate Use Procedures prior to implementation, unless the Director determines, in his or her discretion, that implementation of such proposed amendment is necessary in a shorter period of time in which case the City shall provide notice to Airline as soon as practicable. For the sake of clarity, in the event a conflict between the Gate Use Procedures and this Agreement, this Agreement shall control.

*Final Draft 9.6.2024*

Section 3.5     Transition Space.

Airline acknowledges and agrees that at various times during the Term, Airline may be required, upon no less than thirty (30) days' written notice from the Director, to temporarily relocate to and operate out of space different from that shown in **Exhibit C** to facilitate the construction of projects or installation of fixtures and equipment. Except as provided in Section 3.15(a), such temporary relocation shall be at the cost of the requesting party or, if applicable and as determined by the Director, a project cost. If Airline is required to temporarily relocate to and operate out of different space, Airline's **Exhibit C** will be temporarily modified to reflect such transition change in square footage and space location in writing. All commercially reasonable efforts will be made to relocate Airline in such case to space of a comparable size and finish.  If Airline did not request the transition move, Airline shall not pay for more square footage than what Airline has leased under this Agreement during the transition period.

Section 3.6     "As-Is" Condition of Airline Premises.

WITH THE EXCEPTION OF THOSE FACILITIES AND FIXTURES THAT THE CITY IS REQUIRED TO MAINTAIN AND REPAIR HEREUNDER AND ANY OTHER REPRESENTATIONS, COVENANTS, OR OBLIGATIONS OF THE CITY EXPRESSLY SET FORTH HEREIN AND ANY RELEASES OF AIRLINE HEREIN, AIRLINE EXPRESSLY ACKNOWLEDGES THAT IT HAS INSPECTED OR HAD THE OPPORTUNITY TO INSPECT THE AIRLINE PREMISES, INCLUDING, BUT NOT LIMITED TO, ALL FINISHES, FURNITURE, FIXTURES, AND EQUIPMENT AND ENVIRONMENTAL CONDITIONS THEREIN AND ACCEPTS THE SAME "AS-IS" IN THE CONDITION EXISTING AS OF THE EFFECTIVE DATE (OR, IF AIRLINE IS ASSIGNED ADDITIONAL PREMISES DURING THE TERM PURSUANT TO THIS AGREEMENT, AS OF THE DATE AIRLINE ACCEPTS SUCH AIRLINE PREMISES). AIRLINE FURTHER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE CITY HAS MADE NO REPRESENTATIONS OR WARRANTIES OF ANY NATURE WHATSOEVER, EITHER EXPRESS OR IMPLIED, REGARDING THE AIRPORT OR THE AIRLINE PREMISES INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND/OR ENVIRONMENTAL CONDITION OF THE AIRLINE PREMISES, OR ANY IMPROVEMENTS LOCATED THEREON, OR THE VALUE OF THE AIRLINE PREMISES OR IMPROVEMENTS THERETO,  THEIR ZONING, OR THE SUITABILITY OF THE AIRLINE PREMISES FOR AIRLINE'S NEEDS, OR ANY IMPROVEMENTS THERETO, OR AIRLINE'S LEGAL ABILITY TO USE THE AIRLINE PREMISES OR AIRPORT FOR AIRLINE'S INTENDED USE. THE CITY SHALL NOT BE RESPONSIBLE FOR ANY PATENT OR LATENT DEFECT (EXCEPT TO THE EXTENT AND AS EXPRESSLY SET FORTH IN Section 15.9) AND AIRLINE SHALL NOT, UNDER ANY CIRCUMSTANCES, WITHHOLD ANY AIRLINE RENTALS, FEES, AND CHARGES OR OTHER AMOUNTS PAYABLE TO THE CITY HEREUNDER ON ACCOUNT OF ANY DEFECT IN THE AIRLINE PREMISES. BY ITS ENTRY ONTO THE AIRLINE PREMISES, AIRLINE ACCEPTS THE AIRLINE PREMISES IN THEIR "AS IS" CONDITION AND HEREBY WAIVES ALL CLAIMS ARISING ON OR AFTER THE EFFECTIVE DATE RELATING TO THE CONDITION OF THE AIRLINE PREMISES.

*Final Draft 9.6.2024*

Section 3.7    <u>Reassignment of Airline Premises</u>.

(a)    Airline and the City recognize that, from time to time during the Term of this Agreement, it may become necessary to reassign, reallocate, or relocate part or all of the Airline Premises. Except as provided in Section 3.15, the City may only make such reassignment, reallocation, or relocation for the following reasons:

(i)    To comply with a rule, regulation, or order of any federal, State, or other Governmental Authority (other than the City) that has jurisdiction over the Airport.

(ii)    To implement a Capital Improvement at the Airport that the City has been authorized to proceed with pursuant to the terms of this Agreement that is a part of the City's formal Airport Capital Improvement Program.

(iii)    To meet what the Director has determined to be a compelling necessity to resolve unforeseen and unforeseeable situations.

(b)    If it becomes necessary to adjust Airline's Airline Premises, the Director shall arrange for all parties holding affected Airline Premises to discuss reassignment, reallocation, or relocation of their space among themselves. If the parties do not reach agreement within thirty (30) days from the time the Director requests such discussions, the Director is authorized to make such decisions regarding reassignment, reallocation, or relocation for each of the parties (including Airline) in accordance with the procedures of this Section 3.7.

(c)    If, at the expiration of the thirty (30) day negotiating period, the Director makes decisions regarding reassignment, reallocation, or relocation of Airline's Airline Premises, the Director shall give Airline notice of the City's intent to modify all or portions of the Airline Premises. Within thirty (30) days of receipt of said notice, Airline may submit to the City a written request summarizing its concerns, and Airline shall be given an opportunity to meet with the Director to show cause why the reassignment, reallocation, or relocation should not be made.

(d)    In any reassignment, reallocation, or relocation pursuant to this Section 3.7 and not requested by Airline, Airline shall not be required to accept premises not reasonably adequate for its intended operations.

(e)    In any reassignment, reallocation, or relocation pursuant to this Section 3.7 and not requested by Airline, the City shall:

(i)    Give Airline sixty (60) days' notice of the reassignment, reallocation, or relocation unless otherwise agreed to by the affected parties.

(ii)    Reimburse Airline the undepreciated capital cost on a straight-line basis of Airline's improvements (excluding trade fixtures, furnishings, and other personal property) in the space vacated, provided that such improvements were authorized by the City pursuant to this Agreement; or

(iii)    Make improvements and alterations necessitated by the reassignment, reallocation, or relocation, as mutually agreed upon by the City and Airline, the cost of

which shall not be the responsibility of Airline, including to ensure space to be reassigned to and occupied by Airline is in reasonably the same condition as any comparable space that Airline is vacating.

(iv)     Relocate Airline not at Airline's expense.

(f)     Relocation costs pursuant to this Section 3.7, if any, shall be borne by the requesting party, provided that, if reassignment of all or any portion of the Airline Premises is necessary, in the reasonable discretion of the City, in order to effectuate or enable Capital Improvements that benefit the Airport as a whole or are necessary for the proper functioning of the Airport, the cost of relocating Airline shall be a project cost of such Capital Improvement to be recovered accordingly.

(g)     In any reassignment, reallocation, or relocation pursuant to this Section 3.7 and not requested by Airline which results in a reduction of Airline's Airline Premises, the rentals, fees, and charges owed by Airline pursuant to this Agreement shall be reduced proportionately to the reduction in square footage to the Airline Premises.

(h)     Upon completion of reassignment, **Exhibit C** will be updated to reflect the final reassignment and relocation.

Section 3.8     Minimum Activity Level.

The average minimum level of use required for Airline's preferentially assigned Gate(s) (the "*Preferential Gate Minimum Activity Level*") shall be five (5) Flights per Gate per day or 700 seat departures per Gate per day during a twelve (12) month period (365 days) as measured on a rolling basis, provided that, upon the date which is six (6) months after DBO of the new Terminal Building facilities constructed as part of TDP, the Preferential Gate Minimum Activity Level shall be increased to five and one-half (5.5) Flights per Gate per day or 750 seat departures per Gate per day. For the purpose of this Section 3.6, a "Flight" is defined as two (2) scheduled flight segments (one arrival and one departure). After consultation with the Signatory Airlines and reasonably considering the Signatory Airlines' comments, if any, the City may adjust such Preferential Gate Minimum Activity Level with no less than sixty (60) calendar days' notice to reflect then-current operations, Gate utilization, and availability of Gates at the Airport.

Section 3.9     Preferential Gate Utilization.

(a)     On or before October 1 of each year of this Agreement, the City will provide Airline a Gate use analysis for the immediately preceding twelve- (12) month, 365-day period. Airline's average Gate use will be calculated by dividing the total number of Airline's Flights at its preferentially assigned Gate(s) during a twelve- (12) month, 365-day period by the total number of preferentially assigned Gate(s) assigned to Airline. Airline's average seats per Gate will be calculated by dividing the total number of daily seats per Flight at Airline's preferentially assigned Gate(s) by the total number of preferentially assigned Gate(s) assigned to Airline. Charter(s) or other non-Airline operations will not be counted in this calculation.

*Final Draft 9.6.2024*

Section 3.10    Recapture of Preferentially Assigned Gate(s).

(a)    Should the City at any time determine that Airline has not met the Preferential Gate Minimum Activity Level as described herein, the City may, in its sole discretion and without any obligation to do so, issue written notice to Airline that it has not met the Preferential Gate Minimum Activity Level ("***Initial Recapture Notice***").

(b)    Upon delivery of such Recapture Notice to Airline, Airline shall be granted a cure period of six (6) months by the City. Should Airline fail to meet the applicable Preferential Use Gate Minimum Activity Level during, at minimum, the final four (4) months of such  six (6) month cure period, the City may, at its sole option and in order to accommodate the needs of other Air Carriers at the Airport, by written notice to Airline ("***Final Recapture Notice***"), require that Airline for the remainder of the Term: (a) relinquish a proportionate number of its preferentially assigned Gate(s) such that, on a pro forma basis, excluding such relinquished Gate(s), the remaining Gates preferentially assigned to Airline demonstrate that Airline meets the applicable Preferential Use Gate Minimum Activity Level during the six (6) month cure period; and (b) relinquish a proportionate amount of holdroom, Ticket Counter, ticket office, and other related terminal space to the extent necessary to support an Air Carrier's operations at the reassigned Gate(s).

(c)    The effective date of Airline's relinquishment of preferentially assigned Gate(s), and other portions of the Airline Premises, shall not be less than sixty (60) days following the date of the City's Final Recapture Notice.  At such time, Airline shall vacate the relinquished Airline Premises in accordance with the City's requirements and the Airport Rules and Regulations. During the course of vacating the relinquished Airline Premises, Airline shall minimize disruptions to other Air Carriers' operations and preserve the operational integrity of the relinquished Airline Premises.

(d)    If Airline is directed by the City, but does not itself request, to relocate all or a portion of its remaining Airline Premises as a result of the recapture of one or more of its preferentially assigned Gate(s) pursuant to this Section 3.10, the costs of such relocation shall be (i) borne by the Signatory Airline who has been assigned the preferential use of Airline's relinquished Gate(s), if any; or (ii) if the Director determines, in his or her sole discretion, that such relocation of Airline's remaining Airline Premises is necessary for the proper functioning of the Airport, a cost of the Airport recovered from all Signatory Airlines as part of Terminal Building rentals, fees, and charges.

Section 3.11    City Gates.

(a)    The City shall retain under its control and possession the City Gates. The City reserves the right during the Term of this Agreement to maintain no fewer than ten (10) Gates as City Gates.

(b)    City Gates shall be assigned by the City, and the City shall handle requests for accommodation by an Air Carrier, in accordance with the City's Gate Use Procedures.

(c)    Notwithstanding anything to the contrary in the City's Gate Use Procedures as of the Effective Date, Airline acknowledges that the City will assign international arrivals the highest

priority of use on international capable Gates in the event of a scheduling conflict between Air Carriers.

Section 3.12   City Right of Entry.

Authorized representative(s) of the City shall have the right to enter the Airline Premises, including the non-public areas of the Preferential Use Premises and Exclusive Use Premises, at any and all reasonable times for the purpose of inspection, including inspecting compliance with applicable Environmental Laws as provided in ARTICLE 15 and inspection of all City-owned equipment for compliance with manufacturer's specifications regarding servicing and preventive maintenance, or for any other purpose incident to the performance of the City's obligations hereunder or in the exercise of any of its governmental functions. The City shall use good faith efforts to avoid disruption of Airline's operations and, except in the event of an emergency, shall provide Airline reasonable notice prior to entering the non-public areas of the Preferential Use Premises or Exclusive Use Premises (or, if the City's entry onto public areas of the Preferential Use Premises or Exclusive Use Premises could reasonably adversely impact Airline's operations, prior to entering those such areas) and Airline shall have the right to have an Airline employee accompany the City's representative(s) when entering the non-public areas of the Preferential Use Premises or Exclusive Use Premises.

Section 3.13   Addition and Deletion of Space, Rights, Licenses, or Privileges.

(a)     The City and Airline may, from time to time, by mutual agreement, add additional space or spaces to or delete space or spaces from the various Airline Premises of Airline or may, subject to the provisions of this ARTICLE 3, add rights, licenses or privileges, or delete rights, licenses, or privileges, granted to Airline hereunder, or any two Air Carriers may exchange space, in the following manner: Airline shall submit to the Director a written request for the addition or deletion of rights, licenses, privileges, or space, which shall describe with particularity (i) the rights, licenses, privileges, or space which Airline wishes to add or delete; (ii) the Terminal Building Rentals, if applicable; and (iii) the date on which Airline wishes such addition or deletion to be effective. If the Director approves such addition or deletion in his or her reasonable discretion, she or he shall so notify Airline in writing, and the addition or deletion shall be effective on the date specified in the Director's written approval. **Exhibit C** shall be revised accordingly to reflect any such addition or deletion. Notwithstanding the foregoing, the Director shall not be required to approve the deletion of any space from any Signatory Airline's Airline Premises unless and until another Air Carrier has consented to lease such space on substantially the same terms and conditions as such Signatory Airline. All space added to the Airline Premises or rights, licenses, or privileges added pursuant to this Section shall be subject to all the terms, conditions, and other provisions of this Agreement and Airline shall pay to the City all sums, fees, and charges applicable to such additional space, rights, licenses, or privileges in accordance with the provisions of this Agreement.

Section 3.14   Future Premises Commitment.

Airline acknowledges and agrees that the location and amount of its Exclusive Use Premises and Preferential Use Premises is expected to be adjusted during the Term in connection with TDP. A summary of Airline's commitments to lease Exclusive Use Premises and Preferential

*Final Draft 9.6.2024*

Use Premises, if any, and any applicable conditions are shown in **Exhibit H** ("***Future Premises Commitment***"). Airline acknowledges that the plans for future facilities are conceptual in nature and therefore specific locations and quantities of future Airline Premises have not been determined. Airline agrees that, as elements of TDP are completed, it will relocate within the Terminal Building as directed by the City to the extent that it is consistent with the Future Premises Commitment and **Exhibit G-1.3**. Subject to Section 3.15(c), Airline agrees to lease, at a minimum, the amounts of Exclusive Use Premises and Preferential Use Premises stated in the Future Premises Commitment in the locations specified by the City. The City agrees, subject to ARTICLE 3 and to the extent adequate space is constructed as part of TDP, to provide Airline the amounts of Exclusive Use Premises and Preferential Use Premises identified in **Exhibit H**. The City shall timely notify Airline if there are circumstances reasonably known to the City that may result in the City not constructing, as part of TDP, substantially the amounts of Exclusive Use Premises and Preferential Use Premises that Airline has committed to lease pursuant to **Exhibit H**.

Section 3.15    TDP Specific Provisions.

(a)    *Temporary Relocation During TDP.*

Airline acknowledges that, during construction of TDP, in order to facilitate the continued operations of all Air Carriers at the Airport and to serve the traveling public, it will be necessary for the City, from time to time, to reallocate and reassign space under Section 3.5 on an interim, transitional basis pending completion of all or a portion of TDP. Notwithstanding anything herein to the contrary, relocation costs for such interim reallocations and reassignments shall be project costs of TDP and not borne by Airline or the City individually.

(b)    *Relocation and Reassignment of Airline Premises at DBO.*

(i)    The City agrees to assign Airline and other Signatory Airlines the Preferential Use Premises, including Gates, and Exclusive Use Premises, at DBO of such new Terminal facilities completed as part of TDP, as such facilities are constructed and become available, at the locations and in the amounts shown in **Exhibit G-1.3**, provided, however, that if all or a portion of the anticipated new Terminal Building facilities are not constructed for any reason, the City will assign Preferential Use Premises and Exclusive Use Premises in accordance with this ARTICLE 3. If Airline's preferentially assigned Gates are reassigned pursuant to this Section, Airline shall not be subject to the provisions of Section 3.10 for the initial six- (6) month period during which Airline occupies such reassigned preferentially assigned Gates. Relocation costs for the reassignment of Airline Premises pursuant to this Section shall be project costs of TDP and not borne by Airline or the City individually.

(ii)    The City agrees that it shall use commercially reasonable efforts to assign Airline contiguous space with respect to temporary relocations of the Airline Premises during construction of TDP, or upon DBO of new Terminal Building facilities, unless otherwise agreed to by Airline and the City.

(iii)    The City shall develop a standard set of design and finishes for new Terminal Building facilities constructed as part of TDP. The City shall construct new

Terminal Building facilities to be assigned to Airline in accordance with this standard set of design and finishes, with related costs to be project costs of TDP, unless, at least one (1) year prior to DBO of such Terminal Building facilities, Airline requests deviations from or additions to such standard set of design and finishes and agrees to pay any additional costs as a result thereof, if such deviations or additions are approved by the City.

(c)     *Rightsizing of Airline Premises at DBO.*

(i)     In anticipation of the completion of new Terminal Building facilities to be constructed as part of TDP that the City makes available to Airline, Airline may request and the City shall grant, effective as of DBO of such new facilities, a reduction in the size of the Airline Premises or, to the extent there is available space, an increase in the size of the Airline Premises, provided that:

(A)     Airline may only request, and the City shall only grant, such reductions in the size of the Airline Premises of no greater than ten percent (10%) of the Exclusive Use Premises that Airline has committed to lease pursuant to Section 3.14 and as depicted on **Exhibit H**;

(B)     Airline must make such requests by written notice to the City no later than one (1) year before the Estimated Date of DBO of such new facilities. For purposes of this Section 3.15(c), the "***Estimated Date of DBO***" shall refer to the Estimated Date of DBO established by the City's Construction Manager at Risk ("***CMAR***") pursuant to the CMAR Agreement at the time that the Guaranteed Maximum Price ("***GMP***") in the CMAR Contract is established and agreed upon between the City and the CMAR; provided that if the City has knowledge that the estimated date of DBO is later than reflected in the critical path schedule under the CMAR Agreement as referenced in this Section 3.15(c)(i)(B), the City shall notify Airline of the new estimated date of DBO, which upon such notice shall be considered the Estimated Date of DBO under this provision. As of the Effective Date, the City's CMAR engaged to construct the new Terminal Building facilities in connection with TDP is Hensel Phelps Construction Co. The "***CMAR Agreement***" refers to the agreement between the City and Hensel Phelps Construction Co titled *City of San Antonio, Texas Construction Manager at Risk Contract – New Terminal Facility.*

(C)     Airline may not request, and the City shall not grant, reductions in the size of any Exclusive Use Premises designed for and anticipated to be leased to Airline for the purposes of operating a passenger lounge, unless the City determines as part of the design process that a reduction requested by Airline of up to ten percent (10%) of the space designated for the passenger lounge will not cause there to be unusable or not functional space nor will the reduction materially affect Air Carrier rentals, fees and charges;

(D)     For the sake of clarity, Airline may not request, and the City shall not grant, reductions in the size of any Preferential Use Premises that Airline has committed to lease pursuant to Section 3.14 and as depicted on **Exhibit H**;

(E)     For the sake of clarity, the City may assign to Airline, and Airline shall accept, space in new Terminal Building facilities in different square footage amounts

than shown on **Exhibit H** if the variance is the result of de minimis reductions (or, if requested by or otherwise agreed to by Airline, increases) to square footage recommended and approved by applicable TDP Governance Committees for operational reasons or functional design purposes.

## ARTICLE 4
## USE OF THE AIRPORT

Section 4.1    Permissible Uses.

Subject to the terms and provisions of this Agreement, Airline shall be entitled to the use, in common with other duly authorized users, of the Airport for the following purposes, provided that nothing herein shall be construed as authorizing the conduct of a separate business by Airline, but as permitting Airline to perform only such functions as are incidental to the operation of its Air Transportation Business:

(a)    The operation of Airline's Air Transportation Business, including all activities reasonably necessary to such operation.

(b)    The landing, taking off, flying over, taxiing, pushing, towing, loading, unloading, delivering fuel to aircraft, repairing, maintaining (provided that Airline shall not perform major maintenance or repairs of aircraft or equipment on the ramp unless specifically authorized by the City), conditioning, servicing, parking, storing, and testing of aircraft or other equipment of or operated by Airline or others, including the right to provide or handle all or part of the operations or services of such others. For operations handled by Airline on behalf of other Air Carriers (other than to Airline's Affiliates), Airline shall pay the City a nondiscriminatory fee as established by the Director based on the gross revenues derived by Airline from such handling services. Handling services provided by third-party contractors will be subject to the nondiscriminatory fee, subject to the exception described in Section 4.6(b).

(c)    The sale of tickets, documentation of shipments, handling of reservations, and loading and unloading of persons, property, cargo, baggage, express packages, and mail at the Airport in the operation of Airline's Air Transportation Business.

(d)    The hiring, employment, and training at the Airport of personnel in the current or future employ of Airline, and training of Airline's authorized contractors. Training is to be limited to that incidental to Airline's Air Transportation Business at the Airport. Flight training and testing of aircraft and other equipment shall be undertaken by Airline only with the prior written approval of the Director, and to the extent permitted by, and subject to, the Rules and Regulations.

(e)    The purchase of Airline's requirements of fuel, lubricants, propellants, personal property, services, food, beverage, catering services, other passenger supplies, and any other materials and supplies used by Airline that are incidental to the operation of Airline's Air Transportation Business. Nothing herein shall restrict the City from requiring a permit and levying a charge on any person or company for conducting such commercial operations (e.g., the sale of food, beverage, or commissary supplies, or providing of services, including to Airline) at the Airport.

(f)     The sale, disposal, and exchange of Airline's aircraft, engines, accessories and other equipment, and materials or supplies, provided that such right shall not be construed as authorizing the conduct of a separate regular business by Airline, but as permitting Airline to perform only such functions as are incidental to the operation of its Air Transportation Business at the Airport.

(g)     The servicing by Airline, or by its suppliers of materials or furnishers of services, of aircraft and other equipment operated by Airline, including the provision of line maintenance or other materials or supplies, on Exclusive Use Premises or Preferential Use Premises or at assigned Gates or other locations designated by the Director.

(h)     The installation and operation of static or digital identifying signs, posters, and graphics and directional signs guiding passengers as needed in Airline's Exclusive Use Premises and Preferential Use Premises, subject to the prior written approval of the Director. Such signs shall be substantially uniform in size, type, and location with those of other airlines, consistent with the City's graphic standards and the Rules and Regulations, and in compliance with all Applicable Laws.

(i)     The installation, maintenance, and operation of such electronic or electrical devices, radio, communication, meteorological, and aerial navigation equipment and facilities at suitable locations on the Airport as may be necessary or convenient in the opinion of Airline for its operations; provided that: (i) the location and number of such equipment and facilities shall be subject to the prior written approval of the Director; (ii) the use and location of such equipment and facilities shall not conflict with other similar equipment and facilities at the Airport; and (iii) the use and location of such equipment and facilities on the Airport shall be subject to the payment of standard rental rates established for such use.

(j)     The installation, maintenance, and operation of Airline passenger clubs or lounges in Airline's Exclusive Use Premises assigned for such purpose.

(k)     The installation, maintenance, and operation of computer data lines, non-revenue generating wi-fi networks, telephone communications equipment, radio antennas and equipment, associated cables, associated conduits, and telephone communications switchgear and support computers at suitable locations on the Airport as may be necessary or convenient in the opinion of Airline for its operations; provided that: (i) all such equipment (except for the associated cables and conduits) be clearly tagged as belonging to Airline, to include a contact telephone number; (ii) the location of such equipment shall be subject to the prior written approval of the Director; (iii) the use and location of such equipment shall not interfere with the use of other similar equipment on the Airport; (iv) the use and location of such equipment, except for cables, on the Airport shall be only in Exclusive Use Premises, Preferential Use Premises, or Joint Use Premises assigned to Airline, and for which rentals, fees, and charges are being timely paid by Airline pursuant to this Agreement; (v) all cables are installed in conduits, and when such cables are no longer needed, they are promptly removed by Airline without damage to the space and the conduits are also promptly removed by Airline if so required by the Director; and (vi) all installation or removal is performed in accordance with the City's Cabling standards policy, as such policy may be amended from time to time, and any applicable permitting requirements.

*Final Draft 9.6.2024*

(l)    The storage and parking of equipment, cargo, and vehicles in connection with Airline's Air Transportation Business, but only at such locations as specifically designated by the Director.

(m)    The maintenance and repair of equipment and vehicles in connection with Airline's Air Transportation Business, but only at such locations as specifically designated by the Director.

(n)    The operation of break rooms for Airline's employees (and no other persons), and, to the extent permitted by law and not otherwise restricted by Section 4.3(a)(vi), the serving of food and beverages in such employee break rooms if provided to such employees for free or if pursuant to the limited exception in Section 4.3(a)(vi) for vending machines.

Section 4.2    Ingress and Egress.

(a)    Subject to the terms and provisions of this Agreement, the following privileges of ingress and egress with respect to the Airport are hereby granted:

(i)    For Airline, its agents, employees, contractors, subcontractors, and permitted sublessees and assigns, access to the public areas of the Airport and the Airline Premises. This right shall extend to Airline's aircraft, vehicles, machinery, and equipment used in its Air Transportation Business.

(ii)    For Airline's passengers, guests, and invitees, access to areas leased exclusively or preferentially to Airline and to areas provided for the use of Airline's passengers, guests, and invitees in common with those of other Air Carriers and to public areas and public facilities.  This right shall extend to vehicles of such passengers, guests, and invitees.

(iii)    For Airline's suppliers of materials and furnishers of service, access to the public areas of the Airport and to areas and facilities leased exclusively or preferentially to Airline and to areas and facilities provided for the joint use by Airline or its suppliers of materials and furnishers of services. This right shall extend to vehicles, machinery, or equipment of such suppliers and furnishers used in their business of furnishing such supplies and services to Airline.

(b)    The ingress and egress provided for above shall not be used, enjoyed, or extended to any person, Air Carrier, or vehicle engaging in any activity or performing any act or furnishing any service for or on behalf of Airline that Airline is not authorized to engage in or perform under the provisions of this Agreement unless expressly authorized by the Director.

Section 4.3    Restrictions.

(a)    Airline or any of its agents, employees, directors, officers, contractors, invitees, licensees, or representatives shall not do any of the following:

(i)    Do anything that may interfere with the effectiveness or accessibility of the drainage and sewage system, electrical system, air conditioning system, fire protection

23

system, sprinkler system, alarm system, fire hydrants, and hoses, if any, installed or located on or within the premises of the Airport.

(ii)     Do anything that may invalidate or conflict with any fire or other casualty insurance policies covering the Airport or any part thereof.

(iii)    Keep or store, at any time, flammable or combustible liquids except in storage facilities especially constructed for such purposes in accordance with all Applicable Laws, including the Uniform Fire Code and the Uniform Building Code.

(iv)    Do anything that may be in conflict with the provisions of 14 CFR Part 139, Airport Certification, as may be amended from time to time, or jeopardize the operating certificate of the Airport.

(v)     Do anything that may be in conflict with the provisions of 49 CFR Part 1542, Airport Security, as may be amended from time to time, or the TSA-approved security plan for the Airport.

(vi)    Permit any amusement machine, vending machine, public pay telephone, facsimile machine, copy machine, or other machine operated by coins, tokens, or credit cards to be installed or maintained in any publicly accessible area without the express written determination of the Director. Airline or its nominee may, however, install, maintain, and operate vending machines in Airline's Exclusive Use Premises not accessible to the public for the purpose of providing and making available foods, beverages, and sundry food items to Airline's employees only.

(vii)   Provide commercial ground transportation services to any person upon payment of any fee or charge. Airline shall not be in violation of this Section 4.3(a)(vii) if providing limited ground transportation free of any fee or charge to any passenger as a result of irregular operations or to Airline's employees.

(viii)  Perform aircraft engine run-ups, except at locations and during time periods approved in writing in advance by the Director or in accordance with Airport established processes and procedures.

(ix)    Enter into activities at the Airport that compete with the City in the City's development of any Non-Airline Revenue from Airport passengers, tenants, and other users. Should Airline engage in non-airline business activities not specifically permitted in this Agreement, the City may levy a non-discriminatory fee on such activities.

Section 4.4     Concession Services Rights Reserved by City.

(a)     Except as otherwise provided herein, the City reserves the exclusive right to itself, its agents, and its franchisees to operate all concession services (including, but not limited to, food/beverage and news/gift concessions, specialty retail shops and carts, vending machines, pay telephones, facsimile machines, and other voice and data telecommunications systems, advertising displays, baggage lockers, and baggage carts) in the Terminal Building and the FIS, including the Airline Premises, such as holdrooms and loading bridge exterior areas, and to retain the revenue

therefrom; provided, however, that: (i) the City agrees that no concession services shall be located or operated by the City or its nominees in Airline's Exclusive Use Premises or on Airline-owned equipment without Airline's prior consent; (ii) the City shall not exercise such right in a manner that will materially impede passenger ingress or egress or Airline's business operations; and (iii) with respect to Airline's Preferential Use Premises, the City shall not allow the placement of advertising of competing transportation services or of consumer products or services that are sold in competition with providers with which Airline has an affinity marketing program.

 (b) The City shall operate all concessions and provide such other services (with reasonable due consideration to requests made by Airline) for scheduled airline passenger operations at the Airport as it deems necessary or appropriate. Nothing herein shall limit or preclude the City from operating whatever concessions or providing whatever services it may desire at any and all airports and other facilities owned by the City.

 (c) The distribution, serving or sale of food and/or beverages (including alcoholic beverages) meant to be consumed aboard Airline's aircraft by Airline or its in-flight catering provider shall be limited to Airline's passengers while on Airline's aircraft, unless otherwise set forth in this Agreement or agreed in writing by the Director. The provisions of this section notwithstanding, all distribution of alcoholic beverages shall comply with all Applicable Laws.

 (d) Airline shall be allowed to provide water and typical on-board snacks (such as peanuts, pretzels, etc.) in passenger holdrooms at no cost to Airline's passengers in the event of originating flights with delays greater than two (2) hours, diverted flights, or originating flights that have returned to the Gate. All such food and/or beverages shall be on-board snacks brought from an aircraft or otherwise shall be purchased only from the City's food and beverage concessionaires operating at the Airport or others that pay permit fees to the City or used from Airline's provisional flight supplies, provided, however, that in the event the City's food and beverage concessionaires have closed for the day or are closed due to some other circumstance and Airline is experiencing delays, diversions or originating flights returning to Gates, Airline may seek delivery of food and non-alcoholic beverages from non-City sources. Otherwise, distribution of food and/or beverages at no cost to Airline's passengers by Airline shall be permitted only with advance written approval of the Director.

 (e) Airline shall have the right to utilize the Airline Premises assigned for such purposes for the purpose of maintaining and operating Airline passenger clubs or lounges for its guests, invitees, and passengers and may serve beverages, including alcoholic beverages, and food therein with or without charge and subject to all Applicable Laws.

 (f) Except as allowed herein or approved in writing by the Director, all other serving, distribution, or sale of food or beverages by Airline at the Airport is prohibited.

 Section 4.5 Designation and Use of Affiliates.

 (a) For so long as Airline conducts an Air Transportation Business at the Airport, subject to the City's prior written confirmation that any such Affiliate meets the requirements of this Agreement, Airline may utilize one or more Affiliates and allow such Affiliates to conduct its Air Transportation Business at the Airport; to use, in common with others so authorized, the

*Final Draft 9.6.2024*

common and public areas of the Airport (including the airfield), in addition to the Airline Premises; and to perform all operations and functions as are connected, incidental, or necessary to Airline's Air Transportation Business at the Airport; subject to the following:

      (i)    Airline shall provide the City with a completed **Exhibit I** upon execution of this Agreement and, if designating an Affiliate thereafter, an updated **Exhibit I** and Airline or the Affiliate shall provide the City with a certificate of insurance demonstrating that such Affiliate carries insurance coverage naming the City as an additional insured in accordance with Section 13.1 of this Agreement thirty (30) days prior to the Airline designating a new Affiliate, which designation is subject to the City's confirmation that any such Affiliate meets the requirements of this Agreement. As a precondition of being approved by the City, each Affiliate shall (a) be independently liable for all charges incurred related to its operation at the Airport (in addition to Airline's liability stated below), (b) maintain certain minimum levels of insurance coverage, (c) indemnify and hold the City Indemnified Parties harmless of any and all damages incurred as a result of its operations at the Airport as set forth in Section 13.1 hereof and agreeing to abide by all City rules, regulations, operating directives and/or policies as they may be in effect from time-to-time. The Affiliate of Airline will be required to execute an Affiliate Operating Agreement in substantially the same form as **Exhibit J** memorializing the above.

      (ii)    Airline shall be unconditionally responsible for the payment of all rentals, fees, and charges, including Passenger Facility Charges, due under this Agreement by its Affiliate. Except as expressly provided herein, the privileges granted hereunder to Airline shall also apply to any Affiliate of Airline.

      (iii)    An Affiliate of Airline, which is not otherwise a Signatory Airline, shall be entitled to the Signatory Airline rates for rentals, fees, and charges applicable to Airline under this Agreement.

      (iv)    In addition, Airline shall fully indemnify the City for all conduct and omissions of its Affiliates to the fullest extent as is provided in Section 13.2 of this Agreement.

      (v)    Except as may be otherwise specifically provided by the terms of this Agreement, to the extent that an Affiliate operates on behalf of Airline, Airline and its Affiliates shall be treated as a single entity for purposes of the Agreement and the application of the terms of the Agreement, except the calculation and payment of Airline rentals, fees, and charges, unless otherwise requested by Airline.

      (b)    Airline's designation of an Affiliate under this Agreement for purposes of receiving Signatory Airline rates shall not be effective unless and until approved in writing by the Director (such approval being limited to the confirmation that such Affiliate meets the requirements of this Agreement).

      (c)    As of the execution date of this Agreement, the Air Carriers listed on **Exhibit I** to this Agreement have been designated by Airline, and approved by the City and the Director, as Affiliates of Airline under this Agreement.

*Final Draft 9.6.2024*

Section 4.6    Ground Handling Services by Airline or Others.

(a)    Airline may contract with, or receive from, other Air Carriers serving the Airport or other third-party companies, ground handling services (both above and below the wing services) for Airline's aircraft, provided that:

(i)    Airline shall give the Airport Director written notice of any such proposed handling agreement at least ten (10) business days prior to the effective date thereof;

(ii)    Airline shall obtain any permit, license, or other authorization required by the City to perform such duties at the Airport;

(iii)    Airline shall ensure that its third-party service provider(s) obtains any permit, license, or other authorization required by the City to perform such duties at the Airport; and

(iv)    Nothing in this Section shall be construed to relieve Airline or any such handled Air Carrier from its obligations hereunder.

(b)    Nothing herein shall restrict the City from levying a nondiscriminatory concession fee for ground handling services on any person or company (including Airline when Airline is providing these services to other Air Carriers except for its Affiliates when operating on behalf of Airline). For the avoidance of doubt, if providing these services only to Airline or its Affiliates when operating on behalf of Airline, Airline, its Affiliate, or a wholly-owned subsidiary of Airline will not be charged such fee but shall still be subject to the provisions of this Section.

(c)    Airline's insurance, as required in this Agreement, shall provide insurance coverage for such ground handling services to the extent it is not covered by a ground handling services company's own insurance.

Section 4.7    Airport Security.

Airline understands and agrees that it shall fully indemnify, defend, and hold harmless the City, and the City Indemnified Parties (as defined in Section 13.2) from and against all penalties, fines, or demands of any kind (including, but not limited to, costs of investigation, attorney fees, court costs, and expert fees) to the extent arising out of Airline's acts or omissions resulting in alleged violations of 49 CFR Part 1542, Airport Security, as may be amended from time to time, or any successor regulations related to airport security. If Airline, its officers, employees, agents, or those persons under Airline's control (not including Airline's passengers) shall fail or refuse to comply with the aforementioned security requirements and such non-compliance results in a monetary penalty being assessed against the City, Airline shall be responsible for the costs thereof and shall reimburse the City in the full amount of any such monetary penalty; provided, however, that Airline shall the right, but without withholding timely payment or reimbursement to the City thereof, to contest the validity or amount of any such monetary penalty in accordance with Section 13.2(b).

*Final Draft 9.6.2024*

Section 4.8    Removal of Disabled Aircraft.

Upon release of Airline's disabled aircraft by the proper authorities, Airline shall promptly remove any such disabled aircraft from any part of the Airport (including, without limitation, runways, taxiways, aprons, and Gate positions) and place any such disabled aircraft in such storage area as may be designated by the Director. Airline may store such disabled aircraft only for such length of time and on such terms and conditions as may be established by the City. If Airline fails to remove any of its disabled aircraft promptly in accordance with this paragraph, the Director may, but shall not be obligated to, after delivering reasonable advance notice to Airline, cause the removal of such disabled aircraft, such removal and associated storage consistent with Applicable Laws. Airline agrees to reimburse the City for all costs of such removal and storage.

Section 4.9    Employee Parking Facilities.

Airline and its Airport employees shall have the right to use the vehicular parking facilities at the Airport, in common with employees of other airlines, tenants, and Airport-related services. Use of the employee parking facilities is subject to the payment of such employee parking fees as established from time to time by the City. Such facilities shall be located in an area designated by the Director. Airline shall, on request of the Director, provide verification that it is only authorizing and paying for parking for its on-Airport and/or Airport-based employees in City-designated employee parking spaces.

Section 4.10    Restrictions and Reservations.

Unless explicitly provided otherwise herein, the City specifically reserves and retains all rights not specifically granted herein, including but not limited to those with respect to licensing or contracting for concessions, general consumer services, fixed base operators, or other commercial aeronautical services, and related aviation services at the Airport, including, but not limited to food, beverage, retail, advertising, and vending, within the Terminal Building, whether in Airline Premises or public areas of the Airport, and nothing herein shall restrict the City from requiring a permit and levying a charge on any person or company for conducting business at the Airport.

## ARTICLE 5
## AIRLINE RENTALS, FEES, AND CHARGES

In consideration for use of the Airline Premises, facilities, rights, and privileges granted hereunder and for the undertakings of the City, Airline agrees to pay the City during the Term of this Agreement, without deduction or set-off, certain rentals, fees, and other charges as set forth in this ARTICLE 5 and as calculated according to ARTICLE 6 and the Rates and Fees Schedule.

Section 5.1    Terminal Building Rentals.

Airline shall pay the City, for its assigned Exclusive Use Premises and Preferential Use Premises in the Terminal Building, rent ("***Terminal Building Rentals***") based on the annual rental rates for areas calculated each Fiscal Year in accordance with the Rates and Fees Schedule.

*Final Draft 9.6.2024*

Section 5.2    Joint Use Charges.

Airline shall pay the City, for its shared use of Joint Use Space in the Terminal Building, joint use charges ("***Joint Use Charges***") which shall be calculated each Fiscal Year in accordance with the Rates and Fees Schedule. As illustrated in the Rates and Fees Schedule, Joint Use Charges shall be calculated and charged as follows: first, a total Joint Use Space Requirement shall be calculated in accordance with the Rates and Fees Schedule to establish Non-Signatory rates for Joint Use Charges, and the total amount of Non-Signatory Joint Use Charges shall be subtracted from the Joint Use Space Requirement; then, ten percent (10%) of the remaining total Joint Use Space Requirement shall be charged on an equal basis among all Signatory Airlines and the remaining ninety percent (90%) of the total Joint Use Space Requirement shall be charged on a pro rata basis to all Signatory Airlines according to the ratio of the number of a Signatory Airline's Enplaned Passengers at the Airport (including those of their Affiliates') to the total number of Enplaned Passengers of all Signatory Airlines (including those of their Affiliates') using such facilities, service, or space.

Section 5.3    Loading Bridge Fees.

Airline shall pay the City a fee ("***Loading Bridge Fee***") for its preferentially assigned, City-owned passenger Loading Bridges at the Terminal Building. Such fee shall be calculated each Fiscal Year in accordance with the Rates and Fees Schedule.

Section 5.4    Apron Area Fees.

Airline shall pay the City a fee ("***Apron Area Fee***") on a linear foot basis for its preferentially assigned apron areas at the Terminal Building. Such fee shall be calculated each Fiscal Year in accordance with the Rates and Fees Schedule.

Section 5.5    Baggage Handling System/Security Checkpoint Fees.

Airline shall pay the City a fee ("***Baggage Handling System/Security Checkpoint Fee***" or "***BHS/Security Checkpoint Fee***") for its use, in common with other airlines, of the baggage handling system and security checkpoint in the Terminal Building. Such charges shall be calculated each Fiscal Year in accordance with the Rates and Fees Schedule. As illustrated in the Rates and Fees Schedule, BHS/Security Checkpoint Fees shall be calculated and charged as follows: first, a total BHS/Security Checkpoint Requirement shall be calculated in accordance with this Rates and Fees Schedule to establish Non-Signatory rates for BHS/Security Checkpoint Fees, and the total amount of Non-Signatory BHS/Security Checkpoint Fees shall be subtracted from the total BHS/Security Checkpoint Requirement; then, one hundred percent (100%) of the remaining total BHS/Security Checkpoint Requirement shall be charged on a pro rata basis to all Signatory Airlines according to the ratio of the number of a Signatory Airline's Enplaned Passengers at the Airport to the total number of Enplaned Passengers of all Signatory Airlines using such facilities, service, or space.

Section 5.6    Landing Fees.

Airline shall pay the City landing fees ("***Landing Fees***") based on the annual Landing Fee rate calculated each Fiscal Year in accordance with the Rates and Fees Schedule.

*Final Draft 9.6.2024*

Section 5.7    Per Use Fees.

Airline shall pay the City per use fees ("***Per Use Fees***") for its use of the City Gates and non-preferential use of another Signatory Airline's preferentially assigned Gates ("***Per Use Fees – Gates***"), as well as City Ticket Counters or non-preferential use of another Signatory Airline's preferentially assigned Ticket Counters ("***Per Use Fees – Ticket Counters***"), based on the annual per use charges calculated each Fiscal Year in accordance with the Rates and Fees Schedule.

Section 5.8    FIS Fees.

Airline shall pay the City FIS fees ("***FIS Fees***") on a per Deplaned Passenger basis for its use of the City FIS as such fees are established from time to time by the City in accordance with the Rates and Fees Schedule.

Section 5.9    RON Parking Fees.

Airline shall pay the City fees for RON parking ("***RON Parking Fees***") as such fees are established from time to time by the City in accordance with the Rates and Fees Schedule. A Signatory Airline shall not be charged RON Parking Fees for the RON parking of its aircraft at its preferentially assigned Gate. All Air Carriers shall be charged RON Parking Fees for the use of RON parking in non-Terminal Building locations designated by the Director. If an Air Carrier is authorized to use a City Gate for RON parking, such Air Carrier will be charged a RON Parking Fee for such use.

Section 5.10    Other Charges.

The City reserves the right to assess, and Airline agrees to pay, reasonable charges for the use of City-provided services, facilities, and equipment, including, but not limited to, telecommunications trunk equipment, employee parking facilities, the issuance of security identification badges, and fees to reimburse the City for the fully allocated cost of time and materials pertaining to any reimbursable work performed on behalf of Airline by the City plus a fifteen percent (15%) administrative fee.

Section 5.11    Limited Terminal Condition Adjustment.

(a)    There shall be an adjustment in the rentals, fees, and charges paid hereunder by Air Carriers utilizing Terminal A and/or Terminal B for a limited time. Such adjustment shall be equal to Fifteen Dollars and Zero Cents ($15.00) per square foot as shown in **Exhibit F**. Such adjustments shall be made to the rentals, fees, and charges paid by such Air Carriers for use of holdrooms as Terminal Building Rentals and Per Use Fees – Gates, for the following period:

(i)    Beginning upon the start of the first full Fiscal Year following DBO of the expanded Terminal Building facilities constructed as part of TDP, for three (3) Fiscal Years total of the subject adjustments.

*Final Draft 9.6.2024*

Section 5.12   Terminal C Fuel Hydrant "Stub Out" Costs.

(a)   As reflected in **Exhibit G**, and as part of TDP, certain elements of a hydrant fuel system will be constructed. Costs of such elements, up to Twenty Million Dollars ($20,000,000), will be included in the Terminal Building Cost Center as an Equipment and Capital Outlay, and amortized over twenty (20) years utilizing a three percent (3%) discount rate.

Section 5.13   Time of Payment.

(a)   Airline shall make timely payments to the City of Airline rentals, fees, and charges in accordance with the following:

(i)   Terminal Building Rentals, Apron Area Fees, and Loading Bridge Fees shall be due and payable, without deduction or setoff, in monthly installments in advance on or before the first day of each month.

(ii)   Landing Fees, Joint Use Charges, Baggage Handling System Fees, Per Use Fees – Gates, Per Use Fees – Ticket Counters, FIS Charges, and RON Parking Fees for each month of operations shall be due and payable without deduction or setoff within fifteen (15) days after transmittal of an invoice, given that Airline's monthly statistical report as required in Section 7.1 shall be received by the City within ten (10) days after the last day of the month after such month of operations.

(iii)   Airline shall faithfully collect and promptly remit to the City (without notice or demand by the City and in accordance with 14 CFR 158, Passenger Facility Charges, as may be amended from time to time) the proceeds of the City's Passenger Facility Charge so long as the City has an approved Passenger Facility Charge in effect.

(iv)   Rentals, fees, and charges not described above shall be due and payable within thirty (30) days after transmittal of invoice by the City. The City will provide such invoice within thirty (30) days of activity for which charge is generated.

(b)   The acceptance of any payment made by Airline shall not preclude the City from verifying the accuracy of Airline's reporting and computations or from recovering any additional payment actually due from Airline or preclude Airline from later demonstrating that Airline's report was inaccurate and that a lesser amount was properly owed (and to recover any such overpayment).

(c)   In establishing the rentals, fees, and charges set forth in this Agreement, the City is anticipating timely payment of such rentals, fees, and charges. Untimely payment of these rentals, fees, and charges jeopardizes the operation of the Airport. Therefore, in the event that rentals, fees, and charges are not paid timely by Airline, the Director is authorized and directed to seek any necessary legal and administrative remedy to obtain collection of the unpaid rentals, fees, and charges and to assure timely payment of future rentals, fees, and charges. These remedies shall be in addition to late fees required herein and may include any of the following:

(i)   Seeking administrative relief through appropriate federal agencies, including the FAA.

(ii)     Equitable and judicial remedies.

(iii)     Such other legal and administrative remedies as permitted by law.

(d)     Failure to send a timely invoice does not relieve Airline from any obligation of payment.

Section 5.14    Method of Payment.

Rentals, fees, and charges shall be paid in United States Dollars by wire, electronic funds transfer, or check payable to San Antonio International Airport, the City of San Antonio, which shall be delivered or mailed, postage prepaid, to City of San Antonio, Aviation Department, Accounting Section, 457 Sandau Road, San Antonio, TX 78216 or which may be paid by wire transfers to accounts of the Airport designated in writing by the Director. To arrange payment by wire or electronic funds transfer, Airline shall contact the Aviation Department's Accounting Section at (210) 207-7242 for further information.

Section 5.15    Late Fees on Overdue Payments.

Without waiving any other right available to the City, in the event of a default in Airline's payment of any rentals, fees, and charges under this Agreement, including Passenger Facility Charge proceeds, in the event that Airline is delinquent for a period of thirty (30) calendar days or more from the date when such payment is due to the City, Airline shall pay the City late fees thereon, from the date such rentals, fees, or charges become payable to the date of payment at the rate of one and one-half percent (1.5%) per month; provided, however, that if the maximum rate then provided by law is less than 1.5% per month, then the rate shall be such maximum legal rate. The City may, but is not obligated to, provide Airline with a written reminder when invoiced rentals, fees, or charges have not been received within thirty (30) calendar days of transmittal of the invoice therefore and prior to assessing late fees in accordance with this Section 5.12.

Section 5.16    Performance Guarantee.

(a)     To guarantee Airline's faithful performance of all terms and conditions contained herein, including but not limited to the timely payment of all rentals, fees, and charges, Airline shall remit to the City, prior to the Effective Date, a performance guarantee ("***Performance Guarantee***") in an amount totaling:  three (3) months' of Airline's estimated Terminal Building Rentals, Loading Bridge Fees, Joint Use Charges (as determined using activity data for the most recent six (6) calendar months to determine Airline's obligation using the Joint Use Charges formula), and Landing Fees (as determined on the basis of Airline's estimated Landed Weight each year times three-twelfths (3/12) at the actual Landing Fee rate effective for the Fiscal Year). Either Airline or its Affiliate will also provide a Performance Guarantee in an amount based on Affiliate's activity pursuant to the same calculations for the Affiliate.

(b)     The Performance Guarantee may be adjusted by the City annually, or more frequently, if there is a material change to the amount required in this Section 5.13 from Airline. Such Performance Guarantee shall be in the form of a letter of credit, bond, or other instrument satisfactory to the City, in a form acceptable to the Director. The Performance Guarantee must provide that it shall remain in full force and effect for a period extending three (3) months following

*Final Draft 9.6.2024*

termination of this Agreement (and for a period of three (3) months following any holding over by Airline pursuant to Section 2.3), provided that the City shall release or return the Performance Guarantee to Airline at the conclusion of such 3-month period (less any amounts it is entitled to retain hereunder), which obligation shall survive the expiration or termination of this Agreement.

(c)    In the event the City is required to draw down or collect against Airline's Performance Guarantee for any reason, Airline shall, within ten (10) business days after the City's written demand, take such action as may be necessary to replenish the existing Performance Guarantee to its original value or to provide a replacement Performance Guarantee from another source so that the aggregate of the Performance Guarantee(s) is equal to three (3) months' estimated rents and landing fees payable by Airline as described above.

(d)    Upon Airline's election to assume this Agreement under Federal Bankruptcy Rules and Regulations and the Federal Judgeship Act of 1984 or any successor statute, as such may be amended, supplemented, or replaced, the City, by written notice to Airline given at any time within ninety (90) days of the date such event becomes known to the City, may impose or re-impose the Performance Guarantee requirements on Airline. In such event, Airline shall provide the City with the required Performance Guarantee within ten (10) days from its receipt of such written notice and shall thereafter maintain such bond in effect until the expiration or termination of this Agreement.

(e)    If Airline shall fail to obtain or keep in force such Performance Guarantee required hereunder, such failure shall be grounds for immediate termination of this Agreement. The City's rights under this Article shall be in addition to all other rights and remedies provided to the City under this Agreement.

(f)    Airline and the City agree that if Airline provides a Performance Guarantee in the form of a contract bond or irrevocable letter of credit, such Performance Guarantee provided by Airline is not 'property of the estate' for purposes of Section 541 of the United States Bankruptcy Code (Title 11 U.S.C.), it being understood that any Performance Guarantee is the property of the third party providing it (subject to the City's ability to draw against the Performance Guarantee).

Section 5.17    Passenger Facility Charges.

(a)    The City reserves the right to assess and collect PFCs subject to the terms and conditions set forth in 49 U.S.C. § 40117 (the "**PFC Act**") and the rules and regulations thereunder, 14 C.F.R. Part 158 (the "**PFC Regulations**"), as may be amended from time to time. Airline will collect FAA-approved PFCs imposed by the City from all eligible Enplaned Passengers. On or before the last day of each month, Airline will remit to the City all PFC revenue collected for the previous month, less any compensation provided for under 14 CFR §158.53(a), as may be amended from time to time, together with all reports required under §158.65.

(b)    If Airline transports passengers from the Airport on Airline's aircraft chartered by a charter Air Carrier or tour operator issuing passenger tickets other than Airline's, Airline will provide the City with a schedule detailing the date and time of the flight and the number of Enplaned Passengers. Airline agrees to pay the required PFC amount due the City in a timely

manner and to seek reimbursement from the charter Air Carrier or tour operator with no liability to the City.

(c)     Airline shall hold the net principal amount of all PFCs that are collected by Airline or its agents on behalf of the City pursuant to the PFC Act and the PFC Regulations in trust for the City. For purposes of this Section, net principal amount shall mean the total principal amount of all PFCs that are collected by Airline or its agents on behalf of the City, reduced by all amounts that Airline is permitted to retain pursuant to § 158.53(a) of the PFC Regulations (such net principal amount known as "***PFC Revenue***"). Airline acknowledges that all PFC Revenue collected for the City neither belongs to nor is owned by Airline except to the extent set forth in applicable Federal law and, unless the status of PFC Revenue in the possession of Airline is characterized in a separate manner under FAA regulations (in which case such characterization shall prevail), that such PFC Revenue is held in trust by Airline for the exclusive use and benefit of the City. Airline shall not make any claim in any document or proceeding that, for PFC Revenue collected by Airline on behalf of the City, the Airline has any legal or equitable interest in such PFC Revenue, except to the extent Airline is specifically granted such interest by Federal statute or regulation, including the right of reimbursement from such PFC funds for the Airline's costs of collection.

(d)     Any late payment of the PFC may be subject to late fees computed at the rate of one and one-half percent (1.5%) per month or, if less, the highest rate permitted by Applicable Law, from the due date until paid, to the extent allowed by Applicable Law.

(e)     Airline acknowledges that the City has given to the United States of America, acting by and through the FAA, certain assurances under the PFC Act and the PFC Regulations, including Appendix A thereto (the "***PFC Assurances***"), and Airline agrees that this Agreement shall be subordinate and subject to all PFC Assurances. In the event the FAA requires any modification of this Agreement as a condition precedent to the City's collection of PFCs or as a means to effect the City's compliance with the PFC Act, the PFC Regulations, or the PFC Assurances, Airline shall not withhold its consent to any modification of this Agreement as may reasonably be required for the City to collect PFCs or to comply with the PFC Act, PFC Regulations, and/or PFC Assurances.

## ARTICLE 6
## CALCULATION OF AIRLINE RENTALS, FEES, AND CHARGES

Section 6.1    Annual Calculations.

(a)     Each Fiscal Year during the Term, the Director will calculate Terminal Building Rental rates, the Loading Bridge Fee, the Baggage Handling System Use Fee, Per Use Fees, and the Landing Fee rate for the succeeding Fiscal Year as provided in the Rates and Fees Schedule. Any such calculation of rentals, fees, and other charges will be effective on the first day of the applicable Fiscal Year. the Director will use the following process for the annual calculation of rentals, fees, and charges:

(i)     By July 1 of each year, but no later than August 1, the Director will provide Airline with a complete copy of the proposed Airport Budget, capital improvement plan and exhibits showing proposed rentals, fees, and charges, calculated in accordance with the Rates and Fees Schedule, for the succeeding Fiscal Year.

(ii)     By July 31 of each year, but no later than August 15, the Director will consult with the Signatory Airlines, including Airline, concerning the proposed Airport Budget and the proposed rentals, fees, and charges.

(iii)    By September 1 of each year, but no later than September 30, the Director will make any revisions to the proposed rentals, fees, and charges as the Director determines to be warranted as a result of consultation with the Signatory Airlines or otherwise, and will provide written notice to each Air Carrier at the Airport of new rentals, fees, and charges to be effective as of October 1 of that year.

Section 6.2     Midyear Adjustment.

If it appears to the City, during the course of any Fiscal Year, that the budgeted expenses or projected levels of airline activity the City used to calculate the rentals, fees, and charges set forth in the Rates and Fees Schedule are likely to vary by more than ten percent (10%) from actual results, the City may make adjustments to such rentals, fees, and charges at midyear. The City shall provide Airline with at least thirty (30) days' advance written notice of any adjustments to be made under this Section, which shall include accompanying budget variances and calculations to demonstrate the need for adjustment and resulting change in rates, fees, and charges. Any such mid-year adjustment will be effective on the first day of the month following the notification period.

Section 6.3     Year-End Adjustment to Actual and Settlement.

(a)     As soon as possible following the completion of the audit for each Fiscal Year, the City shall furnish Airline with an accounting of the costs and expenses actually incurred, actual allocations for direct and indirect expenses, revenues and other credits actually realized (reconciled to the audited financial statements of the Airport System), and actual Enplaned Passengers and Landed Weight during such Fiscal Year with respect to each of the components of the calculation of the various rates, fees and charges identified in the Rates and Fees Schedule and shall recalculate the rates, fees, and charges required for the Fiscal Year based on those actual costs and revenues.

(b)     In the event that Airline's rentals, fees, and charges billed and paid during the prior Fiscal Year were more than the amount of Airline's rentals, fees, and charges required (as recalculated based on actual costs and revenues), such excess amount shall be paid in a lump sum or issued as a credit to Airline within sixty (60) days of the calculation of such final settlement.

(c)     In the event that Airline's rentals, fees, and charges billed and paid during the prior Fiscal Year were less than the amount of Airline's rentals, fees, and charges required (as recalculated based on actual costs and revenues), such deficiency shall be billed to Airline and payable by Airline within sixty (60) days of the date of invoice. However, in the event that the amount of the Airline deficiency is more than ten percent (10%) of total rentals, fees, and charges billed and paid by the Airline during the prior Fiscal Year (which deficiency must be at least $50,000), Airline may pay the deficiency to the City in equal monthly installments without interest over the remaining months of the current Fiscal Year.

(d)     In the event that in any given Fiscal Year, the City does not satisfy the Bond Rate Covenant, Airline agrees that the amount needed to comply with such Bond Rate Covenant shall

*Final Draft 9.6.2024*

be allocated between the Terminal Building Cost Center and Airfield Area Cost Center in the final year-end accounting referenced herein. Such allocation shall be based upon the allocation of debt to each such Cost Center, provided, however, that such allocation shall not impact the Airline rentals, fees, and charges paid by Non-Signatory Airlines; provided further that any debt included in such allocation that was allocable to Cost Centers other than the Terminal Building Cost Center and Airfield Area Cost Center shall be split fifty/fifty (50/50) among the Terminal Building Cost Center and Airfield Area Cost Center.

Section 6.4   Competitive Credit.

The Competitive Credit will be calculated and credited as shown and set forth in the Rates and Fees Schedule. The purpose of the Competitive Credit is to keep the cost per Enplaned Passenger competitive with that of other airports similarly situated for the development and retention of air service. The City's intent is to use the Competitive Credit to reduce, to the extent prudent, the cost per Enplaned Passenger.

Section 6.5   Extraordinary Adjustments of Rentals, Fees, and Charges.

(a)   Notwithstanding any other provisions hereof, if, at any time during the Term, Airport Revenue (and the reserves designated for such purposes) is not sufficient to pay when due Airport obligations, including, without limitation, emergency repairs or expenses that relate to the Airport or any aspect thereof, the City may, with thirty (30) days' notice to and in consultation with Airline and other Signatory Airlines, and considering their comments and feedback, if any, recalculate the rentals, fees, and charges in accordance with the Rates and Fees Schedule using revised Airport operating costs, expenses and projected Airport activity.

(b)   If such an extraordinary adjustment of rentals, fees, and charges is necessary, the City will review operating costs and as a prudent airport operator make appropriate adjustments, if possible, to Airport operating expenses, in compliance with all Applicable Laws. Any adjustment to operating expenses would be reflected in the adjustment of rentals, fees, and charges.

(c)   In addition, in the event that in any given Fiscal Year, the City does not satisfy the Bond Rate Covenant, Airline agrees that the amount needed to comply with such Bond Rate Covenant shall be allocated between the Terminal Building Cost Center and Airfield Area Cost Center, prospectively at the beginning of the Fiscal Year and/or at the end of a given Fiscal Year as a part of the year-end adjustment described in Section 6.3. Such allocation shall be based upon the allocation of debt to each such Cost Center, provided, however, that such allocation shall not impact the Airline rentals, fees, and charges paid by Non-Signatory Airlines; provided further that any debt included in such allocation that was allocable to Cost Centers other than the Terminal Building Cost Center and Airfield Area Cost Center shall be split fifty/fifty (50/50) among the Terminal Building Cost Center and Airfield Area Cost Center.

(d)   If the requirement for Airline to provide extraordinary coverage pursuant to Section 6.3(d) or Section 6.5(c) is triggered in two consecutive or any two out of three consecutive Fiscal Years, the City agrees to consult in good faith with Airline and other Signatory Airlines regarding potential options for the City to reduce and/or review O&M Expenses for subsequent Fiscal Year(s) during the Term.

*Final Draft 9.6.2024*

## ARTICLE 7
## AIRLINE ACTIVITY REPORTS

Section 7.1    Required Monthly Activity Reports.

Airline shall furnish to the Director, on or before the tenth (10th) day of each month, an accurate verified report detailing its operations for the previous month in substantially the same form as **Exhibit B** or in such other format as prescribed or approved by the Director. The City reserves the right to periodically audit these reports to verify the accuracy of the information.

Section 7.2    Failure to Furnish Report.

If Airline fails to furnish the City with the report described above, the City reserves the right to calculate Airline's Landing Fee by assuming that the total Landed Weight for Airline during the preceding month was one hundred twenty-five percent (125%) of the total Landed Weight for the most recent month for which such figure is available or other available data. Any necessary adjustment in such Landing Fee shall be calculated after an accurate report is delivered to the Director by Airline for the month in question, and resulting surpluses or deficits shall be applied to Airline's Landing Fee for the next succeeding month. An accounting fee of $100 for each failure to furnish such report by Airline may be charged to Airline and shall be payable by Airline for the additional services required by the City pursuant to this paragraph in addition to any late fees charged pursuant to Section 5.12.

## ARTICLE 8
## CAPITAL IMPROVEMENTS

Section 8.1    Approval of the Terminal Development Program.

(a)    The Parties each hereby approve the cost and scope of the Terminal Development Program as set forth in **Exhibit G,** including without limitation the TDP Airline Rate Base Cap and the TDP GARB Financing Cap. Such approval constitutes Airline's MII approval of the Terminal Development Program for the purposes of this ARTICLE 8 and the City may proceed with the planning, design and construction for the Terminal Development Program without further MII consideration, and include such costs in the calculation of Airline rentals, fees and charges, provided that:

(i)    If the City reasonably anticipates, at the time the City receives bids for construction, new or revised independent fee estimates, or other pertinent information, a Capital Improvement that is part of the Terminal Development Program is projected to cause the City's estimated total cost of completion for the TDP Airline Rate Base Elements to exceed the TDP Airline Rate Base Cap by more than five percent (5%), the City may not include such costs in the calculation of Airline rentals, fees and charges unless:

(A)    an MII approves such Capital Improvement pursuant to the procedures in Section 8.6, in which case the TDP Airline Rate Base Cap shall be raised accordingly; or

*Final Draft 9.6.2024*

(B)     the City, after consultation with the applicable TDP Governance Committees, revises other elements of the Terminal Development Program so that such Capital Improvement no longer would cause the City to exceed the TDP Airline Rate Base Cap.

(b)     The City acknowledges that the planning, design and construction for the Terminal Development Program shall require close coordination between the City, Airline and other Air Carriers. In addition to the MII rights provided herein, Airline shall be provided opportunities to participate in the governance of the City's Terminal Development Program, as described further in **Exhibit G**.

(c)     In addition, if the City believes that it is reasonably necessary for the City to pursue additional financing through GARBs for the Terminal Development Program in an amount that would exceed the TDP GARB Financing Cap by more than five percent (5%), the City may not proceed unless an MII approves such additional financing pursuant to the procedures in Section 8.6, in which case the TDP GARB Financing Cap shall be raised accordingly.

Section 8.2     Approval of Terminal A Renovation and Terminal B Renovation.

(a)     *Terminal A Renovation.* The Parties each hereby approve the cost and scope of the Terminal A Renovation as set forth in **Exhibit M**, including the total projected Net Project Costs of Two Hundred Million Dollars ($200,000,000), and which is separate and apart from and is not included in the TDP. Such approval constitutes Airline's MII approval of the Terminal A Renovation for the purposes of this ARTICLE 8 and the City shall proceed with the planning, design and construction for the Terminal A Renovation without further MII consideration, and include such costs in the calculation of Airline rentals, fees, and charges, provided that:

(i)     If the City reasonably anticipates, at the time the City receives bids for construction, the estimated budget for the Terminal A Renovation has increased or will increase by more than ten percent (10%) (as calculated based on adjusting the original estimate for any increase in the CPI during the time between notifying Airline of such estimate and receiving bids), the City may not include such costs in the calculation of Airline rentals, fees and charges unless an MII approves the adjusted estimate pursuant to the procedures in Section 8.6.

(b)     *Terminal B Renovation.* The Parties each hereby approve the cost and scope of the Terminal B Renovation as set forth in **Exhibit M**, including the total projected Net Project Costs of One Hundred Million Dollars ($100,000,000), and which is separate and apart from and is not included in the TDP. Such approval constitutes Airline's MII approval of the Terminal B Renovation for the purposes of this ARTICLE 8 and the City shall proceed with the planning, design and construction for the Terminal B Renovation without further MII consideration, and include such costs in the calculation of Airline rentals, fees, and charges, provided that:

(i)     If the City reasonably anticipates, at the time the City receives bids for construction, the estimated budget for the Terminal B Renovation has increased or will increase by more than ten percent (10%) (as calculated based on adjusting the original estimate for any increase in the CPI during the time between notifying Airline of such

*Final Draft 9.6.2024*

estimate and receiving bids), the City may not include such costs in the calculation of Airline rentals, fees and charges unless an MII approves the adjusted estimate pursuant to the procedures in Section 8.6.

(c)     As described further in **Exhibit M**, the City acknowledges that the planning of the Terminal A Renovation and the Terminal B Renovation will require close coordination between Airline, other Air Carriers, and the City, including, in particular, Signatory Airlines assigned to Terminal A and/or Terminal B following DBO of expanded Terminal Building facilities.

Section 8.3     Conditional Approval of Cargo Taxiway Construction.

(a)     The Parties each hereby approve the expenditure of up to Twenty-Two Million Dollars ($22,000,000), to be included in the calculation of Airline rentals, fees, and charges, for the construction of a taxiway extension (the "***Cargo Taxiway Extension***") that would serve the to be constructed east cargo apron (the "***East Cargo Apron***"), and which is separate and apart from and is not included in the TDP. The Cargo Taxiway Extension and the East Cargo Apron are depicted on **Exhibit N**.  Such approval constitutes Airline's MII approval of the Cargo Taxiway Extension for the purposes of this ARTICLE 8, provided that such approval is conditional as follows:

(i)     A prerequisite for the initiation of the Cargo Taxiway Extension project is that:

(A)     A definitive design, construction, and plan of finance exists related to the future East Cargo Apron; and

(B)     An entity has committed to a long-term agreement with the City to lease and occupy a to be constructed cargo facility to be located on the East Cargo Apron and to pay for the use of the apron area appurtenant to such cargo facility.

(ii)     In addition, the City agrees to use best efforts to design both the Cargo Taxiway Extension and the East Cargo Apron such that it will maximize the eligibility for federal and/or state grant funding.

Section 8.4     Additional Capital Improvements.

(a)     The Parties hereto recognize that Capital Improvements other than the Terminal Development Program and the Terminal A Renovation may be required to preserve, protect, enhance, expand, or otherwise improve the Airport System, or part hereof, during the Term. Any such Capital Improvements to be paid for or financed with Airport Revenue shall be subject to the provisions of this ARTICLE 8 including without limitation the procedures in Section 8.6.

(b)     The City acknowledges that the planning of projects to construct new terminals or concourses will require close coordination between Airline, other Air Carriers, and the City. The City will include Airline in the planning process.  Airline will be provided opportunities to present planning input to City planners to ensure that any new terminal or concourse project is properly scoped, necessary, operationally efficient, cost effective, and will meet the needs of the traveling public.

*Final Draft 9.6.2024*

Section 8.5    Annual Consultation on CIP.

On or about July 1, or approximately ninety (90) days prior to the end of the then-current Fiscal Year, the City shall notify Airline in writing of its proposed Aviation Department Capital Improvement Program for the subsequent Fiscal Year, as contained in the City's proposed Aviation Department Capital Improvement Budget for such Fiscal Year. The City further reserves the right to notify Airline in writing at any other time of proposed Capital Improvements.

Section 8.6    Capital Improvements Not Subject to MII.

(a)    Notwithstanding the foregoing, in addition to the Terminal Development Program and the Terminal A Renovation, the following Capital Improvements shall be permitted by the City at any time and shall not be subject to MII consideration, and the City may include such costs in the calculation of Airline's rentals, fees and charges:

(i)    Capital Improvements that are underway as of the Effective Date and/or that were previously approved by an MII pursuant to a Prior Use and Lease Agreement.

(ii)    From the Effective Date through the end of Fiscal Year 2031, Capital Improvements that do not exceed Ten Million Dollars ($10,000,000) in Net Project Costs.

(iii)    Beginning in Fiscal Year 2032 and for the remainder of the Term, Capital Improvements that do not exceed Twenty Million Dollars ($20,000,000) in Net Project Costs. The Parties acknowledge their intent that a single project not be spread across multiple Fiscal Years solely to escape the provisions of Section 8.6(a)(ii) and Section 8.6(a)(iii), provided, however, that this intent shall not act to preclude the City from completing separate projects that are reasonably part of a multiyear program, and the City will advise Airline of the general scope of such program encompassing such individual project elements.

(iv)    Capital Improvements that involve the acquisition of land necessary for the Airport, provided that the costs of such acquisition are not projected to trigger Airline's requirement to provide extraordinary coverage pursuant to Section 6.5(c) at the time of acquisition or the subsequent Fiscal Year.

(v)    Capital Improvements necessary to settle claims or lawsuits, satisfy judgments or comply with judicial or administrative orders arising from or related to the ownership, operation, maintenance or use of the Airport.

(vi)    Capital Improvements that are special facilities for which, in all cases, the tenant(s) or other user(s) thereof shall be required to pay directly or reimburse the City for all costs, including financing costs, associated with such facilities during the Term of this Agreement.

(vii)    Capital Improvements that are special facility projects or similar projects to construct new or enlarge or improve existing premises of an Air Carrier, provided that such Air Carrier fully and directly funds the project costs and any associated O&M Expenses.

40

Final Draft 9.6.2024

(viii)    Capital Improvements to be financed in whole by PFCs or PFC-backed bonds, or, if financed in part by PFCs or PFC-backed bonds, only the portion of such Capital Improvements to be financed by PFCs or PFC-backed bonds.

(ix)    Capital Improvements of an emergency nature, which, if not undertaken, would substantially impair the current operation of the Airport.

(x)    Capital Improvements necessary for public or employee safety or security.

(xi)    Capital Improvements necessary to comply with the requirements of federal, state and local agencies, including compliance with any applicable statutes, regulations, orders, certification requirements and FAA Advisory Circulars, building codes and local regulations.

(xii)    Capital Improvements to repair or replace Airport property damaged or destroyed by fire, weather or other casualty to the extent that such damage is not covered by casualty insurance.

Section 8.7    MII Approval and Deferral Process.

(a)    *City Proposal.* Whenever the City shall be required to submit a Capital Improvement for MII consideration pursuant to this ARTICLE 8, the City shall submit a written proposal to Airline and each other Signatory Airline that includes the following:

(i)    The current purpose, scope and definition for the project, including any modifications if the project was previously approved by an MII;

(ii)    A list of changes in scope requiring MII review, if applicable;

(iii)    The currently anticipated schedule;

(iv)    The current funding plan, cost center(s) to which project costs will be allocated, and estimated total project costs and Net Project Costs; and

(v)    The currently anticipated projected impact on Airline rentals, fees and charges, including the currently anticipated projected impact on the Airport's aggregate cost per Enplaned Passenger.

(b)    *Consideration by MII.* A Capital Improvement shall be deemed approved if (i) an MII approves it; or (ii) the City is not notified in writing by the chair of the AAAC within thirty (30) days of delivery of the City's written proposal that an MII has disapproved of the City's proposal (or, for City proposals pursuant to Section 8.1(a)(i)(A), within five (5) business days). Such written notification to the City shall include the written disapproval of each Signatory Airline that has disapproved the proposal.

(c)    *Deferral by MII.*

(i)     Except as provided in Section 8.6(d), in the event of a Capital Improvement disapproval by an MII, the Capital Improvement will be deferred for the applicable time period described in Section 8.6(c)(ii) following the notification to the City of such disapproval unless the City decides to proceed with such Capital Improvement and does not include such costs in the calculation of Airline rentals, fees and charges upon the Capital Improvement's completion. Following such deferral period, the City may proceed with such Capital Improvement and such costs will be included in the calculation of Airline rentals, fees and charges upon the Capital Improvement's completion.

(ii)    Deferral by an MII pursuant to this Section 8.6(c) will be:

(A)    For Capital Improvements that do not exceed Fifty Million Dollars ($50,000,000) in Net Project Costs, twenty-four (24) months;

(B)    For Capital Improvements that are more than Fifty Million Dollars ($50,000,000) in Net Project Costs, the remainder of the Term.

(iii)   Notwithstanding anything else herein to the contrary, any such deferral will not extend beyond the expiration of the Term.

(d)     *Reconsideration by MII.* For any Capital Improvement that is disapproved by an MII, the City may bring such Capital Improvement for an additional vote by the MII, no less than thirty (30) days after the original disapproval by the MII.  If such additional vote results again in a disapproval by the MII, the City may bring such Capital Improvement for additional votes, no less than thirty (30) days after the date of the MII's decision in its most recent additional vote. If the MII disapproves such Capital Improvement in any additional vote the City shall not proceed with such Capital Improvement until an MII has approved such Capital Improvement, the deferral period described in Section 8.6(c) has expired, or after the expiration of the Term, unless the City decides to proceed with such Capital Improvement and does not include such costs in the calculation of Airline rentals, fees and charges upon the Capital Improvement's completion.

Section 8.8    MII Triggered by Budget Increase.

For Capital Improvements subject to MII and not initially disapproved by an MII pursuant to Section 8.6, such Capital Improvements shall be subject to additional MII consideration if, at the time the City receives bids for construction, the estimated budget approved by the original MII has or will increase by more than ten percent (10%) (as calculated based on adjusting the original estimate for any increase in the CPI during the time between notifying Airline of such estimate and receiving bids).

## ARTICLE 9
## BOND ORDINANCE SUBORDINATION

Section 9.1    Subordination to Bond Ordinance.

(a)     This Agreement and all rights of Airline hereunder are expressly subordinated and subject to the lien and provisions of any pledge, transfer, hypothecation, or assignment made (at any time) by the City to secure Airport Bond financing. This Agreement is subject and subordinate

*Final Draft 9.6.2024*

to the terms, covenants, and conditions of the Bond Ordinance authorizing the issuance of Airport Bonds by the City of San Antonio. The City may amend or modify the Bond Ordinance or make any change thereto that does not materially adversely affect Airline rights under this Agreement. Conflicts between this Agreement and the Bond Ordinance shall be resolved in favor of the Bond Ordinance.

(b)    All definitional terms that are not specifically defined herein are to have the meanings set forth in the Bond Ordinance.

**ARTICLE 10**
**MAINTENANCE AND OPERATING RESPONSIBILITIES**

Section 10.1    Designation of Terminal Building Maintenance Responsibilities.

(a)    In addition to the obligations of Airline and the City set forth in this ARTICLE 10, the Parties' responsibilities for maintenance, cleaning, and operation of the Airline Premises and certain other portions of the Airport are set forth in the Maintenance Schedule presented in **Exhibit K**. Airline agrees to perform the obligations set forth in the Maintenance Schedule, which are assigned to Airline, and the City agrees to perform the obligations set forth in the Maintenance Schedule, which are assigned to the City.

(b)    **Exhibit K** may only be amended by written agreement of the Parties, except that the City and Airline agree and anticipate that **Exhibit K** will be amended during the Term to reflect then-existing premises post-DBO of new Terminal Building facilities in the following manner:

(i)    No less than one hundred twenty (120) days prior to DBO of such facilities, the City shall provide Airline with a revised **Exhibit K** reflecting the post-DBO premises;

(ii)    Such revised **Exhibit K** will designate Terminal Building maintenance responsibilities as between the City and Airline in the same manner as the previous **Exhibit K** allocated such responsibilities (*e.g.*, if the City was previously responsible for maintaining a certain category of Joint Use Space, and additional space was added to that category, the City would continue to be responsible, but now including the additional space in that category);

(iii)    If Airline does not (nor does any other Signatory Airline) provide notice of its objection to the revised **Exhibit K** as provided in Section 10.1(b)(iii) below, such revised **Exhibit K** will be deemed to supersede and replace the previous **Exhibit K** without need for written amendment to this Agreement, and the Parties shall comply post-DBO with such revised **Exhibit K**;

(iv)    If Airline objects to the designation of additional responsibility to Airline (or to the Signatory Airlines collectively) as provided in the revised **Exhibit K**, Airline shall provide written notice to the City and to the Chair of the AAAC of such objection no later than ten (10) days after receipt of the revised **Exhibit K**, and the City, acting through the Airport Director or his or her designee, Airline, and the Chair of the AAAC shall meet within thirty (30) days to negotiate in good faith to resolve Airline's objections to the revised **Exhibit K**;

43

*Final Draft 9.6.2024*

(v)    If the City and Airline cannot agree on a revised **Exhibit K** prior to DBO, the Parties agree that each Party will comply with the responsibilities allocated to such Party in the **Exhibit K** provided by the City pursuant to Section 10.1(b)(i) post-DBO until and unless a revised **Exhibit K** is reissued by the City to Airline (and other Signatory Airlines) that was agreed to in writing by the Airport Director and the Chair of the AAAC (on behalf of all Signatory Airlines).

Section 10.2    Maintenance Responsibilities at Airline Premises.

(a)    Airline shall perform ordinary preventive maintenance and upkeep and repair of all facilities located in its Exclusive Use Premises and Preferential Use Premises at Airline's sole cost and expense in accordance with **Exhibit K**. Airline shall, at all times, preserve and keep the Airport, Airport facilities, and Airline Premises in an orderly, clean, neat, and sanitary condition, free from trash and debris resulting from Airline's operation.

(b)    Airline shall keep, at its own expense, its Terminal Building and/or cargo aircraft aprons free of fuel, oil, and other foreign objects and debris resulting from Airline's operations. Airline shall operate and maintain, at its own expense, any improvements and/or equipment installed by Airline for the exclusive use of Airline.

Section 10.3    Airline-Constructed Improvements.

(a)    Airline shall make no alterations, additions, improvements, or installations on the Airline Premises or the Airport without prior written approval from the Director and without obtaining all applicable permits and in compliance with all Rules and Regulations and Applicable Laws.

(b)    Airline shall cause all improvements and facilities, and additions thereto, constructed or installed by Airline, either alone or in conjunction with others, and all vehicles and equipment operated by Airline on the Airport, to be kept and maintained in a safe condition and in good repair in accordance with uniform standards applicable to all similarly situated Airport tenants as established from time to time by the Director. Airline shall keep the Exclusive Use Premises and Preferential Use Premises and improvements thereon in a safe, sanitary, and neat condition.

(c)    Airline covenants and agrees to pay all costs necessary to complete approved alterations or improvements. The City will not be responsible for any costs relating to such alterations or improvements whether such alterations or improvements were requested by Airline or were required by the City in accordance with this Agreement or any other Governmental Authority or pursuant to Applicable Laws.

Section 10.4    Additional Requirements for Construction Contracts.

(a)    In accordance with Section 2252.909 of the Texas Government Code, Airline shall include the following requirements in all Construction Contracts:

(i)    a requirement that the Contractor execute a payment bond that conforms to Subchapter I, Chapter 53, of the Texas Property Code;

(ii)    a requirement that the Contractor execute a performance bond in an amount equal to the amount of the Construction Contract for the protection of the City and conditioned on the faithful performance of the Contractor's work in accordance with the plans, specifications, and contract documents; and

(iii)    a requirement that the Contractor provide to the City a notice of commencement ("***Notice of Commencement***") consistent with said Section 2252.909 at least ninety (90) days before the date construction, alteration, or repair of any Improvement or Alteration to the Premises begins. The Notice of Commencement must:

(A)    identify the public property where the work will be performed;

(B)    describe the work to be performed;

(C)    state the total cost of the work to be performed;

(D)    include copies of the performance and payment bonds required by this Section; and

(E)    include a written acknowledgement signed by the Contractor stating that copies of the required performance and payment bonds will be provided to all subcontractors no later than the fifth day after the date a subcontract is executed.

(b)    On or before the 10th day after the date the City receives a Notice of Commencement, the City may, in its sole discretion, notify Airline that the construction, alteration, or repair of the Improvement or Alteration may not proceed. A material misrepresentation of information in a Notice of Commencement is a Class A misdemeanor.

Section 10.5    Visual Artists Rights Act.

Airline shall not install any object in the Terminal Building or commence construction of any alterations, additions, or improvements that constitutes a work of visual art under the Visual Artists Rights Act of 1990, as amended ("***VARA***") unless and until Airline has provided the City with either (i) written notification satisfactory to the City that VARA does not apply; or (ii) a written waiver from the author of a work of visual art, in form and substance reasonably satisfactory to the City, which identifies specifically the work of visual art and the uses of that work to which the waiver applies in accordance with 17 U.S.C. § 106A(e)(1).

Section 10.6    Performance by City Upon Failure of Airline to Maintain.

In the event Airline fails within thirty (30) days after receipt of written notice from the City to perform any of its obligations required hereunder, the City may enter the Airline Premises involved, without such entering causing or constituting a termination of this Agreement or an interference with the possession of said Airline Premises by Airline, and do all things reasonably necessary to perform such obligation. Director may charge Airline the City's cost of performing such maintenance or repair plus fifteen percent (15%) for administration. Airline agrees to pay to the City upon demand such charges in addition to any other amounts payable by Airline hereunder; provided, however, that if Airline's failure to perform any such obligation endangers the safety of

the public, the employees or property of the City, or other tenants of the Airport and Director so states in its written notice to Airline, the City may perform such obligation of Airline at any time after the giving of such notice and charge to Airline the reasonable cost and expense of such performance including any administrative fees which Airline shall pay as aforesaid.

### ARTICLE 11
### SAN ANTONIO AIRLINE CONSORTIUM

Section 11.1   Airline and other Air Carriers operating at the Airport have formed San Antonio Airline Consortium, Incorporated ("**SAAC**"), a Texas not-for-profit limited liability corporation, to provide certain maintenance, janitorial, and passenger services within the Airline Premises and certain other areas of the Terminal Building assigned to Air Carriers and to operate and maintain certain systems, equipment, and facilities in and about the Terminal Building, on behalf of SAAC member and nonmember Air Carriers and the City, which services, operation, and maintenance are the responsibility of Airline and other Air Carriers under the terms of this Agreement. The City  and SAAC will enter into or have entered into an agreement pursuant to which SAAC may perform such services on behalf of Airline and other Air Carriers. If SAAC is disbanded and/or such agreement between the City and SAAC is terminated, Airline agrees to work diligently with the other Signatory Airlines to ensure the provision of the services designated as the responsibility of SAAC in **Exhibit K**, in a manner reasonably satisfactory to the City.

### ARTICLE 12
### DAMAGE OR DESTRUCTION

Section 12.1   Partial Damage.

If any of the Airline Premises shall be partially damaged by fire or other casualty, but such Airline Premises remain inhabitable, same will be repaired with due diligence by the City to the condition existing just prior to such casualty, but the City's responsibility in this regard shall be limited to the extent of the proceeds of insurance received with respect to such premises and to the extent funds are appropriated for such repair by the City's governing body.

Section 12.2   Extensive Damage.

(a)   If any of the Airline Premises shall be completely destroyed or partially damaged by fire or other casualty rendering all or a substantial portion of the Airline Premises uninhabitable and it is reasonably estimated by the Director that it will take more than one hundred eighty (180) days to repair, the Director will notify Airline in writing within ninety (90) days of such casualty whether the damaged or destroyed Airline Premises will be repaired.  If any or all of the Airline Premises is to be repaired, it will be repaired with due diligence by the City, and the rent allocable to the damaged or destroyed Airline Premises will be abated for the period from the occurrence of the damage to the substantial completion of the repairs. If the repair period is estimated to exceed 180 days, the City will make good faith efforts to provide Airline with temporary substitute space, if available, during such period of repair, at a rental rate for comparable space based on the rentals, fees, and charges principles set forth in this Agreement. If the Airline Premises have been reduced due to the City's election not to repair extensively damaged premises, Airline shall be entitled to either (i) request, and the City shall duly consider, further proportionate reductions in the Airline

Premises so that Airline has use of an operative remainder or (ii) terminate this Agreement with respect to the damaged Airline Premises.

(b)     If the City shall fail to notify Airline of its decision as set forth in the above paragraph (or gives written notice of its intent not to repair), the City will be deemed to have elected to not repair the damaged premises, and the damaged premises shall be automatically deleted from the Airline Premises as of the date of the damage or destruction, with no further liability therefore by either the City or Airline except those liabilities that accrued, including rentals, fees, and charges, prior to such damage or destruction, unless, within ten (10) days of the date upon which the City does provide or would have been required to provide the notice in Section 12.2(a), Airline provides notice to the City that it will reconstruct all its improvements in the damaged or destroyed Airline Premises necessary for the conduct of Airline's business operations at its own cost in the manner existing just prior to the casualty, consistent with the City's obligations set forth in the paragraphs above.

Section 12.3     Limits of City's Obligations Defined.

Redecoration, replacement, and refurbishment of Airline-owned furniture, fixtures, equipment, and supplies will be the responsibility of and paid for by Airline, and any such redecoration and refurbishing or re-equipping will be of substantially equivalent quality to that originally installed hereunder.  The City will not be responsible to Airline for any claims related to loss of use, loss of profits, or loss of business resulting from any partial, extensive, or complete destruction of the Airline Premises regardless of cause of damage.

Section 12.4     Waiver of Subrogation.

To the extent such insurance permits, and then only to the extent collected or collectable by Airline under its property insurance coverage, Airline waives any and all claims against the City and the City Indemnified Parties for loss or damage to Airline's property.

## ARTICLE 13
## INSURANCE AND INDEMNIFICATION

Section 13.1     Insurance.

(a)     By use and occupancy of Airport premises, Airline understands and agrees that it shall, at its sole expense and in a manner acceptable to the City, purchase and maintain or cause to be maintained in force the following insurance coverage for itself and its officers, agents, employees, passengers, guests, patrons, contractors, subcontractors, licensees, subtenants, invitees, and suppliers. Airline shall maintain in full force and effect the forms of insurance specified in this Article 13. All such insurance hereunder shall be maintained with insurance underwriters with an AM Best rating of A- or better, or its international equivalent.

(b)     All liability insurance policies shall provide coverage that includes, or has the same substantive effect as, the following wording:

(i)     "The City of San Antonio and its officers, directors, employees, volunteers, representatives, agents, and elected and appointed representatives are listed as additional

insured parties (except with respect to workers' compensation/employer's liability insurance)."

(ii)    "Airline's insurance shall be primary insurance and non-contributory including a waiver of subrogation with respect to all other available sources."

(iii)    "This insurance shall not be materially changed, altered, canceled, or non-renewed until after thirty (30) days' advance written notice has been given to the City of San Antonio except that only ten (10) days' notice shall be required in the event of cancellation due to non-payment of premium."

(c)    At least ten (10) calendar days prior to the Effective Date of this Agreement, Airline shall furnish the City with evidence of all insurance policies required hereunder. Prior to the expiration of any then-current policy of insurance, Airline shall deliver to the City evidence showing that such insurance coverage has been renewed. At least five (5) calendar days prior to the date of cancellation or reduction of coverage, as received in the written notice from the insurer, Airline shall deliver to the Director evidence showing reinstatement or other provision for the required insurance.

(d)    All such evidence shall be in the form of certificates of insurance reasonably satisfactory to the Director.

(e)    The following types and minimum amounts of coverage are required under this Agreement:

(i)    Aviation liability insurance, covering bodily injury, personal injury, property damage, products/completed operations liability, premise liability, and contractual liability, with a liability limit of not less than Five Hundred Million Dollars ($500,000,000.00) combined single limit per occurrence, on occurrence form policy. Said limit shall be reduced to Two Hundred Fifty Million Dollars ($250,000,000.00) where Airline's maximum seating capacity on the largest aircraft operated at the Airport by Airline is thirty (30) or less. With respect to coverage for products/completed operations and personal injury, except with respect to passengers, a sublimit of not less than Twenty-Five Million Dollars ($25,000,000.00) per occurrence, and in the annual aggregate, shall be permitted with the approval of the Director. Said aircraft liability shall be applicable to owned, non-owned, and hired aircraft.

(ii)    Automobile liability insurance with a liability limit of not less than Ten Million Dollars ($10,000,000.00) for all owned, non-owned, and hired vehicles operated by or on behalf of Airline at the Airport, including any additional or replacement vehicles.

(iii)    Liquor liability insurance for Airline if serving alcoholic beverages in an amount not less than Ten Million Dollars ($10,000,000.00) per occurrence.

(iv)    Employer's liability insurance in an amount not less than One Million Dollars ($1,000,000.00) per occurrence.

(v)    Environmental impairment liability insurance in an amount not less than Two Million Dollars ($2,000,000.00) per occurrence. In lieu of environmental impairment liability insurance, Airline may submit proof of self-insurance by submitting a letter to the City attesting to the limit and extent of coverage.

(vi)    Airline shall likewise maintain workers' compensation insurance or evidence of self-insurance, in accordance with the laws of the State of Texas, covering all of its employees who may from time to time be at the Airport in such capacity. Airline shall require each of its agents, licensees, contractors, subcontractors, and suppliers of the Airline Premises to maintain such workers' compensation insurance covering their employees coming on Airport premises in connection with Airline's operations hereunder. The workers' compensation policy(s) required hereunder shall be endorsed to state that the workers' compensation carrier waives its right of subrogation against the City and the City Indemnified Parties. Upon request by the Director, Airline shall furnish the Director with evidence of such workers' compensation insurance in a form acceptable to the City.

(f)    The minimum limits of the insurance herein required may become inadequate during the Term of this Agreement. The City hereby reserves the right to review all coverages and amounts and request adjustments as necessary in the City's reasonable discretion.

(g)    If, at any time, Airline fails to obtain or maintain in force the insurance required herein, such failure, if not cured within forty-eight (48) hours, shall constitute a default permitting the City, upon prior reasonable written notice to Airline, to (1) terminate Airline's use of the space or Airline's operations or activities in regard to the Airport; and/or (2) with prior written notice and at its option, in addition to all its other remedies, procure insurance coverage at Airline's expense whereupon Airline promptly shall reimburse the City for such expense.

(h)    If any claim for damages is filed with Airline or if any lawsuit is instituted against Airline, Airline shall give prompt and timely notice thereof to the Director, provided that claims and lawsuits subject to such notice are only those that arise out of or are in any way connected with Airline's or its officers', representatives', agents', employees', passengers', guests', patrons', contractors', subcontractors', licensees', subtenants', invitees', or suppliers' use of the Airline Premises or Airline's operations or activities in regard to the Airport and that, in any way, directly or indirectly, contingently or otherwise, affect or might reasonably affect the City, including without limitation Claims as defined in Section 13.2(a). Notice shall be deemed prompt and timely if given within thirty (30) calendar days following the date of receipt of a claim or ten (10) calendar days following the date of service of process of a lawsuit. Accident or property damage claims against Airline in an amount less than Fifty Thousand Dollars ($50,000.00) shall be excluded from the requirements of this paragraph unless such claim is also made against the City or a City Indemnified Party.

(i)    If any claim for damages is filed with the City or if any lawsuit is instituted against the City, the City shall give prompt and timely notice thereof to Airline, provided that claims and lawsuits subject to such notice are only those that arise out of or are in any way connected with the operation of the Airport by the City and that the City reasonably believes materially affects or might reasonably materially affect Airline, including without limitation Claims as defined in Section 13.2(a). Notice shall be deemed prompt and timely if given within thirty (30) calendar

days following the date of receipt of a claim or ten (10) calendar days following the date of service of process of a lawsuit. Accident or property damage claims in an amount less than Fifty Thousand Dollars ($50,000.00) shall be excluded from the requirements of this paragraph unless such claim is also made against Airline or the City is seeking indemnification and/or defense from Airline pursuant to Section 13.2.

(j)    The time limitations set forth above are directory. If the notice required to be given by these paragraphs is not given within the time limitations set forth herein, then the party giving the notice shall not be precluded from establishing that the notice actually given was timely under the circumstances of the particular claim or lawsuit, unless by the failure to give such notice within the applicable time period, the other party has been prejudiced in its ability to consider such claim or to respond to, or properly defend, such lawsuit. If the other party is so prejudiced by a late notice, then the late notice shall not be deemed to be prompt and timely.

Section 13.2    Indemnification.

(a)    Airline covenants and agrees to fully indemnify, defend, and hold harmless, the City and its officers, directors, employees, City-sanctioned volunteers, representatives, agents, elected and appointed representatives, and subdivisions (the "***City Indemnified Parties***"), individually and collectively, from and against any and all costs, claims, liens, damages, losses, expenses, fees, fines, penalties, proceedings, actions, demands, causes of action, liability and suits of any kind and nature, including but not limited to, personal or bodily injury, death and property damage, directly or indirectly arising out of, resulting from or related to Airline's activities under this Agreement or its use of the Airport, including any acts or omissions of Airline, any of its Affiliates (to the extent operating at the Airport on behalf of Airline), and their officers, volunteers, representatives, agents, employees, contractors, subcontractors, licensees, subtenants, invitees (excluding Airline's passengers), or suppliers (the "***Airline Parties***") while in the exercise of the rights or performance of the duties under this Agreement ("***Claims***"). The indemnity provided for in this paragraph shall not apply to any Claims resulting from the negligence of the City, or a City Indemnified Party, to the extent of and in instances where such negligence causes personal injury, death, or property damage. IN THE EVENT AIRLINE AND THE CITY ARE FOUND JOINTLY LIABLE BY A COURT OF COMPETENT JURISDICTION, LIABILITY SHALL BE APPORTIONED COMPARATIVELY IN ACCORDANCE WITH THE LAWS FOR THE STATE OF TEXAS, WITHOUT, HOWEVER, WAIVING ANY GOVERNMENTAL IMMUNITY AVAILABLE TO THE CITY UNDER TEXAS LAW AND WITHOUT WAIVING ANY DEFENSES OF THE PARTIES UNDER TEXAS LAW.

(b)    The provisions of this Section 13.2 are solely for the benefit of the Parties hereto and not intended to create or grant any rights, contractual or otherwise, to any other person or entity except the City Indemnified Parties as described herein. Airline shall promptly advise the City in writing of any Claim against the City or a City Indemnified Party or Airline known to Airline and shall see to the investigation and defense of such Claim at Airline's cost, provided, however, Airline shall not settle any such Claim without obtaining express advance permission from the City unless such settlement provides for an unconditional release of liability for the City or any such City Indemnified Party. In defending any such Claim, Airline shall not, without obtaining express advance permission from the City, raise any defense involving in any way the jurisdiction of the tribunal over the City; the immunity of the City or a City Indemnified Party; the

governmental nature of the City; or the provision of any statutes relating to suits against the City. The City shall have the right, at its option and at its own expense, to participate in such defense without relieving Airline of any of its obligations under this Article.

## ARTICLE 14
## COMPLIANCE WITH LAWS

Section 14.1   Generally.

(a)   Airline shall, in connection with its rights and obligations hereunder, observe and comply with and shall cause its employees, officers, agents, subtenants, contractors, and licensees to observe and comply with, and pay all taxes and obtain all licenses, permits, certificates, and other authorizations required by, all Applicable Laws. Airline shall use commercially reasonable efforts to cause its invitees to comply with and pay all taxes and obtain all licenses, permits, certificates, and other authorizations required by, all Applicable Laws; provided that Airline does not waive its right to contest in good faith the validity or application to Airline of any Applicable Law or Airport Rule and Regulation, including on the basis of federal preemption.

(b)   Airline shall make, at its own expense, all non-structural improvements, repairs, and alterations to its Exclusive Use Premises, equipment, and personal property located on the Airport that are required in order to comply with or conform to Applicable Laws.  Airline shall secure the written approval of the Director before proceeding under this Section 14.1(b), which approval shall not be unreasonably withheld, conditioned, or delayed.

(c)   Airline shall not use the Airport or any part thereof, or knowingly permit the same to be used by any of its employees, officers, agents, subtenants, contractors, invitees, or licensees for any illegal purposes.

Section 14.2   Airport Rules and Regulations.

(a)   Without limiting the foregoing, Airline shall specifically observe and comply and cause its employees, officers, agents, subtenants, contractors, invitees, and licensees to observe and comply with all Rules and Regulations, which include without limitation the rules and regulations adopted in the City's Code of Ordinances, Chapter 3, Airports.

(b)   The Director is authorized to enforce the Rules and Regulations and promulgate other rules, regulations, and policies, from time to time, in furtherance of said purposes and/or that the Director deems are necessary to implement the intent and express terms of this Agreement, provided, however, that such Rules and Regulations shall (a) not be inconsistent or interfere with the reasonable exercise by Airline of any right or privilege expressly granted hereunder or under any other agreement between Airline and the City relating to the Airport or any part thereof, nor be inconsistent with the rules and regulations of any Federal agency having jurisdiction with respect to Airline or its operations, (b) not materially increase Airline's obligations hereunder, and (c) be applied by the City in a not unjustly discriminatory manner. With respect to this Agreement, the obligation of Airline to use its diligent efforts to require such observance and obedience on the part of its passengers, guests, invitees, and business visitors shall apply only while such persons are in the Terminal Area and any of Airline's non-Terminal Area leaseholds.  In the event of any conflict between requirements of Applicable Law and the Rules and Regulations, the more

restrictive requirement shall apply, as long as compliance with a more restrictive Rule or Regulation does not violate a requirement of any Applicable Law.

Section 14.3    Americans with Disabilities Act.

Airline shall comply with all applicable provisions of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101), as may be amended from time to time, and federal regulations promulgated thereunder that may be made applicable as a result of construction activities conducted by Airline.

Section 14.4    Ethics.

(a)    The Charter of the City of San Antonio and the City of San Antonio Code of Ethics ("***Code of Ethics***") prohibit a City officer or employee, as those terms are defined in Section 2-52 of the Code of Ethics, from having a direct or indirect financial interest in any contract with the City. An officer or employee has a "prohibited financial interest" in a contract with the City or in the sale to the City of land, materials, supplies or service, if any of the following individual(s) or entities is a party to the contract or sale:

(i)    a City officer or employee; his or her spouse, sibling, parent, child, or other family member within the first degree of consanguinity or affinity;

(ii)    an entity in which the officer or employee, or his or her parent, child or spouse directly or indirectly owns (i) ten (10) percent or more of the voting stock or shares of the entity, or (ii) ten (10) percent or more of the fair market value of the entity; or

(iii)    an entity in which any individual or entity listed above is (i) a subcontractor on a City contract, (ii) a partner or (iii) a parent or subsidiary entity.

(b)    Pursuant to the subsection above, Airline warrants and certifies, and this Agreement is made in reliance thereon, that by contracting with the City, Airline does not cause a City employee or officer to have a prohibited financial interest in the Contract. Airline further warrants and certifies that it has tendered to the City a Contracts Disclosure Statement in compliance with the City's Ethics Code.

Section 14.5    Furnishing of Services.

As a condition of the use of Airport services and facilities, Airline shall furnish its services on a reasonable, and not unjustly discriminatory basis to all users thereof, and it shall charge reasonable and not unjustly discriminatory prices for each unit or service, provided that Airline may make reasonable and nondiscriminatory discounts, rebates, or other similar types of price reductions to volume purchasers.

Section 14.6    Affirmative Action.

As a condition of the use of Airport services and facilities, Airline shall undertake an affirmative action program to the extent required by FAA regulations, Title 14, Code of Federal Regulations, Part 152, Subpart E, entitled "Nondiscrimination in Airport Aid Program," or as

otherwise approved by the FAA, to ensure that no person shall on the grounds of race, creed, color, national origin, sex, or handicap be excluded from participation in any employment activities covered in such Subpart E. Airline shall not exclude any person on such grounds from participating in or receiving the services or benefits of any program or activity covered by such Subpart E. Airline shall require that its covered suborganizations provide assurances to Airline that they similarly will undertake affirmative action programs and that they will require assurances from their suborganizations, to the extent required by Title 14, Code of Federal Regulations, Part 152, Subpart E, to the same effect.

Section 14.7   Disadvantaged Business Enterprises.

As a condition of its use of Airport services and facilities, Airline shall comply with the applicable requirements of Title 49 of the Code of Federal Regulations, Part 26, and entitled "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs" as this Part may be amended from time to time.

Section 14.8   Federally Required Provisions.

Airline acknowledges that the City is required by the FAA under the terms of its Grant Assurances to include in this Agreement certain required contract provisions, included as **Exhibit L** hereto ("***Required Federal Provisions***"). Airline agrees to comply with the Required Federal Provisions and, where applicable, include the Required Federal Provisions in each of its subcontracts without limitation or alteration. Airline acknowledges that a failure to comply with the Required Federal Provisions constitutes an Event of Default (subject to any applicable notice and cure periods described herein). Airline further acknowledges that the FAA may from time to time amend such required contract provisions and agrees that the City may unilaterally modify the Required Federal Provisions solely to the extent such modification is necessary to comply with its Grant Assurances by providing Airline with prompt notification of such modification.

## ARTICLE 15
## ENVIRONMENTAL PROVISIONS

Section 15.1   Condition of Airline Premises and General Environmental Obligations of Airline.

(a)   At its option, prior to occupying the Airline Premises, Airline may conduct an environmental audit for the purposes described in Section 15.15 below. Airline shall manage and conduct all of its activities on or relating to the Airline Premises:

(i)   in compliance with applicable Environmental Laws and the environmental provisions of this Agreement;

(ii)   in cooperation with the Airport in the Airport's efforts to comply with applicable Environmental Laws; and

(iii)   in adherence with Best Management Practices applicable to Airline's use of the Airline Premises.

*Final Draft 9.6.2024*

(b)    Airline shall promptly correct any non-compliance by Airline with applicable Environmental Laws or the environmental provisions of this Agreement, except in the event of an emergency, in which case, Airline shall take immediate steps to correct any such non-compliance. Airline shall manage and, to the extent within the control of Airline, secure the Airline Premises and its occupation or use of the Airline Premises so as to prevent any violation of applicable Environmental Laws by any person on the Airline Premises in connection with Airline's use of the Airline Premises hereunder.

Section 15.2    Compliance with Environmental Laws.

Airline shall not cause or allow a Hazardous Substance Release into or onto the Airline Premises or any other location upon or above the Airport, and shall not allow any such release by its employees, agents, permittees, contractors, subcontractors, sublessees, or others in Airline's control, supervision, or employment.

Section 15.3    Hazardous Substance Use on Airline Premises.

(a)    Airline may store and use Hazardous Substances that are associated with Airline's Air Transportation Business on the Airline Premises. Airline shall use reasonable efforts to minimize Hazardous Substance use on the Airline Premises and identify and use non-hazardous alternatives in Airline's operations.

Section 15.4    Safety Data Sheets for Hazardous Substances.

Airline shall maintain Safety Data Sheets ("***SDSs***") for all Hazardous Substances used on the Airline Premises by Airline or by its agents, employees, contractors, licensees, invitees, or sublessees, to the extent required by Environmental Laws.  In order to ensure that the SDSs are available to the City in the event of a Hazardous Substances Release or other emergency, the SDSs shall be kept current at all times and a copy of the SDSs shall be kept in a place known to and easily accessible to the City.

Section 15.5    Storm Water Management System and Wash Water Discharges.

(a)    Airline must at its sole cost manage storm water associated with the Airline Premises ("***Airline's Storm Water***") prior to its discharge into any storm sewer system. Airline shall not discharge storm water to any storm sewer system without complying with applicable laws and regulations, including any applicable Environmental Laws and with the City's or Airline's stormwater permit issued under the Texas Pollution Discharge Elimination System ("***TPDES***").

(i)    Airline acknowledges that the City's TPDES municipal separate storm sewer system (MS4) permit and its TPDES industrial multi sector stormwater discharge general permit ("***Industrial Stormwater Permit***"), and any subsequent amendments, extensions, or renewals thereto, to the extent affecting Airline's operations at the Airport, are incorporated by reference into this Agreement. The City shall provide Airline with written notice of the City's MS4 and Industrial Stormwater Permit discharge permit requirements (including any modifications thereto) that are applicable to Airline's operations and that Airline shall be obligated to perform from time to time at the Airport including, but not limited to:  certification of non-stormwater discharges; implementation

of "good housekeeping" measures or Best Management Practices; and maintenance of necessary records.

(ii)    Airline must maintain its own Industrial Stormwater Permit, and may prepare its own Storm Water Pollution Prevention Plan ("**SWPPP**") or subscribe to the SWPPP of the City.

(iii)    Within sixty (60) days of the Effective Date and then annually thereafter as provided in Section 15.20, Airline shall provide information to the City demonstrating compliance of Airline's Storm Water management with Environmental Laws.

(iv)    Airline agrees to participate, to the extent reasonably practical, in any reasonable manner requested by the City in any City organized task force or other work group established to coordinate stormwater activities at the Airport.

Section 15.6    Discharge and Treatment of Industrial Wastewater.

No industrial wastewater discharge shall be made by Airline onto or into the ground, the groundwater, surface water, or any City owned conveyance or storage system unless such discharge meets the requirements of all applicable laws and regulations, including Environmental Laws. The City shall have the right, but not the duty, in its sole discretion, to review and approve or disapprove any industrial wastewater management, treatment or discharge system constructed or modified on the Airline Premises during the term of the Agreement.

Section 15.7    Wetlands Prevention.

Airline shall not create any wetlands under any federal, state, regional or local jurisdiction on the Airline Premises or the Airport during the term of this Agreement or extension thereof, or on any adjacent City-owned or non-City owned property. Airline shall also manage the Airline Premises so that no wetlands are allowed to form on the Airline Premises, or on the Airport as a result of Airline's acts or omissions, and so that Airline's development and use of the Airline Premises or the Airport does not cause the formation of wetlands on any adjacent City-owned or non-City owned property. If the City believes that wetlands are likely to form on the Airline Premises, or on the Airport as a result of Airline's acts or omissions, and Airline has not taken corrective action to prevent the formation of such wetlands resulting from Airline's acts or omissions, the City shall have the right, but not the obligation, to exercise Self Help as provided in Section 15.19.

Section 15.8    Hazardous Substances Releases.

Airline shall be responsible for all response, remediation and restoration of any Hazardous Substance Release and associated Environmental Costs on or from the Airline Premises, on other properties, in the air or surface waters and ground water in violation of Environmental Laws, that results from or occurs in connection with Airline's occupancy, possession, or use of the Airline Premises or the Airport occurring during or continuing after the termination of the Agreement. If the City has reason to suspect that there has been such a Hazardous Substance Release, there is an imminent threat of a Hazardous Substance Release, or that Hazardous Substances are being stored, handled, disposed of or otherwise managed onsite in violation of Environmental Law or the

requirements of this Agreement, then at the City's request Airline shall, at its expense, demonstrate (through such tests, professional inspections, samplings, or other methods as may be reasonably required) that Airline has not caused or permitted any such release of Hazardous Substances in excess of quantities or volumes permitted by Environmental Laws. Airline shall provide copies of reports from any such testing or assessments to the City. Should Airline not provide the requested demonstration to the City, the City may conduct, or cause to be conducted, such tests, inspections, samplings and assessments, and Airline shall reimburse the City for all costs of such actions, no later than forty-five (45) days following demand for reimbursement.

Section 15.9    Limitation of Airline's Liability.

As between the City and Airline, Airline shall have no responsibility for Hazardous Substance Releases or associated Environmental Costs that are not caused by the Airline or its employees, agents, permittees, contractors, subcontractors, sublessees, or others in Airline's control, supervision, or employment, provided, however:  If the City cannot identify with commercially reasonable effort any of the parties causing, unlawfully allowing, contributing to or responsible for a Hazardous Substance Release at or from the Airport requiring the completion of appropriate response actions as provided herein, then the City shall provide reasonable advance written notice to Airline of its intention to take actions to report, repair, contain, investigate, remove, correct or remediate such Hazardous Substance Release consistent with the requirements this Article and Environmental Law. Airline shall thereafter be afforded a reasonable opportunity to commence such actions itself or provide the City with information on the identity of the party or parties causing, contributing to, or responsible for such Hazardous Substance Release (except in emergency circumstances in which such advance notice is not possible), which information shall be considered in good faith by the City and, as appropriate, shall provide a basis for the City's pursuit of any responsible parties consistent with the provisions of this Article.  In addition to the above written notice, the City shall provide Airline with its plan to perform such actions for Airline's review and comment at least seven (7) business days before the commencement of any work (except in emergency circumstances in which such advance notice is not possible), which comments shall be reasonably considered by the City, after which the costs of such actions, if implemented by the City, shall be allocated by the City in its reasonable discretion among appropriate Cost Centers.

Section 15.10  Previously Leased Premises.

Notwithstanding the above Section 15.9, in the event of a Hazardous Substance Release in violation of Environmental Law which occurred prior to the Effective Date is encountered on any portion of the Airline Premises that Airline also leased as the equivalent of Exclusive Use Premises or Preferential Use Premises under its prior agreement with the City, Airline shall be deemed to be responsible for all costs incurred in connection with such contamination, including investigation, removal, remediation, or other required plan, report, or response action, unless Airline provides clear evidence demonstrating that another party is fully responsible.

Section 15.11  Immediate Response.

In the event of a Hazardous Substance Release, or a threat of or reasonable suspicion of a Hazardous Substance Release for which Airline is responsible under this Agreement, Airline shall

*Final Draft 9.6.2024*

immediately undertake and diligently pursue, at Airline's sole expense, all action necessary and appropriate to investigate, contain, stop, accomplish source control, remove and perform interim remediation regarding the Hazardous Substance Release, in each case pursuant to and as required by Environmental Laws.

Section 15.12  Corrective Action and Remediation.

Airline shall promptly undertake, at Airline's sole expense, all actions necessary to ensure that any violation of Environmental Law, any violation of ARTICLE 15 of this Agreement, or any Hazardous Substance Release by Airline, its officers, directors, employees, agents, contractors, invitees, and licensees in any way associated with the Airline Premises is completely remediated to such a condition that a "No Further Action" or "Completion of Cleanup" determination, or an equivalent determination, not conditioned upon facility or use restrictions is obtained from the government agency with jurisdiction over the Hazardous Substance Release. In the alternative, Airline may seek the City's prior written approval of remediation to risk-based levels conditioned upon governmental agency approval and maintenance of facility and use restrictions. The City may approve such an alternative approach on the condition that the Airline assumes responsibility for any liability under Environmental Law and any Environmental Costs of the City resulting from such alternative approach.

Section 15.13  Natural Resources Damages Assessment and Restoration.

Airline shall promptly undertake, at Airline's sole expense, all actions necessary to ensure that any natural resources damage associated with Airline's use of the Airline Premises or the Airport and the violation of Environmental Laws, the environmental provisions of this Agreement or any Hazardous Substance Release by Airline or persons under Airline's control, supervision, or employment is investigated, determined, quantified, assessed, and permanently restored and compensated for, to the extent legally required by any natural resource trustee with jurisdiction over the matter.

Section 15.14  Allocation of Costs.

Any Environmental Costs incurred by the City for Airline's failure to comply with Environmental Laws as required herein shall be reimbursed to the City by Airline. Unless prohibited by law, regulation or judicial/governmental/law enforcement verbal or written order, the City shall promptly notify Airline of any TCEQ or other governmental proceedings or investigations reasonably believed by the City to be applicable or potentially applicable to Airline or the Airline Premises so that Airline has the opportunity to defend against such fines or penalties as appropriate.

Section 15.15  Environmental Audits and Environmental Walkthroughs.

During the term of the Agreement, Airline or the City may decide jointly or unilaterally to conduct Environmental Audits or Environmental Walkthroughs, as described below, to determine whether the Airline Premises have been or are currently being operated in compliance with the Agreement and Environmental Laws. Both the City and Airline shall reasonably conduct such Environmental Audits or Environmental Walkthroughs in a manner that minimizes operational

disruptions to Airline's operations. The types and purposes of Environmental Audits and Environmental Walkthroughs are:

(a)     *Initial*.

Prior to occupying the Airline Premises, Airline and the City shall jointly determine and agree whether to conduct an Environmental Audit or Environmental Walkthrough to determine if the Airline Premises are currently in compliance with the Agreement and Environmental Laws. If the parties cannot agree, then either the Airline or the City may unilaterally determine that an Initial Environmental Audit or Environmental Walkthrough is necessary, subject to the cost allocation in Section 15.16 or Section 15.17, as applicable.

(b)     *Transition*.

If Airline is required to occupy a transition space under Section 3.4, or the Airline Premises is reassigned under Section 3.9, Airline or the City may conduct an Environmental Audit or Environmental Walkthrough to establish the environmental condition of the Airline Premises, the temporary transition space, and/or the new Airline Premises space.

(c)     *Special*.

If the City has reason to suspect that there has been a Hazardous Substance Release, there is an imminent threat of a Hazardous Substance Release, or that Hazardous Substances are being stored, handled, disposed of or otherwise managed onsite in violation of Environmental Law or the requirements of this Agreement, the City may, after written notice outlining those reasons to Airline, conduct an Environmental Audit or Environmental Walkthrough.

(d)     *Exit*.

At the termination or upon a transfer of this Agreement, the City and Airline shall jointly determine and agree whether an Environmental Audit or Environmental Walkthrough is necessary to establish whether the Airline Premises have been operated in compliance with the Agreement and Environmental Laws. If the parties cannot agree, then either the Airline or the City may unilaterally decide that an Exit Environmental Audit or Environmental Walkthrough is necessary, subject to the cost allocation in Section 15.16 or Section 15.17, as applicable. An Exit Audit, if undertaken, shall be conducted not more than one hundred and twenty (120) days, but not less than sixty (60) days, prior to the actual termination or transfer date of this Agreement.

Section 15.16 Environmental Audits.

(a)     When Airline and the City decide to conduct a joint Environmental Audit pursuant to this Agreement, then the time and scope of the audit shall be determined together, a mutually acceptable environmental consultant shall be agreed upon to conduct the Environmental Audit, and the consultant shall timely provide a complete copy of the results of the Environmental Audit to Airline and the City.

(b)     If an Environmental Audit is conducted unilaterally by the City it shall:  provide Airline with reasonable advance written notice of the commencement date; allow Airline to have

a representative present; provide Airline the opportunity to review the findings; and shall not unreasonably disrupt Airline's operations.

(c)     The City and Airline shall share equally in the cost of a joint Environmental Audit. The cost of a unilateral Environmental Audit by either Party shall be borne by the Party electing to perform the work; provided, however, if a Special Environmental Audit or an Exit Environmental Audit reveals the presence of a substantial violation of Environmental Laws, defined to mean any violation that would have resulted in mandatory enforcement under the enforcement policies of the TCEQ or other applicable governmental entity, or a not previously discovered Hazardous Substance Release caused by the Airline or its employees, agents, permittees, contractors, subcontractors, sublessees, or others in Airline's control, supervision, or employment, then Airline shall pay for the cost of such Environmental Audit.

Section 15.17  Environmental Walkthrough.

(a)     When Airline and the City decide to conduct a joint Environmental Walkthrough pursuant to this Agreement, then it shall be conducted by one or more representatives of the Airline and the City. The Environmental Walkthrough shall be for the purpose of determining by visual observation, which may include reviewing non-confidential and non-privileged environmental records, whether the Airline Premises are in compliance with the Agreement and Environmental Laws. At least one representative of Airline and one representative of the City that participates in an Environmental Walkthrough shall be knowledgeable of Environmental Laws. Airline and the City shall each prepare a separate list of observations believed to show where the Airline Premises is not in compliance with the Agreement or Environmental Laws. Within ten days after the completion of the Environmental Walkthrough, the Airline and the City shall exchange copies of the lists.

(b)     If an Environmental Walkthrough is conducted unilaterally by the City it shall: provide Airline with reasonable advance written notice of the commencement date; allow Airline to have a representative present; provide Airline the opportunity to review the findings; and shall not unreasonably disrupt Airline's operations.

(c)     Airline and the City shall each bear its own cost in conducting an Environmental Walkthrough.

Section 15.18  Environmental Access.

The City reserves the right from time to time, after reasonable notice to Airline (except in cases of emergencies when notice shall not be required), to inspect, in a manner that minimizes operational disruptions to Airline's operations, the Airline Premises and Airline's operations on and use of the Airline Premises to: (a) evaluate Airline's management of Hazardous Substances; (b) conduct subsurface or stormwater sampling; (c) evaluate compliance with Environmental Laws; (d) review compliance documentation to facilitate the City's compliance with Environmental Laws or implementation of its environmental management system; and (e) perform Environmental Audits or Environmental Walkthroughs. At the City's request Airline shall make available for inspection and copying any or all of the non-privileged documents and materials prepared by or for Airline pursuant to any Environmental Law. The documents may be retained

by the City or submitted to any governmental regulatory agency; provided, such documents and materials relate to environmental regulatory compliance and pertain to the Airport or the Airline Premises.

Section 15.19  Notices, Review & Approval, and Self-Help.

(a)     *Generally.*

Airline shall promptly notify the City in writing upon becoming aware of: (i) a violation or alleged violation of any applicable Environmental Laws related to the Airline Premises or Airline's use of the Airport or of this ARTICLE 15 of the Agreement; and (ii) any Hazardous Substance Release on, under, from or adjacent to the Airline Premises or the Airport or threat of or reasonable suspicion of such. In addition, Airline shall notify the City of such (i) or (ii) by calling the Airport's twenty-four (24) hour/seven (7) days a week Airport Communication Center: (210) 207-3433. If Airline fails to notify the City of a matter as required in this Section, and if the City does not otherwise acquire knowledge of the matter, Airline shall be liable for any exacerbation of such Hazardous Substance Release that could reasonably have been avoided if such notification by Airline had been provided.

(b)     *Regulatory Notice – Airline.*

If any Environmental Law requires Airline to file any notice or report of a release or threatened release of Hazardous Substances on, under or about the Airline Premises or the Airport, Airline shall promptly submit such notice or report to the appropriate governmental agency and simultaneously provide a copy of such report or notice to the City. In the event that any written allegation, claim, demand, action or notice is made against Airline regarding Airline's failure or alleged failure to comply with any Environmental Law, Airline, as soon as practicable, shall notify the City in writing and provide same with copies of any such written allegations, claims, demands, notices or actions so made.

(c)     *Regulatory Notice – City.*

The City will promptly provide written notice to Airline of any notices received by the City from TCEQ or other regulatory agency regarding Airline's environmental compliance obligations.

(d)     *City's Rights of Approval, Notice, Review and Comment.*

Except in the case of an emergency or a regulatory agency order requiring immediate action, Airline shall give the City advance notice before beginning any response, remediation, or restoration action required by this Agreement or applicable Environmental Laws. In the event that the City disapproves the proposed work and/or the entities and individuals conducting such work, the City shall notify Airline and provide a basis of such disapproval. The City shall have the right to approve or disapprove the proposed work and the entities and individuals conducting such work. Airline shall copy the City, at no cost to the City, on all of such response, remediation, or restoration action deliverables submitted to the regulatory agencies and shall allow the City a reasonable period of time based upon the surrounding circumstances to submit comments thereon to Airline. Within thirty (30) days following completion of any immediate response, remediation

or restoration action required by this Agreement, Airline shall provide the City, at no cost to the City, with a written report describing, in detail, the work performed.

 (e) *Airline's Split Sampling Notice.*

 Airline shall notify the City at least forty-eight (48) hours in advance of any proposed sampling associated with a Hazardous Substance Release in order to allow the City to be present or to collect split samples. Airline shall provide the City with copies, at no cost to the City, of any sampling results and associated chain of custody and quality assurance and quality control information within ten (10) days of receipt by Airline.

 (f) *City's Right to Advise and/or Direct the Immediate Cessation of Operations in an Emergency.*

 The City shall have the right to advise and/or direct Airline to cease all or part of its operations immediately upon delivery of written notice if the City determines that the Airline's operation: (i) is not being undertaken by Airline or Airline's Representatives in any material respect in accordance with Environmental Laws; (ii) constitutes an emergency, meaning an imminent endangerment to human health, safety, or welfare or the environment; or (iii) resulted in a Hazardous Substance Release.

 (g) *City's Right of Self Help.*

 Upon suspicion that Airline has failed to fulfill its obligations related to a Hazardous Substance Release, the City shall have the right, upon giving Airline seven (7) days written notice, stating the obligations in issue, to perform Airline's obligations arising under any Environmental Laws and charge Airline the resulting Environmental Cost, plus any additionally incurred charges from the date any funds were expended by the City ("***Self Help***"). Airline agrees to reimburse the City, upon demand, any amounts the City may spend pursuant to this section on behalf of Airline. The City may not commence performance on behalf of Airline under this section if, within such notice period, Airline promptly notifies the City, begins, and continually thereafter diligently pursues to completion the performance of the obligations stated in the City's notice. Advance written notice by the City is not required in the event of an emergency or a governmental agency order requiring immediate action by the City for which advance written cannot reasonably be given, provided that the City shall provide written notice to Airline as soon as reasonably practicable.

 (h) *City's Right of Final Approval.*

 The Director shall have authority to disapprove an activity of Airline and/or any sublessee, on the basis of a risk assessment performed in accordance with Environmental Laws and through which the City reasonably determines such activity may pose a danger to health, safety or welfare or otherwise may violate Environmental Laws. The parties understand that Airport premises are not intended for use involving refining, processing, manufacturing, overhaul, or similar heavy industrial activities entailing the use, storage, manufacture, or transport of critical volumes of Hazardous Substances, other than reasonable volumes of such Hazardous Substances as permitted through this Agreement and reasonably needed to be used for approved fueling, maintenance, and operations. For purposes of this Agreement, "critical volumes" are those which, in the discretion

and sole judgment of the Director, pose or may pose an unreasonable risk to Airport property, its occupants, employees or the traveling public.

Section 15.20  Additional Environmental Provisions.

(a)  *Generally*.

Airline shall be fully and primarily responsible to the City for any violation of any Environmental Laws or non-performance of the duties stated in this Agreement by Airline or its representatives and Airline shall be fully responsible for the same as if Airline had committed the violation or breach itself.

(b)  *Annual Certification*.

If requested in writing by the City, Airline shall provide on or before each anniversary of the Effective Date of this Agreement, a written statement, certified by Airline as true and complete to the best of its actual knowledge, that during the preceding year with respect to the Airline Premises and Airline's occupation and use of the Airline Premises and the Airport, Airline has complied with applicable Environmental Laws. If Airline is unable to provide such certification at the time requested by the City, then Airline shall provide the City with a written statement of the steps Airline is taking to enable it to provide the City with a certification of compliance.

(c)  *Sustainability*.

The City and Airline shall become familiar with and comply with all Environmental Laws regarding recycling, green building, water conservation, energy conservation, renewable energy, and air quality applicable to their respective operations. Airline shall use commercially reasonable efforts to comply with the City's policies and programs to the extent such policies and programs are not inconsistent with the terms and conditions of this Agreement or Environmental Laws. Airline shall have the opportunity to participate in the development of such policies and programs and the City shall fully consider for incorporation Airline's comments.

(d)  *Noise*.

Airline shall comply with any formal noise abatement program or policy established by the Airport in conformance with Applicable Laws and use commercially reasonable efforts to comply with informal noise abatement programs established by the Airport.  The Airline shall notify the City promptly and may challenge such programs if the Airline believes such formal or informal noise abatement programs may interfere with safe aircraft operation or if Airline believes such programs are not in conformance with federal statues, laws, rules and regulations.

(e)  *Air Quality Improvements*.

Airline acknowledges that in order to protect existing Airport operations, to improve air quality in the region, to meet requirements associated with the expansion of the Airport, and to otherwise comply with federal and state air quality laws, the City and its tenants may be required to implement certain changes to operating practices to address any newly regulated air pollutant, emission or contaminant in accordance with applicable Environmental Laws, including without

*Final Draft 9.6.2024*

limitation such Environmental Laws related to climate change and indoor air quality. In addition, the City may adopt new Best Management Practices that it will request Airline to voluntarily comply with, such as Airline's conversion of ground service equipment and support vehicles to alternative fuels and use of pre-conditioned air and 400 Hz gate power instead of auxiliary power units ("APUs"). The City agrees to consult with Airline during the development of such Best Management Practices to ensure that such efforts are reasonably achievable and cost effective. Airline agrees to utilize the pre-conditioned air and 400 Hz gate power provided on the Loading Bridges unless such equipment is inoperable. Airline will cooperate with the City to identify cost-effective ways to minimize contributions to climate change.

(f)     *Cumulative Remedies.*

All such remedies of the City with regard to environmental requirements as set forth herein shall be deemed cumulative in nature and shall survive termination of this Agreement.

(g)     *Survival of Environmental Provisions.*

Unless specifically stated elsewhere herein, the provisions of this Article, including the representations, warranties, covenants, and indemnities of Airline, are intended to and shall survive termination of this Agreement.

## ARTICLE 16
## TERMINATION

Section 16.1     Termination by City.

(a)     The City, in addition to any other right of cancellation herein given to it or any other rights to which it may be entitled by law or equity or otherwise, may cancel this Agreement by giving Airline written notice, to be served as hereinafter provided, upon or after the happening of any one or more of the following events (each an "***Airline Event of Default***"):

(i)     Failure by Airline to make timely payment of any Airline rentals, fees, and charges due the City under this Agreement, including remittance of Passenger Facility Charges in accordance with the PFC Regulations, within ten (10) days of the date such payment was due, except for Airline rentals, fees, and charges described in Section 5.13(a)(iv) and not explicitly defined herein, failure by Airline to make timely payment within thirty (30) days of the date such payment was due; provided, however, that the first two (2) times any such failure occurs within a twelve (12) month period, the City shall provide Airline with written notice of such failure and ten (10) days to cure;

(ii)     Failure to provide copies of insurance policies or maintain required insurance coverages as described in this Agreement, after ten (10) days' written notice from the City of such failure;

(iii)     The filing by Airline of a voluntary petition in bankruptcy or any assignment for benefit of creditors of all or any part of Airline's assets;

(iv)    Any institution of proceedings in bankruptcy against Airline and the adjudication of Airline as a bankrupt pursuant to such proceedings;

(v)    The taking of jurisdiction by a court of competent jurisdiction of Airline or its assets pursuant to proceedings brought under the provisions of any federal reorganization act;

(vi)    The appointment of a receiver or trustee of Airline's assets by a court of competent jurisdiction or by a voluntary agreement with Airline's creditors;

(vii)    The abandonment by Airline of its conduct of its Air Transportation Business at the Airport and in this connection, suspension of operations for a period of ninety (90) days will be considered abandonment in the absence of an explanation satisfactory to and accepted in writing by the Director;

(viii)    If Airline shall be prevented for a period of ninety (90) days, after exhausting or abandoning all appeals, by any action of any governmental authority, board, agency, or officer having jurisdiction thereof from conducting its Air Transportation business at the Airport; or

(ix)    The default by Airline in the performance of any covenant, obligation, or condition herein required to be performed by Airline and the failure of Airline to remedy such default for a period of thirty (30) days after receipt from the City of written notice to remedy same (or such longer period specified in such written notice, if any, as may be required to remedy such default, provided that Airline shall still be required to commence such remedy within the initial 30-day period after receipt of such written notice and diligently pursue the same to completion).

provided, however, that no notice of cancellation as above provided shall be of any force or effect if Airline shall have remedied the default prior to receipt of the City's notice of cancellation or if, within the applicable period, Airline commences the process of remedying the default and diligently prosecutes the same to completion.

(b)    Failure by the City to take any authorized action upon an Airline Event of Default shall not be construed to be or act as a waiver of said default or of any subsequent default of any of the terms, covenants, and conditions herein contained to be performed, kept, and observed by Airline.

(c)    The acceptance of rentals, fees, and charges by the City from Airline for any period or periods after an Airline Event of Default of any of the terms, covenants, and conditions herein required to be performed, kept, and observed by Airline shall not be deemed a waiver or estoppel of any right on the part of the City to cancel this Agreement for failure by Airline to so perform, keep, or observe any of said terms, covenants, or conditions.

Section 16.2    Termination by Airline.

(a)    In addition to any other right of cancellation herein given to Airline or any other rights to which Airline may be entitled by law, equity, or otherwise, so long as Airline is not in

*Final Draft 9.6.2024*

default in payment to the City of any amounts due the City under this Agreement or otherwise, Airline may cancel this Agreement and thereby terminate all of its rights and unaccrued obligations hereunder by giving the City sixty (60) days' advance written notice, to be served as hereinafter provided, upon or after the happening of any of the following events (each a "***City Event of Default***"):

      (i)     Issuance by a court of competent jurisdiction of an injunction that in any way substantially prevents or restrains the use of the Airport or any part thereof necessary for Airline's scheduled flight operations and which injunction remains in force for a period of at least thirty (30) days after the City has exhausted or abandoned all appeals, if such injunction is not necessitated by or issued as the result of an act or omission of Airline;

      (ii)     If, at any time during the Term, because of the City's failure to provide within a reasonable time safe aircraft operating facilities, the FAA fails or refuses to certify the Airport as adequate to accommodate aircraft that Airline is licensed to operate and is operating into and from all other airports of like size and character and with similar facilities and which aircraft are in general use on Airline's scheduled transportation route system; and which Airline may reasonably desire to operate into or from the Airport; provided such refusal or failure is not due to any fault of Airline;

      (iii)     The assumption by the United States government or any authorized agency thereof of the operation, control, or use of the Airport and facilities, or any substantial part thereof, in such a manner as to substantially restrict Airline, for a continuous period of at least ninety (90) days, from operating its Air Transportation Business; or

      (iv)     The default by the City in the performance of any material covenant or condition within the control of the City and herein required to be performed by the City and failure of the City to use commercially reasonable efforts to remedy such default for a period of sixty (60) days after receipt from Airline of written notice to remedy the same; provided, however, that no notice of cancellation as above provided shall be of any force or effect if the City shall have remedied the default prior to receipt of Airline's notice of cancellation or within the aforesaid sixty (60) day period or during said period commences the process of remedying the same and diligently prosecutes the same to completion.

      (b)     Airline's performance of all or any part of this Agreement for or during any period or periods after a default of the terms, covenants, and conditions herein contained to be performed, kept, and observed by the City shall not be deemed a waiver of any right on the part of Airline to cancel this Agreement for failure by the City to perform, keep, or otherwise observe any of the terms, covenants, or conditions hereof to be performed, kept, and observed by the City, or be construed to be or act as a waiver by Airline of said default or of any subsequent default of any of said terms, covenants, and conditions herein contained and to be performed, kept, and observed by the City.

*Final Draft 9.6.2024*

## ARTICLE 17
## ASSIGNMENT AND SUBLETTING

Section 17.1   Assignment and Subletting.

(a)    Airline shall not, directly, or indirectly, assign, sell, sublease, or otherwise transfer this Agreement, or any portion of Airline Premises, without the prior written approval of the City. The foregoing shall not prevent the assignment of this Agreement to any parent or subsidiary or any corporation with which Airline may merge or consolidate, or which may succeed to the business of Airline, provided such successor corporation no later than thirty (30) days after the date of such merger, consolidation, or succession shall acknowledge by a writing satisfactory in form and content to the City that it has assumed all obligations of Airline and will fully honor all the terms and conditions set forth in this Agreement.

(b)    Airline shall not sublease Airline Premises without the prior written consent of the City, which consent may be withheld if the City has substantially similar unleased space available, or if the City can make substantially similar space available for lease within a reasonable time. Use of Airline's Exclusive Use Premises or any part thereof by anyone other than Airline (or its Affiliates or duly authorized service providers, in compliance with all other terms and conditions of this Agreement, and upon written notice to the City of such arrangement) shall be deemed a sublease. If a sublease is approved, Airline will be solely responsible for ensuring that its sublessee performs pursuant to and in compliance with the terms of this Agreement. If an Airline Event of Default shall occur and be continuing under this Agreement, the City may collect rent from such sublessee or occupant and apply the amount collected to the extent possible to satisfy the obligations of Airline hereunder, but no such collection shall be deemed a waiver by the City of the covenants contained herein or the acceptance by the City of such sublessee or occupant as a successor to Airline or a release of Airline by the City from its obligations hereunder.

(c)    Airline shall include with its request for permission to assign or sublease, a copy of the proposed assignment or sublease agreement. The proposed assignment or sublease agreement submitted with Airline's request shall include the following information: (i) the term (which shall not extend longer than the Term of this Agreement); (ii) the area or space to be assigned or subleased; (iii) the sublease rentals to be charged; (iv) the provision that assignee or sublessee must execute a separate agreement with the City for operating at the Airport; (v) the rent to be paid by such sublessee, which shall not be greater than 110% of the rents paid by Airline; and (vi) financial information satisfactory to the City regarding such proposed subtenant or assignee. Any other information reasonably requested by the City pertaining to said sublease or assignment shall be promptly provided by Airline. A fully executed copy of such sublease or assignment shall be submitted to the City for final approval within sixty (60) days of the occupancy of Airline Premises, or any portion thereof, by the assignee or sublessee.

(d)    In no event will any approved assignment or sublease diminish the City's rights to enforce any and all provisions of this Agreement.

(e)    Before any assignment or sublease becomes effective, the assignee or sublessee will assume and agree by written instruments to be bound by the terms and conditions of this Agreement during the remainder of the Term of this Agreement.

(f)     Nothing in this Article shall be construed to release Airline from its obligations under this Agreement, including but not limited to, the payment of rentals, fees, and charges provided herein.

## ARTICLE 18
## MISCELLANEOUS PROVISIONS

Section 18.1    Acknowledgment.

The Parties hereto acknowledge that they have thoroughly read this Agreement, including any exhibits or attachments hereto, and have sought and received whatever competent advice and counsel was necessary for them to form a full and complete understanding of all rights and obligations hereunder. The Parties further acknowledge that this Agreement is the result of extensive negotiations between the parties and shall not be construed against the City by reason of the preparation of this Agreement by the City.

Section 18.2    Authority of Director.

The Director may exercise all rights and obligations of the City under this Agreement, unless specifically provided otherwise or required by Applicable Law.

Section 18.3    Capacity to Execute.

Each of the Parties hereto warrants and represents that the execution and delivery of this Agreement by its undersigned representative(s) has been duly authorized by all necessary corporate or municipal action, as applicable.

Section 18.4    Covenant Against Liens.

Airline shall not cause nor permit any lien against the Airport, the Airline Premises or any improvements thereto to arise out of or accrue from any action or use thereof by Airline; provided, however, that Airline may, in good faith, contest the validity of any alleged lien.

Section 18.5    Notices.

Any notice required in this Agreement shall be in writing and served personally or sent by registered or certified mail, postage prepaid, or by courier service such as DHL, FedEx, or UPS. Any notice mailed pursuant to this paragraph shall be presumed to have been received by the addressee five (5) business days after deposit of it in the mail, postage prepaid and properly addressed, or, if sent by courier service, when delivered to or refused by the addressee. Notices required to be given pursuant to this Agreement shall be addressed to:

For City:      [Name]
               [Title]
               [Address]
               [Email Address]

For Airline:   [Name]

[Title]
[Address]
[Email Address]

Either Party may change their designated contact for notices under this Agreement at any time during the Term with written notice to the other Party in accordance with this Section 18.1.

Section 18.6    Employees of Airline.

Airline shall require all of its employees and subcontractors or independent contractors hired by Airline working in view of the public and about the Terminal Building to display appropriate identification. Airline employees shall obtain identification badges from the City. Airline shall be responsible for paying the cost of TSA required employee background checks and badging.

Section 18.7    Entire Agreement.

This Agreement, including all exhibits and attachments hereto, constitutes the entire agreement between the Parties on the subject matter hereof and may not be changed, modified, discharged, or extended except by written instrument duly executed by the City and Airline. This Agreement supersedes all prior agreements and understandings, written and oral, expressed, or implied, between the City and Airline related hereto. Airline agrees that no representations or grant of rights or privileges shall be binding upon the City unless expressed in writing in this Agreement.

Section 18.8    Amendment.

No amendment, modification, or alteration of the terms of this Agreement shall be binding unless the same be in writing, dated subsequent to the date hereof and duly executed by the Parties hereto, except in accordance with the terms herein. The Director is authorized to execute amendments which do not substantially alter the material terms of this Agreement, provided that such amendments shall be approved in form and substance by the City Attorney or his or her designee. All other amendments must be authorized in writing by City Council by passage of an ordinance thereto.

Section 18.9    Non-Exclusive Rights.

Nothing in this Agreement shall be deemed to grant Airline any exclusive right or privilege within the meaning of 49 U.S.C. § 40103(e) or 49 U.S.C. § 40103(a)(4) with respect to activities on the Airport.

Section 18.10   Most Favored Nations.

Airline shall have the same rights and privileges and pay the same City-established fees and charges, not to exceed those established under the provisions of this Agreement as periodically revised under the terms hereof, with respect to the use of the Airport as are granted to or charged any other airline executing a similar use and lease agreement with the City for use of the Airport. The previous sentence notwithstanding, the City may waive or reduce any fees and charges set under this Agreement pursuant to a City-approved Air Service Incentive Plan ("***ASIP***") for a

*Final Draft 9.6.2024*

period not to exceed two years. The City shall give Signatory Airlines an opportunity to review and comment on any proposed updates and/or revisions to such ASIP. It is understood that rents and fees are set as established in this Agreement and to the extent permitted under applicable federal law therefore may vary among lessees on account of the different premises to be leased. For the avoidance of doubt, the cost of the aforementioned waivers and reductions of fees and charges shall not be included as a component of any of the Airline fees or charges that are presented in the Rates and Fees Schedule.

Section 18.11  Force Majeure.

Except as provided herein, neither the City nor Airline shall be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder by reason of strikes, boycotts, labor disputes, embargoes, shortages of material, acts of God, pandemic, epidemic, acts of the public enemy, acts of superior governmental authority, weather conditions, tides, riots, rebellion, sabotage, or any other circumstances for which it is not responsible or which is not in its control; provided, however, that these provisions shall not excuse Airline from paying Airline rentals, fees, and charges hereunder.

Section 18.12  No Third-Party Beneficiaries.

Each of the parties has entered into this Agreement solely for its own benefit. Except as expressly provided herein, this Agreement does not grant to any third person the right to claim damages or to bring any suit, action, or any other proceeding against either the City or Airline because of any breach hereof.

Section 18.13  Governing Law; Venue.

The laws of the State of Texas shall govern this Agreement and all disputes arising hereunder, with venue in Bexar County, Texas.

Section 18.14  Headings.

The headings of the Articles and paragraphs of this Agreement are inserted only as a matter of convenience and for reference and do not define or limit the scope or intent of any provisions of this Agreement and shall not be construed to affect in any manner the terms and provisions of this Agreement or of its interpretation.

Section 18.15  No Partnership or Agency.

Nothing herein contained is intended or shall be construed to in any respect create or establish any relationship other than that of licensor and licensee, and nothing herein shall be construed to establish any partnership, joint venture, or association or to make Airline the general representative or agent of the City for any purpose whatsoever.

Section 18.16  Invalid Provisions.

In the event any covenant, condition, or provision herein contained is held to be invalid by a court of competent jurisdiction, the invalidity of any such covenant, condition, or provision shall

in no way affect any other covenant, condition, or provision herein contained, provided the invalidity of any such covenant, condition, or provision does not materially prejudice either the City or Airline in its respective rights and obligations contained in the valid covenants, conditions, and provisions of this Agreement.

Section 18.17  Nonliability of Individuals.

No director, officer, agent, elected official, or employee of either Party shall be charged personally or held contractually liable by or to the other party under any term or provision of this Agreement or because of any breach thereof or because of its or their execution or attempted execution.

Section 18.18  Noninterference with Airport Operations.

Airline, by accepting this Agreement, expressly agrees for itself, its successors, and assigns that it will not make use of its Airline Premises in any manner that might interfere with the landing and taking off of aircraft at the Airport or otherwise constitute a hazard. In the event the aforesaid covenant is breached, on reasonable notice to Airline and opportunity to cure, the City reserves the right to enter the Airline Premises and cause the abatement of such interference at the expense of Airline.

Section 18.19  Avigation Rights.

The City reserves unto itself, its successors, and assigns for the use and benefit of the public, a right of flight for the passage of aircraft in the airspace above the surface of the Airport for navigation or flight in the said airspace for landing on, taking off from, or operating at the Airport.

Section 18.20  Height Limitation.

Airline expressly agrees for itself, its successors and assigns, to restrict the height of structures, objects of natural growth and other obstructions on the Airline Premises to such a height so as to comply with Federal Aviation Regulations, Part 77, as such may be amended or superseded from time to time.

Section 18.21  Remedies to Be Nonexclusive.

All remedies provided in this Agreement shall be deemed cumulative and additional and not in lieu of or exclusive of each other or of any other remedy available to the City or Airline at law or in equity (to the extent not inconsistent with the express provisions hereof), and the exercise of any remedy or the existence herein of other remedies or indemnities shall not prevent the exercise of any other remedy.

Section 18.22  Right to Audit Books and Records.

Airline agrees to keep books and records on its operations at the Airport, for a period of at least four (4) years following the expiration or earlier termination of this Agreement, and the Director or any other authorized City representative, upon reasonable advance written notice to

Airline, shall have the right to inspect and audit such books and records to ensure compliance with the prevailing municipal bond disclosure requirements and to determine that the City has received from Airline all moneys due the City under the terms hereof, including, but not limited to, rentals, fees, and charges and PFCs (if applicable) payable to the City by Airline. Likewise, Airline shall have the right to inspect the books and records of the City relating to the provisions hereof.

Section 18.23  Right to Lease to United States Government.

During time of war or national emergency, the City shall have the right to lease the Airport landing area or any part thereof to the United States government and, if any such lease is executed, the provisions of this Agreement insofar as they are inconsistent with the provisions of the lease to the Government shall be suspended; however, such suspension shall not extend the Term of this Agreement. If, as a result of any such lease, the rights or duties of Airline hereunder are materially affected, then Airline shall receive an equitable rental adjustment.

Section 18.24  Subordination.

(a)    Nothing contained herein shall unlawfully impair the right of the City to exercise its governmental or legislative functions. This Agreement is made subject to the Constitution and laws of the State of Texas and to the Charter of the City of San Antonio, Texas, and to the provisions of the Airport Improvement Program Grant Agreements applicable to the Airport and its operation.

(b)    Airline agrees that this Agreement shall be subject and subordinate to the provisions of any existing or future agreements between the City and the United States of America, relative to the operation and maintenance of the Airport, the terms and execution of which have been or may be required as a condition precedent to the expenditure by or reimbursement to the City or the County of Federal funds for the development of the Airport ("***Grant Assurances***"). In the event that this Agreement, either on its own terms or by any other reason, conflicts with or violates any such Grant Assurances, the City has the right to amend, alter, or otherwise modify the terms of this Agreement in order to resolve such conflict or violation. Airline further agrees that it shall not knowingly cause the City to violate any Grant Assurances made by the City to the Federal Government in connection with the granting of such Federal funds.

Section 18.25  Successors and Assigns.

The provisions of this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

Section 18.26  Time of the Essence.

Time is of the essence in this Agreement.

Section 18.27  Quiet Enjoyment.

Upon payment by Airline of the rentals, fees, and charges as herein required and subject to performance and compliance by Airline of the covenants, conditions, and agreements on the part of Airline to be performed and complied with hereunder, Airline shall peaceably have and enjoy the rights, uses, and privileges granted to it herein of the Exclusive Use Premises during the Term,

*Final Draft 9.6.2024*

subject to the provisions hereof and in conformance with Applicable Laws and Rules and Regulations.

[Signature Page(s) to Follow]

*Final Draft 9.6.2024*

**IN WITNESS WHEREOF, the parties hereto have subscribed their names the day and year first above written.**

CITY OF SAN ANTONIO, TEXAS:

_____

Erik Walsh
City Manager

Approved as to form:

_____

City Attorney

AIRLINE:

_____

By:

Title:

*Notary of Airline Signature:*

_____

STATE OF _____ COUNTY OF _____

SIGNED IN BEFORE ME THIS _____ DAY OF _____ 2024

*Final Draft 9.6.2024*

## EXHIBIT A

### AIRPORT MAP





*Final Draft 9.6.2024*

## **EXHIBIT B**

### **AIRLINE ACTIVITY REPORT**



## SAN ANTONIO INTERNATIONAL AIRPORT
### MONTHLY ACTIVITY REPORT

**1. AIRLINE CODE:**

Month, Year: | Airline Name: | Handling Agent:

**2. LANDINGS:** (Please copy and use this same form to report landing information if additional space is required)

| Type of Aircraft | Aircraft Series | Aircraft's Total Seats (A) | Landing Weight * (Pounds) (B) | Scheduled (C) | Charter (D) | Diversions/Unscheduled (E) | Total Landings (C+D+E) (F) | Total Available Seating (A * F) | Total Landing Weight (B * F) |
|---|---|---|---|---|---|---|---|---|---|
| **A. DOMESTIC** | | | | | | | | | |
| | | | | | | | | - | - |
| | | | | | | | - | - | - |
| | | | | | | | - | - | - |
| | | | | | | | - | - | - |
| | | | | | | | - | - | - |
| | | **Total Domestic** | | - | - | - | - | - | - |
| **B. INTERNATIONAL** | | | | | | | | | |
| | | | | | | | - | - | - |
| | | | | | | | - | - | - |
| | | | | | | | - | - | - |
| | | | | | | | - | - | - |
| | | | | | | | - | - | - |
| | | **Total International** | | - | - | - | - | - | - |

* Certified Maximum Gross Landing Weight to the nearest 1,000 pounds

**TOTAL DOMESTIC & INTERNATIONAL**    -    -    -

FY__ Landing Fee    / 1,000 LBS    TOTAL DUE TO THE CITY    $0.00

**3. PASSENGER COUNTS:**

| | Domestic Enplaned | Deplaned | International Enplaned | Deplaned | | Charter Enplaned | Deplaned |
|---|---|---|---|---|---|---|---|
| Revenue | | | | | | | |
| Non-revenue | | | | | | | |
| **Totals** | 0 | 0 | 0 | 0 | | 0 | 0 |

**4. BHS FEE (Per Enplaned Passenger):**

BHS fee is ___ per enplaned passenger.

TOTAL DUE TO THE CITY

**5. FIS FEE (Per Deplaned Passenger):**

FIS fee is ___ per deplaned passenger.

TOTAL DUE TO THE CITY

**4. CARGO WEIGHTS:** Please Report in Pounds    Cargo Handler: Enter Cargo Handler Name

| | Scheduled Enplaned | Deplaned | Charter Enplaned | Deplaned |
|---|---|---|---|---|
| **Domestic** | | | | |
| Mail | | | | |
| Freight & Express | | | | |
| **International** | | | | |
| Mail | | | | |
| Freight & Express | | | | |
| **Total Mail** | 0 | 0 | 0 | 0 |
| **Total Cargo** | 0 | 0 | 0 | 0 |

**Perishables Cargo** (please indicate the amount of perishable cargo included in the above cargo figures)
Domestic
International

Prepared by (signature): | Date: | Phone #:
Print Name of Preparer: | Fax Number:

*Final Draft 9.6.2024*

## **EXHIBIT C**

### **AIRLINE PREMISES**[1]

---

[1] Exhibit C in each Signatory Airline Agreement will show that Airline's specific Airline Premises as of the Effective Date.



*Final Draft 9.6.2024*

## EXHIBIT D-1

### TERMINAL BUILDING SPACE EXHIBIT





VEHICLE

125'

NK

125'

CITY

30' WIDE TUG

125'

WN

125'



12!

150'

UA









*Final Draft 9.6.2024*

## **EXHIBIT D-2**

### **JOINT USE SPACE**





*Final Draft 9.6.2024*

## EXHIBIT E-1

### SPRINGING PROVISIONS RELATED TO THE EXTENDED TERM CIP

If and upon the automatic extension of the Term of this Agreement pursuant to Section 2.2, "Extended Term," the following provisions shall be effective and incorporated in this Agreement as a new Section 8.9:

Section 8.9    Approval of the Extended Term CIP.

(a)    The Parties each hereby approve the cost and scope of the additional Capital Improvements set forth in **Exhibit E-2** (the "***Extended Term CIP***"), including the total projected Net Project Costs of such Extended Term CIP set forth in **Exhibit E-2** (the "***Extended Term CIP Cap***"). Such approval constitutes Airline's MII approval of the Extended Term CIP for the purposes of this Article 8 and the City may proceed with the planning, design and construction for the Extended Term CIP without further MII consideration, and include such costs in the calculation of Airline rentals, fees and charges, provided that:

(i)    If, at the time the City receives bids for construction, a Capital Improvement that is part of the Extended Term CIP will exceed the original estimate of Net Project Costs provided on **Exhibit E-2** for such Capital Improvement by more than ten percent (10%) (as calculated based on adjusting the original estimate for any increase in the CPI during the time between notifying Airline of such estimate and receiving bids), the City may not proceed unless:

(A)    the Extended Term CIP Cap will not be exceeded by more than ten percent (10%);

(B)    the City revises the Extended Term CIP such that the Extended Term CIP Cap is not exceeded by more than ten percent (10%) and provides a copy of the revised Extended Term CIP to Airline; or

(C)    an MII approves the adjusted estimate for such Capital Improvement pursuant to the procedures in Section 8.7, "MII Approval and Deferral Process." If an MII approves such Capital Improvement pursuant to this subsection, the adjusted estimate shall be incorporated into the Extended Term CIP and the Extended Term CIP Cap shall be adjusted accordingly.



### Final Draft 9.6.2024EXHIBIT E-2

### EXTENDED TERM CIP

[To be inserted if and upon the automatic extension of the Term pursuant to Section 2.2, "Extended Term," of the Agreement]



*Final Draft 9.6.2024*

## EXHIBIT "F"
### to Signatory Airline Agreement for
### San Antonio International Airport

## RATES AND FEES SCHEDULE

### SECTION I - DEFINITIONS

The following words, terms and phrases used in this Exhibit "F" shall have the meanings set forth in this Section and the meanings shall apply to both the singular and plural forms of such words, terms and phrases. Additional words, terms and phrases used in this Exhibit "F", but not defined in this Section, shall have the meanings ascribed to them in the individual sections of this Exhibit "F", the Agreement or the Bond Resolution. The specific methodologies for calculating the rates, fees and charges defined below can be found in Section II of this Exhibit "F".

**Sections I, II, III and IV of this Rates and Fees Schedule will not be revised during the Term of the Agreement unless mutually agreed upon and amended by the Airline and City.**

1. "Additional Revenue Required – Coverage" means the amount calculated by dividing the Baseline Net Revenue by Debt Service that results in a minimum Debt Service Coverage of twenty five percent (25%).

2. "Adjusted Signatory Landing Fee" means the adjusted Landing Fee needed to meet a minimum Debt Service Coverage of twenty five percent (25%) of Debt Service in a rate setting period.

3. "Adjusted Signatory Terminal Rental Rate" means the adjusted Terminal Building Rentals needed to meet a minimum Debt Service Coverage of twenty five percent (25%) of Debt Service in a rate setting period.

4. "Airfield Area Cost Center" means the Airport Cost Center further described in **Table F-8** of this Exhibit "F".

5. "Apron Area Cost Center" means the Airport Cost Center further described in **Table F-8** of this Exhibit "F".

6. "Baggage Handling System/ Security Checkpoint (BHS) Cost Center" means the Airport Cost Center further described in **Table F-8** of this Exhibit "F".

7. "Baseline Net Revenues" means Airport Revenues minus Maintenance and Operating Expenses to calculate the Adjusted Signatory Terminal Rental Rate and Adjusted Signatory Landing Fee.

8. "Bond Reserve Fund" means the fund(s) by that name established by City for the Airport to assure that there are sufficient funds to pay debt service on a timely basis.

9. "Differential Rate Period" means the period beginning upon the start of the first full Fiscal Year following DBO of the expanded Terminal Building facilities constructed as part of TDP and continuing for three (3) Fiscal Years total of the subject adjustments, as set forth in Section 5.11 of the Agreement.

10. "Excess PFC Revenues" means PFC Revenues available to repay Debt Service that was issued to fund PFC-eligible Capital Improvements.

11. "Fuel Flowage Revenues" means the fees collected by the City for each gallon of fuel and oil delivered to the Airports for use by private aircraft owners with City-approved self-fueling facilities or sold to the public by the fixed base operators.

12. "Leased Unenclosed Space" means space that is leased by an Air Carrier as Exclusive Use Premises that is classified as unenclosed space in the Terminal Building and charged at the Unenclosed Space Rate.

Exhibit "F" to Signatory Airline Agreement – SAT

*Final Draft 9.6.2024*

13. "Loading Bridge Cost Center" means the Direct Cost Center further described in **Table F-8** of this Exhibit "F".

14. "Non-Rentable Space" means space in the Terminal Building that is non-rentable such as City Aviation Department, Art, Mechanical, Storage, Public Use, Stairs, Elevators and Escalators.

15. "Other Buildings and Areas Cost Center" means the Direct Cost Center further described in **Table F-8** of this Exhibit "F".

16. "Parking Cost Center" means the Direct Cost Center further described in **Table F-8** of this Exhibit "F".

17. "Rate Setting Period" means the Fiscal Year for which the rates, fees and charges are being calculated hereunder.

18. "Stinson Cost Center" means the Direct Cost Center further described in **Table F-8** of this Exhibit "F".

19. "Terminal Building Cost Center" means the Direct Cost Center further described in **Table F-8** of this Exhibit "F".

20. "Ticket Counter" means each two-position ticket counter within the Terminal rentable by an Air Carrier for the processing of passengers and baggage for a departing flight, including the ticket counter itself, kiosks, queuing space, and space behind the ticket counter position.

21. "Total Rentable Space" means the total amount of space available for rent in the Terminal Building to Air Carriers (or available for use by an Air Carrier on a per-use fee basis), which includes Preferential Use Premises and Exclusive Use Premises assignable to Signatory Airlines and/or Non-Signatory Airlines, Joint Use Space (enclosed and unenclosed), and City Gates ("Airline Rentable Space"), and to tenants/users other than Air Carriers (e.g., concessionaires) ("Non-Airline Rentable Space"), as may be adjusted and/or weighted during the course of any Fiscal Year for changes in space classifications after consultation with the airlines. If the City assigns Exclusive Use Premises (except for passenger clubs or lounges) to a Non-Signatory Airline on a month-to-month basis, such Non-Signatory Airline will be required to pay Terminal Building Rentals to the City for the use of such space at the same rate as Signatory Airlines would pay for such space, plus the Non-Signatory premium of fifteen percent (15%). Airline Rentable Space as of the Effective Date is shown on **Exhibit D-1 to this Agreement**, which may be changed from time to time due to a change in the purpose of the space or due to the construction or demolition of Terminal Building space.

22. "Turn" means a single inbound and outbound flight operation, for which an Air Carrier uses a Gate, Loading Bridge, and Apron.

23. "Turns per Day" means the divisor for the Per Use Fee calculation with an average of four (4) Turns per day.

24. "Unenclosed Space Rate" means the discounted rate for Leased Unenclosed Space which is sixty percent (60%) of the Terminal Rental Rate as calculated in Section II of this Exhibit "F".

*Final Draft 9.6.2024*

## SECTION II - RATE CALCULATIONS

1.  <u>Explanation of Rate Calculation Line Items.</u>  The following Line Items listed in **Tables F-1.1** and **F- 2** - **F-5** are included in the calculation of Terminal Rental Rate, Baggage Handling System/ Security Checkpoint Fee, Loading Bridge Fee, Apron Area Fee and Landing Fee for each Rate Setting Period. Each Line Item in **Tables F-1.1** and **F2** - **F-5** is identified by the corresponding letter set forth below.

> **Line Item A.**   <u>Maintenance and Operating Expenses.</u> This Line Item includes those expenses directly assignable to the Terminal, Baggage Handling System/ Security Checkpoint, Loading Bridge, Apron Area or Airfield Cost Centers ("<u>Direct Maintenance and Operating Expenses</u>") and those expenses associated with Maintenance and Operating of the Airport that are not directly assignable but are allocated to the Airport Cost Centers ("<u>Indirect Maintenance and Operating Expenses</u>"). The sum of Direct Maintenance and Operating Expenses and Indirect Maintenance and Operating Expenses are hereinafter referred to as "Maintenance and Operating Expenses".

> **Line Item B.**   <u>Maintenance and Operating Reserve.</u> This Line Item includes the Maintenance and Operating Reserve for the current Rate Setting Period less the Maintenance and Operating Reserve for the prior Rate Setting Period allocated to the Terminal, Baggage Handling System/ Security Checkpoint, Loading Bridge, Apron Area or Airfield Cost Centers

> **Line Item C.**   <u>Debt Service.</u>  This Line Item includes Debt Service directly assignable to the Terminal, Baggage Handling System/ Security Checkpoint, Loading Bridge, Apron Area or Airfield Cost Centers ("<u>Direct Debt Service</u>") and Debt Service assignable to the Indirect Cost Centers ("<u>Indirect Debt Service</u>"). Indirect Debt Service shall be allocated to the Direct Cost Centers on the basis of the procedures set forth in Section V(3) below for the distribution of Indirect Maintenance and Operating Expenses. The sum of Direct Debt Service and Indirect Debt Service are hereinafter referred to as "Total Debt Service".

> **Line Item D.**   <u>Debt Service Coverage.</u>  This Line Item includes Debt Service Coverage attributable to the Terminal, Baggage Handling System/ Security Checkpoint, Loading Bridge, Apron Area or Airfield Cost Centers.

> **Line Item E.**   <u>Other Debt.</u> This Line Item includes Other Financing attributed to the Terminal, Baggage Handling System/ Security Checkpoint, Loading Bridge, Apron Area or Airfield Cost Centers.

> **Line Item F.**   <u>Amortization</u>. This Line Item includes Amortization attributable to the Terminal, Baggage Handling System/ Security Checkpoint, Loading Bridge, Apron Area or Airfield Cost Centers.

> **Line Item G.**   <u>Non-Amortized Capital and Equipment Outlays.</u> This Line Item includes Non-amortized Capital and Equipment Outlays attributable to the Terminal, Baggage Handling System/ Security Checkpoint, Loading Bridge, Apron Area or Airfield Cost Centers.

> **Line Item H.**   <u>Total Requirement.</u>  The Total Requirement is the sum of Line Items A through G. The Total Requirement is applicable to Terminal, Baggage Handling System/ Security Checkpoint, Loading Bridge, Apron Area or Airfield Cost Centers.

> **Line Item I.**   <u>Credits.</u>  This Line Item identifies the Credits to the Total Requirement that may be included in the Terminal, Baggage Handling System/ Security Checkpoint, Loading Bridge, Apron Area or Airfield Cost Centers and as follows:

> > a.  Credits to the Terminal Total Requirement in **Table F-1.1** includes Excess PFC Revenues.
> > b.  Credits to the Baggage Handling System Total Requirement in **Table F-2** include Excess PFC Revenues.

Exhibit "F" to Signatory Airline Agreement – SAT

    c. Credits to the Loading Bridge Total Requirement in **Table F-3** include Excess PFC Revenues.

    d. No credits are included in the Apron Area Total Requirement in **Table F-4** except in FY2025 pursuant to subsection (f) below.

    e. Credits to the Airfield Total Requirement in **Table F-5** include Excess PFC Revenue, Fuel Flowage Revenue, and Non-Terminal RON Parking.

    f. In FY2025, and in no other Rate Setting Period, credits to the above-referenced requirements include the prior Rate Setting Period's Debt Service Coverage (if any).

**Line Item J.**   Net Requirement. The Net Requirement equals Total Requirement minus Credits.

**Line Item K.**   Line Item K in **Tables F-1.1** and **F-2 - F-5** shall be defined as follows:

- **Table F-1.1:** Leased Airline Preferential, Exclusive and Joint Use Space. The term "Leased Airline Preferential, Exclusive and Joint Use Space" in **Table F-1.1** means the total amount of the Airline Rentable Space that is leased or assigned to an Air Carrier in the Terminal Building.

- **Table F-2:** Total Enplaned Passengers. The term "Total Enplaned Passengers" in **Table F-2** means the Enplaned Passengers for all commercial airlines, including Signatory and Non-Signatory Airlines.

- **Table F-3:** Total Loading Bridges. The term "Total Loading Bridges" means the total Loading Bridges at the Airport.

- **Table F-4:** Total Apron Area. The term "Total Apron Area" means the total linear feet of apron adjacent to Terminal Building.

- **Table F-5:** Total Landed Weight. The term "Total Landed Weight" in **Table F-5** means the Landed Weight for all commercial airlines, including Signatory and Non-Signatory Airlines.

**Line Item L.**   Line Item L in **Tables F-1.1** and **F-2 - F-5** shall be calculated as follows:

- **Table F-1.1:** Leased Unenclosed Space. The term "Leased Unenclosed Space" has the meaning given to it in Section I of this Exhibit "F".

- **Table F-2:** BHS/ Security Checkpoint Fee. Calculated in **Table F-2** as (J) Baggage Handling System/ Security Checkpoint Net Requirement divided by (K) Total Enplaned Passengers.

- **Table F-3:** Loading Bridge Fee. Calculated in **Table F-3** as (J) Loading Bridge Net Requirement divided by (K) Total Loading Bridges.

- **Table F-4:** Apron Area Fee. Calculated in **Table F-4** as (J) Apron Area Net Requirement divided by (K) Total Apron Area.

- **Table F-5:** Landing Fee. Calculated in **Table F-5** as (J) Airfield Net Requirement divided by (K) Total Landing Weight.

**Line Item M.**   Total Rentable Space. The term "Total Rentable Space" in **Table F-1.1** means all Airline Rentable Space and Non-Airline Rentable Space in the Terminal Building.

**Line Item N.**   Airline Terminal Net Requirement. Calculated in **Table F-1.1** as (1) (J) Terminal Net Requirement multiplied by (2) (the sum of (K) Leased Airline Preferential Use Premises, Exclusive Use Premises and Joint Use Space and (L) Leased Unenclosed Space) divided by (M) Total Rentable Space.

Exhibit "F" to Signatory Airline Agreement – SAT

*Final Draft 9.6.2024*

**Line Item O.**    Terminal Rental Rate for Preferential, Exclusive and Joint Use Space (per square foot). Calculated in **Table F-1.1** as (N) Airline Terminal Net Requirement divided by the sum of (AA) Signatory Preferential Use Premises and Exclusive Use Premises (Weighted to $15 during Differential Rate Period), (BB) Joint Use Space, (CC) Terminal A+B Holdroom Leased Space, (DD) Non-Signatory Airline Exclusive Leased Space (Weighted for 115% Non-Signatory Premium), and (EE) Unenclosed Leased Space (Weighted for 60% discount).

*Final Draft 9.6.2024*

2.  <u>Calculation of Terminal Rental, Baggage Handling System/ Security Checkpoint Fee, Loading Bridge Fee, Apron Area Fee and Landing Fee.</u> The Terminal Rental Rate, Baggage Handling System/ Security Checkpoint Fee, Loading Bridge Fee, Apron Area Fee and Landing Fee for each Rate Setting Period shall be calculated as set forth in this subsection.

   A.  <u>Terminal Rental Rate.</u> The methodology for calculating the Terminal Rental Rate is set forth in **Table F-1.1** below. During the Differential Rate Period and as described in Section 5.11 of the Agreement, there will be a differential rate calculation. Such differential rate calculation is applied to Line Item O through Z in the following Table F-1.1.

| Table F-1.1 Terminal Rental Rate Calculation | |
|---|---|
| | **Line Item** (See Section II(1) above for corresponding descriptions) |
| Maintenance and Operating Expenses | A |
| Maintenance and Operating Reserve | B |
| Debt Service | C |
| Debt Service Coverage | D |
| Other Debt | E |
| Amortization | F |
| Non-Amortized Capital Improvements | G |
| | |
| Terminal Total Requirement | H = SUM (A:G) |
| | |
| Less: Credits to Terminal Total Requirement | I |
| | |
| Terminal Net Requirement | J = H + I |
| | |
| Leased Airline Preferential Use Premises, Exclusive Use Premises, and Joint Use Space | K |
| Leased Unenclosed Space | L |
| Total Rentable Space | M |
| | |
| Airline Terminal Net Requirement | N = J * ((K + L) / M) |
| | |
| Terminal Rental Rate for Preferential Use Premises, Exclusive Use Premises and Joint Use Space (per square foot) | |
| Signatory Airline Terminal Rental Rate | O = N / ( AA + BB + CC + (115% * DD) + (60% * EE)) |
| Non-Signatory Airline Terminal Rental Rate | P = O * 115% |
| | |
| Differential Signatory Airline Terminal Rental Rate [1] | O2 = (N + $15 * CC) / (AA + BB + CC + (115% * DD) + (60% * EE)) |
| Differential Non-Signatory Airline Terminal Rental Rate | P2 = O2 * 115% |
| | |
| Terminal A+B Holdroom Rental Rate (per square foot) | |
| Signatory Airline[1] | Q = O2 - $15 |
| Non-Signatory Airline | R = Q * 115% |
| | |
| Unenclosed Space Rate (per square foot) | |
| Signatory Airline | S = O * 60% |
| Non-Signatory Airline | T = S * 115% |
| | |
| Baseline Net Revenues | U |
| Additional Terminal Revenue Required – 1.25X Coverage | V |

*Final Draft 9.6.2024*

| | |
|---|---|
| Terminal Portion | W |
| Airfield Portion | X |
| Total Additional Revenue Required - Terminal | Y = V * W |
| Additional  Signatory Terminal Rental Rate (per square foot) | Z = Y / (AA + CC) |
| Adjusted Signatory Airline Terminal Rental Rate[2] | Z2 = Z + O |
| Adjusted Signatory Airline Terminal A+B Holdroom Rental Rate (per square foot) | Z3 = Z + Q |
| | |
| Signatory Preferential Use Premises and Exclusive Use Premises | AA |
| Joint Use Space | BB |
| Terminal A+B Holdroom Leased Space | CC |
| Non-Signatory Exclusive Leased Space | DD |
| Unenclosed Leased Space | EE |
| Total Airline Leased Space | FF = SUM (AA:EE) |

Note:

1/  The Terminal Rental Rate calculation only includes the $15 differential rental rate adjustment during the Differential Rate Period. When not in the Differential Rate Period, the Terminal A+B Holdroom Rental Rate (per square foot) for Signatory and Non-Signatory does not apply and the calculation for the Signatory Terminal Rental Rate is O = N / (AA + BB + CC + (115% * DD) + (60% * EE)).

2/  If extraordinary coverage pursuant to Section 6.3(d) or Section 6.5(c) of the Agreement is triggered during the Differential Rate Period, then the calculation for Z2 would be Z2 = Z + O2.

*Final Draft 9.6.2024*

B. <u>Calculation of Joint Use Charges.</u>   The methodology for calculating Joint Use Charges, as defined in Section I to this Exhibit "F", is set forth in **Table F-1.2** below.

| Table F-1.2  Joint Use Charges Calculation | |
|---|---|
| Total Enclosed Joint Use Space (square feet) | A |
| Signatory Airline Terminal Rental Rate (per square foot) | B |
| Enclosed Joint Use Requirement | C=A*B |
| | |
| Total Unenclosed Joint Use Space (square feet) | D |
| Signatory Unenclosed Space Rate (per square foot) | E |
| Unenclosed Joint Use Requirement | F=D*E |
| | |
| Total Joint Use Requirement | G=C+F |
| | |
| Total Signatory Airline Enplaned Passengers | H |
| Total Non-Signatory Airline Enplaned Passengers | I |
| Total Enplaned Passengers | K=H+I |
| | |
| Average Joint Use Charge Per Enplaned Passenger | L=G/K |
| Non-Signatory Airline Joint Use Charge Per Enplaned Passenger | M=L*115% |
| Total Non-Signatory Airline Joint Use Charges | N=I*M |
| | |
| Net Signatory Airline Joint Use Requirement | O=G-N |
| | |
| Net Signatory Airline Joint Use Requirement Allocation – Enplaned Passenger Based | P=O*90% |
| Net Signatory Airline Joint Use Requirement Allocation – Fixed Based | Q=O*10% |

*Final Draft 9.6.2024*

C. <u>Per Use Fee – Gate.</u>  The methodology for calculating Per Use Fee - Gate is set forth in **Table F-1.3** below.

| Table F-1.3 Per Use Fee - Gate Calculation | |
|---|---|
| Terminal A Holdrooms (square feet) | A |
| Ground Load Facility Holdrooms (square feet) | B |
| Terminal B Holdrooms (square feet) | C |
| Terminal C Holdrooms (square feet) | D |
| Total Holdroom Space (square feet) | E = SUM (A:D) |
| Total Number of Gates | F |
| Average Space Per Holdroom (square feet) | G=E/F |
| | |
| Signatory Airline Terminal Rental Rate (per square foot)[1] | H |
| Average Cost Per Holdroom (All Terminal) | I=G*H |
| | |
| Total Terminal A+B Holdroom Space (square feet) | J = A + B + C |
| Total Number of Gates (Terminal A, B, and Ground Load Facility) | K |
| Average Space Per Holdroom (square feet) | L = J / K |
| Terminal A+B Holdroom Rental Rate (square feet) | M |
| Average Cost Per Holdroom (Terminal A+B) | N = L * M |
| | |
| Total Terminal C Holdroom (square feet) | O |
| Total Number of Gates (Terminal C) | P |
| Average Space Per Holdroom (square feet) | Q = O / P |
| Signatory Airline Terminal Rental Rate (per square foot) | R |
| Average Cost Per Holdroom (Terminal C) | S |
| | |
| Total Apron Area (linear feet) | T |
| Total Number of Gates | U |
| Average Space Per Apron Area (linear feet) | V=T/ U |
| | |
| Apron Area Net Requirement (per linear foot) | W |
| Average Cost Per Apron Area | X =V* W |
| | |
| Loading Bridge Fee | Y |
| | |
| Total Cost Per Gate | Z=I+X+Y |
| Days in Year | AA |
| Turns per Day | BB |
| | |
| Signatory Airline Per Use Fee - Gate | CC=Z/AA/BB |
| Non-Signatory Airline Per Use Fee - Gate | DD = CC * 115% |
| | |
| Average Cost Per Holdroom (Terminal A+B) | EE = N |
| Average Cost Per Apron | FF = X |
| Loading Bridge Fee | GG = Y |
| Total Cost Per Gate (Terminal A+B) | HH = EE + FF + GG |
| Days in Year | II |
| Turns per Day | JJ |
| | |
| Signatory Airline Per Use Fee – Gate (Terminal A+B)[2] | KK = HH / II / JJ |
| Non-Signatory Airline per Use Fee – Gate (Terminal A+B) | LL = KK * 115% |

*Final Draft 9.6.2024*

| | |
|---|---|
| Average Cost Per Holdroom (Terminal C) | MM = S |
| Average Cost Per Apron | NN = X |
| Loading Bridge Fee | OO = Y |
| Total Cost Per Gate (Terminal C) | PP = MM + NN +OO |
| Days in Year | QQ |
| Turns per Day | RR |
| | |
| Signatory Per Use Fee – Gate (Terminal C)[2] | SS = PP / QQ / RR |
| Non-Signatory Per Use Fee – Gate (Terminal C) | TT = SS * 115% |

Note:

1/  The Terminal Rental Rate calculation only includes the $15 differential rental rate adjustment during the Differential Rate Period. During this time, Line Item H pulls Line Item O2 from **Table F.1-1**. When not in the Differential Rate Period, the Terminal A+B Holdroom Rental Rate (per square foot) for Signatory Airlines and Non-Signatory Airlines does not apply and the calculation for the Signatory Terminal Rental Rate is O = N / (AA + BB + CC + (115% * DD) + (60% * EE)) as depicted in **Table F.1-1** above.

2/  There is only a separate calculation for a Per Use Fee – Gate (Terminal A+B) and a Per Use Fee – Gate (Terminal C) during the Differential Rate Period. When not in the Differential Rate Period, the Per Use Fee – Gate is calculated as shown on Line Item CC in this **Table F.1-3**.

*Final Draft 9.6.2024*

D. <u>Per Use Fee - Ticket Counter</u>.  The methodology for calculating Per Use Fee – Ticket Counter is set forth in **Table F-1.4** below.

| Table F-1.4 Per Use Fee - Ticket Counter Calculation | |
|---|---|
| Ticket Counter Space (square feet per position) | A |
| Signatory Airline Terminal Rental Rate (per square foot) | B |
| Cost of Ticket Counter (Per Position) | C=A*B |
| | |
| Days in Year | D |
| Turns per Day | E |
| | |
| Signatory Airline Per Use Fee – Ticket Counter | F=C/D/E |
| Non-Signatory Airline Per Use Fee – Ticket Counter | G = F * 115% |

*Final Draft 9.6.2024*

E. <u>Baggage Handling System/ Security Checkpoint Fee:</u>  The methodology for calculating the Baggage Handling System Fee is set forth in **Table F-2** below.

| Table F-2.  Baggage Handling System/ Security Checkpoint (BHS) Fee Calculation | |
|---|---|
| | **Line Item**<br>(See Section II(1) above for<br>corresponding descriptions) |
| Maintenance and Operating Expenses | A |
| Maintenance and Operating Reserve | B |
| Debt Service | C |
| Debt Service Coverage | D |
| Other Debt | E |
| Amortization | F |
| Non-Amortized Capital Improvements | G |
| | |
| BHS/ Security Checkpoint Total Requirement | H=A+B+C+D+E+F+G |
| | |
| Less:  Credits to BHS/ Security Checkpoint Total Requirement | I |
| | |
| BHS/ Security Checkpoint Net Requirement | J=H-I |
| | |
| **Total Signatory Airline Enplaned Passengers** | **K** |
| **Total Non-Signatory Airline Enplaned Passengers** | **L** |
| Total Enplaned Passengers | M=K+L |
| | |
| Average BHS/Security Checkpoint Fee Per Enplaned Passenger | N=J/M |
| Non-Signatory Airline BHS/ Security Checkpoint Fee Per Enplaned Passenger | O=N*115% |
| Total Non-Signatory Airline BHS/Security Checkpoint Charges | P=O*L |
| | |
| Net Signatory Airline BHS/ Security Checkpoint Requirement | Q=J-P |
| | |
| Net Signatory Airline BHS/ Security Checkpoint Requirement Allocation – Enplaned Passenger Based | R=Q*100% |
| Net Signatory Airline BHS/ Security Checkpoint Requirement Fee – Signatory Enplaned Passenger | S=R/K |

*Final Draft 9.6.2024*

F.  <u>Loading Bridge Fee:</u> The methodology for calculating the Loading Bridge Fee is set forth in **Table F-3** below.

| Table F-3.  Loading Bridge Fee Calculation | |
|---|---|
| | **Line Item**<br>(See Section II(1) above for<br>corresponding descriptions) |
| Maintenance and Operating Expenses | A |
| Maintenance and Operating Reserve | B |
| Debt Service | C |
| Debt Service Coverage | D |
| Other Debt | E |
| Amortization | F |
| Non-Amortized Capital Improvements | G |
| | |
| Loading Bridge Total Requirement | H=A+B+C+D+E+F+G |
| | |
| Less: Credits to Loading Bridge Total Requirement | I |
| | |
| Loading Bridge Net Requirement | J=H-I |
| | |
| Total Loading Bridges | K |
| | |
| Loading Bridge Fee | L=J/K |

*Final Draft 9.6.2024*

G. <u>Apron Area Fee:</u> The methodology for calculating the Apron Area Fee is set forth in **Table F-4** below.

| Table F-4.  Apron Area Fee Calculation | |
|---|---|
| | **Line Item** <br> (See Section II(1) above for <br> corresponding descriptions) |
| Maintenance and Operating Expenses | A |
| Maintenance and Operating Reserve | B |
| Debt Service | C |
| Debt Service Coverage | D |
| Other Debt | E |
| Amortization | F |
| Non-Amortized Capital Improvements | G |
| | |
| Apron Area Total Requirement | H=A+B+C+D+E+F+G |
| | |
| Less: Credits to Apron Area Total Requirement | I |
| | |
| Apron Area Net Requirement | J=H-I |
| | |
| Total Apron Area (linear feet) | K |
| | |
| Apron Area Fee (per linear foot) | L=J/K |

*Final Draft 9.6.2024*

H. <u>Landing Fee.</u> The methodology for calculating the Landing Fee is set forth in **Table F-5** below.

| Table F-5. Landing Fee Calculation | |
|---|---|
| | **Line Item** (See Section II(1) above for corresponding descriptions) |
| Maintenance and Operating Expenses | A |
| Maintenance and Operating Reserve | B |
| Debt Service | C |
| Debt Service Coverage | D |
| Other Debt | E |
| Amortization | F |
| Non-Amortized Capital Improvements | G |
| | |
| Airfield Total Requirement | H = SUM (A:G) |
| | |
| Less: Credits to Airfield Total Requirement | I |
| | |
| Airfield Net Requirement | J = H – I |
| | |
| Signatory Airline Landing Fee | K = P / R |
| Non-Signatory Airline Premium | L |
| **Non-Signatory Airline Landing Fee** | **M = K * L** |
| | |
| Non-Signatory Airline Landed Weight (thousand pound units) | N |
| Non-Signatory Airline Landing Fee Revenues | O = M * N |
| | |
| Net Signatory Airline Requirement | P = J – O |
| Additional Revenue Required – Coverage | Q |
| Signatory Airline Landed Weight (thousand pound units) | R |
| **Adjusted Signatory Airline Landing Fee** | **S = (P + Q) / R** |

*Final Draft 9.6.2024*

3. <u>Miscellaneous Fees and Charges.</u>

      A. <u>FIS Fee.</u>   The FIS Fee shall be a fee charged per deplaned international passenger as established by the City and presented in Attachment F-1 of this Exhibit "F".

      B. <u>Non-Terminal RON Parking Fee.</u>  Any Air Carrier parking an aircraft in a remote location overnight shall be charged a fee per overnight period as established by the City and presented in Attachment F-1 of this Exhibit "F".

      C. <u>RON Parking Fees.</u> A Signatory Airline shall not be charged RON Parking Fees for the RON parking of its aircraft at its preferentially assigned Gate. All Air Carriers shall be charged RON Parking Fees for the use of RON parking in non-Terminal Building locations designated by the Director. If an Air Carrier is authorized to use a City Gate for RON parking, such Air Carrier will be charged a RON Parking Fee for such use presented in Attachment F-1 of this Exhibit "F".

*Final Draft 9.6.2024*

## SECTION III – COMPETITIVE CREDIT

1. Calculation of <u>Tier 1 Competitive Credit.</u> Tier 1 Competitive Credit shall be calculated by City in accordance with this Section. The following Line Items listed in **Table F-6** are included in the calculation of Revenue Sharing. Each Line Item in **Table F-6** is identified by the corresponding letter set forth below.

   **Line Item A.**  <u>Competitive Credit per Enplaned Passenger.</u> Line Item A will be $2.00 prior to DBO of the expanded Terminal Building facilities and $1.25 thereafter.

   **Line Item B.**  <u>Signatory Enplaned Passengers.</u> Line Item B will be total Signatory Enplaned Passengers for that Fiscal Year.

   **Line Item C.**  <u>Total Activity-Based Competitive Credit.</u> Line Item C will be Line Item A times Line Item B.

   **Line Item D.**  <u>Total Tier 1 Airline Share</u>. Line Item D will be the calculated Total Amount for Signatory Activity-Based Tier 1 Competitive Credit.

   **Line Item E.**  <u>Signatory Air Carrier's Landed Weight Based Competitive Credit</u>. Line Item E will be the percentage share for Landed Weight Based Competitive Credit at twenty five percent (25%).

   **Line Item F.**  <u>Signatory Air Carrier's Passenger Based Competitive Credit.</u> Line Item F will be the percentage share for Passenger Based Competitive Credit at seventy five percent (75%).

2. <u>Table F-6.</u> The methodology for calculating each Signatory Airline's (including Airline's) share of Revenue Sharing is set forth in **Table F-6** below.

| Table F-6. Signatory Airline Competitive Credit Calculation | |
|---|---|
| | **Line Item** <br>(See Section III(1) above for corresponding descriptions) |
| Competitive Credit per Enplaned Passenger | A |
| Signatory Airline Enplaned Passengers | B |
| Tier 1 Competitive Credit | C = A * B |
| Total Activity-Based Tier 1 Competitive Credit | D = C |
| | |
| Signatory Airlines' Landed Weight Based Tier 1 Credit | E = D * 25% |
| Signatory Airlines' Enplaned Passenger Based Tier 1 Credit | F = D * 75% |

*Final Draft 9.6.2024*

3. Calculation of <u>Tier 2 Competitive Credit.</u>  Competitive Credit shall be calculated by City in accordance with this Section. Starting at DBO at the expanded Terminal Building facilities the following Line Items listed in **Table F-7** are included in the calculation of the Tier 2 Competitive Credit.  Each Line Item in **Table F-7** is identified by the corresponding letter set forth below.

**Line Item A.**    <u>Total Airport Revenues</u> (as defined in Article 1 of this Agreement). less, $25M in the first year after DBO (and then escalated by 2% per year thereafter).

**Line Item B.**    <u>Total Debt Service.</u> Line Item B includes total Debt Service, as defined in Article 1 of this Agreement, excluding any Debt Service funded with PFCs or CFCs.

**Line Item C**.    <u>Total Interim Financing.</u>  Line Item C includes any interest payments by the Airport for outstanding principal on project costs funded through interim financing.

**Line Item D.**    <u>Total Maintenance and Operating Expenses.</u> Line Item D means "Total Maintenance and Operating Expenses" as defined in Article 1 of the  Agreement.

**Line Item E**.    <u>Total Debt Service Coverage.</u> Line Item E includes Debt Service Coverage calculated using Total Debt Service defined in Line Item B.

**Line Item F.**    <u>Total Amortization of Capital Expenditures.</u> Line Item F includes Amortization attributable to the Airport Cost Centers but not including amortization attributable to the Terminal C Fuel Hydrant "Stub Out" Costs as described in Section 5.12 of the Agreement.

**Line Item G.**    <u>Tier 1 Competitive Credit.</u> Line Item G includes the Tier 1 Competitive Credit as calculated above in **Table F-6** in this Exhibit "F".

**Line Item H.**    <u>Total Amount Available for Tier 2 Competitive Credit.</u> Line Item H includes Line Item A less Line Items B, C, D, E, F, and G.

**Line Item I.**    <u>Airport Share Percentage.</u> Line Item I denotes the percentage share for the Airport.

**Line Item J.**    <u>Airline Share Percentage.</u> Line Item J denotes the percentage share for the Signatory Air Carriers.

**Line Item K.**    <u>Total Tier 2 Airport Share.</u> Line Item K will be the calculated Total Amount for Airport Share at fifty percent (50%).

**Line Item L.**    <u>Total Tier 2 Airline Share.</u> Line Item L will be the calculated Total Amount for Signatory Airline Share at fifty percent (50%).

**Line Item M.**    <u>Signatory Airlines' Landed Weight Based Competitive Credit.</u> Line Item M will be the percentage share for Landed Weight Based Competitive Credit at twenty five percent (25%).

**Line Item N.**    <u>Signatory Airlines' Passenger Based Competitive Credit.</u> Line Item N will be the percentage share for Passenger Based Competitive Credit at seventy five percent (75%).

*Final Draft 9.6.2024*

4. <u>Table F-7.</u> The methodology for calculating each Signatory Airline's (including Airline's) share of Revenue Sharing is set forth in **Table F-7** below.

| Table F-7.  Signatory Airline Competitive Credit Calculation ||
|---|---|
|  | **Line Item**<br>(See Section III(1) above for corresponding descriptions) |
| Total Airport Revenues | A |
| Total Debt Service | B |
| Total Interim Financing | C |
| Total Maintenance and Operating Expenses | D |
| Total Debt Service Coverage | E |
| Total Amortization | F |
| Tier 1 Competitive Credit | G |
|  |  |
| Total Amount Available for Tier 2 Competitive Credit | H = A – SUM (B:G) |
|  |  |
| Airport Share – Percentage | I – 15% |
| Airline Share – Percentage | J – 85% |
|  |  |
| Total Tier 2 Airport Share | K = H * I |
| Total Tier 2 Airline Share | L = H * J |
|  |  |
| Signatory Airlines' Landed Weight Based Tier 2 Credit | M = L * 25% |
| Signatory Airlines' Enplaned Passenger Based Tier 2 Credit | N = L *75% |

*Final Draft 9.6.2024*

## SECTION V – COST CENTERS

1. <u>Direct Cost Centers.</u> The Direct Cost Centers are those Cost Centers listed in **Table F-8** below.

| Table F-8.  Direct Cost Centers | |
|---|---|
| **Cost Center** | **Description of Area Included or Functional Activity** |
| Airfield Area | Those portions of the Airport including runways, taxiways, taxilanes, and apron areas (other than the Apron Area, other leased apron areas, and common use cargo aprons), navigational aids, hazard designation and warning devices, airfield security roads and fencing, blast fencing, lighting, runway protection zones and safety areas for landing, taking off, and taxiing of aircraft, avigation easements, land used in connection therewith or acquired for such purpose, and facilities, the acquisition, construction, or installation cost of which is wholly or partially paid by City. |
| Apron Area | The areas at the Airport dedicated to the parking, servicing, and ground handling of aircraft at the Terminal Building. |
| Baggage Handling System/ Security Checkpoint | The areas and non-TSA equipment at the Airport associated with the consolidated baggage handling system (BHS), security checkpoint in the Terminal Building, and related areas designed to automatically transfer checked baggage from airline-monitored inputs to a Transportation Security Administration (TSA) operated inline checked baggage inspection system with sortation capabilities to automatically transfer checked baggage inspection system cleared bags to designated baggage makeup carousels for pickup by Airline and other airline personnel. |
| Loading Bridges | Any passenger loading bridges serving aircraft at the Terminal Building. |
| Other Buildings and Areas | All other facilities that are not included in the other direct cost centers of the Airport, including air cargo buildings, areas occupied by the Federal Aviation Administration (FAA), the fuel storage facility, areas for the sale and servicing of aircraft, and general aviation hangars, buildings, and aprons. |
| Parking and Ground Transportation | Areas designated for employee and public automobile parking, rental car operations, all Airport access roadways, and the public parking garage and associated access ramps, surface lots (hourly, daily, and economy), and other automobile parking areas; employee parking lots; and taxicab service areas at the Airport. |
| Stinson | Stinson Municipal Airport and any other aviation facility as may be from time to time be owned or operated by City and designated by City to be part of the Airport System. |
| Terminal Building | The portion of the Terminal Building and associated curbside entrance areas, including, but not limited to, passenger ticket counters, TSA screening areas, baggage claim areas, non-rentable space, FIS, Terminal A, Terminal B and Terminal C which includes the secure area containing the holdrooms, concession areas, and public circulation areas. |

*Final Draft 9.6.2024*

## ATTACHMENT "F-1"
## TO EXHIBIT "F"

## STATEMENT OF RATES
### FISCAL YEAR 2025

(October 1, 2024 through September 30, 2025)

### SECTION I – FY 2025 SUMMARY of RATES

1. Terminal Rental Rate.
    a.  Signatory Airline: $163.98 per square foot.
    b.  Non-signatory Airline: $188.57 per square foot.[1]

2. Landing Fee Rate.
    a.  Signatory Airline: $3.50 per 1,000 pounds of Landed Weight.
    b.  Non-signatory Airline: $4.03 per 1,000 pounds of Landed Weight.

3. Baggage Handling System/ Security Checkpoint Fee:
    a.  Signatory Airline: $0.64 per Enplaned Passenger.
    b.  Non-signatory Airline: $0.74 per Enplaned Passenger

4. Loading Bridge Fee:
    a.  $29,962.00 per loading bridge attached to preferentially leased holdroom

5. Apron Area Fee:
    a.  $1,753.00 per linear foot adjacent to preferentially leased holdroom passenger.

6. Per Use Fee – Gate:

    a.  Signatory Airline: $427.10 per two (2) hour use, or any portion thereof.
    b.  Non-Signatory Airline: $491.17 per two (2) hour use, or any portion thereof.

7. Per Use – Fee Ticket Counter:
    a.  Signatory Airline: $30.21 per two (2) hour use, or portion thereof, of ticket counter area.
    b.  Non-Signatory Airline: $34.74 per two (2) hour use, or portion thereof, of ticket counter area.

8. Federal Inspection Services (FIS) Facility Fee Rate:  $10.50 per international Deplaned Passenger requiring FIS processing.

9. Non-Terminal RON Parking Fee: $150.00 for each Overnight use of Remote aircraft parking area.

10. RON Parking Fee: $150.00 for each Overnight use of aircraft parking at a City Gate.

---

[1] Non-Signatory Airline rates shall apply to Non-Signatory Airline terminal tenants/licensees if terminal rental rates apply to such tenants/licensees. Non-Signatory Joint Use charges will include a fifteen percent surcharge in addition to the rate charged to Signatory Airlines.

Exhibit "F" to Signatory Airline Agreement – SAT

*Final Draft 9.6.2024*

## SECTION II – FY 2025 RATE CALCULATIONS TABLE

*Final Draft 9.6.2024*

## EXHIBIT G

## TERMINAL DEVELOPMENT PROGRAM

I.    Preamble.

The Terminal Development Program is comprised of the Capital Improvements identified in **Exhibit G-1.1** and **Exhibit G-1.2**. As of the Effective Date, the City anticipates that the total cost of the Terminal Development Program will be approximately $1,603,000,000[1]. However, the City has committed to the Signatory Airlines that the Net Project Costs (*i.e.*, the amount to be included in the airline rate base) of the Terminal Development Program will be no more than $1,267,100,000 (subject to increases by MII approval pursuant to Section 8.1 of the Agreement) for costs associated with the Capital Improvements identified in **Exhibit G-1.1**. Capital Improvements identified in **Exhibit G-1.2** will have zero Net Project Costs unless submitted to the Signatory Airlines for MII approval pursuant to Article 8 of the Agreement. Further, because of the agreement by the Signatory Airlines to provide extraordinary coverage pursuant to Section 6.3(d) and Section 6.5(c) of the Agreement, the City has also committed to the Signatory Airlines that the City will only finance up to $1,404,000,000 of the total cost of the Terminal Development Program through GARBs (which includes costs associated with Capital Improvements identified in either **Exhibit G-1.1** or **Exhibit G-1.2**). This cap on the City's GARB financing for the Terminal Development Program may be increased pursuant to Section 8.1 of the Agreement. The City anticipates that it will finance the remaining portion of the total cost of the Terminal Development Program through a combination of grants, PFCs, and City or Airport non-airline funds. Consistent with the foregoing, the City and Airline agree to and incorporate by reference into the Agreement the provisions of this **Exhibit G**.

II.    Contents. This **Exhibit G** consists of the following:

**Exhibit G-1**    Description of TDP
**Exhibit G-1.1** TDP Airline Rate Base Elements
**Exhibit G.1-2** TDP Non-Airline Rate Base Elements
**Exhibit G-1.3** Initial Post-DBO Gate Assignments
**Exhibit G-2**    TDP Governance and Airline Participation
**Exhibit G-2.1** TDP Governance Committee Charters
**Exhibit G-2.2** TDP Governance Committee Descriptions

---

[1] Per-project contingency estimates are included in the line item estimated costs for the TDP Airline Rate Base Elements listed in **Exhibit G-1.1** and the TDP Non-Airline Rate Base Elements listed in **Exhibit G-1.2**. For the sake of clarity, the total estimated cost of TDP of approximately $1,603,000,000 noted here is exclusive of program-wide contingency amounts for which the City may need to seek additional authorization from City Council. The City's spending of such additional program-wide contingency amounts would still be subject to the provisions of this **Exhibit G** and Article 8 of the Agreement with respect to the TDP Airline Rate Base Cap and the TDP GARB Financing Cap.



*Final Draft 9.6.2024*

## EXHIBIT G-1

### DESCRIPTION OF TDP

I.  <u>Generally</u>.

    A.  By execution of this Agreement, Airline and the other Signatory Airlines have authorized and approved the Terminal Development Program ("***TDP***"), subject to the terms and conditions herein. The anticipated elements of the TDP which are so approved by the Signatory Airlines are listed in the attached **Exhibit G-1.1** and **Exhibit G-1.2**, with estimated costs and descriptions of scope for each element. Initial Gate assignments following the anticipated construction of new Gates as part of TDP are depicted in **Exhibit G-1.3**.

    a.  To the extent there is any conflict between the terms and conditions in this **Exhibit G** and those of the Agreement, the Agreement shall control.



*Final Draft 9.6.2024*

## EXHIBIT G-1.1

### TDP AIRLINE RATE BASE ELEMENTS

I.     <u>List of TDP Airline Rate Base Elements.</u>

    A.     The portion of TDP that has been pre-approved by Airline and the Signatory Airlines by execution of this Agreement to be included in the TDP Airline Rate Base Cap is comprised of the following projects ("***TDP Airline Rate Base Elements***") which, as of the Effective Date, are each projected to have the estimated costs and scope shown below.

| TDP Airline Rate Base Element Project Name | Estimated Total Project Cost |
|---|---|
| New Terminal | $1,236,600,000 |
| Terminal Apron | $111,900,000 |
| Terminal A Reconfiguration | $6,800,000 |
| Terminal B Reconfiguration | $8,300,000 |
| Central Utility Plant (CUP) Upgrades | $19,000,000 |
| Terminal Triturator | $3,200,000 |
| South RON Aircraft Parking | $29,200,000 |
| Utility Corridor – Landside/Offsite | $14,700,000 |
| Terminal C Fuel Hydrant "Stub Out" | $20,000,000 |
| **Estimated Total Costs[2]** | **$1,449,700,000** |

    B.     By execution of this Agreement, the Signatory Airlines have authorized the City to proceed with the design and construction of each of the TDP Airline Rate Base Elements without further MII consideration, subject to the provisions of Article 8, *Capital Improvements*.

    C.     Consistent with the provisions of Article 8, *Capital Improvements*, the City and the Signatory Airlines acknowledge that it is their intent that the **TDP Airline Rate Base Cap** is intended to be a programmatic cap on the total Net Project Costs to be included in the airline rate base for the TDP Airline Rate Base Elements, such that the City may, without further MII consideration, proceed with a TDP Airline Rate Base Element despite a revised estimate for the completion of such TDP Airline Rate Base Element, so long as such programmatic cap will not be exceeded by more than the five percent (5%). Notwithstanding the foregoing, however, the City agrees that the intent of the City and Airline is that the City will not eliminate one of the TDP Airline Rate Base Elements from the TDP altogether without following the

---

[2] Pursuant to Section 8.1 of the Agreement, the City agrees that the estimated Net Project Costs of these listed TDP Airline Rate Base Elements will not exceed the TDP Airline Rate Base Cap.



*Final Draft 9.6.2024*

process for MII review and approval in Section 8.7, "MII Approval and Deferral Process."

D.      With respect to the above-referenced Terminal C Fuel Hydrant "Stub Out," the subject Twenty Million Dollars ($20,000,000) will be included in the Terminal Cost Center as an Equipment and Capital Outlay, and amortized over twenty (20) years utilizing a three percent (3%) discount rate, pursuant to Section 5.12, "Terminal C Fuel Hydrant "Stub Out" Costs," of the Agreement.



*Final Draft 9.6.2024*

## TDP AIRLINE RATE BASE ELEMENT PROJECT DESCRIPTIONS



### New Terminal

The New Terminal project is an approximately 850,000 sf new gateway terminal serving 17 narrowbody gates, 6 of which are international capable swing gates designed to accommodate widebodies in a 2:1 MARS configuration.

The building will serve as the central processor for the New Terminal and the existing Terminal B, incorporating landside ticketing, concessions and Security Screening Check Point. The airside concourse includes spacious holdrooms, airline clubs, passenger amenities, and a robust concessions program and a secure connector to Terminal B. A new immigration facility supports international arrivals while a new domestic baggage claim serves all other passengers. The new facility will incorporate a distinctive San Antonio sense of place with a focus on sustainability.



*Final Draft 9.6.2024*

## TDP AIRLINE RATE BASE ELEMENT PROJECT DESCRIPTIONS



Scope

## Terminal Apron

To support the development of the New Terminal, the Terminal Apron will be reconstructed to accommodate the new aircraft parking layout. The project includes demolition of the existing apron; regrading to meet new drainage criteria and NFPA requirements; new underground utilities to service the New Terminal; and new paving to align with the final grading requirements of the New Terminal.



*Final Draft 9.6.2024*

## <u>TDP AIRLINE RATE BASE ELEMENT PROJECT DESCRIPTIONS</u>



**Departures Level**

⌐ ¬ Limits of TDP scope

**Arrivals Level**

## Terminal A Reconfiguration

The Terminal A Reconfiguration project will help relieve curbside congestion and improve passenger processing through closure of the eastern most curbside entrance doors; relocation of the SSCP (7 lanes); check-in counter reconfiguration/reduction; concession reassignments; and replacement of baggage reclaim devices. Renovation of Terminal A is limited specifically to the areas listed above.



*Final Draft 9.6.2024*

## TDP AIRLINE RATE BASE ELEMENT PROJECT DESCRIPTIONS



**Departures Level**

 Limits of TDP scope

## Terminal B Reconfiguration

The Terminal B Reconfiguration project is limited to the replacement of the existing Terminal B SSCP with landside and airside concessions space; replacement of baggage reclaim devices; and BHS requirements to connect to the New Terminal CBIS.



*Final Draft 9.6.2024*

# TDP Airline Rate Base Element Project Descriptions



## Central Utility Plant (CUP) Upgrades

The existing CUP requires upgrades and the installation of additional equipment to support the heating and cooling needs of the New Terminal. The upgrades include additional electrical equipment; new chillers and pumps; cooling tower expansion; and an approximate 1-million-gallon thermal energy storage system (TES).



*Final Draft 9.6.2024*

## TDP AIRLINE RATE BASE ELEMENT PROJECT DESCRIPTIONS



## Terminal Triturator

The new Triturator building will accommodate disposal of aircraft lavatory waste for the New Terminal project. This new facility can support two lavatory vehicles simultaneous and includes dual pits and grinders and security and surveillance systems.



*Final Draft 9.6.2024*

## TDP AIRLINE RATE BASE ELEMENT PROJECT DESCRIPTIONS



## Landside Utilities

The Utility Corridor Relocation Project upgrades the size/capacity and location of existing storm, sanitary, and water utility infrastructure to accommodate the increased demand of the New Terminal.  It leverages the location of the existing utility corridor along the terminal loop road and will replace all existing landside storm, sanitary, and water infrastructure.

---



*Final Draft 9.6.2024*

## TDP AIRLINE RATE BASE ELEMENT PROJECT DESCRIPTIONS



## RON Parking

Construction of the future New Terminal will require existing RON positions on the future New Terminal site to be relocated. The South RON requires up to 6 positions supporting narrowbody traffic, which supplements capacity from the Ground Loading Facility.

Relocation of the RON parking positions to the south site will require a mixture of simple re-striping and addition of full depth aircraft rated pavement. The RON position construction will be phased in tandem with the construction of the Ground Load Facility.



12

*Final Draft 9.6.2024*

## TDP AIRLINE RATE BASE ELEMENT PROJECT DESCRIPTIONS

### Terminal C Fuel Hydrant "Stub Out"

The new hydrant system will generally consist of new dual, 12" mains pressurized underground fuel transfer lines (with 6" laterals to fuel pits) to supply future fuel to the new aircraft gates. The design will incorporate intermediate aboveground isolation valve stations (IVS) to provide loop hydrant piping system isolation, redundant fuel supply connections and Emergency Fuel Shut Off (EFSO) capabilities. The piping will be provided with a new cathodic protection system. Hydrant fueling and high/low point pits will be prefabricated fiberglass construction installed within the concrete apron.  The 12" fuel mains and laterals will be capped and hydrogen filled for future connection to hydrant fuel transmission lines from a TBD fuel farm.



*Final Draft 9.6.2024*

## **EXHIBIT G-1.2**

### **TDP NON-AIRLINE RATE BASE ELEMENTS**

I.    List of TDP Non-Airline Rate Base Elements .

A.    Consistent with the terms of the Agreement and this **Exhibit G**, the costs of the Capital Improvements identified below as TDP Non-Airline Rate Base Elements are not to be included in the calculation of the TDP Airline Rate Base Cap, and such Capital Improvements shall have zero Net Project Costs unless the City has obtained MII approval pursuant to Section 8.6 or the Capital Improvement meets the requirements for an exemption from MII review and approval pursuant to Section 8.5.

**Notwithstanding the foregoing, the GARB-funded portions of the costs of the TDP Non-Airline Rate Base Elements are included in the TDP GARB Financing Cap.**

| **TDP Non-Airline Rate Base Element Project Name** | **Estimated Total Project Cost** |
| --- | --- |
| Demo Hgr.4, P.S. & Badge/ID | $9,300,000 |
| Utility Corridor | $2,800,000 |
| P.S. Bldg.- Sandau Renovation | $5,900,000 |
| Badging Bldg.- Hold Renovation | $5,900,000 |
| Lynx Bldg. (Operations) | $1,200,000 |
| Airport Access Road | $58,300,000 |
| Permanent Employee Parking | $15,200,000 |
| Terminal Curbside Roadway | $51,700,000 |
| Central Utility Plant (CUP) Upgrades | $3,600,000 |
| **Estimated Total Costs[3]** | **$153,900,000** |

---

[3] Based upon estimates made in June 2023.  None of these costs will be included in airline cost centers. However, as indicated above, costs of the TDP Non-Airline Rate Base Elements are included in the TDP GARB Financing Cap.



*Final Draft 9.6.2024*

| Non- TDP Airline Rate Base Element Project Name | Project Description |
|---|---|
| **Demolition of Hangar 4, Public Safety, and Badge ID** | Construction of the future New Terminal necessitates the relocation of RON parking and the addition of new Ground Transportation Center. The existing Hangar 4, existing Public Safety Building, and existing Badge ID buildings require demolition and removal to accommodate RON parking and the new Ground Transportation Facility with connector to the new Terminal |
| **Utility Corridor** | See description in previous section regarding TDP Rate-base elements |
| **Public Safety Building – Sandau Renovation** | Construction of the future New Terminal necessitates demolition of existing Public Safety building and relocation of the Public Safety and TSA to the existing Sandau Building. This requires renovation existing Sandau Building and improvements to the site and parking to meet program parking requirements. |
| **Badge ID Building – Holt Renovation** | Construction of the future New Terminal necessitates demolition of existing Badge ID building and relocation of the Badge / ID Office and Airport Security to the existing Holt Building. This requires renovation of existing Holt Building and the addition of new surface parking adjacent to Holt Building to meet program parking requirements. |
| **Operations Building – Lynx Renovation** | Construction of the future New Terminal requires the relocation Airport Ops from the Sandau Building to the Lynx Building. T requires renovation of existing Lynx Building to meet progr requirements. |
| **Airport Access Roadways** | Improvements to the Airport Access Roadway are an essential step to improving access to the airport and increasing the efficiency by altering the inbound/outbound flow of traffic at the airport. Improvements include reconfiguration of Airport Boulevard, creation of Northern Boulevard Extension, Dee Howard Way reconfiguration, reconfigure access points into passenger parking lots, and removing traffic signals and intersections. Landscaping will be added consistent with the new Terminal's Sense of Place. |
| **Permanent Employee Parking** | Construction of the future New Terminal will require existing Employee Parking on the future New Terminal site to be relocated. The new location for Employee Parking consist of several different parking lots and other operations that are combined to create a single parking product. Existing operations and elements will be demolished and removed. A singular efficient parking lot will be constructed at this location. |
| **Central Utility Plant Upgrades** | See description in previous section regarding TDP Rate Base Elements. |



*Final Draft 9.6.2024*

## **EXHIBIT G-1.3**

### **INITIAL POST-DBO GATE ASSIGNMENTS**



Terminal A gate locations are meant to be representative of a 10-gate Southwest operation and are subject to further review and placement within Terminal A. Terminal B gate locations are meant to be representative of a 5-gate United Airlines operation and 1-gate Spirit operation within Terminal B and are subject to further review and placement by City in coordination with United Airlines and Spirit.



*Final Draft 9.6.2024*

## EXHIBIT G-2

### TDP GOVERNANCE AND AIRLINE PARTICIPATION

II.    TDP Governance.

    A.    The City has formed the TDP Governance Committees described in **Exhibit G-2.1** ("***TDP Governance Committee Charters***") and **Exhibit G-2.2** ("***TDP Governance Committee Descriptions***") and has formed or intends to form associated TDP Working Groups for purposes of planning, input, oversight and coordination of stakeholder engagement related to the TDP. The TDP Governance Committee Charters and the TDP Governance Committee Descriptions further describe the function, process, and composition of each committee, and are subject to revision and amendment by vote of the applicable committee; provided, however, that the airline representation described in Section III herein may not be altered without written agreement by all Signatory Airlines.

    B.    The City is committed to collaborating with the Signatory Airlines during the design and construction process of the TDP. In addition to the formal committee roles of airline representatives described below, the City anticipates regular engagement with airline representatives, directly and through the Airport-Airline Affairs Committee ("***AAAC***"), led by the AAAC Chair, throughout the duration of the TDP to coordinate technical details, operating requirements, operational impacts, and other items requiring airline input. Unless authorized in writing by City staff, neither airline staff nor representatives may provide directives or make requests directly to any City contractors or consultants, including but not limited to, the Executive Program Manager ("***EPM***"), the Master Architect, and the Construction Manager At Risk ("***CMAR***"). All such airline requests or directives must be provided to City staff or their designated representative for review and dissemination to the appropriate party.

III.    Airline Participation in TDP Governance.

    A.    Airline, together with other Signatory Airlines, may select, jointly, by written notice to the City, one airline representative ("***Signatory Airline Representative***") to participate in each of the following TDP Governance Committees on their behalf: (1) Design Review Committee; (2) Construction Review Committee; and (3) Budget Committee. If the Signatory Airlines have engaged an airline technical representative ("***ATR***"), the ATR will be the Signatory Airline Representative on such committees. As of the Effective Date, the Signatory Airlines have engaged an ATR and said ATR will be the Signatory Airline Representative.

    B.    The City shall also provide the Signatory Airlines the opportunity to select, jointly or individually, by written notice to the City, a subject matter expert or experts to represent the Signatory Airline(s) on any TDP Working Group (each, a "***Signatory Airline Working Group Member***"). Such written notice shall specify whether the Signatory Airline Working Group Member will represent an individual Signatory Airline or all Signatory Airlines jointly.



*Final Draft 9.6.2024*

C.    By advance written notice to the City, a Signatory Airline may request (through the Signatory Airline Representative) that a Signatory Airline Working Group member attend a meeting of the Design Review Committee, Construction Review Committee, or Budget Committee where the committee is considering a recommendation from the applicable TDP Working Group. Such attendance shall be at the reasonable discretion of the applicable committee chair, and, if any such request is disapproved, such committee chair shall provide the reason(s) for such disapproval in writing to the Signatory Airline Representative prior to the start of the meeting for which attendance was requested.

D.    The Signatory Airline Representative shall be a voting member of the Design Review Committee, Construction Review Committee, and Budget Committee.

E.    Any Signatory Airline Working Group Members shall be non-voting members of the respective TDP Working Group.

F.    The Signatory Airlines shall provide the name, phone number, and email address of the person and/or firm they have selected to serve as their Signatory Airline Representative by written notice to the City from the AAAC Chair on behalf of all Signatory Airlines. If, at any time during the Term, the Signatory Airlines no longer employ an ATR (or replace the ATR with a different firm) and wish to designate a different Signatory Airline Representative, the Signatory Airlines shall provide such written notice to the City from the AAAC Chair no later than three (3) business days prior to any previously scheduled committee meeting to be attended by such new designee. In the event of an unscheduled committee meeting or one that occurs with less than three (3) business days' notice, the Signatory Airlines may designate a different person to serve as their Signatory Airline Representative by written notice to the City from the AAAC Chair on behalf of all Signatory Airlines up until the start time of such committee meeting.

G.    If either of the Design Review Committee or the Construction Review Committee (i) does not reach a decision on a matter that may materially affect Airline's operations, and such decision will instead be made by the TDP Senior Leadership Committee, or (ii) makes a recommendation on a matter that may materially affect Airline's operations to the TDP Senior Leadership Committee to which the Signatory Airline Representative voted against at the committee level, Airline (through the Signatory Airline Representative) may request that Airline representatives be allowed to attend the TDP Senior Leadership Committee where such decision will be deliberated. The Signatory Airline Representative shall make such request by advance written notice to the City and specify, in such notice, what representatives Airline proposes to attend such meeting with the Signatory Airline Representative.

H.    Airline shall comply and shall cause the Signatory Airline Representative and Signatory Airline Working Group Members to comply with any confidentiality requirements that the City may require of committee or working group participants.



**EXHIBIT G-2.1**

**TDP GOVERNANCE COMMITTEE CHARTERS**

*Final Draft 9.6.2024*

## Construction Committee Charter – v2

### Goals and Purpose

**Background/Purpose:** The SAT Airport Team has established Governance requirements for the Terminal Development Program (TDP). TDP Governance will provide for streamlining of communication as well as making and enforcing decisions on design, budget and schedule.

**Role:**
The role of the Construction Committee is to provide a forum to discuss, coordinate and advise on TDP construction activities.

**Goals:**
- Mitigate / minimize negative impacts from construction for public and Airport operations
- Keep project on track toward overall target budget
- Minimalize schedule impacts and delays

**Responsibility:**
- Support CM Team in evaluation of critical construction activities with regard to safety, schedule, budget, permitting, and conformance with design and quality standards.
- Advise on management of construction activities on general public and Airport operations.
- Set and track KPIs/KFIs leading indicators, such as: safety, schedule of spend, % budget spent, response time to contractor, payments (create a dashboard)
- Track schedule and budget against targets
- Support seamless coordination between TDP, ASEIP, and CIP Construction activities and be aware of potential construction method implications.

### Construction Committee: High Level Roles & Responsibilities at a Glance

| Committee Members | Lead | Decision Authority | Participant |
|---|---|---|---|
| PM / CM | X | X | |
| Construction PM | | | X |
| CMAR / builder (s) | | | X |
| SAAS Finance | | | X |
| SAAS ORAT | | | X |
| SAAS OPS | | | X |
| SAAS Safety | | | X |
| TDP Development | | X | X |
| COSA City Attorney Office | | | X |
| SAAS Facilities | | | X |
| SAAS IT | | | X |
| ATR | | X | |
| EPM | | X | |
| SAAS Communications | | | X |
| ORAT | | | X |
| PMCM- Meeting Management | | | X |

All committees - HL Roles Respons Glance

### High-Level Committee Engagement Process

| Regular Meetings | Decision Making | Escalation | Stakeholder Management |
|---|---|---|---|
| Biweekly Meetings to discuss, coordinate, align and manage issues. | • Review and assess information provided by WGs<br>• Make decisions and advise WGs<br>• Engage decision authority, as needed | • Escalate to ICP (process issues)<br>• Escalate to SLC issues unresolved by committee | Ensure appropriate coordination between CM Firm(s) and Critical SAAS stakeholders regarding construction activities |



### Key Protocols

**Conduct of Meetings & Information Management**

- Biweekly Meetings. Urgent meetings as necessary
- Agenda and presentation materials provided 3 days in advance of meetings (24 hours in advance of unplanned urgent meetings)
- Produce minutes and distribute copies of meeting proceedings for review by voting members within 48 hours of meeting's conduct

**Escalation & Decision-Making**
It is the intent that a majority of decisions will be resolved by the Construction Committee or sent back to the Working Groups."

- Decisions which cannot be reached by the Construction Committee as a whole will be escalated to Committee Decision Authority for vote.
- Escalate process issues and roadblocks to ICP (Chief Integration Officer).
- Decisions which cannot be reached by committee decision authority will be escalated to SLC.
- Decisions that significantly affect airlines or passengers, but don't have airline support, can be brought to the SLC with written notice, where the ATR can present its position
*Detailed decision tree will be developed as the committee gets underway and issues surface.*



### Working Groups

| Safety | CIP / ASEIP Coordination | Security | Group Name |
|---|---|---|---|
| Advice on Public and Worker Safety | Main Objective | Main Objective | Main Objective |
| Leader | Leader | Leader | Leader |

Rev. 2024.03.20





# Design Committee Charter – v2

## Goals and Purpose

**Background:** The SAT Airport Team has established Governance requirements for the Terminal Development Program (TDP). TDP Governance will provide for streamlining of communication as well as making and enforcing decisions on design, budget and schedule.

**Charter:** The Design Review Committee has oversight for the Design Team and provides direction for the Terminal Development Program to achieve the vision, identity, budget, schedule, and operational requirements established by the City of San Antonio and the San Antonio Airport System Leadership. Input from stakeholders, the community, and the traveling public will be evaluated to inform decisions and recommendations to the Senior Leadership Committee for major decisions.

### Goals:
- Keep project on track toward overall target budget
- Minimize schedule impacts and delays

### Responsibility:
- Identify key issues that need executive decision
- Support Design Team(s) with timely decision making
- Support Design Team(s) in evaluation of critical design management activities.
- Advise / ensure design coordination with critical Aviation and community stakeholders.
- Advise / ensure design aligns with and enhances aviation department performance criteria for accessibility, sustainability, and design standards
- Track design schedule and budget against targets
- Design to budget, bring items to Budget Committee, as needed
- Ensure that facility works for us (sense of place, passenger flow, operational)

### Design Committee: High Level Roles & Responsibilities at a Glance

| Committee Members | Lead | Decision Authority | Participant |
|---|---|---|---|
| EPM | X | X | |
| Deputy Director TDP | | X | |
| SAAS IT | | | X |
| EPM | | | X |
| SAAS Architect | | X | |
| SAAS Customer Experience | | | X |
| Master Architect | | | X |
| TDP Development | | | X |
| SAAS Facilities | | | X |
| SAAS Safety | | | X |
| SAAS OPS | | | X |
| ORAT | | | X |
| SAAS ORAT | | | X |
| ATR | | X | |
| EPM- Meeting Management | | | X |

All committees - HL Roles, Respons, Glance

## High-Level Committee Engagement Process



| Regular Meetings | Decision Making | Escalation | Stakeholder Management |
|---|---|---|---|
| Biweekly meetings to discuss, coordinate, align and manage issues. | • Review and assess information provided by WGs<br>• Make decisions and advise WGs<br>• Engage decision authority, as needed | • Escalate to ICP (process issues)<br>• Escalate to SLC issues unresolved by committee | Ensure appropriate coordination between Design team(s) and Critical SAAS stakeholders regarding design activities |

### Key Protocols

**Conduct of Meetings & Information Management**

- Biweekly Meetings. Urgent meetings as necessary

- Agenda and presentation materials provided 3 days in advance of meetings (24 hours in advance of unplanned urgent meetings)

- Produce minutes and distribute copies of meeting proceedings for review by voting members within 48 hours of meeting's conduct

**Escalation & Decision-Making**

It is the intent that a majority of decisions will be resolved by the Design Committee or sent back to the Working Groups.*

- Decisions which cannot be reached by Design Committee as a whole will be escalated to Committee Decision Authority for Vote.

- Escalate process issues and roadblocks to ICP (Chief Integration Officer).

- Decisions which cannot be reached by committee decision authority will be escalated to SLC.

- Decisions that significantly affect airlines or passengers, but don't have airline support, can be brought to the SLC with written notice, where the ATR can present its position

### Working Groups



| ORAT | Inclusive Design | Design Options | Integrated Special Systems |
|---|---|---|---|
| SAAS ORAT | Deputy Director TDP | SAAS Architect | SAAS IT |

| Facility Maintenance | Group Name |
|---|---|
| SAAS Maintenance | Group Lead |

Rev. 2024.03.07

20



# Budget Committee Charter – v2

## Goals and Purpose

**Background/Purpose:** The SAT Airport Team has established Governance requirements for the Terminal Development Program (TDP). TDP Governance will provide for streamlining of communication as well as making and enforcing decisions on design, budget and schedule.

**Role:** The role of the Budget Committee is to provide a forum to discuss, coordinate and align program scope, schedule, and budget with program funding and financing plans

### Responsibility:
- Advise TDP team and TDP committees on Aviation & CoSA fiscal protocols. Ensure understanding and accountability.
- Align the program & individual project scope(s) with funding. Allocate funding sources and address: funding overages and shortfalls
- Track program / project budgets against fiscal targets.
- Align program/ project costs eligibility with funding sources and use plans
- Tight coordination with / mutual accountability with Design and Construction Committee relative to managing scope and budget.

### Budget Committee: High Level Roles & Responsibilities at a Glance

| Committee Members | Lead | Decision Authority | Participant |
|---|---|---|---|
| SAAS Finance | X | X | |
| SAAS Deputy Director – TDP | | X | |
| COSA Finance/Budget | | X | |
| COSA OMB | | | X |
| COSA Finance | | | X |
| SAAS Properties | | | X |
| SAAS Budget | | | X |
| EPM Finance Lead | | | X |
| ATR | | X | |
| SAAS TDP Development | | | X |
| EPM- Meeting Management | | | X |

## Process

| Regular Meetings | Decision Making & Problem Solving | Escalation | Stakeholder Management |
|---|---|---|---|
| Regular Meetings to discuss, coordinate, align and manage issues | • Review and assess information provided by WGs<br>• Make decisions and advise WGs<br>• Engage decision authority, as needed | • Escalate to ICP (process decisions)<br>• Escalate to SLC issues unresolved by committee | Manage Communication with City Finance and Budget Offices |



### Protocols & Tools

**Conduct of Meetings & Information Management**
- Recurring basis (Monthly or Biweekly) Urgent meetings as necessary
- Agenda provided one week in advance of meetings (48 hours in advance of unplanned urgent meetings)
- Distribute meeting presentation materials at least 72 hours in advance of recurring meetings (24 hours in advance of urgent meetings)
- Produce minutes and distribute copies of meeting proceedings for review by voting members within 48 hours of meeting's conduct

**Escalation & Decision-Making**
It is the intent that a majority of decisions will be resolved by the Budget Committee or sent back to the Working Groups (including cross-cutting committee working groups).*

- Decisions which cannot be reached by Budget Committee will be escalated to Committee Decision Authority for Vote.
- Escalate process issues and roadblocks to ICP (Chief Integration Officer).
- Decisions which cannot be reached by committee decision authority will be escalated to SLC.
- All decisions requiring Council vote will be managed by SAAS Director and Deputy Director.
- Decisions that significantly affect airlines or passengers, but don't have airline support, can be brought to the SLC with written notice, where the ATR can present its position

*Detailed decision tree will be developed as the committee gets underway . Cross cutting working groups with Design and Budget are likely.*



### Working Groups

| Grants | TBD | TBD |
|---|---|---|
| Main Objective | Main Objective | Main Objective |
| Leader | Leader | Leader |

21



# Senior Leadership Committee Charter



## Goals and Purpose

**Background:** The SAT Airport Team has established Governance requirements for the Terminal Development Program (TDP). TDP Governance will provide for streamlining of communication as well as making and enforcing decisions on design, budget and schedule.

**Role:** The role of the Senior Leadership Committee is to provide consistent strategic leadership to the Terminal Development (TDP) team, ensuring alignment throughout the SAT team including city staff, shared services staff, and integrated consultant team members

**Goals:**

- Works towards mutual support of Airlines, City Management, and Community of San Antonio as the TDP progresses.
- Facilitate decision making and leadership to support delivery on schedule and aligned with fiscal plan.

**Responsibility:**

- Set and support TDP culture throughout the departments, city and community (**Elevate**)
- Manage expectations with clear protocols and leverage ICP
- Set expectations with each Governance Committee and provide support across committees
- Communicate and coordinate program status and challenges with the Aviation Director.
- Ensure timely and efficient resolution of issues in order to maintain the forward progress of the TDP.
- Conduit to the Executive Steering Committee (ESC) to communicate vital information, program status, and challenges which may require advising and input from ESC.
- Decision making body for issues which require escalation beyond other committees and working groups.

## High-Level Committee Engagement Process

| Regular Meetings | Decision Making & Problem Solving | Escalation | Stakeholder Communication |
|---|---|---|---|
| • Bi-Monthly Meetings (Initially).<br>• SLC meetings week following Budget, Design, Construction Committees. | • Removing roadblocks.<br>• Ensuring awareness and consistency across committees.<br>• Decision Making as appropriate. | • Collaborate with City Departments to tackle challenges.<br>• Escalate/Engage SAAS Director as needed.<br>• Escalate items to the Executive Steering Committee as appropriate. | • Manage Communication with Executive Steering Committee.<br>• Manage Communication with Airlines, Partners, and Other Key Stakeholders (via dedicated comms staff) |



### Key Protocols

**Meeting Preparedness**

- Biweekly Meetings. Urgent meetings as necessary
- Agenda and presentation materials provided 3 days in advance of meetings (24 hours in advance of unplanned urgent meetings)
- Review, prepare, and engage in level of effort needed to be informed prior to meetings and presence in meetings.
- Produce minutes and distribute copies of meeting proceedings

**Voting & Decision-Making Authority**

It is the intent that this committee advises and few decisions will need to be made by the SLC. Process issues which get escalated to SLC should be handled by ICP Team.

- The few decisions which cannot be reached by Budget, Design, and Construction Committees will be escalated to SLC.
- If the SLC cannot come to an agreed upon decision, the SAAS Airport Director will have final decision-making authority so long as there is no increase in the approved budget.
- All decisions requiring Council vote will be managed by SAAS Director and Deputy Director.

*Detailed decision tree will be developed as the committee gets underway and issues surface.*

## Committee Members and High-Level Roles at a Glance

| Committee Members | Lead | Decision Authority | Participant |
|---|---|---|---|
| **Deputy Director TDP** | X | X | X |
| SAAS Properties | | X | X |
| SAAS TDP Development | | X | X |
| SAAS Development | | | X |
| SAAS Finance | | X | X |
| SAAS OPS | | X | X |
| SAAS Airlines | | | X |
| SAAS ICP | | | X |
| SAAS ORAT | | | X |
| SAAS Communications | | | X |
| SAAS IT | | | X |
| EPM | | | X |
| EPM- Meeting Mgmt | | | X |



### Working Groups

| Committee Name<br>Main Objective<br>Leader | Committee Name<br>Main Objective<br>Leader | Committee Name<br>Main Objective<br>Leader |
|---|---|---|



**San Antonio AIRPORT SYSTEM**

## TDP Governance Committees

| Senior Leadership Committee | Design Review Committee | Construction Review Committee | Budget Review Committee |
|---|---|---|---|
| **SAAS -Deputy Director -TDP**<br>SAAS -Deputy Director - Properties<br>SAAS -Finance<br>SAAS -OPS<br>SAAS -Properties<br>SAAS -ICP<br>SAAS -ORAT<br>SAAS -Communications<br>SAAS -Development<br>SAAS -TDP-Development<br>SAAS -IT<br>EPM<br><br><br><br><br>EPM - Meeting Management | **EPM -Design Manager**<br>SAAS -Deputy Director -TDP<br>SAAS -IT<br>SAAS -Architect<br>Master Architect<br>SAAS -TDP-Development<br>SAAS- Customer Experience<br>SAAS -OPS<br>SAAS -Safety<br>SAAS -ORAT<br>SAAS -Facilities<br>ATR<br>EPM<br>ORAT<br><br>EPM-Meeting Management | PM/CM<br>Construction PM<br>Debbie Drew (SAAS- ICP)<br>SAAS -Budget<br>SAAS -ORAT<br>SAAS -OPS<br>SAAS -Safety<br>SAAS -TDP-Development<br>SAAS -Facilities<br>COSA City Attorney Office<br>SAAS -IT<br>EPM<br>ATR<br>ORAT<br>CMAR<br>PM/CM- Meeting Management | **SAAS -FINANCE**<br>SAAS -Deputy Director -TDP<br>SAAS -Properties<br>SAAS -TDP-Development<br>COSA Finance/Budget<br>COSA Finance<br>EPM Finance Lead<br>SAAS -Budget<br>COSA OBM<br>ATR<br>EPM<br><br><br><br><br>EPM -Meeting Management |
| **Role:**<br>Provide day-to-day strategic leadership to the TDP team, ensuring alignment throughout the SAT team including City staff, shared services staff, and integrated consultant team members. | **Role:**<br>Provide a forum where the design team and key stakeholders can meet, discuss, debate, and make appropriate recommendations on the details of the designs within the TDP project elements. | **Role:**<br>Provide a forum for discussion, review, input, and concurrence of all construction aspects of the TDP including contracts, scope changes, change orders, and airport operations impacts. | **Role:**<br>Provide a forum to discuss, coordinate, and align program scope, schedule, and budget with program funding and financing plans.<br><br>e.g., *Project Boost* |
| **Responsibility:**<br>Communicate and coordinate program status and challenges with the Aviation Director and the ESC to ensure timely and efficient resolution of issues in order to maintain the forward progress of the TDP. | **Responsibility:**<br>Make recommendations in alignment with the scope, schedule, and budget of the program, and identify areas that Management should consider for potential value-added changes. | **Responsibility:**<br>Ensure decisions are made in alignment with TDP scope, schedule and budget parameters, funding plans, and procurement rules/regulations. | **Responsibility:**<br>-Align the program scope with program funding<br>-Review program budgets and costs<br>-Allocate funding sources and address funding overages and shortfalls<br>-Ensure program cost eligibility with funding sources and use plans |

Revised 07.17.2024

*EXHIBIT G-2.2*

*TDP GOVERNANCE COMMITTEE DESCRIPTIONS*

*Final Draft 9.6.2024*

23

**SAT**

*Final Draft 9.6.2024*

## EXHIBIT H

### FUTURE PREMISES COMMITMENT[1]

Pursuant to and subject to Section 3.14 of the Agreement, Airline's Future Premises Commitment is as follows:

| Type of space | Number (for gates) or minimum square footage committed to by Airline (other types of space) |
|---|---|
| Gates (preferential use)[2] | |
| Ticket counters (preferential use) | |
| Passenger lounge/club (exclusive use)[3] | |
| Airline ticket office (ATO) space (exclusive use) | |
| Airline operational space (exclusive use) | |
| Airline baggage services office (BSO) space (exclusive use) | |

---

[1] Individual airline exhibits will be included in each Signatory Airline's Agreement.

[2] To be located in Terminal [___] as shown on **Exhibit G-1.3**.

[3] To be located in Terminal [___].



*Final Draft 9.6.2024*

## **EXHIBIT I**

### **AFFILIATE DESIGNATION FORM**



*Final Draft 9.6.2024*

## SAN ANTONIO INTERNATIONAL AIRPORT

## AFFILIATE DESIGNATION FORM[1]

_____ ("Airline"), a Signatory Airline operating at the San Antonio International Airport (the "Airport") under the San Antonio Airport Airline Operating Agreement and Terminal Building Lease with the City of San Antonio (the "City") effective October 1, 2024 (the "Signatory Airline Agreement"), hereby designates the following Air Carrier(s) as its Affiliate(s) at the Airport in accordance with and subject to Section 4.5, "Designation and Use of Affiliates," of the Signatory Airline Agreement:

1. _____
2. _____
3. _____
4. _____
5. _____

With respect to the above Affiliate(s), Airline agrees as follows:

1. All capitalized terms not otherwise defined herein shall have the meanings specified in the Signatory Airline Agreement.

2. This designation is effective as of _____, 20__.

3. Airline hereby represents to the City that each Affiliate listed above meets the definition of Affiliate in Article 1, "Definitions," of the Signatory Airline Agreement.

4. Does any Affiliate sell tickets to passengers under its own trade name and flight number at the Airport? **[Circle one]** Yes / No

   If yes, state which Affiliate(s): _____

5. Each Affiliate has complied with the requirements of Section 4.5, "Designation and Use of Affiliates," of the Signatory Airline Agreement, including securing the required insurance and providing evidence of same to the City and executing an Affiliate Operating Agreement.

6. Airline hereby confirms and agrees that **[check one]**:

   ☐ Airline
   ☐ Affiliate

---

[1] This "Affiliate Designation Form" form will be attached as **Attachment 1** to the Affiliate Operating Agreement for each of Airline's designated Affiliates.

will pay to the City the Airline rentals, fees, and charges incurred by such Affiliate at the Airport while operating as Airline's designated Affiliate under the Signatory Airline Agreement, and will submit to the City the activity reports required by Article 7, "Airline Activity Reports," of the Signatory Airline Agreement.

If different for any Affiliate(s), please specify: _____

7.  Airline hereby confirms and agrees that **[check one]**:

    ☐  Airline
    ☐  Affiliate

    will pay to the City all PFCs collected for such Affiliate's enplaning passengers at the Airport.

    If different for any Affiliate(s), please specify: _____

8.  Airline hereby confirms and agrees that **[check one]**:

    ☐  Airline
    ☐  Affiliate

    will provide a Performance Guarantee in an amount based on Affiliate's activity pursuant to the same calculations for Affiliate as provided for and pursuant to the provisions of Section 5.16, "Performance Guarantee," of the Signatory Airline Agreement.

    If different for any Affiliate(s), please specify: _____

9.  Airline confirms and agrees that it shall remain, with each such Affiliate, jointly and severally liable to the City for the payment of Airline rentals, fees, and charges, incurred by such Affiliate at the Airport while operating as Airline's designated Affiliate under the Signatory Airline Agreement (including PFCs), and the submission of all activity reports due to the City for such Affiliate's use of any Airport facilities or Airport services as an Affiliate of Airline.

[Signature Page to Follow]

*Final Draft 9.6.2024*

**AIRLINE:** _____


By: _____
            Signature

Printed Name: _____

Title:            _____

*Final Draft 9.6.2024*

## <u>EXHIBIT J</u>

## AFFILIATE OPERATING AGREEMENT



*Final Draft 9.6.2024*

## SAN ANTONIO INTERNATIONAL AIRPORT

## AFFILIATE OPERATING AGREEMENT

### PREAMBLE

This AFFILIATE OPERATING AGREEMENT ("***Agreement***") between the City of San Antonio (the "***City***") and _____ ("***Affiliate***") grants to Affiliate certain rights to use facilities to conduct its Air Transportation Business at the San Antonio International Airport (the "***Airport***") as an Affiliate of _____ ("***Airline***"), a Signatory Airline operating under the San Antonio Airport Airline Operating Agreement and Terminal Building Lease with the City effective October 1, 2024 (the "***Signatory Airline Agreement***").

The Signatory Airline Agreement gives such Signatory Airline the opportunity to designate one or more Affiliates if certain conditions are met. The intent of this Agreement is to adopt by reference various specified provisions of the Signatory Airline Agreement, and make them applicable to Affiliate. If a provision of the Signatory Airline Agreement is not specified below, it shall not apply to Affiliate. In consideration of these benefits, Affiliate agrees to abide by all of the terms and conditions of this Agreement.

### ARTICLE 1
### DEFINITIONS; INTERPRETATION

Section 1.1    Definitions.

All capitalized terms used in this Agreement, if not defined within this Agreement, shall have the meanings specified in Article 1, "Definitions; Interpretation," of the Signatory Airline Agreement or where the context clearly indicates otherwise.

Section 1.2    Cross-References.

All references to articles, sections, and exhibits in this Agreement pertain to material in this Agreement, unless specifically noted otherwise.

Section 1.3    Interpretation.

Words used in this Agreement in the present tense include the future as well as the present. Words used in the masculine gender include the feminine and neuter. The singular number includes the plural and the plural includes the singular. The word "person" means a business or corporation as well as a natural person. All references in the text of this Agreement to articles, sections, and exhibits pertain to articles, sections, and exhibits of this Agreement, unless otherwise specified.



*Final Draft 9.6.2024*

## ARTICLE 2
## TERM

Section 2.1    Effective Date.

This Agreement shall take effect as of the date specified in the "Affiliate Designation Form" attached as **Attachment 1**[1] and made a part hereof ("*Effective Date*").

Section 2.2    Termination Date.

This Agreement shall terminate as of the earliest of:  (i) the expiration or earlier termination of the Signatory Airline Agreement; (ii) the termination date of this Agreement due to default as provided in ARTICLE 16 herein; (iii) the effective date of Airline's termination of Affiliate's status as an Affiliate of Airline, provided that Airline has provided at least thirty (30) days' prior written notice to the City of such termination; or (iv) the date upon which Affiliate itself becomes a Signatory Airline by meeting the requirements of and executing the Signatory Airline Use and Lease Agreement.

Section 2.3    Prior Agreement.

On the Effective Date, any Prior Use and Lease Agreement between the City and Airline shall terminate without further action required by either the City or Affiliate, provided that the termination of such prior agreement shall not be construed as a waiver, relinquishment, or release of any claims, damages, liability, rights of action, or causes of action that either of the parties hereto may have against the other under such prior agreement and that have accrued before the Effective Date of this Agreement. Affiliate's liability that survives the termination of the prior agreement shall not be terminated by the execution of this Agreement.

## ARTICLE 3
## USE OF AIRLINE PREMISES

Affiliate shall have the same rights to use Airline's Airline Premises, as designated and described in Article 3, "Airline Premises," of the Signatory Airline Agreement, subject to the requirements for Affiliates in Section 4.5, "Designation and Use of Affiliates," of the Signatory Airline Agreement, at times and locations within the Airline Premises specified by Airline, and shall be bound by and subject to the same accommodation, reassignment, and other provisions in Article 3, "Airline Premises," of the Signatory Airline Agreement that may affect Airline's rights to and use of the Airline Premises.

## ARTICLE 4
## USE OF THE AIRPORT

For the operation of Affiliate's Air Transportation Business as an Affiliate of Airline, Affiliate shall have the same rights of use as Airline under Article 4, "Use of the Airport," of the

---

[1] **Attachment 1** shall be a copy of the "Affiliate Designation Form" provided to the City by Airline pursuant to Section 4.5, "Designation and Use of Affiliates," in the Signatory Airline Agreement.



*Final Draft 9.6.2024*

Signatory Airline Agreement and shall be subject to the same exclusions and conditions applicable to Airline under such Article of the Signatory Airline Agreement.

### ARTICLE 5
### AIRLINE RENTALS, FEES, AND CHARGES

Rentals, fees, and charges due to the City for Affiliate's use of the Airline Premises, facilities, rights, and privileges granted hereunder as an Affiliate of Airline shall be calculated in accordance with Article 5, "Airline Rentals, Fees, and Charges," of the Signatory Airline Agreement and Article 6, "Calculation of Airline Rentals, Fees, and Charges," in the Signatory Airline Agreement; provided, however, that Affiliate's activity as an Affiliate of Airline shall be treated as activity of Airline. Affiliate shall be subject to and bound by the PFC requirements in Section 5.17, "Passenger Facility Charges," of the Signatory Airline Agreement. Payment of such rentals, fees, and charges and collection and payment of PFCs to the City shall be submitted to the City by Affiliate or Airline, whichever is designated as responsible for such submission in **Attachment 1** herein. Affiliate or Airline, whichever is designated accordingly in **Attachment 1** herein, shall be responsible for compliance with the provisions of Section 5.16, "Performance Guarantee," of the Signatory Airline Agreement.

### ARTICLE 6
### [RESERVED]

### ARTICLE 7
### AIRLINE ACTIVITY REPORTS

Monthly activity reports detailing Affiliate's use of any Airport facilities or services as an Affiliate of Airline shall be prepared by Affiliate or Airline and submitted to the City by Affiliate or Airline on behalf of Affiliate, whichever is designated as responsible for such submission in **Attachment 1** herein, in accordance with Article 7, "Airline Activity Reports," of the Signatory Airline Agreement.

### ARTICLE 8
### CAPITAL IMPROVEMENTS

Article 8, "Capital Improvements," of the Signatory Airline Agreement shall not apply to Affiliate.

### ARTICLE 9
### BOND ORDINANCE SUBORDINATION

Section 9.1    Subordination to Bond Ordinance.

(a)    This Agreement and all rights of Affiliate hereunder are expressly subordinated and subject to the lien and provisions of any pledge, transfer, hypothecation, or assignment made (at any time) by the City to secure Airport Bond financing. This Agreement is subject and subordinate to the terms, covenants, and conditions of the Bond Ordinance authorizing the issuance of Airport Bonds by the City of San Antonio. The City may amend or modify the Bond Ordinance or make any change thereto that does not materially adversely affect Affiliate's rights under this Agreement.



*Final Draft 9.6.2024*

Conflicts between this Agreement and the Bond Ordinance shall be resolved in favor of the Bond Ordinance.

Section 9.2    All definitional terms that are not specifically defined herein are to have the meanings set forth in the Bond Ordinance.

## ARTICLE 10
## MAINTENANCE AND OPERATING RESPONSBILITIES

Affiliate shall conduct its Air Transportation Business as an Affiliate of Airline in a manner consistent with Airline's obligations under Article 10, "Maintenance and Operating Responsibilities," of the Signatory Airline Agreement.

## ARTICLE 11
## [RESERVED]

## ARTICLE 12
## [RESERVED]

## ARTICLE 13
## INSURANCE AND INDEMNIFICATION

Affiliate shall be subject to and bound by Article 13, "Insurance and Indemnification," of the Signatory Airline Agreement.

## ARTICLE 14
## COMPLIANCE WITH LAWS

Affiliate shall be subject to and bound by Article 14, "Compliance with Laws," of the Signatory Airline Agreement.

## ARTICLE 15
## ENVIRONMENTAL PROVISIONS

Affiliate shall be subject to and bound by Article 15, "Environmental Provisions," of the Signatory Airline Agreement, including without limitation the same obligation to indemnify the City as provided in Section 13.2, "Indemnification," of the Signatory Airline Agreement.

## ARTICLE 16
## TERMINATION

Affiliate shall be subject to and bound by Article 16, "Termination," of the Signatory Airline Agreement.



*Final Draft 9.6.2024*

## ARTICLE 17
## ASSIGNMENT AND SUBLETTING

Article 17, "Assignment, Subletting, and Transfer," of the Signatory Airline Agreement shall not apply to Affiliate. Affiliate shall have no right to assign or transfer this Agreement or sublet the whole or any portion of the Airline Premises leased or assigned to Airline.

## ARTICLE 18
## MISCELLANEOUS PROVISIONS

Affiliate shall be subject to and bound by Article 18, "Miscellaneous Provisions," of the Signatory Airline Agreement, including without limitation the audit provisions in Section 18.22, "Right to Audit Books and Records," and Section 18.5, "Notices," of the Signatory Airline Agreement, for purposes of which the following contact information shall be used for Affiliate:

Name: _____
Title: _____
Address: _____
_____
Email Address: _____

[Signature Page(s) to Follow]



5

*Final Draft 9.6.2024*

**IN WITNESS WHEREOF,** the parties hereto have subscribed their names the day and year first above written.

CITY OF SAN ANTONIO, TEXAS:

_____
Erik Walsh
City Manager

Approved as to form:

_____
City Attorney

AFFILIATE:

_____
By:

Title:

*Notary of Affiliate Signature:*

_____

STATE OF _____ COUNTY OF _____

SIGNED IN BEFORE ME THIS _____ DAY OF _____ 2024



*Final Draft 9.6.2024*

## ATTACHMENT 1

### AFFILIATE DESIGNATION FORM



*Final Draft 9.6.2024*

## **EXHIBIT K**

### MAINTENANCE SCHEDULE



**EXHIBIT E**

**RESPONSIBILITY OF CITY AND AIRLINE FOR SERVICES, MAINTENANCE AND OPERATIONS**

Legend:
A = AIRLINE
C = CITY
C/S = CITY, ASSIGNED TO SAAC
N/A = NOT APPLICABLE
CV = CITY VENDOR
CR = CONRAC

| Type of Maintenance | Airline Exclusive / Preferential Leased Premises | | | | | | | | | Joint Use | Common Use Facilities | | | | | Ramp Area | | Other | | | City Occupied/Public Areas | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ticket Counter / Queuing | Ticket Offices | Baggage Office | Curbside | Operations Offices | Holdrooms /Gate | Clubroom | Boarding Bridge | Other Space | Joint Use Terminal Area | Ticket Counter / Queuing | Holdrooms / Gate | Boarding Bridge | CUPPS | Other Space | Ramp Area | Apron Area | TSA Checkpoint | FIS | CONRAC | Public Area | Public Curbside | City Occupied / City Public |
| **Maintenance** | | | | | | | | | | | | | | | | | | | | | | | |
| Other Than Structure | A | A | A | A | A | A | A | C/S | A | C | C | C | C/S | N/A | C | C | C | C | C | C | C | C | C |
| Structure | C | C | C | C | C | C | C | A | C | C | C | C | C | N/A | C | C | C | C | C | C | C | C | C |
| Exterior | C | C | C | C | C | C | C | A | C | C | C | C | C | N/A | C | C | C | C | C | C | C | C | C |
| **Window Cleaning** | | | | | | | | | | | | | | | | | | | | | | | |
| Exterior | N/A | C | C | C | C | C | C | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Interior | N/A | A | A | A | A | C/S | A | C/S | A | C/S | C/S | C/S | C/S | N/A | C/S | N/A | N/A | C/S | C | CR | C/S | C/S | C |
| Window Tint | C | A | A | A | A | C | A | C | A | C | C | C | C | N/A | C | N/A | N/A | C | C | C | C | C | C |
| **Building Finishes** | | | | | | | | | | | | | | | | | | | | | | | |
| Flooring: Carpet, Concrete, Tile, Terrazzo, VCT, LVT | C | A | A | A | A | C | A | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Wall: Repair Due to Damages | C | A | A | A | A | C | A | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Wall Paint | C | A | A | A | A | C | A | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Ceiling Tile | C | A | A | A | A | C | A | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Ceiling Sheet Rock | C | A | A | A | A | C | A | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Ceiling Metal Panels (if applicable) | C | A | A | A | A | C | A | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| **Custodial Services** | | | | | | | | | | | | | | | | | | | | | | | |
| Cleaning: Walls and Flooring | C/S | C/S | C/S | A | A | C/S | C/S | C/S | A | C/S | C/S | C/S | N/A | C/S | A | A | C/S | C | CR | C/S | C | C | |
| Cleaning: Vents | C | A | A | A | A | C | A | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Cleaning: Ceiling | C | A | A | A | A | C | A | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Trash and Recycle | C/S | C/S | C/S | A | C/S | C/S | C/S | C/S | A | C/S | C/S | C/S | C/S | N/A | C/S | A | A | C/S | C | C | C/S | C | C |
| **Doors** | | | | | | | | | | | | | | | | | | | | | | | |
| Conveyor Doors | C/S | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | C/S | C/S | N/A | N/A | N/A | C/S | N/A | N/A | N/A | C/S | N/A | N/A | N/A | N/A |
| Automatic Doors | C | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | C | C | N/A | N/A | N/A | C | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Doors (Interior) | C | A | A | A | A | C | A | C | C | C | C | C | C | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Door (Exterior) | C | C | C | C | C | C | A | C | C | C | C | C | C | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Door Hardware (handles, hinges, closers, etc) | C | A | A | A | A | C | A | N/A | C | C | C | C | N/A | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Lock and Push Button Locks | C | A | A | A | A | C | A | C | C | C | C | C | N/A | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Push Bar | C | A | A | A | A | C | A | N/A | C | C | C | C | N/A | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Card Reader | C | N/A | N/A | N/A | N/A | C | N/A | N/A | C | C | C | C | C | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Card Reader: Magnetic Lock / Electronic Strike | C | N/A | N/A | N/A | N/A | C | N/A | N/A | C | C | C | C | C | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Overhead Doors | N/A | N/A | N/A | N/A | C | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | C | N/A | N/A | N/A | N/A |
| **Electrical** | | | | | | | | | | | | | | | | | | | | | | | |
| Bulb & Tube replacement (Excluding Ballasts) | C | A | A | A | A | C | A | A | A | C | C | C | C | N/A | A | C | C | C | C | C | C | C | C |
| Ballasts (If City Approved fixture) | C | A | A | A | A | C | A | A | A | C | C | C | C | N/A | A | C | C | C | C | C | C | C | C |
| Illumination Incl. Power | C | C | C | C | C | C | A | N/A | C | C | C | C | N/A | N/A | C | C | C | C | C | C | C | C | C |
| Power Exc. For Illumination | C | C | C | C | C | C | C | N/A | C | C | C | C | C | N/A | C | C | C | C | C | C | C | C | C |
| Maintenance | C | C | C | C | C | C | C | C | C | C | C | C | C | N/A | C | C | C | C | C | C | C | C | C |
| Operation | C | A | A | A | A | C | A | A | A | C | C | C | C | C | A | A | A | C | C | C | C | C | C |
| **Ground Support Equipment** | | | | | | | | | | | | | | | | | | | | | | | |
| Maintenance | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | C/S | C/S | N/A | N/A | N/A | N/A | N/A | N/A |
| Operations | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | C/S | C/S | N/A | N/A | N/A | N/A | N/A | N/A |
| **Heating, Ventilation and Air Conditioning** | | | | | | | | | | | | | | | | | | | | | | | |
| Maintenance | C | C | C | C | C | C | C | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Operation | C | C | C | C | C | C | C | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Chilled Air Distribution | C | C | C | C | C | C | C | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| Warm Air Distribution | C | C | C | C | C | C | C | C/S | C | C | C | C | C/S | N/A | C | N/A | N/A | C | C | C | C | C | C |
| **Water Maintenance, Sewage and Plumbing** | | | | | | | | | | | | | | | | | | | | | | | |
| Water Supply | C | C | C | C | C | N/A | C | N/A | N/A | C | C | N/A | N/A | N/A | C | N/A | C | N/A | C | C | C | C | C |
| Sinks | C | C | C | C | C | N/A | C | N/A | N/A | C | C | N/A | N/A | N/A | C | C | C | N/A | C | C | C | C | C |
| Water Fountains | C | C | C | C | C | N/A | C | N/A | N/A | C | C | N/A | N/A | N/A | C | C | C | N/A | C | C | C | C | C |
| Toilets/Urinals | C | C | C | C | C | N/A | C | N/A | N/A | C | C | N/A | N/A | N/A | C | C | C | N/A | C | C | C | C | C |
| Sewage | C | C | C | C | C | N/A | C | N/A | N/A | C | C | N/A | N/A | N/A | C | C | C | N/A | C | C | C | C | C |
| Appliances (Dish Washer, Garbage Disposal, etc) | N/A | A | A | A | A | N/A | A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Distribution | C | C | C | C | C | C | C | N/A | C | C | C | N/A | N/A | N/A | C | C | C | C | N/A | C | C | C | C |
| Fixtures | C | A | A | A | A | N/A | A | N/A | N/A | C | C | N/A | N/A | N/A | C | C | C | C | N/A | C | C | C | C |
| **Restrooms** | | | | | | | | | | | | | | | | | | | | | | | |
| Stalls | C | A | A | A | A | N/A | A | N/A | N/A | C | C | N/A | N/A | N/A | C | N/A | N/A | C | C | CR | C | C | C |
| Finishes - Flooring, Walls, Ceiling | C | A | A | A | A | N/A | A | N/A | N/A | C | C | N/A | N/A | N/A | C | N/A | N/A | C | C | CR | C | C | C |
| Counters | C | A | A | A | A | N/A | A | N/A | N/A | C | C | N/A | N/A | N/A | C | N/A | N/A | C | C | CR | C | C | C |
| Mirrors | C | A | A | A | A | N/A | A | N/A | N/A | C | C | N/A | N/A | N/A | C | N/A | N/A | C | C | CR | C | C | C |
| Stalls/Partitions | C | A | A | A | A | N/A | A | N/A | N/A | C | C | N/A | N/A | N/A | C | N/A | N/A | C | C | CR | C | C | C |
| Toilets | C | A | A | A | A | N/A | A | N/A | N/A | C | C | N/A | N/A | N/A | C | N/A | N/A | C | C | CR | C | C | C |
| Sinks | C | A | A | A | A | N/A | A | N/A | N/A | C | C | N/A | N/A | N/A | C | N/A | N/A | C | C | CR | C | C | C |
| **Baggage Handling System, Baggage Claim & Baggage Make Up Area** | | | | | | | | | | | | | | | | | | | | | | | |
| Maintenance | C/S | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | C/S | C/S | N/A | N/A | N/A | N/A | C/S | N/A | N/A | C/S | N/A | N/A | N/A | N/A |
| Operation | C/S | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | C/S | C/S | N/A | N/A | N/A | N/A | C/S | N/A | N/A | C/S | N/A | N/A | N/A | N/A |
| **Elevators/Escalators** | | | | | | | | | | | | | | | | | | | | | | | |
| Maintenance | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | C | C | C | C | C |
| Operations | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | C | C | C | C | C |
| Cleaning | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | C/S | CR | C/S | C/S | C |
| **Public Address System** | | | | | | | | | | | | | | | | | | | | | | | |
| | C | C | C | C | C | C | C | C | C | C | C | C | N/A | C | C | N/A | C | C | C | C | C | C |
| **Security Items** | | | | | | | | | | | | | | | | | | | | | | | |
| | C | C | C | C | C | C | C | C | C | C | C | C | N/A | C | C | C | C | C | C | C | C | C |
| **Technology** | | | | | | | | | | | | | | | | | | | | | | | |
| Maintenance | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | CV | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Operations | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | CV | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| FIDS/GIDS | C | N/A | N/A | N/A | N/A | C | N/A | N/A | N/A | N/A | C | C | N/A | N/A | C | N/A | N/A | N/A | C | N/A | C | C | N/A |

*Final Draft 9.6.2024*

## EXHIBIT L

### REQUIRED FEDERAL PROVISIONS

A. <u>Compliance with Nondiscrimination Provisions</u>.    During the performance of this Agreement, Airline, for itself, its assignees, and successors in interest (hereinafter collectively referred to as "Airline") agrees as follows:

    1. **Compliance with Regulations:** Airline will comply with the Title VI List of Pertinent Nondiscrimination Acts And Authorities, as they may be amended from time to time, which are herein incorporated by reference and made a part of this Agreement.

    2. **Non-discrimination:** Airline, with regard to the work performed by it during the term of this Agreement, will not discriminate on the grounds of race, color, or national origin in the selection and retention of contractors, including procurements of materials and leases of equipment.  Airline will not participate directly or indirectly in the discrimination prohibited by the Nondiscrimination Acts and Authorities, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 CFR Part 21.

    3. **Solicitations for Agreements, Including Procurements of Materials and Equipment:**  In all solicitations, either by competitive bidding, or negotiation made by Airline for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential contractor or supplier will be notified by Airline of Airline's obligations under this Agreement and the Nondiscrimination Acts And Authorities on the grounds of race, color, or national origin.

    4. **Information and Reports:**  Airline will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the sponsor or the Federal Aviation Administration to be pertinent to ascertain compliance with such Nondiscrimination Acts And Authorities and instructions.  Where any information required of Airline is in the exclusive possession of another who fails or refuses to furnish the information, Airline will so certify to the City or the Federal Aviation Administration, as appropriate, and will set forth what efforts it has made to obtain the information.

    5. **Sanctions for Noncompliance:**  In the event of Airline's noncompliance with the Non-discrimination provisions of this contract, the City will impose such sanctions as it or the Federal Aviation Administration may determine to be appropriate, including, but not limited to cancelling, terminating, or suspending the Agreement, in whole or in part.

    6. **Incorporation of Provisions:**  Airline will include the provisions of paragraphs one through six of this <u>Attachment A, Section (A)</u> in every contract, including



1

*Final Draft 9.6.2024*

procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant thereto. Airline will take action with respect to any contract or procurement as the City or the Federal Aviation Administration may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if Airline becomes involved in, or is threatened with litigation by a contractor, or supplier because of such direction, Airline may request City to enter into any litigation to protect the interests of the City. In addition, Airline may request the United States to enter into the litigation to protect the interests of the United States.

B.  Real Property Acquired or Improved Under the Airport Improvement Program. Airline for itself, its heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree that in the event facilities are constructed, maintained, or otherwise operated on the property described in this Agreement for a purpose for which a Federal Aviation Administration activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, Airline will maintain and operate such facilities and services in compliance with all requirements imposed by the Nondiscrimination Acts and Regulations listed in the Pertinent List of Nondiscrimination Authorities (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

C.  Construction/Use/Access to Real Property Acquired Under the Activity, Facility or Program. Airline for itself, its heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, and (3) that Airline will furnish its services in compliance with all other requirements imposed by or pursuant to the List of Nondiscrimination Acts And Authorities.

D.  Title VI List of Pertinent Nondiscrimination Acts and Authorities. During the performance of this Agreement, Airline, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

     i.  Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin);

    ii.  49 CFR Part 21 (Non-discrimination In Federally-Assisted Programs of The Department of Transportation—Effectuation of Title VI of The Civil Rights Act of 1964);



iii.    The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);

iv.    Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq.*), as amended, (prohibits discrimination on the basis of disability); and 49 CFR Part 27;

v.    The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq.*), (prohibits discrimination on the basis of age);

vi.    Airport and Airway Improvement Act of 1982, (49 USC § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);

vii.    The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);

viii.    Titles II and III of the Americans with Disabilities Act of 1990, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 CFR Parts 37 and 38;

ix.    The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);

x.    Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, which ensures non-discrimination against minority populations by discouraging programs, policies, and activities with disproportionately high and adverse human health or environmental effects on minority and low-income populations;

xi.    Executive Order 13166, Improving Access to Services for Persons with Limited English Proficiency, and resulting agency guidance, national origin discrimination includes discrimination because of limited English proficiency (LEP). To ensure compliance with Title VI, you must take reasonable steps to ensure that LEP persons have meaningful access to your programs (70 Fed. Reg. at 74087 to 74100); and

xii.    Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. 1681 et seq).



*Final Draft 9.6.2024*

E. <u>General Civil Rights Provision</u>. Airline agrees to comply with pertinent statutes, Executive Orders and such rules as are promulgated to ensure that no person shall, on the grounds of race, creed, color, national origin, sex (including gender identity), age, or disability be excluded from participating in any activity conducted with or benefiting from Federal assistance. If Airline transfers its obligation to another, the transferee is obligated in the same manner as Airline. This provision obligates Airline for the period during which the property is owned, used or possessed by Airline and the airport remains obligated to the Federal Aviation Administration. This provision is in addition to that required by Title VI of the Civil Rights Act of 1964.

F. <u>Right of Re-entry</u>. In the event of breach of any of the above Nondiscrimination covenants, the City will have the right to terminate the Agreement and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the Agreement had never been made or issued.

<u>Subcontracts</u>. Airline agrees that it shall insert the above six provisions (<u>Section (A)</u> through <u>Section (F)</u>) in any agreement by which Airline grants a right or privilege to any person, firm, or corporation to render accommodations and/or services to the public under this Agreement.



4

*Final Draft 9.6.2024*

## EXHIBIT M

### TERMINAL A/B RENOVATIONS

I.     <u>Generally</u>.

     A.    As part of this Agreement, the City and the Signatory Airlines intend that, after DBO of expanded Terminal Building facilities to be constructed as part of TDP (*i.e.*, new Terminal C), certain upgrades be performed to Terminal A and Terminal B in light of the advancing age of these facilities.

     B.    Accordingly, separate and apart from TDP, by execution of this Agreement, Airline and the other Signatory Airlines have authorized and approved, pursuant to Section 8.2 of this Agreement and subject to the terms and conditions herein, the inclusion in airline rentals, fees, and charges of up to $300 million in Net Project Costs for the Terminal A Renovation and Terminal B Renovation projects described herein, provided that up to $200 million in Net Project Costs will be allocated to the Terminal A Renovation and up to $100 million in Net Project Costs will be allocated to the Terminal B Renovation.

     C.    Notwithstanding the foregoing, the City and the Signatory Airlines acknowledge that certain upgrades to Terminal A and/or Terminal B may be identified during the scope validation process described in Section II herein that can be initiated or completed prior to DBO of new Terminal C, and the City may apply the costs of such upgrades toward the amounts authorized and approved as described in Section I.B herein, in accordance with the provisions of this **Exhibit M**.

     D.    To the extent there is any conflict between the terms and conditions in this **Exhibit M** and those of the Agreement, the Agreement shall control.

     E.    For the avoidance of doubt, if anything in this **Exhibit M** conflicts with applicable federal, state, or local procurement law, such law(s) shall control, and the City will consult with the Signatory Airlines on any required modifications to the processes in this **Exhibit M**.

II.    <u>Preliminary Scope and Validation</u>.

     A.    The preliminary anticipated scope for each of the Terminal A Renovation and the Terminal B Renovation are included below in Section V and Section VI of this **Exhibit M**. However, the City agrees to commence a comprehensive assessment during Fiscal Year 2025 to further refine and identify the desired and necessary upgrades and improvements to each of Terminal A and Terminal B, which may result in the expansion, contraction or other modification of these preliminary scope descriptions below in Section V and Section VI of this **Exhibit M**. Once such assessment is complete, the City will provide the Signatory Airlines with the conclusory report including findings and recommendations as well as concept drawings and preliminary cost estimates and consult with the Signatory Airlines



*Final Draft 9.6.2024*

about such findings and recommendations. The City will use commercially reasonable efforts to ensure such assessment is complete no later than the end of Fiscal Year 2025 and that resulting plans for the Terminal A/B Renovations have progressed to at least ten percent (10%) conceptual design by the end of Fiscal Year 2026.

III.    Procurement and Construction.

    A.    The Signatory Airlines acknowledge that, as of the Effective Date, the City has not determined what method(s) of procurement will be used for the design and construction of the Terminal A Renovation and/or the Terminal B Renovation (collectively, the "***Terminal A/B Renovations***"). The City reserves the right to select the method of procurement and the sequencing of the design and construction of such projects in its sole discretion. The City may not make a determination about procurement methods until a time closer to DBO of the expanded Terminal Building facilities constructed as part of TDP.

    B.    Subject to Section III.A, as of the Effective Date, the Terminal A Renovation is expected to be undertaken and completed after such DBO of new Terminal C but prior to the commencement of the Terminal B Renovation. However, as stated in Section I.C herein, the City may determine that certain elements of the Terminal A/B Renovations may be initiated before such DBO of new Terminal C (or, similarly, that certain elements of the Terminal B Renovation may be initiated before the completion of the Terminal A Renovation). In making such determinations, the City will consult with the Signatory Airlines consistent with the processes described in Section IV herein.

    C.    The City may determine in its reasonable discretion that it is in the City's best interest to procure the design and construction of each project separately, together, and/or in multiple delivery methods (*e.g.*, design-build vs. separate design and construction contracts).

IV.    Signatory Airline Participation.

    A.    Notwithstanding the foregoing, the City agrees that it will, subject to all Applicable Laws, include the Signatory Airlines in the process for assessing and refining the scope, costs, and timing of the Terminal A/B Renovations, including in the follow manner:

        1.    The City is committed to collaborating with the Signatory Airlines during the design and construction process of the Terminal A/B Renovations. The City anticipates regular engagement with airline representatives, directly and through the Airport-Airline Affairs Committee ("***AAAC***"), throughout the duration of the Terminal A/B Renovations to coordinate technical details, operating requirements, operational impacts, and other items requiring airline input. Unless authorized in writing by City staff, neither airline staff nor representatives may provide directives or make requests



*Final Draft 9.6.2024*

directly to any City contractors or consultants. All such airline requests or directives must be provided to City staff or their designated representative for review and dissemination to the appropriate party.

2.    In the development of solicitation and contract documents and construction schedules, including for refinement and prioritization of the scope described herein and allocation of funding, the City and its architects and engineers will consult with the ATR and give due consideration to the reasonable requests, suggestions, and recommendations of the Signatory Airlines, and in particular of the Signatory Airlines expected to occupy Preferential Use Premises and/or Exclusive Use Premises in Terminal A and/or Terminal B. The City agrees to establish a terminal renovation planning working group to solicit such reasonable requests, suggestions, and recommendations of the Signatory Airlines.

3.    The City will notify the ATR in advance of contract solicitations related to the Terminal A Renovation and/or Terminal B Renovation.

4.    The City will include the ATR[1] as a voting member on the selection committee for the design contract and on the selection committee for the construction contract (or, if procured together, on such single committee) for contract solicitations related to the Terminal A Renovation and/or Terminal B Renovation. Each Signatory Airline expected to occupy Preferential Use Premises and/or Exclusive Use Premises in the Terminal Building facilities that are the subject of such contract(s) shall also be permitted one (1) representative per Signatory Airline in addition to the ATR to serve as an advisory non-voting member of the applicable selection committee(s).

5.    If the City determines that any portion of the Terminal A/B Renovations will be performed as a discrete project that does not require the City to initiate a competitive solicitation process, the City will consult with the Signatory Airlines prior to initiating such project and consider their suggestions related to the scope and allocation of funding for such projects.

6.    The City will consult with the Signatory Airlines following the conclusion of the scope validation process described in Section II herein and at each of 30, 60 and 90 percent design for each of the Terminal A Renovation and the Terminal B Renovation, if such milestones for design are applicable to the work being performed. After each such consultation, the Signatory Airlines may request that the City propose, subject to and in accordance with the MII process described in Article 8, *Capital Improvements*, of this Agreement, that additional funds in excess of the amounts authorized and approved as

---

[1] If the Signatory Airlines no longer retain an ATR during the Terminal A/B Renovations, the AAAC may notify the City in writing of which Signatory Airline will serve as the voting representative for Signatory Airlines on applicable selection committee(s).



described above in Section I.B be allocated for the Terminal A Renovation or Terminal B Renovation in order to improve overall operational efficiency, function, and/or customer experience in either of Terminal A or Terminal B.

7.  The Signatory Airlines shall comply and shall cause the ATR and any other Signatory Airline representative(s) to comply with any confidentiality requirements that the City may require of committee or working group participants.

V.  Terminal A Renovation.

A.  The following represents, as of the Effective Date, the anticipated scope of the upgrades to Terminal A as part of the Terminal A Renovation. This scope, and the associated $200 million in pre-approved funding for the Terminal A Renovation, is in addition to, and not a replacement for, and is not intended to modify, the scope of or funding for the TDP, including anticipated work on Terminal A that is in the TDP scope.

1.  Reconfiguration of Terminal A ticket lobby with respect to the existing ticketing counters and landside concessions to accommodate for the relocation of the Security Screening Check Point (SSCP) that is included in the scope for TDP. The expanded secure side square footage to be repurposed to increase post-security re-composure area, improved circulation, and expanded secure side concessions.

2.  Reconfiguration and expansion of the secure-side area adjacent to the SSCP and the concourse and holdroom areas in what are gates A1 through A9 as of the Effective Date in an effort to improve concourse circulation throughout Terminal A to current standards.

3.  Specific items identified for upgrades include:

    −  Reconfiguration and expansion of SSCP – up to 8 lanes
    −  Check-in counter and queue area reconfiguration which may cause existing ATO space to also be reconfigured/repurposed
    −  Reduction of landside concessions by approximately 2,100 SF
    −  Expansion of airside concessions by approximately 3,000 SF
    −  Closure of eastern most set of doors on the curbside
    −  Renovation of bag claim area which may result in replacement of 3 existing flat plate bag claim devices with sloped plate devices
    −  Evaluation of potential renovations to bag drop area on secure side
    −  Redesign of the baggage handling system that currently serves both Terminals A and B such that
        (1) all five screening machines can be utilized efficiently by the Terminal A ticket counter baggage induction points



4

          (2) the system can deliver bags to all Terminal A baggage make-up devices

          (3) queue belts are added to the alarm line to alleviate post-screening congestion

          (4) manual encode induction and exit lanes are optimized

- Gate reduction with commensurate holdroom expansion (targeting 3,000 SF holdroom size on average)
- Restroom upgrades and expansion
- Concessions space optimization
- Infrastructure, technology, and signage upgrades
- Finishes throughout with focus on public access areas to include but not limited to carpet, paint, ceiling tiles, lighting, fixtures, seating, and power for seating

VI.   <u>Terminal B Renovation</u>.

    A.   The following represents, as of the Effective Date, the anticipated scope of the upgrades to Terminal B as part of the Terminal B Renovation. This scope, and the associated $100 million in pre-approved funding for the Terminal B Renovation, is in addition to, and not a replacement for, and is not intended to modify, the scope of or funding for the TDP, including anticipated work on Terminal B that is in the TDB scope.

        1.   Currently identified priorities for consideration for improvement options to the following area(s) of Terminal B for optimal operational efficiency, improved passenger experience include but are not limited to:

- Reconfiguration for holdroom expansion and optimization (including consideration of up to 3,000 SF holdroom size on average)
- Reduce walking distance from ticket lobby counters to Terminal B holdrooms following DBO of new Terminal C to improve passenger experience and increase accessibility for all passengers regardless of their age, size, or ability
- Check-in counter and queue area reconfiguration for lobby used by Terminal B airlines which may cause existing ATO space to also be reconfigured/repurposed
- Curbside check in and ticket lobby used by Terminal B airlines
- Bag claim area used by Terminal B airlines
- Restroom upgrades and expansion
- Concessions space optimization
- Reconfiguration of operational space
- Infrastructure, technology, lighting, and signage upgrades
- Assessment and repair/renovation of passenger loading bridges
- Finishes throughout with focus on public access areas to include but not limited to carpet, paint, ceiling tiles, lighting, fixtures, seating, and power for seating



*Final Draft 9.6.2024*

## EXHIBIT N

## CONDITIONAL CARGO TAXIWAY CONSTRUCTION

> Cargo Taxiway Extension (blue)
> East Cargo Apron (green)





KRH
09/12/2024
Item No. 6

## EXHIBIT 2
## NON-SIGNATORY AIRPORT OPERATING PERMIT

*Draft 9.6.2024*

# NON-SIGNATORY AIRLINE OPERATING PERMIT

# AND

# TERMINAL BUILDING LEASE

by and between

THE CITY OF SAN ANTONIO, TEXAS

and

———————————————

*Draft 9.6.2024*

## TABLE OF CONTENTS

**ARTICLE 1 DEFINITIONS; INTERPRETATION** .................................................................1

**ARTICLE 2 TERM** ........................................................................................................7

**ARTICLE 3 AIRLINE PREMISES**.................................................................................9

**ARTICLE 4 USE OF THE AIRPORT** ..........................................................................10

**ARTICLE 5 AIRLINE RENTALS, FEES, AND CHARGES**...................................16

**ARTICLE 6 [RESERVED]**...........................................................................................20

**ARTICLE 7 AIRLINE ACTIVITY REPORTS** .........................................................20

**ARTICLE 8 [RESERVED]**...........................................................................................21

**ARTICLE 9 BOND ORDINANCE SUBORDINATION**...........................................21

**ARTICLE 10 MAINTENANCE AND OPERATING RESPONSIBILITIES** .......................21

**ARTICLE 11 [RESERVED]**.........................................................................................23

**ARTICLE 12 [RESERVED]**.........................................................................................23

**ARTICLE 13 INSURANCE AND INDEMNIFICATION**........................................23

**ARTICLE 14 COMPLIANCE WITH LAWS** ............................................................27

**ARTICLE 15 ENVIRONMENTAL PROVISIONS**...................................................29

**ARTICLE 16 TERMINATION**....................................................................................38

**ARTICLE 17 ASSIGNMENT AND SUBLETTING**.................................................39

**ARTICLE 18 MISCELLANEOUS PROVISIONS** ...................................................40

## PREAMBLE

## NON-SIGNATORY AIRLINE OPERATING PERMIT AND

## TERMINAL BUILDING LEASE

THE STATE OF TEXAS       )(

COUNTY OF BEXAR       )(

This NON-SIGNATORY AIRLINE OPERATING PERMIT AND TERMINAL BUILDING LEASE (this "*Agreement*") is made and entered into as of the ___ day of _____, 20__ (the "*Effective Date*") by and between the City of San Antonio, Texas, a municipal corporation and home-rule city principally situated in Bexar County (hereinafter defined and referred to as the "*City*") and _____, a corporation doing business in the State of Texas (hereinafter defined and referred to as "*Airline*") (the City and Airline each, a "*Party*" and collectively, the "*Parties*").

### WITNESSETH:

WHEREAS, the City is the owner of San Antonio International Airport (hereinafter defined and referred to as "*Airport*" and more completely identified on **Exhibit A** attached hereto and made a part hereof), which is located in the City of San Antonio, Bexar County, Texas; and

WHEREAS, pursuant to Ordinance No. _____ enacted September 12, 2024, the City has entered into a Signatory Airline Operating Agreement and Terminal Building Lease ("*Signatory Airline Agreement*") with certain Signatory Airlines (defined below in Section 1.1) that establishes the methodology for setting airline rates and charges at the Airport, among other terms and conditions, as set forth therein during the term of such Signatory Airline Agreement; and

WHEREAS, Airline is engaged in the business of commercial air transportation of persons, property, cargo, or mail as a scheduled Air Carrier and is certificated or otherwise authorized by the United States Government to engage in such business; and

WHEREAS, Airline has requested that the City grant it certain rights, privileges, and services in connection with the use of said Airport and its facilities in the conduct of Airline's business as a scheduled Air Carrier; and

WHEREAS, Airline has not executed a Signatory Airline Agreement and intends to operate at the Airport as a Non-Signatory Airline (defined below in Section 1.1); and

WHEREAS, the City is willing to grant Airline such rights, privileges, and services upon the terms and conditions and for the consideration hereinafter stated; and

*Draft 9.6.2024*

WHEREAS, the City and Airline deem it desirable to enter into a written agreement setting forth the respective rights, privileges, obligations, and duties of the parties hereto and defining the rights, services, and privileges granted and the terms, conditions, and consideration on which they are granted;

NOW, THEREFORE, for and in consideration of Airline's use of the Airport and the Airline Premises and the mutual covenants herein contained and the rentals, fees, and charges to be paid by Airline, it is agreed and understood by and between the City and Airline as follows.

*Draft 9.6.2024*

## ARTICLE 1
## DEFINITIONS; INTERPRETATION

Section 1.1    Definitions.

"*Activity Report*" means the reporting form required to be submitted by Airline to the City each month in accordance with Article 7 of the Signatory Airline Agreement.

"*Affiliate*" has the meaning given to it in the Signatory Airline Agreement. For purposes of this Agreement, an Air Carrier shall only be deemed an Affiliate of a Signatory Airline while operating at the Airport on behalf of that Signatory Airline. Non-Signatory Airlines may not designate Affiliates to operate on their behalf at the Airport.

"*Air Carrier*" means any air carrier or foreign air carrier, as defined in 49 U.S.C. § 40102, as amended, operating an Air Transportation Business from time to time at the Airport.

"*Air Transportation Business*" means the business operated by an Air Carrier to and from the Airport for the commercial transportation by air of persons, property, cargo, mail, or any combination thereof, as a common carrier for compensation or hire, in commerce, as defined in 49 U.S.C. § 40102, as amended.

"*Airline Premises*" means those areas in the Terminal Building leased to Airline as Exclusive Use Premises (if any) and Joint Use Space and City Gates assigned to Airline, in accordance with this Agreement, and as shown on **Exhibit C**, **Exhibit D-1** and **Exhibit D-2**, attached hereto; provided, however, that, in the case of City Gates and Joint Use Space, such areas will only constitute "Airline Premises" during the period of time for which Airline has the right to use such areas.

"*Airline*" means the Air Carrier identified in the preamble of this Agreement.

"*Airline Parties*" has the meaning given to it in Section 13.2.

"*Airport*" means San Antonio International Airport as it now exists, as shown on **Exhibit A**, attached hereto, or as it may be modified in the future.

"*Airport System*" means all airport and aviation facilities, or any interest therein, now or from time to time hereafter owned, operated or controlled in whole or in part by the City, together with all properties, facilities and services thereof, and all additions, extensions, replacements and improvements thereto, and all services provided or to be provided by the City in connection therewith, but expressly excluding Special Facilities. The Airport System currently includes San Antonio International Airport and Stinson Municipal Airport.

"*Applicable Laws*" means all laws, statutes, ordinances, rules, and regulations (including without limitation Environmental Laws) lawfully issued or promulgated by any Governmental Authority governing or otherwise applicable to Airline or the Airport, as any of the same may now exist or may hereafter be adopted or amended, modified, extended, re-enacted, re-designated, or replaced from time to time and judicial interpretations thereof.

*Draft 9.6.2024*

"***Best Management Practices***" or "***BMPs***" means, for purposes of ARTICLE 15, the schedules of activities, prohibitions of practices, maintenance procedures, and other techniques to control, prevent or reduce the discharge of pollutants. BMPs shall include those environmental or operational standards or guidelines specifying common and accepted practices appropriate for Airline's and its representatives' use of the Airport, and such standards or guidelines as have been articulated by pertinent professional associations, or regulatory agencies, that Airline should be reasonably aware of or that the City has provided to Airline.

"***Bond Ordinance***" means the Master Ordinances and any Supplemental Ordinances, heretofore or hereafter adopted, amendatory, or supplemental thereto, authorizing the issuance of Bonds and Obligations that are payable from or secured by all or any part of the gross revenues of the Airport, grant funds, CFCs, or PFCs.

"***Bonds***" means any bonds or certificates of obligation issued in accordance with a Master Ordinance or any Supplemental Ordinance.

"***City Gate***" means a Gate in the Terminal Building that is not preferentially assigned to a Signatory Airline and which may be assigned for use on a common use basis by the City in accordance with the Signatory Airline Agreement.

"***Consumer Price Index***" or "***CPI***" means the consumer price index for all urban consumers (or "***CPI-U***") published by the U.S. Bureau of Labor Statistics for the most current 12-month period such data is available at the time of the applicable measurement or adjustment under this Agreement. If CPI is no longer calculated by the U.S. Bureau of Labor Statistics, the Director shall, in his or her reasonable judgement, select such other index as may be generally published that measures the increase in consumer costs, which index shall be substituted for CPI. Specific dollar amounts referenced in this Agreement as being increased by CPI shall be adjusted by multiplying such amounts by a factor of one (1) plus the percentage increase (but not decrease), if any, in CPI during the most recently ended twelve-month period for which such CPI is available.

"***Deplaned Passenger***" shall mean any revenue passenger disembarking an aircraft at the Terminal Building, including any such passenger that shall subsequently board another aircraft of the same or a different Air Carrier or the same aircraft, if previously operating under a different flight number.

"***Director***" means the person holding the position of Director of Airports of the City or any duly authorized designee.

"***Effective Date***" has the meaning given to it in Section 2.1.

"***Enplaned Passenger***" means any revenue passenger boarding an aircraft at the Terminal Building, including any such passenger that previously disembarked from another aircraft of the same or a different Air Carrier or from the same aircraft, if previously operating under a different flight number.

"***Environmental Audit***" means a systematic voluntary evaluation, review, or assessment of compliance with Environmental Laws, with any permit issued under an Environmental Law, and with the requirements of ARTICLE 15, conducted under ASTM Standard E2107-00 (Standard

*Draft 9.6.2024*

Practice for Environmental Regulatory Compliance Audits) or other standard relevant and appropriate to Airline's use of the Airport.

"***Environmental Costs***" means damages, fines, costs and fees arising from any violation of or noncompliance in any material respect with: (a) any applicable Environmental Laws; or (b) any of the environmental provisions of this Agreement, including but not limited to costs incurred in connection with immediate response, remediation, and restoration actions, natural resources damage, Self Help (defined in ARTICLE 15), oversight and participation costs of governmental agencies, including natural resource trustees; reasonable and documented fees and costs of project managers, attorneys, legal assistants, engineers, consultants, accountants, and experts, whether or not employees of the damaged party and whether or not taxable as costs, incurred prior to, at or after any administrative or judicial proceeding, including appeals and other forms of judicial review; and diminution in value, loss or restriction on use of the Airport.

"***Environmental Laws***" means all applicable federal, State of Texas, regional and local laws, regulations, rules, permit terms, codes, ordinances, and legally enforceable guidance documents, now or hereafter in effect, as the same may be amended from time to time, and applicable decisional law, which govern materials, substances, regulated wastes, emissions, pollutants, water, storm water, ground water, wellfield and wellhead protection, cultural resources protection, animals or plants, noise, or products and relate to the protection of health, safety or the environment and natural resources, including land, sediments, water, groundwater, and stormwater, and shall include, but not be limited to: the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. Section 136 *et seq*.; the Safe Drinking Water Act, 42 U.S.C. Section 300(f) *et seq*.; the Oil Pollution Control Act of 1990, 33 U.S.C. Section 2701 *et seq*.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C., Section 9601 *et seq*.; and as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. Law No. 99-499, 100 Stat. 1613; the Toxic Substances Control Act, 15 U.S.C., Section 2601 *et seq*.; the Clean Air Act as amended, 42 U.S.C., Section 7401 *et seq*.; the Clean Water Act, 33 U.S.C., Section 1251, *et seq*.; the Hazardous Materials Transportation Act, 49 U.S.C., Section 5101 *et seq*.; the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C., Section 651-678; the Resource Conservation and Recovery Act, 42 U.S.C., Section 6901 *et seq*.; and their State counterparts.

"***Exclusive Use Premises***" means the space in the Terminal Building assigned by the Director to Airline (if any) for its use and occupancy to the exclusion of all others, as further depicted in **Exhibit C**. Airline's Exclusive Use Premises may include ticket offices, operations space, or baggage services offices.

"***FAA***" means the Federal Aviation Administration of the United States Government or any successor federal agency or agencies.

"***FIS***" means the Federal Inspection Services facilities and spaces within the Terminal Building which are dedicated to processing arriving international passengers. FIS space includes sterile connectors from the aircraft to passport control, baggage control, and other federal agencies.

*Draft 9.6.2024*

"***Fiscal Year***" means the twelve- (12) month period beginning October 1 of any year and ending September 30 of the following year, or any other twelve- (12) month period adopted by the City for its financial affairs.

"***Gate***" means those portions of the Terminal Building consisting of an aircraft parking position and associated holdroom, apron area, Loading Bridge (if any), and other appurtenant space. Gates include City Gates and preferentially assigned Gates. Only Signatory Airlines may be assigned Gates on a preferential use basis.

"***Gate Use Procedures***" means the City's Gate Use Procedures that establish rules and regulations for the assignment and use of all Gates, including the assignment and use of City Gates and the accommodation of Air Carriers at another Air Carrier's preferentially assigned Gates and the use of the City's Common Use Passenger Processing System, as such may be amended from time to time.

"***Governmental Authority***" means any Federal, state, county, municipal, or other governmental entity (including the City in its governmental capacity), or any subdivision thereof, with authority over, as applicable, the Airport, Air Carriers, or Airline.

"***Grant Assurances***" has the meaning given to it in Section 18.23.

"***Hazardous Substances***" means any and all substances, materials, pollutants, oils, contaminants, materials or products defined, designated, or regulated as hazardous, toxic, radioactive, dangerous or regulated wastes or materials or any other similar term in or under any applicable Environmental Laws. Examples of Hazardous Materials include but are not limited to, asbestos and asbestos containing materials, petroleum products including crude oil or any fraction thereof, gasoline, aviation fuel, diesel fuel, lubricating oils and solvents, urea formaldehyde, flammable explosives, PCBs, radioactive materials or waste.

"***Hazardous Substance Release***" shall include the spilling, discharge, deposit, injection, dumping, emitting, releasing, placing, leaking, migrating, leaching, and seeping of any Hazardous Substance into the air or into or on any land, sediment or waters, except any release in compliance with Environmental Laws or specifically authorized by a current and valid permit issued under Environmental Laws with which Airline is in compliance at the time of such release, but not including within the exception any such release in respect of which the State of Texas has determined that application of the State of Texas' Hazardous Substance removal and remedial action rules might be necessary in order to protect public health, safety or welfare, or the environment.

"***Joint Use Space***" means space managed by the City that may be made available to Airline from time to time for use in common with other Air Carriers, as assigned by the Director and as further depicted on **Exhibit D-1** and **Exhibit D-2**. Joint Use Space includes baggage claim areas, passenger screening areas, baggage makeup, tug lanes, and baggage handling systems.

"***Landed Weight***" means the maximum gross certificated landed weight, in thousand (1,000) pound units, that an aircraft operated by an Air Carrier is authorized by the FAA to land at the Airport, as recited in each Air Carrier's flight manual governing that aircraft type. For all landing fee computations, said sum shall be rounded up to the nearest thousand (1,000) pound units.

*Draft 9.6.2024*

"***Loading Bridge***" means an enclosed passenger loading bridge and any preconditioned air system(s), ground power supply unit(s) and other related equipment attached to the bridge or a concourse at a Gate.

"***Maintenance and Operating Expenses***" or "***O&M Expenses***" means the City's costs for the operation, maintenance and repair of the Airport System and shall include, but shall not be limited to, salaries and employee benefits, utility costs, ordinary maintenance, administrative and general expenses, security, and all such other expenses as defined and determined in accordance with the Bond Ordinance. Direct and indirect O&M Expenses shall be allocated by the City from time to time to the Airport Cost Center(s) to which those expenses relate.

"***Non-Signatory Airline***" means any Air Carrier providing service at the Airport that is not a Signatory Airline. Non-Signatory Airlines shall pay the Non-Signatory Airline rates, fees and charges presented in the Rates and Fees Schedule in the Signatory Airline Agreement, which will include a fifteen percent (15%) premium over the rentals, fees, and charges charged to Signatory Airlines.

"***Obligations***" means any obligation of the Airport System, including any Bonds issued pursuant to the Bond Ordinance or other issuing instrument, as applicable.

"***Other Debt***" means any debt other than Bonds incurred by the City for Airport purposes including but not limited to Interim Financing.

"***Passenger Facility Charges***" or "***PFCs***" means charges collected by Airline and other Air Carriers on behalf of the City in accordance with Section 5.5 and pursuant to the authority granted by 49 U.S.C. § 40117 and 14 CFR Part 158, as may be amended from time to time, in respect of any component of the Airport and interest earnings thereon, net of amounts that collecting Air Carriers are authorized to retain for collecting, handling, and remitting such PFC Revenues.

"***Performance Guarantee***" has the meaning given to it in Section 5.13.

"***Preferential Use Premises***" means those portions of the Terminal Building assigned to a Signatory Airline to which such Signatory Airline shall have priority over other users, subject to the terms and conditions of the Signatory Airline Agreement. A Signatory Airline's Preferential Use Premises may include Gates, ticketing space/counters, curbside baggage check-in, apron area, or Loading Bridges.

"**Prior Use and Lease Agreement**" means any agreement between the City and an Air Carrier under which the Air Carrier operated at the Airport and which governed the terms and conditions of such Air Carrier's air transportation operations at the Airport prior to the Effective Date.

"***Rates and Fees Schedule***" means the Rates and Fees Schedule attached to the Signatory Airline Agreement as **Exhibit F**, a copy of which is attached to this Agreement as **Exhibit F**.

*Draft 9.6.2024*

"***Revenue Landing***" means any aircraft landing by Airline at the Airport for which Airline receives revenue and those non-revenue landings whenever the same aircraft subsequently departs the Airport as a revenue flight.

"***Rules and Regulations***" means the lawful rules and regulations governing the conduct and operation of the Airport promulgated from time to time by the City or the Director, including without limitation the City's duly adopted and generally applicable policies, operating directives, standard procedures, and the Airport Security Plan, in each case as such may be in force and amended from time to time.

"***Signatory Airline***" means an Air Carrier that has the right to operate at the Airport pursuant to a Signatory Airline Agreement with the City.

"***Special Facilities***" means any property, real or personal, incident or related to the Airport, which is financed by the issuance of Obligations that are not directly or indirectly secured or payable from Net Revenues.

"***TCEQ***" means the Texas Commission on Environmental Quality or any successor agency or agencies thereto.

"***Term***" has the meaning given to it in Section 2.1.

"***Terminal Building***" means the terminal building and connected concourses, as may be expanded from time to time, which serve Air Carriers and other terminal tenants and activities, all as currently indicated on **Exhibit A**, **Exhibit D-1** and **Exhibit D-2** as such exhibits may be amended from time to time.

"***TSA***" means the Transportation Security Administration of the United States Government or any successor federal agency or agencies.

Section 1.2    Interpretation.

The terms used in this Agreement shall have the meanings indicated in this ARTICLE 1 unless expressly defined elsewhere in the Agreement or defined in the Signatory Airline Agreement or where the context clearly indicates otherwise. Words used in this Agreement in the present tense include the future as well as the present. Words used in the masculine gender include the feminine and neuter. The singular number includes the plural and the plural includes the singular. The word "person" means a business or corporation as well as a natural person. All references in the text of this Agreement to articles, sections, and exhibits pertain to articles, sections, and exhibits of this Agreement, unless otherwise specified.

Section 1.3    Exhibits.

The following exhibits are incorporated herein and a made a part of this Agreement:

| **Exhibit A** | Airport Map |
| **Exhibit B** | *[Reserved]* |
| **Exhibit C** | Exclusive Use Premises |

*Draft 9.6.2024*

| **Exhibit D-1** | Terminal Building Space Exhibit |
| **Exhibit D-2** | Joint Use Space |
| **Exhibit E** | [*Reserved*] |
| **Exhibit F** | Rates and Fees Schedule |
| **Exhibit G** | [*Reserved*] |
| **Exhibit H** | [*Reserved*] |
| **Exhibit I** | [*Reserved*] |
| **Exhibit J** | [*Reserved*] |
| **Exhibit K** | Maintenance Schedule |
| **Exhibit L** | Required Federal Provisions |

Any changes to the exhibits that occur from time to time consistent with and pursuant to the terms of this Agreement shall be reflected in revised exhibits provided by the City to Airline. Such revised exhibits shall be deemed to be effective without requiring a formal amendment to this Agreement or City Council action.

## ARTICLE 2
## TERM

Section 2.1     Term; Effective Date.

The term ("***Term***") of this Agreement shall commence the Effective Date and shall continue on a month to month basis until the earlier of (i) cancellation by either Party with at least thirty (30) days' written notice to the other Party, such cancellation to be effective at the end of the thirty (30) day notice period; (ii) the date on which the Signatory Airline becomes an Affiliate or a Signatory Airline at the Airport; (iii) termination by the City in accordance with ARTICLE 16; or (iv) the expiration or earlier termination of the Signatory Airline Agreements with all Signatory Airlines.

Section 2.2     Holding Over.

(a)     If Airline, at the request of or without objection by the City, shall continue to occupy the Airline Premises and conduct its Air Transportation Business beyond the Term of this Agreement, such holding over shall not constitute a renewal of this Agreement, but shall be considered a month-to-month tenancy only, with or without the consent of the City. The month-to-month tenancy shall be subject to all terms and conditions of this Agreement. No such holding over shall be deemed to operate as a renewal or extension of the Term. Such month-to-month tenancy may be terminated by the City or Airline by giving thirty (30) days prior written notice of said termination to the other Party at any time.

(b)     If Airline shall hold over in any portion of the Airline Premises after the termination of this Agreement and the City objects or does not consent to such holdover, Airline shall occupy such portion of the Airline Premises as a tenant at will. The City may relocate Airline in such case without compliance with the provisions of ARTICLE 3 hereof. If Airline fails to vacate the Airline Premises within sixty (60) days after written notice of termination from the City, Airline shall pay the City one hundred twenty-five percent (125%) of Non-Signatory Airline rentals, fees, and charges for each period beginning more than sixty (60) days after such notice, and the City reserves

the right to determine Airline rentals, fees, and charges according to any methodology permitted under Applicable Law.

Section 2.3     Surrender.

Upon expiration or early termination of this Agreement, Airline shall surrender the Airline Premises to the City in substantially the same condition as such Airline Premises were in at the time of the original occupancy by Airline, or, if improved, in substantially the same condition as of the completion date of the last improvement authorized by the City pursuant to this Agreement and made by Airline or the City to the Airline Premises, in each case excepting reasonable wear and tear. Airline shall provide the environmental demonstrations concerning the Airline Premises set out in ARTICLE 15 below.

Section 2.4     Airline Removal of Property.

(a)     Except as otherwise provided in this Article, all equipment, trade fixtures, and other personal property installed or placed by Airline in the Airline Premises or on or about the Airport and which can be removed without structural damage to the Airline Premises or any other City-owned property shall remain the property of Airline unless otherwise provided in subsequent written agreements between Airline and the City, and Airline shall have the right at any time during the Term and prior to its expiration or early termination to remove any and all of said property from the Airport provided Airline is not in default in its payments hereunder (beyond all applicable notices and opportunity to cure periods).  Airline agrees to repair or pay for all damages, if any, resulting from such removal.  All City property damaged by or as a result of the removal of Airline's property shall be restored at Airline's expense to the same condition as or better condition than, it was prior to such damage.

(b)     Any and all property not removed by Airline within thirty (30) days after the expiration or earlier termination of this Agreement and the cessation of operations from all or a portion of the Airline Premises is deemed to be abandoned property. Airline hereby authorizes the City to remove and dispose of its abandoned property. Airline agrees to reimburse the City for the cost of removing and disposing of its abandoned property.

Section 2.5     Prior Agreement.

On the Effective Date, any Prior Use and Lease Agreement between the City and Airline shall terminate without further action required by either the City or Airline, provided that the termination of such prior agreement shall not be construed as a waiver, relinquishment, or release of any claims, damages, liability, rights of action, or causes of action that either of the parties hereto may have against the other under such prior agreement and that have accrued before the Effective Date of this Agreement. Airline's liability that survives the termination of the prior agreement shall not be terminated by the execution of this Agreement.  It is understood that for the purposes of this Agreement, Airline's cargo facility lease with the City, if any exists at the Effective Date, shall not be considered a Prior Use and Lease Agreement.

## ARTICLE 3
## AIRLINE PREMISES

Section 3.1    Exclusive Use Premises.

The City grants to Airline, subject to the terms and conditions of this Agreement, the exclusive right to use the Exclusive Use Premises (if any) identified in **Exhibit C**. **Exhibit C** may be updated and amended from time to time by the Director in accordance with the terms of this Agreement without need for formal amendment thereto.

Section 3.2    Joint Use Space.

The City grants to Airline, subject to the terms and conditions of this Agreement, the right to use, on a shared basis, the Joint Use Space identified in **Exhibit D-1** and **Exhibit D-2**.

Section 3.3    Gate Use Procedures.

Airline's use of Gates shall be subject to the City's Gate Use Procedures, as amended from time to time..

Section 3.4    "As-Is" Condition of Airline Premises.

WITH THE EXCEPTION OF THOSE FACILITIES AND FIXTURES THAT THE CITY IS REQUIRED TO MAINTAIN AND REPAIR HEREUNDER AND ANY OTHER REPRESENTATIONS, COVENANTS, OR OBLIGATIONS OF THE CITY EXPRESSLY SET FORTH HEREIN AND ANY RELEASES OF AIRLINE HEREIN, AIRLINE EXPRESSLY ACKNOWLEDGES THAT IT HAS INSPECTED OR HAD THE OPPORTUNITY TO INSPECT THE AIRLINE PREMISES, INCLUDING, BUT NOT LIMITED TO, ALL FINISHES, FURNITURE, FIXTURES, AND EQUIPMENT AND ENVIRONMENTAL CONDITIONS THEREIN AND ACCEPTS THE SAME "AS-IS" IN THE CONDITION EXISTING AS OF THE EFFECTIVE DATE (OR, IF AIRLINE IS ASSIGNED ADDITIONAL PREMISES DURING THE TERM PURSUANT TO THIS AGREEMENT, AS OF THE DATE AIRLINE ACCEPTS SUCH AIRLINE PREMISES). AIRLINE FURTHER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE CITY HAS MADE NO REPRESENTATIONS OR WARRANTIES OF ANY NATURE WHATSOEVER, EITHER EXPRESS OR IMPLIED, REGARDING THE AIRPORT OR THE AIRLINE PREMISES INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND/OR ENVIRONMENTAL CONDITION OF THE AIRLINE PREMISES, OR ANY IMPROVEMENTS LOCATED THEREON, OR THE VALUE OF THE AIRLINE PREMISES OR IMPROVEMENTS THERETO, THEIR ZONING, OR THE SUITABILITY OF THE AIRLINE PREMISES FOR AIRLINE'S NEEDS, OR ANY IMPROVEMENTS THERETO, OR AIRLINE'S LEGAL ABILITY TO USE THE AIRLINE PREMISES OR AIRPORT FOR AIRLINE'S INTENDED USE. THE CITY SHALL NOT BE RESPONSIBLE FOR ANY PATENT OR LATENT DEFECT AND AIRLINE SHALL NOT, UNDER ANY CIRCUMSTANCES, WITHHOLD ANY AIRLINE RENTALS, FEES, AND CHARGES OR OTHER AMOUNTS PAYABLE TO THE CITY HEREUNDER ON ACCOUNT OF ANY DEFECT IN THE AIRLINE PREMISES. BY ITS ENTRY ONTO THE AIRLINE PREMISES, AIRLINE ACCEPTS THE AIRLINE PREMISES IN THEIR "AS IS" CONDITION AND HEREBY WAIVES ALL CLAIMS

*Draft 9.6.2024*

ARISING ON OR AFTER THE EFFECTIVE DATE RELATING TO THE CONDITION OF THE AIRLINE PREMISES.

Section 3.5    City Gates.

(a)    The City shall retain under its control and possession the City Gates.

(b)    City Gates shall be assigned by the City, and the City shall handle requests for accommodation by Airline, in accordance with the Signatory Airline Agreement and the City's Gate Use Procedures.

(c)    Notwithstanding anything to the contrary in the City's Gate Use Procedures as of the Effective Date, Airline acknowledges that the City will assign international arrivals the highest priority of use on international capable Gates in the event of a scheduling conflict between Air Carriers.

Section 3.6    City Right of Entry.

Authorized representative(s) of the City shall have the right to enter the Airline Premises, including the non-public areas of the Exclusive Use Premises, at any and all reasonable times for the purpose of inspection, including inspecting compliance with applicable Environmental Laws as provided in ARTICLE 15 and inspection of all City-owned equipment for compliance with manufacturer's specifications regarding servicing and preventive maintenance, or for any other purpose incident to the performance of the City's obligations hereunder or in the exercise of any of its governmental functions. The City shall use good faith efforts to avoid disruption of Airline's operations and, except in the event of an emergency, shall provide Airline reasonable notice prior to entering the non-public areas of the Exclusive Use Premises.

# ARTICLE 4
# USE OF THE AIRPORT

Section 4.1    Permissible Uses.

Subject to the terms and provisions of this Agreement, Airline shall be entitled to the use, in common with other duly authorized users, of the Airport for the following purposes, provided that nothing herein shall be construed as authorizing the conduct of a separate business by Airline, but as permitting Airline to perform only such functions as are incidental to the operation of its Air Transportation Business:

(a)    The operation of Airline's Air Transportation Business, including all activities reasonably necessary to such operation.

(b)    The landing, taking off, flying over, taxiing, pushing, towing, loading, unloading, delivering fuel to aircraft, repairing, maintaining (provided that Airline shall not perform major maintenance or repairs of aircraft or equipment on the ramp unless specifically authorized by the City), conditioning, servicing, parking, storing, and testing of aircraft or other equipment of or operated by Airline or others, including the right to provide or handle all or part of the operations or services of such others. For operations handled by Airline on behalf of other Air Carriers, Airline

shall pay the City a nondiscriminatory fee as established by the Director based on the gross revenues derived by Airline from such handling services. Handling services provided by third-party contractors will be subject to the nondiscriminatory fee, subject to the exception described in Section 4.5(b).

(c)     The sale of tickets, documentation of shipments, handling of reservations, and loading and unloading of persons, property, cargo, baggage, express packages, and mail at the Airport in the operation of Airline's Air Transportation Business.

(d)     The hiring, employment, and training at the Airport of personnel in the current or future employ of Airline, and training of Airline's authorized contractors. Training is to be limited to that incidental to Airline's Air Transportation Business at the Airport. Flight training and testing of aircraft and other equipment shall be undertaken by Airline only with the prior written approval of the Director, and to the extent permitted by, and subject to, the Rules and Regulations.

(e)     The purchase of Airline's requirements of fuel, lubricants, propellants, personal property, services, food, beverage, catering services, other passenger supplies, and any other materials and supplies used by Airline that are incidental to the operation of Airline's Air Transportation Business. Nothing herein shall restrict the City from requiring a permit and levying a charge on any person or company for conducting such commercial operations (e.g., the sale of food, beverage, or commissary supplies, or providing of services, including to Airline) at the Airport.

(f)     The sale, disposal, and exchange of Airline's aircraft, engines, accessories and other equipment, and materials or supplies, provided that such right shall not be construed as authorizing the conduct of a separate regular business by Airline, but as permitting Airline to perform only such functions as are incidental to the operation of its Air Transportation Business at the Airport.

(g)     The servicing by Airline, or by its suppliers of materials or furnishers of services, of aircraft and other equipment operated by Airline, including the provision of line maintenance or other materials or supplies, on Exclusive Use Premises or at assigned Gates or other locations designated by the Director.

(h)     The installation and operation of static or digital identifying signs, posters, and graphics and directional signs guiding passengers as needed in Airline's Exclusive Use Premises, subject to the prior written approval of the Director. Such signs shall be substantially uniform in size, type, and location with those of other airlines, consistent with the City's graphic standards and the Rules and Regulations, and in compliance with all Applicable Laws.

(i)     The installation, maintenance, and operation of such electronic or electrical devices, radio, communication, meteorological, and aerial navigation equipment and facilities at suitable locations on the Airport as may be necessary or convenient in the opinion of Airline for its operations; provided that: (i) the location and number of such equipment and facilities shall be subject to the prior written approval of the Director; (ii) the use and location of such equipment and facilities shall not conflict with other similar equipment and facilities at the Airport; and (iii) the use and location of such equipment and facilities on the Airport shall be subject to the payment of standard rental rates established for such use.

(j)     The installation, maintenance, and operation of computer data lines, non-revenue generating wi-fi networks, telephone communications equipment, radio antennas and equipment, associated cables, associated conduits, and telephone communications switchgear and support computers at suitable locations on the Airport as may be necessary or convenient in the opinion of Airline for its operations; provided that: (i) all such equipment (except for the associated cables and conduits) be clearly tagged as belonging to Airline, to include a contact telephone number; (ii) the location of such equipment shall be subject to the prior written approval of the Director; (iii) the use and location of such equipment shall not interfere with the use of other similar equipment on the Airport; (iv) the use and location of such equipment, except for cables, on the Airport shall be only in Exclusive Use Premises or Joint Use Premises assigned to Airline, and for which rentals, fees, and charges are being timely paid by Airline pursuant to this Agreement; (v) all cables are installed in conduits, and when such cables are no longer needed, they are promptly removed by Airline without damage to the space and the conduits are also promptly removed by Airline if so required by the Director; and (vi) all installation or removal is performed in accordance with the City's Cabling standards policy, as such policy may be amended from time to time, and any applicable permitting requirements.

(k)     The storage and parking of equipment, cargo, and vehicles in connection with Airline's Air Transportation Business, but only at such locations as specifically designated by the Director.

(l)     The maintenance and repair of equipment and vehicles in connection with Airline's Air Transportation Business, but only at such locations as specifically designated by the Director.

(m)     The operation of break rooms for Airline's employees (and no other persons), and, to the extent permitted by law and not otherwise restricted by Section 4.3(a)(vi), the serving of food and beverages in such employee break rooms if provided to such employees for free or if pursuant to the limited exception in Section 4.3(a)(vi) for vending machines.

Section 4.2     Ingress and Egress.

(a)     Subject to the terms and provisions of this Agreement, the following privileges of ingress and egress with respect to the Airport are hereby granted:

(i)     For Airline, its agents, employees, contractors, subcontractors, and permitted sublessees and assigns, access to the public areas of the Airport and the Airline Premises. This right shall extend to Airline's aircraft, vehicles, machinery, and equipment used in its Air Transportation Business.

(ii)     For Airline's passengers, guests, and invitees, access to areas leased exclusively to Airline and to areas provided for the use of Airline's passengers, guests, and invitees in common with those of other Air Carriers and to public areas and public facilities. This right shall extend to vehicles of such passengers, guests, and invitees.

(iii)     For Airline's suppliers of materials and furnishers of service, access to the public areas of the Airport and to areas and facilities leased exclusively to Airline and to areas and facilities provided for the joint use by Airline or its suppliers of materials and furnishers of services. This right shall extend to vehicles, machinery, or equipment of such

suppliers and furnishers used in their business of furnishing such supplies and services to Airline.

(b)     The ingress and egress provided for above shall not be used, enjoyed, or extended to any person, Air Carrier, or vehicle engaging in any activity or performing any act or furnishing any service for or on behalf of Airline that Airline is not authorized to engage in or perform under the provisions of this Agreement unless expressly authorized by the Director.

Section 4.3     Restrictions.

(a)     Airline or any of its agents, employees, directors, officers, contractors, invitees, licensees, or representatives shall not do any of the following:

(i)     Do anything that may interfere with the effectiveness or accessibility of the drainage and sewage system, electrical system, air conditioning system, fire protection system, sprinkler system, alarm system, fire hydrants, and hoses, if any, installed or located on or within the premises of the Airport.

(ii)     Do anything that may invalidate or conflict with any fire or other casualty insurance policies covering the Airport or any part thereof.

(iii)     Keep or store, at any time, flammable or combustible liquids except in storage facilities especially constructed for such purposes in accordance with all Applicable Laws, including the Uniform Fire Code and the Uniform Building Code.

(iv)     Do anything that may be in conflict with the provisions of 14 CFR Part 139, Airport Certification, as may be amended from time to time, or jeopardize the operating certificate of the Airport.

(v)     Do anything that may be in conflict with the provisions of 49 CFR Part 1542, Airport Security, as may be amended from time to time, or the TSA-approved security plan for the Airport.

(vi)     Permit any amusement machine, vending machine, public pay telephone, facsimile machine, copy machine, or other machine operated by coins, tokens, or credit cards to be installed or maintained in any publicly accessible area without the express written determination of the Director. Airline or its nominee may, however, install, maintain, and operate vending machines in Airline's Exclusive Use Premises not accessible to the public for the purpose of providing and making available foods, beverages, and sundry food items to Airline's employees only.

(vii)     Provide commercial ground transportation services to any person upon payment of any fee or charge. Airline shall not be in violation of this Section 4.3(a)(vii) if providing limited ground transportation free of any fee or charge to any passenger as a result of irregular operations or to Airline's employees.

(viii)   Perform aircraft engine run-ups, except at locations and during time periods approved in writing in advance by the Director or in accordance with Airport established processes and procedures.

(ix)   Enter into activities at the Airport that compete with the City in the City's development of any Non-Airline Revenue from Airport passengers, tenants, and other users. Should Airline engage in non-airline business activities not specifically permitted in this Agreement, the City may levy a non-discriminatory fee on such activities.

Section 4.4   Concession Services Rights Reserved by City.

(a)   Except as otherwise provided herein, the City reserves the exclusive right to itself, its agents, and its franchisees to operate all concession services (including, but not limited to, food/beverage and news/gift concessions, specialty retail shops and carts, vending machines, pay telephones, facsimile machines, and other voice and data telecommunications systems, advertising displays, baggage lockers, and baggage carts) in the Terminal Building and the FIS, including the Airline Premises, such as holdrooms and loading bridge exterior areas, and to retain the revenue therefrom; provided, however, that: (i) the City agrees that no concession services shall be located or operated by the City or its nominees in Airline's Exclusive Use Premises or on Airline-owned equipment without Airline's prior consent; and (ii) the City shall not exercise such right in a manner that will materially impede passenger ingress or egress or Airline's business operations.

(b)   The City shall operate all concessions and provide such other services (with reasonable due consideration to requests made by Airline) for scheduled airline passenger operations at the Airport as it deems necessary or appropriate. Nothing herein shall limit or preclude the City from operating whatever concessions or providing whatever services it may desire at any and all airports and other facilities owned by the City.

(c)   The distribution, serving or sale of food and/or beverages (including alcoholic beverages) meant to be consumed aboard Airline's aircraft by Airline or its in-flight catering provider shall be limited to Airline's passengers while on Airline's aircraft, unless otherwise set forth in this Agreement or agreed in writing by the Director. The provisions of this section notwithstanding, all distribution of alcoholic beverages shall comply with all Applicable Laws.

(d)   Airline shall be allowed to provide water and typical on-board snacks (such as peanuts, pretzels, etc.) in passenger holdrooms at no cost to Airline's passengers in the event of originating flights with delays greater than two (2) hours, diverted flights, or originating flights that have returned to the Gate. All such food and/or beverages shall be on-board snacks brought from an aircraft or otherwise shall be purchased only from the City's food and beverage concessionaires operating at the Airport or others that pay permit fees to the City or used from Airline's provisional flight supplies, provided, however, that in the event the City's food and beverage concessionaires have closed for the day or are closed due to some other circumstance and Airline is experiencing delays, diversions or originating flights returning to Gates, Airline may seek delivery of food and non-alcoholic beverages from non-City sources. Otherwise, distribution of food and/or beverages at no cost to Airline's passengers by Airline shall be permitted only with advance written approval of the Director.

*Draft 9.6.2024*

(e)     Except as allowed herein or approved in writing by the Director, all other serving, distribution, or sale of food or beverages by Airline at the Airport is prohibited.

Section 4.5     Ground Handling Services by Airline or Others.

(a)     Airline may contract with, or receive from, other Air Carriers serving the Airport or other third-party companies, ground handling services (both above and below the wing services) for Airline's aircraft, provided that:

(i)     Airline shall give the Airport Director written notice of any such proposed handling agreement at least ten (10) business days prior to the effective date thereof;

(ii)    Airline shall obtain any permit, license, or other authorization required by the City to perform such duties at the Airport;

(iii)   Airline shall ensure that its third-party service provider(s) obtains any permit, license, or other authorization required by the City to perform such duties at the Airport; and

(iv)    Nothing in this Section shall be construed to relieve Airline or any such handled Air Carrier from its obligations hereunder.

(b)     Nothing herein shall restrict the City from levying a nondiscriminatory concession fee for ground handling services on any person or company (including Airline when Airline is providing these services to other Air Carriers.

(c)     Airline's insurance, as required in this Agreement, shall provide insurance coverage for such ground handling services to the extent it is not covered by a ground handling services company's own insurance.

Section 4.6     Airport Security.

Airline understands and agrees that it shall fully indemnify, defend, and hold harmless the City, and the City Indemnified Parties (as defined in Section 13.2) from and against all penalties, fines, or demands of any kind (including, but not limited to, costs of investigation, attorney fees, court costs, and expert fees) to the extent arising out of Airline's acts or omissions resulting in alleged violations of 49 CFR Part 1542, Airport Security, as may be amended from time to time, or any successor regulations related to airport security. If Airline, its officers, employees, agents, or those persons under Airline's control (not including Airline's passengers) shall fail or refuse to comply with the aforementioned security requirements and such non-compliance results in a monetary penalty being assessed against the City, Airline shall be responsible for the costs thereof and shall reimburse the City in the full amount of any such monetary penalty; provided, however, that Airline shall the right, but without withholding timely payment or reimbursement to the City thereof, to contest the validity or amount of any such monetary penalty in accordance with Section 13.2(b).

*Draft 9.6.2024*

Section 4.7    Removal of Disabled Aircraft.

Upon release of Airline's disabled aircraft by the proper authorities, Airline shall promptly remove any such disabled aircraft from any part of the Airport (including, without limitation, runways, taxiways, aprons, and Gate positions) and place any such disabled aircraft in such storage area as may be designated by the Director. Airline may store such disabled aircraft only for such length of time and on such terms and conditions as may be established by the City. If Airline fails to remove any of its disabled aircraft promptly in accordance with this paragraph, the Director may, but shall not be obligated to, after delivering reasonable advance notice to Airline, cause the removal of such disabled aircraft, such removal and associated storage consistent with Applicable Laws. Airline agrees to reimburse the City for all costs of such removal and storage.

Section 4.8    Employee Parking Facilities.

Airline and its Airport employees shall have the right to use the vehicular parking facilities at the Airport, in common with employees of other airlines, tenants, and Airport-related services. Use of the employee parking facilities is subject to the payment of such employee parking fees as established from time to time by the City. Such facilities shall be located in an area designated by the Director. Airline shall, on request of the Director, provide verification that it is only authorizing and paying for parking for its on-Airport and/or Airport-based employees in City-designated employee parking spaces.

Section 4.9    Restrictions and Reservations.

Unless explicitly provided otherwise herein, the City specifically reserves and retains all rights not specifically granted herein, including but not limited to those with respect to licensing or contracting for concessions, general consumer services, fixed base operators, or other commercial aeronautical services, and related aviation services at the Airport, including, but not limited to food, beverage, retail, advertising, and vending, within the Terminal Building, whether in Airline Premises or public areas of the Airport, and nothing herein shall restrict the City from requiring a permit and levying a charge on any person or company for conducting business at the Airport.

## ARTICLE 5
## AIRLINE RENTALS, FEES, AND CHARGES

In consideration for use of the Airline Premises, facilities, rights, and privileges granted hereunder and for the undertakings of the City, Airline agrees to pay the City during the Term of this Agreement, without deduction or set-off, certain rentals, fees, and other charges calculated according to Article 6 of the Signatory Airline Agreement and the Rates and Fees Schedule.

Section 5.1    Time of Payment.

(a)    Airline shall make timely payments to the City of Airline rentals, fees, and charges in accordance with the following:

*Draft 9.6.2024*

(i)     Terminal Building Rentals, Apron Area Fees, and Loading Bridge Fees shall be due and payable, without deduction or setoff, in monthly installments in advance on or before the first day of each month.

(ii)    Landing Fees, Joint Use Charges, Baggage Handling System Fees, Per Use Fees – Gates, Per Use Fees – Ticket Counters, FIS Charges, and RON Parking Fees for each month of operations shall be due and payable without deduction or setoff within fifteen (15) days after transmittal of an invoice, given that Airline's monthly statistical report as required in Section 7.1 shall be received by the City within ten (10) days after the last day of the month after such month of operations.

(iii)   Airline shall faithfully collect and promptly remit to the City (without notice or demand by the City and in accordance with 14 CFR 158, Passenger Facility Charges, as may be amended from time to time) the proceeds of the City's Passenger Facility Charge so long as the City has an approved Passenger Facility Charge in effect.

(iv)    Rentals, fees, and charges not described above shall be due and payable within thirty (30) days after transmittal of invoice by the City. The City will provide such invoice within thirty (30) days of activity for which charge is generated.

(b)     The acceptance of any payment made by Airline shall not preclude the City from verifying the accuracy of Airline's reporting and computations or from recovering any additional payment actually due from Airline or preclude Airline from later demonstrating that Airline's report was inaccurate and that a lesser amount was properly owed (and to recover any such overpayment).

(c)     In establishing the rentals, fees, and charges set forth in this Agreement, the City is anticipating timely payment of such rentals, fees, and charges. Untimely payment of these rentals, fees, and charges jeopardizes the operation of the Airport. Therefore, in the event that rentals, fees, and charges are not paid timely by Airline, the Director is authorized and directed to seek any necessary legal and administrative remedy to obtain collection of the unpaid rentals, fees, and charges and to assure timely payment of future rentals, fees, and charges. These remedies shall be in addition to late fees required herein and may include any of the following:

(i)     Seeking administrative relief through appropriate federal agencies, including the FAA.

(ii)    Equitable and judicial remedies.

(iii)   Such other legal and administrative remedies as permitted by law.

(d)     Failure to send a timely invoice does not relieve Airline from any obligation of payment.

Section 5.2     Method of Payment.

Rentals, fees, and charges shall be paid in United States Dollars by wire, electronic funds transfer, or check payable to San Antonio International Airport, the City of San Antonio, which

shall be delivered or mailed, postage prepaid, to City of San Antonio, Aviation Department, Accounting Section, 457 Sandau Road, San Antonio, TX 78216 or which may be paid by wire transfers to accounts of the Airport designated in writing by the Director. To arrange payment by wire or electronic funds transfer, Airline shall contact the Aviation Department's Accounting Section at (210) 207-7242 for further information.

Section 5.3    Late Fees on Overdue Payments.

Without waiving any other right available to the City, in the event of a default in Airline's payment of any rentals, fees, and charges under this Agreement, including Passenger Facility Charge proceeds, in the event that Airline is delinquent for a period of thirty (30) calendar days or more from the date when such payment is due to the City, Airline shall pay the City late fees thereon, from the date such rentals, fees, or charges become payable to the date of payment at the rate of one and one-half percent (1.5%) per month; provided, however, that if the maximum rate then provided by law is less than 1.5% per month, then the rate shall be such maximum legal rate. The City may, but is not obligated to, provide Airline with a written reminder when invoiced rentals, fees, or charges have not been received within thirty (30) calendar days of transmittal of the invoice therefore and prior to assessing late fees in accordance with this Section 5.12.

Section 5.4    Performance Guarantee.

(a)    To guarantee Airline's faithful performance of all terms and conditions contained herein, including but not limited to the timely payment of all rentals, fees, and charges, Airline shall remit to the City, prior to the Effective Date, a performance guarantee ("***Performance Guarantee***") in an amount totaling:  three (3) months' of Airline's estimated Terminal Building Rentals, Loading Bridge Fees, Joint Use Charges (as determined using activity data for the most recent six (6) calendar months to determine Airline's obligation using the Joint Use Charges formula, if such data is available, or on any reasonable basis determined by the City in its discretion including Airline's published schedule as of that date), and Landing Fees (as determined on the basis of Airline's estimated Landed Weight each year times three-twelfths (3/12) at the actual Landing Fee rate effective for the Fiscal Year).

(b)    The Performance Guarantee may be adjusted by the City annually, or more frequently, if there is a material change to the amount required in this Section 5.13 from Airline. Such Performance Guarantee shall be in the form of a letter of credit, bond, or other instrument satisfactory to the City, in a form acceptable to the Director. The Performance Guarantee must provide that it shall remain in full force and effect for a period extending three (3) months following termination of this Agreement (and for a period of three (3) months following any holding over by Airline pursuant to Section 2.2), provided that the City shall release or return the Performance Guarantee to Airline at the conclusion of such 3-month period (less any amounts it is entitled to retain hereunder), which obligation shall survive the expiration or termination of this Agreement.

(c)    In the event the City is required to draw down or collect against Airline's Performance Guarantee for any reason, Airline shall, within ten (10) business days after the City's written demand, take such action as may be necessary to replenish the existing Performance Guarantee to its original value or to provide a replacement Performance Guarantee from another

source so that the aggregate of the Performance Guarantee(s) is equal to three (3) months' estimated rents and landing fees payable by Airline as described above.

(d)     Upon Airline's election to assume this Agreement under Federal Bankruptcy Rules and Regulations and the Federal Judgeship Act of 1984 or any successor statute, as such may be amended, supplemented, or replaced, the City, by written notice to Airline given at any time within ninety (90) days of the date such event becomes known to the City, may impose or re-impose the Performance Guarantee requirements on Airline. In such event, Airline shall provide the City with the required Performance Guarantee within ten (10) days from its receipt of such written notice and shall thereafter maintain such bond in effect until the expiration or termination of this Agreement.

(e)     If Airline shall fail to obtain or keep in force such Performance Guarantee required hereunder, such failure shall be grounds for immediate termination of this Agreement.  The City's rights under this Article shall be in addition to all other rights and remedies provided to the City under this Agreement.

(f)     Airline and the City agree that if Airline provides a Performance Guarantee in the form of a contract bond or irrevocable letter of credit, such Performance Guarantee provided by Airline is not 'property of the estate' for purposes of Section 541 of the United States Bankruptcy Code (Title 11 U.S.C.), it being understood that any Performance Guarantee is the property of the third party providing it (subject to the City's ability to draw against the Performance Guarantee).

Section 5.5     Passenger Facility Charges.

(a)     The City reserves the right to assess and collect PFCs subject to the terms and conditions set forth in 49 U.S.C. § 40117 (the "*PFC Act*") and the rules and regulations thereunder, 14 C.F.R. Part 158 (the "*PFC Regulations*"), as may be amended from time to time.  Airline will collect FAA-approved PFCs imposed by the City from all eligible Enplaned Passengers.  On or before the last day of each month, Airline will remit to the City all PFC revenue collected for the previous month, less any compensation provided for under 14 CFR §158.53(a), as may be amended from time to time, together with all reports required under §158.65.

(b)     If Airline transports passengers from the Airport on Airline's aircraft chartered by a charter Air Carrier or tour operator issuing passenger tickets other than Airline's, Airline will provide the City with a schedule detailing the date and time of the flight and the number of Enplaned Passengers.  Airline agrees to pay the required PFC amount due the City in a timely manner and to seek reimbursement from the charter Air Carrier or tour operator with no liability to the City.

(c)     Airline shall hold the net principal amount of all PFCs that are collected by Airline or its agents on behalf of the City pursuant to the PFC Act and the PFC Regulations in trust for the City.  For purposes of this Section, net principal amount shall mean the total principal amount of all PFCs that are collected by Airline or its agents on behalf of the City, reduced by all amounts that Airline is permitted to retain pursuant to § 158.53(a) of the PFC Regulations (such net principal amount known as "*PFC Revenue*").  Airline acknowledges that all PFC Revenue collected for the City neither belongs to nor is owned by Airline except to the extent set forth in applicable Federal

law and, unless the status of PFC Revenue in the possession of Airline is characterized in a separate manner under FAA regulations (in which case such characterization shall prevail), that such PFC Revenue is held in trust by Airline for the exclusive use and benefit of the City. Airline shall not make any claim in any document or proceeding that, for PFC Revenue collected by Airline on behalf of the City, the Airline has any legal or equitable interest in such PFC Revenue, except to the extent Airline is specifically granted such interest by Federal statute or regulation, including the right of reimbursement from such PFC funds for the Airline's costs of collection.

(d)     Any late payment of the PFC may be subject to late fees computed at the rate of one and one-half percent (1.5%) per month or, if less, the highest rate permitted by Applicable Law, from the due date until paid, to the extent allowed by Applicable Law.

(e)     Airline acknowledges that the City has given to the United States of America, acting by and through the FAA, certain assurances under the PFC Act and the PFC Regulations, including Appendix A thereto (the "***PFC Assurances***"), and Airline agrees that this Agreement shall be subordinate and subject to all PFC Assurances. In the event the FAA requires any modification of this Agreement as a condition precedent to the City's collection of PFCs or as a means to effect the City's compliance with the PFC Act, the PFC Regulations, or the PFC Assurances, Airline shall not withhold its consent to any modification of this Agreement as may reasonably be required for the City to collect PFCs or to comply with the PFC Act, PFC Regulations, and/or PFC Assurances.

## ARTICLE 6
## [RESERVED]

## ARTICLE 7
## AIRLINE ACTIVITY REPORTS

### Section 7.1     Required Monthly Activity Reports.

Airline shall furnish to the Director, on or before the tenth (10th) day of each month, an accurate verified report detailing its operations for the previous month in accordance with Section 7.1 of the Signatory Airline Agreement. The City reserves the right to periodically audit these reports to verify the accuracy of the information.

### Section 7.2     Failure to Furnish Report.

If Airline fails to furnish the City with the report described above, the City reserves the right to calculate Airline's Landing Fee by assuming that the total Landed Weight for Airline during the preceding month was one hundred twenty-five percent (125%) of the total Landed Weight for the most recent month for which such figure is available or other available data. Any necessary adjustment in such Landing Fee shall be calculated after an accurate report is delivered to the Director by Airline for the month in question, and resulting surpluses or deficits shall be applied to Airline's Landing Fee for the next succeeding month. An accounting fee of $100 for each failure to furnish such report by Airline may be charged to Airline and shall be payable by Airline for the additional services required by the City pursuant to this paragraph in addition to any late fees charged pursuant to Section 5.12.

*Draft 9.6.2024*

## ARTICLE 8
## [RESERVED]

## ARTICLE 9
## BOND ORDINANCE SUBORDINATION

Section 9.1    Subordination to Bond Ordinance.

(a)    This Agreement and all rights of Airline hereunder are expressly subordinated and subject to the lien and provisions of any pledge, transfer, hypothecation, or assignment made (at any time) by the City to secure Airport Bond financing. This Agreement is subject and subordinate to the terms, covenants, and conditions of the Bond Ordinance authorizing the issuance of Airport Bonds by the City of San Antonio. The City may amend or modify the Bond Ordinance or make any change thereto that does not materially adversely affect Airline rights under this Agreement. Conflicts between this Agreement and the Bond Ordinance shall be resolved in favor of the Bond Ordinance.

## ARTICLE 10
## MAINTENANCE AND OPERATING RESPONSIBILITIES

Section 10.1    Designation of Terminal Building Maintenance Responsibilities.

(a)    In addition to the obligations of Airline and the City set forth in this ARTICLE 10, the Parties' responsibilities for maintenance, cleaning, and operation of the Airline Premises and certain other portions of the Airport are set forth in the Maintenance Schedule presented in **Exhibit K**. Airline agrees to perform the obligations set forth in the Maintenance Schedule, which are assigned to Airline, and the City agrees to perform the obligations set forth in the Maintenance Schedule, which are assigned to the City.

Section 10.2    Maintenance Responsibilities at Airline Premises.

(a)    Airline shall perform ordinary preventive maintenance and upkeep and repair of all facilities located in its Exclusive Use Premises at Airline's sole cost and expense in accordance with **Exhibit K**. Airline shall, at all times, preserve and keep the Airport, Airport facilities, and Airline Premises in an orderly, clean, neat, and sanitary condition, free from trash and debris resulting from Airline's operation.

(b)    Airline shall keep, at its own expense, its Terminal Building and/or cargo aircraft aprons free of fuel, oil, and other foreign objects and debris resulting from Airline's operations. Airline shall operate and maintain, at its own expense, any improvements and/or equipment installed by Airline for the exclusive use of Airline.

Section 10.3    Airline-Constructed Improvements.

(a)    Airline shall make no alterations, additions, improvements, or installations on the Airline Premises or the Airport without prior written approval from the Director and without obtaining all applicable permits and in compliance with all Rules and Regulations and Applicable Laws.

*Draft 9.6.2024*

(b)     Airline shall cause all improvements and facilities, and additions thereto, constructed or installed by Airline, either alone or in conjunction with others, and all vehicles and equipment operated by Airline on the Airport, to be kept and maintained in a safe condition and in good repair in accordance with uniform standards applicable to all similarly situated Airport tenants as established from time to time by the Director. Airline shall keep the Exclusive Use Premises and improvements thereon in a safe, sanitary, and neat condition.

(c)     Airline covenants and agrees to pay all costs necessary to complete approved alterations or improvements. The City will not be responsible for any costs relating to such alterations or improvements whether such alterations or improvements were requested by Airline or were required by the City in accordance with this Agreement or any other Governmental Authority or pursuant to Applicable Laws.

Section 10.4    Additional Requirements for Construction Contracts.

(a)     In accordance with Section 2252.909 of the Texas Government Code, Airline shall include the following requirements in all Construction Contracts:

(i)     a requirement that the Contractor execute a payment bond that conforms to Subchapter I, Chapter 53, of the Texas Property Code;

(ii)     a requirement that the Contractor execute a performance bond in an amount equal to the amount of the Construction Contract for the protection of the City and conditioned on the faithful performance of the Contractor's work in accordance with the plans, specifications, and contract documents; and

(iii)     a requirement that the Contractor provide to the City a notice of commencement ("***Notice of Commencement***") consistent with said Section 2252.909 at least ninety (90) days before the date construction, alteration, or repair of any Improvement or Alteration to the Premises begins. The Notice of Commencement must:

(A)     identify the public property where the work will be performed;

(B)     describe the work to be performed;

(C)     state the total cost of the work to be performed;

(D)     include copies of the performance and payment bonds required by this Section; and

(E)     include a written acknowledgement signed by the Contractor stating that copies of the required performance and payment bonds will be provided to all subcontractors no later than the fifth day after the date a subcontract is executed.

(b)     On or before the 10th day after the date the City receives a Notice of Commencement, the City may, in its sole discretion, notify Airline that the construction, alteration, or repair of the Improvement or Alteration may not proceed. A material misrepresentation of information in a Notice of Commencement is a Class A misdemeanor.

*Draft 9.6.2024*

Section 10.5    Visual Artists Rights Act.

Airline shall not install any object in the Terminal Building or commence construction of any alterations, additions, or improvements that constitutes a work of visual art under the Visual Artists Rights Act of 1990, as amended ("**VARA**") unless and until Airline has provided the City with either (i) written notification satisfactory to the City that VARA does not apply; or (ii) a written waiver from the author of a work of visual art, in form and substance reasonably satisfactory to the City, which identifies specifically the work of visual art and the uses of that work to which the waiver applies in accordance with 17 U.S.C. § 106A(e)(1).

Section 10.6    Performance by City Upon Failure of Airline to Maintain.

In the event Airline fails within thirty (30) days after receipt of written notice from the City to perform any of its obligations required hereunder, the City may enter the Airline Premises involved, without such entering causing or constituting a termination of this Agreement or an interference with the possession of said Airline Premises by Airline, and do all things reasonably necessary to perform such obligation. Director may charge Airline the City's cost of performing such maintenance or repair plus fifteen percent (15%) for administration. Airline agrees to pay to the City upon demand such charges in addition to any other amounts payable by Airline hereunder; provided, however, that if Airline's failure to perform any such obligation endangers the safety of the public, the employees or property of the City, or other tenants of the Airport and Director so states in its written notice to Airline, the City may perform such obligation of Airline at any time after the giving of such notice and charge to Airline the reasonable cost and expense of such performance including any administrative fees which Airline shall pay as aforesaid.

**ARTICLE 11**
**[RESERVED]**

**ARTICLE 12**
**[RESERVED]**

**ARTICLE 13**
**INSURANCE AND INDEMNIFICATION**

Section 13.1    Insurance.

(a)    By use and occupancy of Airport premises, Airline understands and agrees that it shall, at its sole expense and in a manner acceptable to the City, purchase and maintain or cause to be maintained in force the following insurance coverage for itself and its officers, agents, employees, passengers, guests, patrons, contractors, subcontractors, licensees, subtenants, invitees, and suppliers. Airline shall maintain in full force and effect the forms of insurance specified in this Article 13. All such insurance hereunder shall be maintained with insurance underwriters with an AM Best rating of A- or better, or its international equivalent.

(b)    All liability insurance policies shall provide coverage that includes, or has the same substantive effect as, the following wording:

(i)      "The City of San Antonio and its officers, directors, employees, volunteers, representatives, agents, and elected and appointed representatives are listed as additional insured parties (except with respect to workers' compensation/employer's liability insurance)."

(ii)     "Airline's insurance shall be primary insurance and non-contributory including a waiver of subrogation with respect to all other available sources."

(iii)    "This insurance shall not be materially changed, altered, canceled, or non-renewed until after thirty (30) days' advance written notice has been given to the City of San Antonio except that only ten (10) days' notice shall be required in the event of cancellation due to non-payment of premium."

(c)      At least ten (10) calendar days prior to the Effective Date of this Agreement, Airline shall furnish the City with evidence of all insurance policies required hereunder. Prior to the expiration of any then-current policy of insurance, Airline shall deliver to the City evidence showing that such insurance coverage has been renewed. At least five (5) calendar days prior to the date of cancellation or reduction of coverage, as received in the written notice from the insurer, Airline shall deliver to the Director evidence showing reinstatement or other provision for the required insurance.

(d)      All such evidence shall be in the form of certificates of insurance reasonably satisfactory to the Director.

(e)      The following types and minimum amounts of coverage are required under this Agreement:

(i)      Aviation liability insurance, covering bodily injury, personal injury, property damage, products/completed operations liability, premise liability, and contractual liability, with a liability limit of not less than Five Hundred Million Dollars ($500,000,000.00) combined single limit per occurrence, on occurrence form policy. Said limit shall be reduced to Two Hundred Fifty Million Dollars ($250,000,000.00) where Airline's maximum seating capacity on the largest aircraft operated at the Airport by Airline is thirty (30) or less. With respect to coverage for products/completed operations and personal injury, except with respect to passengers, a sublimit of not less than Twenty-Five Million Dollars ($25,000,000.00) per occurrence, and in the annual aggregate, shall be permitted with the approval of the Director. Said aircraft liability shall be applicable to owned, non-owned, and hired aircraft.

(ii)     Automobile liability insurance with a liability limit of not less than Ten Million Dollars ($10,000,000.00) for all owned, non-owned, and hired vehicles operated by or on behalf of Airline at the Airport, including any additional or replacement vehicles.

(iii)    Liquor liability insurance for Airline if serving alcoholic beverages in an amount not less than Ten Million Dollars ($10,000,000.00) per occurrence.

(iv)     Employer's liability insurance in an amount not less than One Million Dollars ($1,000,000.00) per occurrence.

(v)     Environmental impairment liability insurance in an amount not less than Two Million Dollars ($2,000,000.00) per occurrence. In lieu of environmental impairment liability insurance, Airline may submit proof of self-insurance by submitting a letter to the City attesting to the limit and extent of coverage.

(vi)     Airline shall likewise maintain workers' compensation insurance or evidence of self-insurance, in accordance with the laws of the State of Texas, covering all of its employees who may from time to time be at the Airport in such capacity. Airline shall require each of its agents, licensees, contractors, subcontractors, and suppliers of the Airline Premises to maintain such workers' compensation insurance covering their employees coming on Airport premises in connection with Airline's operations hereunder. The workers' compensation policy(s) required hereunder shall be endorsed to state that the workers' compensation carrier waives its right of subrogation against the City and the City Indemnified Parties. Upon request by the Director, Airline shall furnish the Director with evidence of such workers' compensation insurance in a form acceptable to the City.

(f)     The minimum limits of the insurance herein required may become inadequate during the Term of this Agreement. The City hereby reserves the right to review all coverages and amounts and request adjustments as necessary in the City's reasonable discretion.

(g)     If, at any time, Airline fails to obtain or maintain in force the insurance required herein, such failure, if not cured within forty-eight (48) hours, shall constitute a default permitting the City, upon prior reasonable written notice to Airline, to (1) terminate Airline's use of the space or Airline's operations or activities in regard to the Airport; and/or (2) with prior written notice and at its option, in addition to all its other remedies, procure insurance coverage at Airline's expense whereupon Airline promptly shall reimburse the City for such expense.

(h)     If any claim for damages is filed with Airline or if any lawsuit is instituted against Airline, Airline shall give prompt and timely notice thereof to the Director, provided that claims and lawsuits subject to such notice are only those that arise out of or are in any way connected with Airline's or its officers', representatives', agents', employees', passengers', guests', patrons', contractors', subcontractors', licensees', subtenants', invitees', or suppliers' use of the Airline Premises or Airline's operations or activities in regard to the Airport and that, in any way, directly or indirectly, contingently or otherwise, affect or might reasonably affect the City, including without limitation Claims as defined in Section 13.2(a). Notice shall be deemed prompt and timely if given within thirty (30) calendar days following the date of receipt of a claim or ten (10) calendar days following the date of service of process of a lawsuit. Accident or property damage claims against Airline in an amount less than Fifty Thousand Dollars ($50,000.00) shall be excluded from the requirements of this paragraph unless such claim is also made against the City or a City Indemnified Party.

(i)     If any claim for damages is filed with the City or if any lawsuit is instituted against the City, the City shall give prompt and timely notice thereof to Airline, provided that claims and lawsuits subject to such notice are only those that arise out of or are in any way connected with the operation of the Airport by the City and that the City reasonably believes materially affects or might reasonably materially affect Airline, including without limitation Claims as defined in Section 13.2(a). Notice shall be deemed prompt and timely if given within thirty (30) calendar

days following the date of receipt of a claim or ten (10) calendar days following the date of service of process of a lawsuit. Accident or property damage claims in an amount less than Fifty Thousand Dollars ($50,000.00) shall be excluded from the requirements of this paragraph unless such claim is also made against Airline or the City is seeking indemnification and/or defense from Airline pursuant to Section 13.2.

(j)     The time limitations set forth above are directory. If the notice required to be given by these paragraphs is not given within the time limitations set forth herein, then the party giving the notice shall not be precluded from establishing that the notice actually given was timely under the circumstances of the particular claim or lawsuit, unless by the failure to give such notice within the applicable time period, the other party has been prejudiced in its ability to consider such claim or to respond to, or properly defend, such lawsuit. If the other party is so prejudiced by a late notice, then the late notice shall not be deemed to be prompt and timely.

Section 13.2    Indemnification.

(a)     Airline covenants and agrees to fully indemnify, defend, and hold harmless, the City and its officers, directors, employees, City-sanctioned volunteers, representatives, agents, elected and appointed representatives, and subdivisions (the "***City Indemnified Parties***"), individually and collectively, from and against any and all costs, claims, liens, damages, losses, expenses, fees, fines, penalties, proceedings, actions, demands, causes of action, liability and suits of any kind and nature, including but not limited to, personal or bodily injury, death and property damage, directly or indirectly arising out of, resulting from or related to Airline's activities under this Agreement or its use of the Airport, including any acts or omissions of Airline, and their officers, volunteers, representatives, agents, employees, contractors, subcontractors, licensees, subtenants, invitees (excluding Airline's passengers), or suppliers (the "***Airline Parties***") while in the exercise of the rights or performance of the duties under this Agreement ("***Claims***"). The indemnity provided for in this paragraph shall not apply to any Claims resulting from the negligence of the City, or a City Indemnified Party, to the extent of and in instances where such negligence causes personal injury, death, or property damage. IN THE EVENT AIRLINE AND THE CITY ARE FOUND JOINTLY LIABLE BY A COURT OF COMPETENT JURISDICTION, LIABILITY SHALL BE APPORTIONED COMPARATIVELY IN ACCORDANCE WITH THE LAWS FOR THE STATE OF TEXAS, WITHOUT, HOWEVER, WAIVING ANY GOVERNMENTAL IMMUNITY AVAILABLE TO THE CITY UNDER TEXAS LAW AND WITHOUT WAIVING ANY DEFENSES OF THE PARTIES UNDER TEXAS LAW.

(b)     The provisions of this Section 13.2 are solely for the benefit of the Parties hereto and not intended to create or grant any rights, contractual or otherwise, to any other person or entity except the City Indemnified Parties as described herein. Airline shall promptly advise the City in writing of any Claim against the City or a City Indemnified Party or Airline known to Airline and shall see to the investigation and defense of such Claim at Airline's cost, provided, however, Airline shall not settle any such Claim without obtaining express advance permission from the City unless such settlement provides for an unconditional release of liability for the City or any such City Indemnified Party. In defending any such Claim, Airline shall not, without obtaining express advance permission from the City, raise any defense involving in any way the jurisdiction of the tribunal over the City; the immunity of the City or a City Indemnified Party; the governmental nature of the City; or the provision of any statutes relating to suits against the City.

The City shall have the right, at its option and at its own expense, to participate in such defense without relieving Airline of any of its obligations under this Article.

## ARTICLE 14
## COMPLIANCE WITH LAWS

Section 14.1   Generally.

(a)      Airline shall, in connection with its rights and obligations hereunder, observe and comply with and shall cause its employees, officers, agents, subtenants, contractors, and licensees to observe and comply with, and pay all taxes and obtain all licenses, permits, certificates, and other authorizations required by, all Applicable Laws. Airline shall use commercially reasonable efforts to cause its invitees to comply with and pay all taxes and obtain all licenses, permits, certificates, and other authorizations required by, all Applicable Laws; provided that Airline does not waive its right to contest in good faith the validity or application to Airline of any Applicable Law or Airport Rule and Regulation, including on the basis of federal preemption.

(b)      Airline shall make, at its own expense, all non-structural improvements, repairs, and alterations to its Exclusive Use Premises, equipment, and personal property located on the Airport that are required in order to comply with or conform to Applicable Laws.  Airline shall secure the written approval of the Director before proceeding under this Section 14.1(b), which approval shall not be unreasonably withheld, conditioned, or delayed.

(c)      Airline shall not use the Airport or any part thereof, or knowingly permit the same to be used by any of its employees, officers, agents, subtenants, contractors, invitees, or licensees for any illegal purposes.

Section 14.2   Airport Rules and Regulations.

(a)      Without limiting the foregoing, Airline shall specifically observe and comply and cause its employees, officers, agents, subtenants, contractors, invitees, and licensees to observe and comply with all Rules and Regulations, which include without limitation the rules and regulations adopted in the City's Code of Ordinances, Chapter 3, Airports.

(b)      The Director is authorized to enforce the Rules and Regulations and promulgate other rules, regulations, and policies, from time to time, in furtherance of said purposes and/or that the Director deems are necessary to implement the intent and express terms of this Agreement. With respect to this Agreement, the obligation of Airline to use its diligent efforts to require such observance and obedience on the part of its passengers, guests, invitees, and business visitors shall apply only while such persons are in the Terminal Area and any of Airline's non-Terminal Area leaseholds.  In the event of any conflict between requirements of Applicable Law and the Rules and Regulations, the more restrictive requirement shall apply, as long as compliance with a more restrictive Rule or Regulation does not violate a requirement of any Applicable Law.

Section 14.3   Americans with Disabilities Act.

Airline shall comply with all applicable provisions of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101), as may be amended from time to time, and federal regulations

promulgated thereunder that may be made applicable as a result of construction activities conducted by Airline.

Section 14.4   Ethics.

(a)   The Charter of the City of San Antonio and the City of San Antonio Code of Ethics ("***Code of Ethics***") prohibit a City officer or employee, as those terms are defined in Section 2-52 of the Code of Ethics, from having a direct or indirect financial interest in any contract with the City. An officer or employee has a "prohibited financial interest" in a contract with the City or in the sale to the City of land, materials, supplies or service, if any of the following individual(s) or entities is a party to the contract or sale:

(i)   a City officer or employee; his or her spouse, sibling, parent, child, or other family member within the first degree of consanguinity or affinity;

(ii)   an entity in which the officer or employee, or his or her parent, child or spouse directly or indirectly owns (i) ten (10) percent or more of the voting stock or shares of the entity, or (ii) ten (10) percent or more of the fair market value of the entity; or

(iii)   an entity in which any individual or entity listed above is (i) a subcontractor on a City contract, (ii) a partner or (iii) a parent or subsidiary entity.

(b)   Pursuant to the subsection above, Airline warrants and certifies, and this Agreement is made in reliance thereon, that by contracting with the City, Airline does not cause a City employee or officer to have a prohibited financial interest in the Contract. Airline further warrants and certifies that it has tendered to the City a Contracts Disclosure Statement in compliance with the City's Ethics Code.

Section 14.5   Furnishing of Services.

As a condition of the use of Airport services and facilities, Airline shall furnish its services on a reasonable, and not unjustly discriminatory basis to all users thereof, and it shall charge reasonable and not unjustly discriminatory prices for each unit or service, provided that Airline may make reasonable and nondiscriminatory discounts, rebates, or other similar types of price reductions to volume purchasers.

Section 14.6   Affirmative Action.

As a condition of the use of Airport services and facilities, Airline shall undertake an affirmative action program to the extent required by FAA regulations, Title 14, Code of Federal Regulations, Part 152, Subpart E, entitled "Nondiscrimination in Airport Aid Program," or as otherwise approved by the FAA, to ensure that no person shall on the grounds of race, creed, color, national origin, sex, or handicap be excluded from participation in any employment activities covered in such Subpart E. Airline shall not exclude any person on such grounds from participating in or receiving the services or benefits of any program or activity covered by such Subpart E. Airline shall require that its covered suborganizations provide assurances to Airline that they similarly will undertake affirmative action programs and that they will require assurances from

their suborganizations, to the extent required by Title 14, Code of Federal Regulations, Part 152, Subpart E, to the same effect.

Section 14.7    Disadvantaged Business Enterprises.

As a condition of its use of Airport services and facilities, Airline shall comply with the applicable requirements of Title 49 of the Code of Federal Regulations, Part 26, and entitled "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs" as this Part may be amended from time to time.

Section 14.8    Federally Required Provisions.

Airline acknowledges that the City is required by the FAA under the terms of its Grant Assurances to include in this Agreement certain required contract provisions, included as **Exhibit L** hereto ("***Required Federal Provisions***"). Airline agrees to comply with the Required Federal Provisions and, where applicable, include the Required Federal Provisions in each of its subcontracts without limitation or alteration. Airline acknowledges that a failure to comply with the Required Federal Provisions constitutes an Event of Default (subject to any applicable notice and cure periods described herein). Airline further acknowledges that the FAA may from time to time amend such required contract provisions and agrees that the City may unilaterally modify the Required Federal Provisions solely to the extent such modification is necessary to comply with its Grant Assurances by providing Airline with prompt notification of such modification.

## ARTICLE 15
## ENVIRONMENTAL PROVISIONS

Section 15.1    Condition of Airline Premises and General Environmental Obligations of Airline.

(a)    At its option, prior to occupying the Airline Premises, Airline may conduct an environmental audit for the purposes described in Section 15.15 below. Airline shall manage and conduct all of its activities on or relating to the Airline Premises:

(i)    in compliance with applicable Environmental Laws and the environmental provisions of this Agreement;

(ii)    in cooperation with the Airport in the Airport's efforts to comply with applicable Environmental Laws; and

(iii)    in adherence with Best Management Practices applicable to Airline's use of the Airline Premises.

(b)    Airline shall promptly correct any non-compliance by Airline with applicable Environmental Laws or the environmental provisions of this Agreement, except in the event of an emergency, in which case, Airline shall take immediate steps to correct any such non-compliance. Airline shall manage and, to the extent within the control of Airline, secure the Airline Premises and its occupation or use of the Airline Premises so as to prevent any violation of applicable

*Draft 9.6.2024*

Environmental Laws by any person on the Airline Premises in connection with Airline's use of the Airline Premises hereunder.

Section 15.2    Compliance with Environmental Laws.

Airline shall not cause or allow a Hazardous Substance Release into or onto the Airline Premises or any other location upon or above the Airport, and shall not allow any such release by its employees, agents, permittees, contractors, subcontractors, sublessees, or others in Airline's control, supervision, or employment.

Section 15.3    Hazardous Substance Use on Airline Premises.

(a)    Airline may store and use Hazardous Substances that are associated with Airline's Air Transportation Business on the Airline Premises. Airline shall use reasonable efforts to minimize Hazardous Substance use on the Airline Premises and identify and use non-hazardous alternatives in Airline's operations.

Section 15.4    Safety Data Sheets for Hazardous Substances.

Airline shall maintain Safety Data Sheets ("**SDSs**") for all Hazardous Substances used on the Airline Premises by Airline or by its agents, employees, contractors, licensees, invitees, or sublessees, to the extent required by Environmental Laws.  In order to ensure that the SDSs are available to the City in the event of a Hazardous Substances Release or other emergency, the SDSs shall be kept current at all times and a copy of the SDSs shall be kept in a place known to and easily accessible to the City.

Section 15.5    Storm Water Management System and Wash Water Discharges.

(a)    Airline must at its sole cost manage storm water associated with the Airline Premises ("**Airline's Storm Water**") prior to its discharge into any storm sewer system. Airline shall not discharge storm water to any storm sewer system without complying with applicable laws and regulations, including any applicable Environmental Laws and with the City's or Airline's stormwater permit issued under the Texas Pollution Discharge Elimination System ("**TPDES**").

(i)    Airline acknowledges that the City's TPDES municipal separate storm sewer system (MS4) permit and its TPDES industrial multi sector stormwater discharge general permit ("**Industrial Stormwater Permit**"), and any subsequent amendments, extensions, or renewals thereto, to the extent affecting Airline's operations at the Airport, are incorporated by reference into this Agreement. The City shall provide Airline with written notice of the City's MS4 and Industrial Stormwater Permit discharge permit requirements (including any modifications thereto) that are applicable to Airline's operations and that Airline shall be obligated to perform from time to time at the Airport including, but not limited to:  certification of non-stormwater discharges; implementation of "good housekeeping" measures or Best Management Practices; and maintenance of necessary records.

(ii)   Airline must maintain its own Industrial Stormwater Permit, and may prepare its own Storm Water Pollution Prevention Plan ("***SWPPP***") or subscribe to the SWPPP of the City.

(iii)   Within sixty (60) days of the Effective Date and then annually thereafter as provided in Section 15.20, Airline shall provide information to the City demonstrating compliance of Airline's Storm Water management with Environmental Laws.

(iv)   Airline agrees to participate, to the extent reasonably practical, in any reasonable manner requested by the City in any City organized task force or other work group established to coordinate stormwater activities at the Airport.

Section 15.6   Discharge and Treatment of Industrial Wastewater.

No industrial wastewater discharge shall be made by Airline onto or into the ground, the groundwater, surface water, or any City owned conveyance or storage system unless such discharge meets the requirements of all applicable laws and regulations, including Environmental Laws. The City shall have the right, but not the duty, in its sole discretion, to review and approve or disapprove any industrial wastewater management, treatment or discharge system constructed or modified on the Airline Premises during the term of the Agreement.

Section 15.7   Wetlands Prevention.

Airline shall not create any wetlands under any federal, state, regional or local jurisdiction on the Airline Premises or the Airport during the term of this Agreement or extension thereof, or on any adjacent City-owned or non-City owned property. Airline shall also manage the Airline Premises so that no wetlands are allowed to form on the Airline Premises, or on the Airport as a result of Airline's acts or omissions, and so that Airline's development and use of the Airline Premises or the Airport does not cause the formation of wetlands on any adjacent City-owned or non-City owned property. If the City believes that wetlands are likely to form on the Airline Premises, or on the Airport as a result of Airline's acts or omissions, and Airline has not taken corrective action to prevent the formation of such wetlands resulting from Airline's acts or omissions, the City shall have the right, but not the obligation, to exercise Self Help as provided in Section 15.19.

Section 15.8   Hazardous Substances Releases.

Airline shall be responsible for all response, remediation and restoration of any Hazardous Substance Release and associated Environmental Costs on or from the Airline Premises, on other properties, in the air or surface waters and ground water in violation of Environmental Laws, that results from or occurs in connection with Airline's occupancy, possession, or use of the Airline Premises or the Airport occurring during or continuing after the termination of the Agreement. If the City has reason to suspect that there has been such a Hazardous Substance Release, there is an imminent threat of a Hazardous Substance Release, or that Hazardous Substances are being stored, handled, disposed of or otherwise managed onsite in violation of Environmental Law or the requirements of this Agreement, then at the City's request Airline shall, at its expense, demonstrate (through such tests, professional inspections, samplings, or other methods as may be reasonably required) that Airline has not caused or permitted any such release of Hazardous Substances in

excess of quantities or volumes permitted by Environmental Laws. Airline shall provide copies of reports from any such testing or assessments to the City. Should Airline not provide the requested demonstration to the City, the City may conduct, or cause to be conducted, such tests, inspections, samplings and assessments, and Airline shall reimburse the City for all costs of such actions, no later than forty-five (45) days following demand for reimbursement.

Section 15.9    Previously Leased Premises.

In the event of a Hazardous Substance Release in violation of Environmental Law which occurred prior to the Effective Date is encountered on any portion of the Airline Premises that Airline also leased as the equivalent of Exclusive Use Premises or Preferential Use Premises under its prior agreement with the City, Airline shall be deemed to be responsible for all costs incurred in connection with such contamination, including investigation, removal, remediation, or other required plan, report, or response action, unless Airline provides clear evidence demonstrating that another party is fully responsible.

Section 15.10    Immediate Response.

In the event of a Hazardous Substance Release, or a threat of or reasonable suspicion of a Hazardous Substance Release for which Airline is responsible under this Agreement, Airline shall immediately undertake and diligently pursue, at Airline's sole expense, all action necessary and appropriate to investigate, contain, stop, accomplish source control, remove and perform interim remediation regarding the Hazardous Substance Release, in each case pursuant to and as required by Environmental Laws.

Section 15.11    Corrective Action and Remediation.

Airline shall promptly undertake, at Airline's sole expense, all actions necessary to ensure that any violation of Environmental Law, any violation of ARTICLE 15 of this Agreement, or any Hazardous Substance Release by Airline, its officers, directors, employees, agents, contractors, invitees, and licensees in any way associated with the Airline Premises is completely remediated to such a condition that a "No Further Action" or "Completion of Cleanup" determination, or an equivalent determination, not conditioned upon facility or use restrictions is obtained from the government agency with jurisdiction over the Hazardous Substance Release. In the alternative, Airline may seek the City's prior written approval of remediation to risk-based levels conditioned upon governmental agency approval and maintenance of facility and use restrictions. The City may approve such an alternative approach on the condition that the Airline assumes responsibility for any liability under Environmental Law and any Environmental Costs of the City resulting from such alternative approach.

Section 15.12    Natural Resources Damages Assessment and Restoration.

Airline shall promptly undertake, at Airline's sole expense, all actions necessary to ensure that any natural resources damage associated with Airline's use of the Airline Premises or the Airport and the violation of Environmental Laws, the environmental provisions of this Agreement or any Hazardous Substance Release by Airline or persons under Airline's control, supervision, or employment is investigated, determined, quantified, assessed, and permanently restored and

compensated for, to the extent legally required by any natural resource trustee with jurisdiction over the matter.

Section 15.13   Allocation of Costs.

Any Environmental Costs incurred by the City for Airline's failure to comply with Environmental Laws as required herein shall be reimbursed to the City by Airline. Unless prohibited by law, regulation or judicial/governmental/law enforcement verbal or written order, the City shall promptly notify Airline of any TCEQ or other governmental proceedings or investigations reasonably believed by the City to be applicable or potentially applicable to Airline or the Airline Premises so that Airline has the opportunity to defend against such fines or penalties as appropriate.

Section 15.14   Environmental Audits and Environmental Walkthroughs.

During the term of the Agreement, Airline or the City may decide jointly or unilaterally to conduct Environmental Audits or Environmental Walkthroughs, as described below, to determine whether the Airline Premises have been or are currently being operated in compliance with the Agreement and Environmental Laws. Both the City and Airline shall reasonably conduct such Environmental Audits or Environmental Walkthroughs in a manner that minimizes operational disruptions to Airline's operations. The types and purposes of Environmental Audits and Environmental Walkthroughs are:

(a)   *Initial.*

Prior to occupying the Airline Premises, Airline and the City shall jointly determine and agree whether to conduct an Environmental Audit or Environmental Walkthrough to determine if the Airline Premises are currently in compliance with the Agreement and Environmental Laws.  If the parties cannot agree, then either the Airline or the City may unilaterally determine that an Initial Environmental Audit or Environmental Walkthrough is necessary, subject to the cost allocation in Section 15.15 or Section 15.16, as applicable.

(b)   *Transition.*

If Airline is required to occupy a transition space under Section 3.4, or the Airline Premises is reassigned under Section 3.9, Airline or the City may conduct an Environmental Audit or Environmental Walkthrough to establish the environmental condition of the Airline Premises, the temporary transition space, and/or the new Airline Premises space.

(c)   *Special.*

If the City has reason to suspect that there has been a Hazardous Substance Release, there is an imminent threat of a Hazardous Substance Release, or that Hazardous Substances are being stored, handled, disposed of or otherwise managed onsite in violation of Environmental Law or the requirements of this Agreement, the City may, after written notice outlining those reasons to Airline, conduct an Environmental Audit or Environmental Walkthrough.

(d)   *Exit.*

*Draft 9.6.2024*

At the termination of this Agreement, the City and Airline shall jointly determine and agree whether an Environmental Audit or Environmental Walkthrough is necessary to establish whether the Airline Premises have been operated in compliance with the Agreement and Environmental Laws. If the parties cannot agree, then either the Airline or the City may unilaterally decide that an Exit Environmental Audit or Environmental Walkthrough is necessary, subject to the cost allocation in Section 15.15 or Section 15.16, as applicable. An Exit Audit, if undertaken, shall be conducted not more than one hundred and twenty (120) days, but not less than sixty (60) days, prior to the actual termination or transfer date of this Agreement.

Section 15.15  Environmental Audits.

(a)     When Airline and the City decide to conduct a joint Environmental Audit pursuant to this Agreement, then the time and scope of the audit shall be determined together, a mutually acceptable environmental consultant shall be agreed upon to conduct the Environmental Audit, and the consultant shall timely provide a complete copy of the results of the Environmental Audit to Airline and the City.

(b)     If an Environmental Audit is conducted unilaterally by the City it shall:  provide Airline with reasonable advance written notice of the commencement date; allow Airline to have a representative present; provide Airline the opportunity to review the findings; and shall not unreasonably disrupt Airline's operations.

(c)     The City and Airline shall share equally in the cost of a joint Environmental Audit. The cost of a unilateral Environmental Audit by either Party shall be borne by the Party electing to perform the work; provided, however, if a Special Environmental Audit or an Exit Environmental Audit reveals the presence of a substantial violation of Environmental Laws, defined to mean any violation that would have resulted in mandatory enforcement under the enforcement policies of the TCEQ or other applicable governmental entity, or a not previously discovered Hazardous Substance Release caused by the Airline or its employees, agents, permittees, contractors, subcontractors, sublessees, or others in Airline's control, supervision, or employment, then Airline shall pay for the cost of such Environmental Audit.

Section 15.16  Environmental Walkthrough.

(a)     When Airline and the City decide to conduct a joint Environmental Walkthrough pursuant to this Agreement, then it shall be conducted by one or more representatives of the Airline and the City. The Environmental Walkthrough shall be for the purpose of determining by visual observation, which may include reviewing non-confidential and non-privileged environmental records, whether the Airline Premises are in compliance with the Agreement and Environmental Laws. At least one representative of Airline and one representative of the City that participates in an Environmental Walkthrough shall be knowledgeable of Environmental Laws. Airline and the City shall each prepare a separate list of observations believed to show where the Airline Premises is not in compliance with the Agreement or Environmental Laws. Within ten days after the completion of the Environmental Walkthrough, the Airline and the City shall exchange copies of the lists.

*Draft 9.6.2024*

(b)    If an Environmental Walkthrough is conducted unilaterally by the City it shall: provide Airline with reasonable advance written notice of the commencement date; allow Airline to have a representative present; provide Airline the opportunity to review the findings; and shall not unreasonably disrupt Airline's operations.

(c)    Airline and the City shall each bear its own cost in conducting an Environmental Walkthrough.

Section 15.17  Environmental Access.

The City reserves the right from time to time, after reasonable notice to Airline (except in cases of emergencies when notice shall not be required), to inspect, in a manner that minimizes operational disruptions to Airline's operations, the Airline Premises and Airline's operations on and use of the Airline Premises to: (a) evaluate Airline's management of Hazardous Substances; (b) conduct subsurface or stormwater sampling; (c) evaluate compliance with Environmental Laws; (d) review compliance documentation to facilitate the City's compliance with Environmental Laws or implementation of its environmental management system; and (e) perform Environmental Audits or Environmental Walkthroughs.  At the City's request Airline shall make available for inspection and copying any or all of the non-privileged documents and materials prepared by or for Airline pursuant to any Environmental Law. The documents may be retained by the City or submitted to any governmental regulatory agency; provided, such documents and materials relate to environmental regulatory compliance and pertain to the Airport or the Airline Premises.

Section 15.18  Notices, Review & Approval, and Self-Help.

(a)    *Generally*.

Airline shall promptly notify the City in writing upon becoming aware of: (i) a violation or alleged violation of any applicable Environmental Laws related to the Airline Premises or Airline's use of the Airport or of this ARTICLE 15 of the Agreement; and (ii) any Hazardous Substance Release on, under, from or adjacent to the Airline Premises or the Airport or threat of or reasonable suspicion of such.  In addition, Airline shall notify the City of such (i) or (ii) by calling the Airport's twenty-four (24) hour/seven (7) days a week Airport Communication Center: (210) 207-3433.  If Airline fails to notify the City of a matter as required in this Section, and if the City does not otherwise acquire knowledge of the matter, Airline shall be liable for any exacerbation of such Hazardous Substance Release that could reasonably have been avoided if such notification by Airline had been provided.

(b)    *Regulatory Notice – Airline*.

If any Environmental Law requires Airline to file any notice or report of a release or threatened release of Hazardous Substances on, under or about the Airline Premises or the Airport, Airline shall promptly submit such notice or report to the appropriate governmental agency and simultaneously provide a copy of such report or notice to the City. In the event that any written allegation, claim, demand, action or notice is made against Airline regarding Airline's failure or alleged failure to comply with any Environmental Law, Airline, as soon as practicable, shall notify

the City in writing and provide same with copies of any such written allegations, claims, demands, notices or actions so made.

      (c)    *Regulatory Notice – City.*

      The City will promptly provide written notice to Airline of any notices received by the City from TCEQ or other regulatory agency regarding Airline's environmental compliance obligations.

      (d)    *City's Rights of Approval, Notice, Review and Comment.*

      Except in the case of an emergency or a regulatory agency order requiring immediate action, Airline shall give the City advance notice before beginning any response, remediation, or restoration action required by this Agreement or applicable Environmental Laws. In the event that the City disapproves the proposed work and/or the entities and individuals conducting such work, the City shall notify Airline and provide a basis of such disapproval. The City shall have the right to approve or disapprove the proposed work and the entities and individuals conducting such work. Airline shall copy the City, at no cost to the City, on all of such response, remediation, or restoration action deliverables submitted to the regulatory agencies and shall allow the City a reasonable period of time based upon the surrounding circumstances to submit comments thereon to Airline. Within thirty (30) days following completion of any immediate response, remediation or restoration action required by this Agreement, Airline shall provide the City, at no cost to the City, with a written report describing, in detail, the work performed.

      (e)    *Airline's Split Sampling Notice.*

      Airline shall notify the City at least forty-eight (48) hours in advance of any proposed sampling associated with a Hazardous Substance Release in order to allow the City to be present or to collect split samples. Airline shall provide the City with copies, at no cost to the City, of any sampling results and associated chain of custody and quality assurance and quality control information within ten (10) days of receipt by Airline.

      (f)    *City's Right to Advise and/or Direct the Immediate Cessation of Operations in an Emergency.*

      The City shall have the right to advise and/or direct Airline to cease all or part of its operations immediately upon delivery of written notice if the City determines that the Airline's operation: (i) is not being undertaken by Airline or Airline's Representatives in any material respect in accordance with Environmental Laws; (ii) constitutes an emergency, meaning an imminent endangerment to human health, safety, or welfare or the environment; or (iii) resulted in a Hazardous Substance Release.

      (g)    *City's Right of Self Help.*

      Upon suspicion that Airline has failed to fulfill its obligations related to a Hazardous Substance Release, the City shall have the right, upon giving Airline seven (7) days written notice, stating the obligations in issue, to perform Airline's obligations arising under any Environmental Laws and charge Airline the resulting Environmental Cost, plus any additionally incurred charges from the date any funds were expended by the City ("**Self Help**"). Airline agrees to reimburse the

City, upon demand, any amounts the City may spend pursuant to this section on behalf of Airline. The City may not commence performance on behalf of Airline under this section if, within such notice period, Airline promptly notifies the City, begins, and continually thereafter diligently pursues to completion the performance of the obligations stated in the City's notice. Advance written notice by the City is not required in the event of an emergency or a governmental agency order requiring immediate action by the City for which advance written cannot reasonably be given, provided that the City shall provide written notice to Airline as soon as reasonably practicable.

(h) *City's Right of Final Approval.*

The Director shall have authority to disapprove an activity of Airline and/or any sublessee, on the basis of a risk assessment performed in accordance with Environmental Laws and through which the City reasonably determines such activity may pose a danger to health, safety or welfare or otherwise may violate Environmental Laws. The parties understand that Airport premises are not intended for use involving refining, processing, manufacturing, overhaul, or similar heavy industrial activities entailing the use, storage, manufacture, or transport of critical volumes of Hazardous Substances, other than reasonable volumes of such Hazardous Substances as permitted through this Agreement and reasonably needed to be used for approved fueling, maintenance, and operations. For purposes of this Agreement, "critical volumes" are those which, in the discretion and sole judgment of the Director, pose or may pose an unreasonable risk to Airport property, its occupants, employees or the traveling public.

Section 15.19 Additional Environmental Provisions.

(a) *Generally.*

Airline shall be fully and primarily responsible to the City for any violation of any Environmental Laws or non-performance of the duties stated in this Agreement by Airline or its representatives and Airline shall be fully responsible for the same as if Airline had committed the violation or breach itself.

(b) *Annual Certification.*

If requested in writing by the City, Airline shall provide on or before each anniversary of the Effective Date of this Agreement, a written statement, certified by Airline as true and complete to the best of its actual knowledge, that during the preceding year with respect to the Airline Premises and Airline's occupation and use of the Airline Premises and the Airport, Airline has complied with applicable Environmental Laws. If Airline is unable to provide such certification at the time requested by the City, then Airline shall provide the City with a written statement of the steps Airline is taking to enable it to provide the City with a certification of compliance.

(c) *Sustainability.*

The City and Airline shall become familiar with and comply with all Environmental Laws regarding recycling, green building, water conservation, energy conservation, renewable energy, and air quality applicable to their respective operations. Airline shall use commercially reasonable efforts to comply with the City's policies and programs to the extent such policies and programs

are not inconsistent with the terms and conditions of this Agreement or Environmental Laws. Airline shall have the opportunity to participate in the development of such policies and programs and the City shall fully consider for incorporation Airline's comments.

(d)     *Noise.*

Airline shall comply with any formal noise abatement program or policy established by the Airport in conformance with Applicable Laws and use commercially reasonable efforts to comply with informal noise abatement programs established by the Airport.  The Airline shall notify the City promptly and may challenge such programs if the Airline believes such formal or informal noise abatement programs may interfere with safe aircraft operation or if Airline believes such programs are not in conformance with federal statues, laws, rules and regulations.

(e)     *Air Quality Improvements.*

Airline acknowledges that in order to protect existing Airport operations, to improve air quality in the region, to meet requirements associated with the expansion of the Airport, and to otherwise comply with federal and state air quality laws, the City and its tenants may be required to implement certain changes to operating practices to address any newly regulated air pollutant, emission or contaminant in accordance with applicable Environmental Laws, including without limitation such Environmental Laws related to climate change and indoor air quality. In addition, the City may adopt new Best Management Practices that it will request Airline to voluntarily comply with, such as Airline's conversion of ground service equipment and support vehicles to alternative fuels and use of pre-conditioned air and 400 Hz gate power instead of auxiliary power units ("APUs"). Airline agrees to utilize the pre-conditioned air and 400 Hz gate power provided on the Loading Bridges unless such equipment is inoperable. Airline will cooperate with the City to identify cost-effective ways to minimize contributions to climate change.

(f)     *Cumulative Remedies.*

All such remedies of the City with regard to environmental requirements as set forth herein shall be deemed cumulative in nature and shall survive termination of this Agreement.

(g)     *Survival of Environmental Provisions.*

Unless specifically stated elsewhere herein, the provisions of this Article, including the representations, warranties, covenants, and indemnities of Airline, are intended to and shall survive termination of this Agreement.

## ARTICLE 16
## TERMINATION

Section 16.1   Termination by City.

(a)     The City, in addition to any other right of cancellation herein given to it or any other rights to which it may be entitled by law or equity or otherwise, may cancel this Agreement by giving Airline written notice, to be served as hereinafter provided, upon or after the happening of any one or more of the following events (each an "***Airline Event of Default***"):

(i)     Failure by Airline to make timely payment of any Airline rentals, fees, and charges due the City under this Agreement, including remittance of Passenger Facility Charges in accordance with the PFC Regulations, within ten (10) days of the date such payment was due;

(ii)    Failure to provide copies of insurance policies or maintain required insurance coverages as described in this Agreement, after ten (10) days' written notice from the City of such failure;

(iii)   The filing by Airline of a voluntary petition in bankruptcy or any assignment for benefit of creditors of all or any part of Airline's assets;

(iv)    Any institution of proceedings in bankruptcy against Airline and the adjudication of Airline as a bankrupt pursuant to such proceedings;

(v)     The taking of jurisdiction by a court of competent jurisdiction of Airline or its assets pursuant to proceedings brought under the provisions of any federal reorganization act;

(vi)    The appointment of a receiver or trustee of Airline's assets by a court of competent jurisdiction or by a voluntary agreement with Airline's creditors;

(vii)   The default by Airline in the performance of any covenant, obligation, or condition herein required to be performed by Airline and the failure of Airline to remedy such default for a period of thirty (30) days after receipt from the City of written notice to remedy same.

(b)     Failure by the City to take any authorized action upon an Airline Event of Default shall not be construed to be or act as a waiver of said default or of any subsequent default of any of the terms, covenants, and conditions herein contained to be performed, kept, and observed by Airline.

(c)     The acceptance of rentals, fees, and charges by the City from Airline for any period or periods after an Airline Event of Default of any of the terms, covenants, and conditions herein required to be performed, kept, and observed by Airline shall not be deemed a waiver or estoppel of any right on the part of the City to cancel this Agreement for failure by Airline to so perform, keep, or observe any of said terms, covenants, or conditions.

## ARTICLE 17
## ASSIGNMENT AND SUBLETTING

Section 17.1   Assignment and Subletting.

(a)     Airline shall not, directly, or indirectly, assign, sell, sublease, or otherwise transfer this Agreement, or any portion of Airline Premises or this Agreement.

*Draft 9.6.2024*

## ARTICLE 18
## MISCELLANEOUS PROVISIONS

Section 18.1    Acknowledgment.

The Parties hereto acknowledge that they have thoroughly read this Agreement, including any exhibits or attachments hereto, and have sought and received whatever competent advice and counsel was necessary for them to form a full and complete understanding of all rights and obligations hereunder. The Parties further acknowledge that this Agreement is the result of extensive negotiations between the parties and shall not be construed against the City by reason of the preparation of this Agreement by the City.

Section 18.2    Authority of Director.

The Director may exercise all rights and obligations of the City under this Agreement, unless specifically provided otherwise or required by Applicable Law.

Section 18.3    Capacity to Execute.

Each of the Parties hereto warrants and represents that the execution and delivery of this Agreement by its undersigned representative(s) has been duly authorized by all necessary corporate or municipal action, as applicable.

Section 18.4    Covenant Against Liens.

Airline shall not cause nor permit any lien against the Airport, the Airline Premises or any improvements thereto to arise out of or accrue from any action or use thereof by Airline; provided, however, that Airline may, in good faith, contest the validity of any alleged lien.

Section 18.5    Notices.

Any notice required in this Agreement shall be in writing and served personally or sent by registered or certified mail, postage prepaid, or by courier service such as DHL, FedEx, or UPS. Any notice mailed pursuant to this paragraph shall be presumed to have been received by the addressee five (5) business days after deposit of it in the mail, postage prepaid and properly addressed, or, if sent by courier service, when delivered to or refused by the addressee. Notices required to be given pursuant to this Agreement shall be addressed to:

For City:     [Name]
              [Title]
              [Address]
              [Email Address]

For Airline:  [Name]
              [Title]
              [Address]
              [Email Address]

Either Party may change their designated contact for notices under this Agreement at any time during the Term with written notice to the other Party in accordance with this Section 18.1.

### Section 18.6   Employees of Airline.

Airline shall require all of its employees and subcontractors or independent contractors hired by Airline working in view of the public and about the Terminal Building to display appropriate identification. Airline employees shall obtain identification badges from the City. Airline shall be responsible for paying the cost of TSA required employee background checks and badging.

### Section 18.7   Entire Agreement.

This Agreement, including all exhibits and attachments hereto, constitutes the entire agreement between the Parties on the subject matter hereof and may not be changed, modified, discharged, or extended except by written instrument duly executed by the City and Airline. This Agreement supersedes all prior agreements and understandings, written and oral, expressed, or implied, between the City and Airline related hereto. Airline agrees that no representations or grant of rights or privileges shall be binding upon the City unless expressed in writing in this Agreement.

### Section 18.8   Amendment.

No amendment, modification, or alteration of the terms of this Agreement shall be binding unless the same be in writing, dated subsequent to the date hereof and duly executed by the Parties hereto, except in accordance with the terms herein. The Director is authorized to execute amendments which do not substantially alter the material terms of this Agreement, provided that such amendments shall be approved in form and substance by the City Attorney or his or her designee. All other amendments must be authorized in writing by City Council by passage of an ordinance thereto.

### Section 18.9   Non-Exclusive Rights.

Nothing in this Agreement shall be deemed to grant Airline any exclusive right or privilege within the meaning of 49 U.S.C. § 40103(e) or 49 U.S.C. § 40103(a)(4) with respect to activities on the Airport.

### Section 18.10  Force Majeure.

Except as provided herein, neither the City nor Airline shall be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder by reason of strikes, boycotts, labor disputes, embargoes, shortages of material, acts of God, pandemic, epidemic, acts of the public enemy, acts of superior governmental authority, weather conditions, tides, riots, rebellion, sabotage, or any other circumstances for which it is not responsible or which is not in its control; provided, however, that these provisions shall not excuse Airline from paying Airline rentals, fees, and charges hereunder.

Section 18.11  No Third-Party Beneficiaries.

Each of the parties has entered into this Agreement solely for its own benefit.  Except as expressly provided herein, this Agreement does not grant to any third person the right to claim damages or to bring any suit, action, or any other proceeding against either the City or Airline because of any breach hereof.

Section 18.12  Governing Law; Venue.

The laws of the State of Texas shall govern this Agreement and all disputes arising hereunder, with venue in Bexar County, Texas.

Section 18.13  Headings.

The headings of the Articles and paragraphs of this Agreement are inserted only as a matter of convenience and for reference and do not define or limit the scope or intent of any provisions of this Agreement and shall not be construed to affect in any manner the terms and provisions of this Agreement or of its interpretation.

Section 18.14  No Partnership or Agency.

Nothing herein contained is intended or shall be construed to in any respect create or establish any relationship other than that of licensor and licensee, and nothing herein shall be construed to establish any partnership, joint venture, or association or to make Airline the general representative or agent of the City for any purpose whatsoever.

Section 18.15  Invalid Provisions.

In the event any covenant, condition, or provision herein contained is held to be invalid by a court of competent jurisdiction, the invalidity of any such covenant, condition, or provision shall in no way affect any other covenant, condition, or provision herein contained, provided the invalidity of any such covenant, condition, or provision does not materially prejudice either the City or Airline in its respective rights and obligations contained in the valid covenants, conditions, and provisions of this Agreement.

Section 18.16  Nonliability of Individuals.

No director, officer, agent, elected official, or employee of either Party shall be charged personally or held contractually liable by or to the other party under any term or provision of this Agreement or because of any breach thereof or because of its or their execution or attempted execution.

Section 18.17  Noninterference with Airport Operations.

Airline, by accepting this Agreement, expressly agrees for itself, its successors, and assigns that it will not make use of its Airline Premises in any manner that might interfere with the landing and taking off of aircraft at the Airport or otherwise constitute a hazard. In the event the aforesaid covenant is breached, on reasonable notice to Airline and opportunity to cure, the City reserves

the right to enter the Airline Premises and cause the abatement of such interference at the expense of Airline.

### Section 18.18  Avigation Rights.

The City reserves unto itself, its successors, and assigns for the use and benefit of the public, a right of flight for the passage of aircraft in the airspace above the surface of the Airport for navigation or flight in the said airspace for landing on, taking off from, or operating at the Airport.

### Section 18.19  Height Limitation.

Airline expressly agrees for itself, its successors and assigns, to restrict the height of structures, objects of natural growth and other obstructions on the Airline Premises to such a height so as to comply with Federal Aviation Regulations, Part 77, as such may be amended or superseded from time to time.

### Section 18.20  Remedies to Be Nonexclusive.

All remedies provided in this Agreement shall be deemed cumulative and additional and not in lieu of or exclusive of each other or of any other remedy available to the City or Airline at law or in equity (to the extent not inconsistent with the express provisions hereof), and the exercise of any remedy or the existence herein of other remedies or indemnities shall not prevent the exercise of any other remedy.

### Section 18.21  Right to Audit Books and Records.

Airline agrees to keep books and records on its operations at the Airport, for a period of at least four (4) years following the expiration or earlier termination of this Agreement, and the Director or any other authorized City representative, upon reasonable advance written notice to Airline, shall have the right to inspect and audit such books and records to ensure compliance with the prevailing municipal bond disclosure requirements and to determine that the City has received from Airline all moneys due the City under the terms hereof, including, but not limited to, rentals, fees, and charges and PFCs (if applicable) payable to the City by Airline. Likewise, Airline shall have the right to inspect the books and records of the City relating to the provisions hereof.

### Section 18.22  Right to Lease to United States Government.

During time of war or national emergency, the City shall have the right to lease the Airport landing area or any part thereof to the United States government and, if any such lease is executed, the provisions of this Agreement insofar as they are inconsistent with the provisions of the lease to the Government shall be suspended; however, such suspension shall not extend the Term of this Agreement. If, as a result of any such lease, the rights or duties of Airline hereunder are materially affected, then Airline shall receive an equitable rental adjustment.

*Draft 9.6.2024*

Section 18.23  Subordination.

(a)    Nothing contained herein shall unlawfully impair the right of the City to exercise its governmental or legislative functions. This Agreement is made subject to the Constitution and laws of the State of Texas and to the Charter of the City of San Antonio, Texas, and to the provisions of the Airport Improvement Program Grant Agreements applicable to the Airport and its operation.

(b)    Airline agrees that this Agreement shall be subject and subordinate to the provisions of any existing or future agreements between the City and the United States of America, relative to the operation and maintenance of the Airport, the terms and execution of which have been or may be required as a condition precedent to the expenditure by or reimbursement to the City or the County of Federal funds for the development of the Airport ("***Grant Assurances***").   In the event that this Agreement, either on its own terms or by any other reason, conflicts with or violates any such Grant Assurances, the City has the right to amend, alter, or otherwise modify the terms of this Agreement in order to resolve such conflict or violation.  Airline further agrees that it shall not knowingly cause the City to violate any Grant Assurances made by the City to the Federal Government in connection with the granting of such Federal funds.

Section 18.24  Successors and Assigns.

The provisions of this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

Section 18.25  Time of the Essence.

Time is of the essence in this Agreement.

Section 18.26  Quiet Enjoyment.

Upon payment by Airline of the rentals, fees, and charges as herein required and subject to performance and compliance by Airline of the covenants, conditions, and agreements on the part of Airline to be performed and complied with hereunder, Airline shall peaceably have and enjoy the rights, uses, and privileges granted to it herein of the Exclusive Use Premises during the Term, subject to the provisions hereof and in conformance with Applicable Laws and Rules and Regulations.

[Signature Page(s) to Follow]

*Draft 9.6.2024*

**IN WITNESS WHEREOF, the parties hereto have subscribed their names the day and year first above written.**

CITY OF SAN ANTONIO, TEXAS:

_____

Erik Walsh
City Manager

Approved as to form:

_____

City Attorney

AIRLINE:

_____

By:

Title:

*Notary of Airline Signature:*

_____

STATE OF _____ COUNTY OF _____

SIGNED IN BEFORE ME THIS _____ DAY OF _____ 2024

*Draft 9.6.2024*

# **EXHIBIT A**

## **AIRPORT MAP[1]**

---

[1] To be inserted as identical exhibit to Exhibit A of the Signatory Airline Agreement.

1

*Draft 9.6.2024*

## **EXHIBIT C**

### **EXCLUSIVE USE PREMISES[2]**

---

[2] Exhibit C is only applicable and to be inserted if the Non-Signatory Airline is leasing Exclusive Use Premises under this Agreement.

*Draft 9.6.2024*

## **EXHIBIT D-1**

### **TERMINAL BUILDING SPACE EXHIBIT[3]**

---

[3] To be inserted as identical exhibit to Exhibit D-1 of the Signatory Airline Agreement.

*Draft 9.6.2024*

## **EXHIBIT D-2**

## **JOINT USE SPACE[4]**

---

[4] To be inserted as identical exhibit to Exhibit D-2 of the Signatory Airline Agreement.

*Draft 9.6.2024*

## EXHIBIT F

### RATES AND FEES SCHEDULE[5]

---

[5] To be inserted as identical exhibit to Exhibit F of the Signatory Airline Agreement.

*Draft 9.6.2024*

## **EXHIBIT K**

### **MAINTENANCE SCHEDULE[6]**

---

[6] To be inserted as identical exhibit to Exhibit K of the Signatory Airline Agreement.

*Draft 9.6.2024*

## EXHIBIT L

## REQUIRED FEDERAL PROVISIONS[7]

---

[7] To be inserted as identical exhibit to Exhibit L of the Signatory Airline Agreement.