**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| SOUTHWEST AIRLINES CO., | § | |
| *Plaintiff* | § | |
| | § | SA-24-CV-01085-XR |
| -vs- | § | |
| | § | |
| CITY OF SAN ANTONIO, TEXAS, | § | |
| JESUS SAENZ, IN HIS OFFICIAL | § | |
| CAPACITY AS DIRECTOR OF | § | |
| AIRPORTS FOR THE CITY OF SAN | § | |
| ANTONIO, TEXAS; | § | |
| *Defendants* | § | |

## ORDER

On this date, the Court considered Defendants the City of San Antonio (the City) and Jesus Saenz's (Saenz) motion to dismiss (ECF No. 58) and Plaintiff Southwest Airlines Co.'s (SWA) motion for summary judgment in part (ECF No. 60). After careful consideration, and considering the parties' oral arguments on August 19, 2025, the Court issues the following order.

## INTRODUCTION

This case arises out of the City of San Antonio's gating decisions when designing a new Terminal C in the San Antonio International Airport (SAT). Terminal C will contain 17 gates and 850,000 square feet and is slated to open sometime in 2028. SWA, which currently flies out of Terminal A and is the largest airline operator in SAT, was angling for Terminal C space alongside three other airlines (American, Delta, and United). It was shut out. In this zero-sum allotment, American and Delta were placed in Terminal C, United in Terminal B, with SWA remaining in Terminal A.

Unsatisfied with this arrangement, SWA sued the City in September 2024, just days before the execution of new Airline Use and Lease Agreements (AULA) that formalized this arrangement

1

along with other terms and conditions applicable to signatory airlines at SAT. ECF No. 1.[1] SWA challenged the criteria used by the City to allocate gate space in Terminal C as preempted by the Airline Deregulation Act of 1978 because they consist of impermissible factors—including whether an airline committed to building an airline club, whether it offered first-class service, and whether it flew certain routes.[2] On this claim, the Court denied SWA's motion for a temporary restraining order in October 2024. *See* ECF No. 17.

After engaging in discovery, SWA filed an amended complaint which bolstered its preemption claim and added two more claims: a claim under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment and a state-law claim for promissory estoppel. *See* ECF No. 57.

## **BACKGROUND**

The Court recites the factual allegations in the amended complaint and treats the allegations as true, unless otherwise stated.[3] Given the procedural posture, the Court notes where the summary judgment record raises key factual disputes.

### I.    **Facts**

#### A.   **Southwest Airlines and San Antonio International Airport**

SWA is a major airline in the United States that operates on a low-cost carrier model. *Id.* ¶ 20. It was established in 1967 in San Antonio and began operating as an intrastate airline within

---

[1] SWA has also filed a Part 16 Complaint with the Federal Aviation Administration (FAA) that raises many of the same issues as here but seeks different relief. *See* ECF No. 64-1. The eventual outcome of that proceeding has no bearing on this case.

[2] SWA refers to the airline clubs as "VIP lounges," whereas the City refers to them as "airline clubs." As the clubs here are being built by the airlines themselves, the Court uses the term "airline club."

[3] SWA cites numerous batestamped documents in its amended complaint, but does not attach these documents to its amended complaint, nor does it attach them to its motion for summary judgment. While the Court takes the allegations as true, it does not draw any additional inferences from the unidentified citations.

the State of Texas. *Id.* ¶ 21. In the following decades, it expanded nationwide and currently serves airports in 42 states and multiple near-international destinations. *Id.* SWA is the largest air carrier at SAT, with a 37% share of passengers in 2024. *Id.* ¶ 22.

SAT is located on property that the City acquired in 1944, which was then named the San Antonio International Airport and after which regular flights began. *Id.* ¶ 25. Several renovations and upgrades were carried out in the early 1950s, and a large expansion project took place in the late 1960s. *Id.*

Today, SAT has two terminals: A and B. The existing Terminal A was commissioned in 1984, totals nearly 400,000 square feet, and has 16 gates. *Id.* ¶ 26. Terminal A has seen better days and is "in severe need of reconstruction." *Id.* Even Defendant Saenz—the Director of Airports for the City—reported to the media that the City "feel[s] like [it] can get another five to eight years out of [Terminal A], but after that, it's a demolition." *Id.* The existing Terminal B was constructed in 2010 and has nearly 250,000 square feet. *Id.* ¶ 27. Still, Terminal B is not nearly as modern as the new Terminal C will be.

**B. Expansion of SAT and Terminal C**

Given the wanting infrastructure in the current Terminals A and B, the City planned to expand SAT and add a new Terminal C. Terminal C is expected to cost approximately $1.4 billion and will be situated next to the existing Terminal B. *Id.* ¶ 28. It is slated to feature seventeen gates (six for international travel or other operations) and total approximately 850,000 square feet, which is 30% larger than Terminals A and B combined. *Id.*; ECF No. 57-3 at 2. Projected to open sometime in 2028, Terminal C will have larger gate hold rooms, an enhanced entry and indoor courtyard, new passenger screening areas to provide greater retail and concession offerings, a new

Federal Inspection Station for expanded international travel, and nearly 30,000 square feet for airline club lounge space. ECF No. 57 ¶ 28.

Space is coveted in Terminal C. Four airlines—American, Delta, United, and SWA—requested gate space. ECF No. 57-3. Each airline currently flies out of SAT. American requested six gates, Delta requested five, United requested six, and SWA requested ten. *Id.* As Terminal C will only have seventeen gates, it cannot fit all four airlines. So from the beginning, the City embarked on a plan to determine who would be in Terminal C. *How* the City did so is the subject of this case.

According to SWA, the City gave preference in Terminal C to airlines that catered to business and affluent passengers by providing airline clubs and first class/business services and excluded low-cost providers like SWA that catered to value-minded travelers. ECF No. 57 ¶ 33. SWA also contends that the City gave preference to airlines that committed to offering certain routes, including a non-stop route to Washington, D.C. *Id.* ¶ 42.

In support, SWA points to (1) the City's directive to Corgan, the Master Architect of Terminal C, *id.* ¶¶ 28–29 and (2) the City's own "Summary of Decision-Making Process for Post-DBO Gate and Club Locations." *Id.* ¶¶ 38–42; ECF No. 57-3 (Gate Assignment Memorandum or GAM). The Court lays out each below.

## C. Predetermined Design of Terminal C and the Master Architect Recommendation

According to SWA, even though the City residents had little interest in club spaces and Corgan thought the clubs were unnecessary, the City prioritized airline clubs in the planning and design of Terminal C. ECF No. 57 ¶ 29; *see id.* ¶ 33 (alleging that it was the City's "original recommendation" to Corgan to keep SWA in Terminal A, not the other way around). SWA alleges that the City instructed Corgan to include nearly 30,000 square feet into the design—even before

any airline had committed to building or operating a club—to isolate "ultra low-cost carriers in Terminal A" and exclude SWA because it "did not operate VIP clubs." *Id.* ¶¶ 29, 33.

On October 31, 2023, Corgan issued its gating recommendation that placed American and Delta in Terminal C and SWA in Terminal A. *Id.* ¶ 34. When presenting this plan to the City, Corgan explained that the benefits of its gating recommendation included "large club spaces" and that Delta could provide direct access to some of its gates from its airline club. *Id.*[4]

According to SWA, the City, armed with a plan that accomplished its initial objective, then engineered the type of service that the City felt "should be offered in the new Terminal C." *Id.* ¶ 29. For example, when Delta expressed concerns that it could not commit to a club by February 2024, the City changed its tune and stated that Delta was "likely staying in [Terminal A]." *Id.* ¶ 34. Just a few months later, Delta informed the City that it received approval to build a SkyClub, but only if it was assigned to Terminal C, which the City obliged. *Id.*

---

[4] The summary judgment record on this point—who decided which airlines would be in Terminal C—is hotly contested. Some of the City's evidence appears to suggest that the requirement for clubs came from the City. *See, e.g.*, ECF No. 72-5 at 9 (Trupiano Dep., Mar. 14, 2025) (stating that the "requirement . . . that clubs be included in the new terminal" did *not* come from Corgan and "predate[d] Corgan's involvement"); ECF No. 72-6 at 12 (Brandenburg Dep., Mar. 18, 2025) (conceding "there was a component of the design that needed to address VIP lounges"). SWA also cites testimony that states Corgan did *not* "make a recommendation to the City that Delta and American should be in Terminal C." ECF No. 60-16 at 10 (Trupiano Dep., Mar. 14, 2025)*; but see* ECF No. 72-4 at 4 (O'Krongley Decl., May 6, 2025) (stating he does "not understand the basis for [Trupiano's] position").

But the City contends that the recommendation came from Corgan. *See* ECF No. 72-2 at 9 (O'Krongley Decl., Sept. 29, 2024) (stating that "the decision as to where to locate each airlines' gates . . . was made by the [Executive Steering Committee], *which decided to adopt the recommendation of the Master Architect*" (emphasis added)); ECF No. 72-4 at 4 (O'Krongley Declar., May 6, 2025) (stating that "[n]either the City nor the Executive Program Manager directed [Corgan] on how to perform the analysis or reach any result" and that Corgan "conducted the load balancing analysis independently"); *id.* at 6 (stating that "[w]ith respect to clubs, the City did not request that any airline provide or expand a club"); ECF No. 72-6 at 5–6 (Brandenburg Dep., Mar. 18, 2025) (stating that Corgan "ultimately, made the recommendation [for the gating decision]" and "recommended to the City that American and Delta be assigned gates in the new terminal"); ECF No. 72-7 at 3 (Jeff Coyle Decl., May 6, 2025) (stating that "[t]he City did not direct [Corgan] on how to perform the analysis or reach any particular result").

### D. The City's Internal Decision-Making Process

Alongside the City's alleged directive to Corgan to design Terminal C to account for airline clubs, the Gate Assignment Memorandum sheds further light on the process.[5]

**The Criteria.** The GAM set forth the following factors—Gate Assignment Criteria (GAC) that the City allegedly considered in determining which airlines would go in Terminal C:

- Number of preferential gates requested by airline;
- *Whether an airline club was requested;*
- *Whether airline operates or commits to operating international routes*
- Whether airline has relevant code share arrangements
- Current level of enplaned passengers @ SAT
- *The airline's "fit" into San Antonio*
- *The airline's service growth, and experience*
- *The existence of a written commitment by airline to city pairs, specific flights, or minimum levels of enplaned passengers*
- Potential need by airline for appurtenant City Gates (for expansion); [and]
- Terminal load-balancing considerations

*Id.* at 1 (emphasis added).

The GAM further details how the City evaluated the GAC. The City also completed Worksheets and a Scorecard, which aligned with the GAM and assigned points to each airline according to the GAC. SWA alleges that the GAC was outcome determinative as it was used to get past an "impasse of not being able to finalize the gates [in Terminal C]." ECF No. 57 ¶ 4.[6]

---

[5] The Court takes judicial notice of the GAM, ECF No. 57-3, as it is attached to SWA's amended complaint. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). For the same reason, the Court takes judicial notice of the related Gating Placement Analysis Worksheet, ECF No. 57-2 (Worksheets), and Gating Scorecard, ECF No. 57-3 (Scorecard).

[6] On summary judgment, the City contests this. The Assistant Director of Finance and Administration for the City's Department of Aviation, Michael Garnier, states that he created the Worksheets "in the last week of April [2024] to provide additional support for the recommended solution [from Corgan], in addition to load balancing and cost savings." ECF No. 72-3 at 8 (Garnier Decl., May 7, 2025). Garnier adds that he did not share the results of the score sheets with the Executive Steering Committee (only with the Executive Program Manager "for input and a check on whether [his] analysis was out of the realm of reasonable") and that the process outlined in the GAM, including use of the Worksheets and Scorecard were *not* a factor in the final decision. *Id.* at 11. Timothy O'Krongley, the Deputy Aviation Director of Planning, Infrastructure and Development for the City also rejects that the GAM and related documents "[were] the basis for the City's gating decision." ECF No. 72-4 at 5 ("It was my understanding, based on the discussion in the meeting, that the Gating Scorecard slide was not a factor in the final decision"); *see also* ECF No. 72-7 at 4 (Jeff Coyle Decl., May 6, 2025) (same); ECF No. 72-14 at 3–4 (Jesus Saenz Decl., May 7, 2025) (same).

**The Process Employed.** In this section, the GAM explains that to slot airlines in Terminal C, the City considered the "non-quantifiable considerations" above-emphasized, including (1) each carrier's "fit" into San Antonio (relating to desirability of passenger profile (business, leisure, mix, etc.) and airline brand position (network, ultra-low-cost carrier, established, start-up, etc.) and (2) each airline's "service, growth and experience" (relating to the airline's growth potential and commitment to SAT, aspiration for international flights, and any differentiation of product used that would enhance customer experience). ECF No. 57-3 at 1. The section does not discuss airline clubs as a "non-quantifiable consideration."

According to the GAM, the analysis "*then turned*" to broad-based terminal load balancing considerations. *Id.* (emphasis added). At this stage, the City "assessed the airport's operations as a whole and determine what was advisable from an airport-wide balancing viewpoint." *Id.* In other words, according to SWA, the City only considered load balancing factors *after* ranking the airlines according to the "non-quantifiable considerations."

**The Summary of Decision.** By contrast, the GAM's "Summary of Decision" represents that the "first component of the decision-making process was to examine airline clubs requests." *Id.* at 2. It explains that accounting for airline clubs was key, given that they are "valuable to the airport/city for potential customer experience, represent a fixed financial commitment by the airline, and are a unique challenge with respect to available space/sitting options." *Id.* It concluded that the two largest club requests—American and Delta (who, together, took up all eleven domestic gates in Terminal C)—could only reasonably be accommodated in Terminal C. *Id.* The Summary added that while United requested a club in Terminal C, it had a smaller footprint than American and Delta and so was left in in Terminal B for cost considerations. *Id.* Spirit Airlines also received

---

Like the dispute over the City's directive to Corgan, at this procedural posture, the Court treats SWA's allegations as true.

one gate in Terminal B. *Id.* This section does not expressly mention the City's consideration of American or Delta's fit or service, growth, and experience.

That left SWA, which requested ten gates but did not commit to building an airline club as part of its offerings. *Id.* The Summary explains that scenarios were assessed—the second-stage "load balancing" considerations—that placed SWA in either Terminal C or B. But given SWA's high passenger level, "concerns arose" over the strain the amount of passengers would have on resources in the terminal." *Id.* The City also considered placing SWA in both terminals, but decided against this as it "would overload the Terminal C baggage system" and potentially disrupt international flights which "necessarily" have priority over SWA's domestic operation. *Id.* So the City determined that "the most reasonable overall solution" was to keep SWA in Terminal A. *Id.* While it acknowledged that Terminal A "was less than ideal," the City explained that additional resources would enlarge the holdrooms and refurbish the interior "to match the look and feel of the new terminal facilities." *Id.*

**The Worksheets Align with this Decision.** The City also assigned points to each airline in the Worksheets (later memorialized in a Scorecard). These appear to align with the GAM and GAC.

*First*, American, Delta, and United were each awarded seven points for requesting an airline club, whereas SWA received zero points. ECF No. 57-2 at 1, 4, 7, 10.

*Second*, American and Delta were awarded seven points each for "fit into SAT," which included "desirability of passenger profile" such as business, leisure, or a mix, and "airline brand position" such as network, established, or start-up, whereas SWA and United received five points each. *Id.* at 1–2, 4, 7, 10. The comments to the Worksheets support this point spread. *See id.* at 3

(discussing American being a "network carrier" and its business traveler and leisure appeal), at 6 (same, for Delta), at 9 (noting SWA was a "point to point with a focus city").

*Third*, American was awarded seven points and Delta was awarded six points for "service, growth, experience," which looked to the type of cabin service, club experience, growth potential, and aspirations for international flights or any other differentiation that would "enhance customer experience," whereas SWA and United were awarded six points each. *Id.* at 1–3, 4, 7, 10. Again, the comments to the Worksheets provide supporting explanations for these awards. American was noted to have a "split cabin" (first class and regular fare), a "top-tier club experience," a "hub feed," a high "growth potential," and a "known DC commitment." *Id.* at 3.[7] Delta was rated similarly. *Id.* at 6. SWA, by contrast, had a "different boarding experience" and was "seeking" a DC commitment (as opposed to American's *known* DC commitment). *Id.* at 9.

*Fourth*, points were assigned based on other factors, including the number of gates requested, current enplaned passenger amount, and whether the airlines offered international flights.[8] No points, however, were assigned based on the possible need for appurtenant City Gates, written commitments for flights or enplaned passengers, and terminal load balancing considerations, even though each was discussed in the GAM (and GAC). *See* ECF No. 57-2 at 1, 4, 7, 10 (listing these categories as "N/A").[9]

---

[7] The City contests this as a factor on summary judgment, which again creates a disputed issue of fact. *See* ECF No. 72-2 at 8 (O'Krongley Dep., Sept. 29, 2024) (stating that he was unaware of any "written commitment that [any airline] would provide service at SAT between certain city pairs [or] operate specific flights or schedules").

[8] For "gates requested," American received four-and-a-half points, Delta received four, SWA received five, and United received four. ECF No. 57-2 at 1, 4, 7, 10; *but see* ECF No. 57-1 at 1 (listing 5 points for American and United). For "international flights," SWA appears to have received four points, while all the other airlines received zero. ECF No. 57-2 at 1, 4, 7, 10; *but see* ECF No. 57-1 at 1 (listing five points). And for "international code share," Delta received four points, while all the other airlines received zero. ECF No. 57-2 at 1, 4, 7, 10.

[9] That said, the Worksheet comments discuss the American's Washington D.C. commitment in the "service, growth and experience" section, which *was* assigned points. *See, e.g.*, *id.* at 2–3.

In total, American received 30 (or 29.5) points, Delta received 31, SWA 26 (or 25), and United 26 (or 25). *See* ECF No. 57-1 at 1; *supra* note 8. Based on these numbers, had the club access not been considered, SWA would have had more points than any other airline and—assuming that the Worksheets accurately captured the City's decision-making process—been an apparent frontrunner for placement in Terminal C. ECF No. 57 ¶ 42. On the other hand, even if SWA was afforded seven points for "fit" and "service, growth, and experience"—the same as American and (one more than) Delta—it still would be out of the running on its own account.[10]

***

To recap. SWA does not allege how, if at all, the GAC played a role in *Corgan's* recommendation to locate American and Delta in Terminal C and SWA in Terminal A. According to SWA, Corgan was directed to consider airline clubs, not type of service or routes. Indeed, Corgan never used the GAC, Worksheets, or Scorecard, which were all created *after* Corgan made its recommendation. Further, the GAM, including the GAC and related documents indicate that other factors played a role in allocating gate space in Terminal C, including the number of gates requested and enplaned passengers.

But the GAM states that the City considered the GAC in its decision-making process, and it is plausible that the GAC was outcome determinative—whether in the City's initial recommendation to Corgan, its later decision to adopt Corgan's recommendation, or its final decision to adopt the AULAs. Thus, the Court assumes, for purposes of the motion to dismiss, that the GAC—and its preference for airlines that requested club space, had first-class offerings, and committed to a certain routes—guided the process used to allocate gate space in Terminal C.

---

[10] In this scenario, SWA would receive 29 points (7 for "fit" instead of 5, and 7 for "service, growth, and experience," instead of 6; totaling 29 (26 + 3)). *See* ECF No. 57-1. But 29 points is still less than American and Delta.

E.  **The City Reveals its Decision in May 2024 and SWA's Response**

SWA alleges that despite Corgan's recommendation, some City officials disagreed that SWA should remain in Terminal A. *Id.* ¶ 35. At any rate, on May 29, 2024—about seven months *after* Corgan made its recommendation to the City that placed SWA in Terminal C in October 2023—the City informed SWA that it was to remain in Terminal A. *Id.* ¶ 36.

SWA contends that being excluded from Terminal C will result in a diminished customer experience, place SWA on unequal footing with competing airlines, and preclude it from implementing its long-term commercial plan for SAT, all of which will result in a loss of reputation and goodwill. *Id.* ¶¶ 55, 58.

Over the next few months, SWA voiced these concerns to the City. It explained that Terminal A's facilities were not sufficient to support SWA's passenger volume and various other operational and structural needs, and that the City's decision would "preclude [SWA] from being able to operate [its] long-term commercial plan for San Antonio." *Id.* ¶ 44.

SWA, perhaps sensing a lost battle in Terminal C, also renewed its attention to Terminal A's development. In an August 12, 2024 letter to Saenz, it stated that it "simply will not accept the diminished experience for our Customers and Employees and the risk of facility constraints to our future commercial plan by remaining in the airport's oldest facility [Terminal A]" and that it looked "forward to further engagement." *Id.* ¶ 45. SWA further objected that the $200M commitment for infrastructure projects and finish improvements that was previously negotiated alongside the construction of Terminal C was insufficient to meet its needs. *Id.* ¶¶ 44–45.

No progress was made. Later that month, SWA executives met with City officials to reiterate its concern that the City had not presented a viable solution for Terminal A, was seeking

to force SWA to "take-it-or-leave-it," and represented that SWA would not sign a new lease that left it in Terminal A until a new funding structure for Terminal A was resolved. *Id.* ¶ 46.

Notwithstanding SWA's protest, the City Council approved the AULAs, which were executed on October 1, 2024. *Id.* ¶ 46.

### F.  The Terms of the AULAs

The AULAs are ten-year agreements (with a five-year extension) between SAT and the signatory airlines that include the terms and conditions (including rates and charges) on which the airlines lease gates and other space at SAT. *Id.* ¶ 47. Airlines that do not sign an AULA do not enjoy certain benefits of "signatory status," including input into capital development decisions and preferential rights on designated gate assignments and revenue sharing. *Id.* Non-signatory airlines also pay premium rates compared to signatory airlines. *Id.* Although each signatory airline signs a separate AULA, the terms are identical and "each signatory airline pays the same rate under the AULAs for each landing and takeoff of its aircraft." *Id.*

SWA has held "signatory status" at SAT since 1971 and wants to keep it. *Id.* ¶ 49. But SWA alleges that the AULAs are the byproduct of an unlawful gating assignment and so seeks to enjoin their recognition and enforcement (or alternatively, certain sections of the AULAs).[11] For now, construction of Terminal C is underway, signatory airlines have signed on, and SWA continues to hold out.

---

[11] SWA also challenges the substantive fairness of the AULAs. *First*, SWA alleges that the current structure of the AULA is unfair because it burdens SWA, regardless of whether it signs the AULA or proceeds as a non-signatory, with the largest share of construction costs of Terminal C without being able to use it. *Id.* ¶ 47. This is because the airline with the most flights at SAT (which is SWA) pays the most fees under the AULAs, and, according to SWA, these fees fund capital improvements for Terminal C. *Id. Second*, SWA takes issue with the majority-in-interest provision that governs when airline fees can be used for new capital improvement projects that are not included in the AULAs. *Id.* ¶ 48. SWA contends that under the current structure, it will be unable to seek funds over the $200M allocated in the AULAs to fund improvements to Terminal A because SWA's competitors must vote for capital improvements in Terminal A, which they have no incentive to do. *Id.* SWA points to Assistant City Manager Jeffrey Coyle's recent comments that SWA "[a]sking for more money beyond the initial $200 million isn't realistic and would require a majority approval from the signatory airlines." *Id.*

### G. Additional Allegations of Unfulfilled Promises

SWA also contends that Defendants strung it along by "verbally commit[ing]" to SWA that it would have "all or the majority of its 10 gates located in the new Terminal C" on *numerous occasions over three years*, beginning in June 2021. *Id.* ¶ 30(a)–(i).

For example, SWA alleges that in November 2021, September 2022, and January 2023, Saez repeatedly told SWA that it "would occupy gates in the new SAT terminal. *See id.* ¶ 30(a)–(c). Even after Corgan's October 2023 recommendation that kept SWA in Terminal A, Saez allegedly told SWA in November 2023 that this was a "non-starter" and again committed that "the majority of Southwest's gates at SAT would be in the new terminal," *id.* ¶ 30(d). A few days later, Michael Garnier told SWA, perhaps hedging, that "we can *probably* do something else (better?) for [SWA] via some creative sighting [sic] of its gates between part of the new terminal and Terminal B," which "would be great for both [SWA] and its passengers." *Id.* ¶ 30(e) (emphasis added). Continuing, Saenz told SWA in December 2023 that while he could not commit to all ten gates in Terminal C, "I give you my word that [SWA] will have a presence in the new terminal," this time showing SWA a diagram of SWA occupying eight gates in Terminal C. *Id.* ¶ 30(f).

Over the next few months, Saenz allegedly continued to tell SWA that it would occupy gates in Terminal C, even when he had information to the contrary. *Id.* ¶ 30(g)–(h). For example, in April 2024, Saenz continued to tell SWA that SWA would be in the new terminal, even though he was aware of the City's draft plans which left SWA in Terminal A. *Id.* ¶¶ 30(h), 31. And even after SWA learned of the City's decision and complained to Saenz that "remaining in Terminal A was not what [Saenz] had repeatedly promised [SWA]," Saenz kept quiet. *Id.* ¶ 30(i).

SWA contends that it relied on these representations and engaged in lease negotiations with the City based on an understanding that it would be placed in Terminal C, and so ignored

negotiations for lease terms related to Terminal A. *Id.* ¶¶ 31–32. According to SWA, had the City timely informed SWA that it would remain in Terminal A, it would have adopted a "different bargaining position," and the City would "have been unable to force [SWA] into a 'take-it-or-leave-it' lease for inferior space at unjust rates." *Id.* ¶ 32. SWA does not, however, identify any specific bargaining positions it would have taken or what additional concessions from the City it could have attained.

## II.    <u>Procedural History</u>

SWA sued Defendants on September 26, 2024—a few days before the AULAs were to be signed—and moved for a temporary restraining order on its preemption claim that same day. ECF Nos. 1, 2. The Court held oral argument on the motion on September 30, 2024, after which it denied SWA's request. ECF No. 17 ("Prior Order").

In its Prior Order, the Court concluded that SWA was unlikely to prevail on the merits of its preemption claim as the GAC as implemented by the City did not have the "force and effect of law." *See id.* at 8–13. The Court explained that it viewed the City as a market-participant because it is "negotiating and privately contracting with airlines based on its 'own interest in its efficient procurement of needed goods and services,'" specifically "airlines that meet its requirements for Terminal C (and Terminal[s] B and A)." *Id.* at 13 (quoting *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 693 (5th Cir. 1999)). The Court also concluded that the City's conduct likely fell within the ADA's "proprietary [powers] exception." ECF No. 17 at 10 n.7. While the Court did not consider whether the GAC "relates to a price, route, or service," it noted that it did not appear to bind SWA "to any specific price, route, or service." *Id.* at 12 n.12. Finally, the Court found that the SWA failed to demonstrate irreparable harm, given the harm appeared to be speculative and could be remedied by monetary damages. *Id.* at 14–15.

The Court set a preliminary injunction hearing for December 2024. After the Court addressed various discovery disputes, the Court entered an amended scheduling order in January 2025, which set a briefing schedule and reset the preliminary injunction hearing for April 2025. ECF Nos. 50, 53. On February 27, SWA filed its amended complaint. ECF No. 57. In its amended complaint, SWA bolstered its preemption claim and added an equal protection claim under the Fourteenth Amendment and a promissory estoppel claim under Texas state law. *Id.* ¶¶ 62–94.

With respect to relief, SWA seeks declaratory and injunctive relief on its preemption claim, *id.* at 41–42, and damages on its equal protection and promissory estoppel claim, *id.* at 43. SWA seeks a declaratory judgment that (1) the City's use of the GAC and Worksheets (as laid out in the GAM) is preempted by the ADA and is void and unenforceable, (2) the AULAs, which "ratify, effectuate, and implement" the GAC and Scorecard are preempted, void, and unenforceable, or alternatively, (3) that specific sections in the AULA that "base the allocation of terminal gate space on subjective preferences and criteria" are preempted, void, and unenforceable.[12] SWA also seeks injunctive relief to enjoin the City from recognizing and enforcing the AULAs (or alternatively, the specific sections of them). *Id.* at 41–42. SWA does not ask that the City stop construction on Terminal C or tear down Terminal C's two airline clubs.

After the parties filed their respective dispositive motions, SWA moved to vacate the preliminary injunction hearing and instead rested on its motion for partial summary judgment. ECF No. 62. The Court heard oral argument on August 19, 2025.

---

[12] Specifically, SWA challenges Sections 3.1–3.3, 3.14, 3.15, Exhibit G-1.3, Exhibit H, Article 8, Exhibit G, Sections 8.2, 8.7, Article 5, and Exhibit F. *Id.* at 41–43. The Court takes judicial notice of the AULA (ECF No. 60-12), which SWA attached to its motion for summary judgment, but not its amended complaint. *See supra* note 5.

## ANALYSIS

These motions present overlapping issues. The Court begins (and ends) with Defendants' motion to dismiss. The Court refers only to facts in SWA's amended complaint and judicially-noticed documents in its analysis. For the reasons explained below, the Court grants Defendants' motion and dismisses SWA's claims with prejudice, as it would be futile to amend.

### I.   Subject Matter Jurisdiction

The Court must first ensure itself of subject-matter jurisdiction. *See Elldakli v. Garland*, 64 F.4th 666, 669 (5th Cir. 2023). SWA's preemption claim presents a federal question under 28 U.S.C. § 1331. *See Shaw v. Delta Air Lines*, 463 U.S. 85, 96 n.14 (1983); *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 433 (5th Cir. 2023).[13] So does SWA's equal protection claim, which it asserts under Section 1983. The Court assumes supplemental jurisdiction over SWA's promissory estoppel claim under 28 U.S.C. § 1367(a).

### II.   Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to

---

[13] SWA also has a cause of action to assert its preemption claim. *See Green Valley Special Util. Dist. v. Schertz*, 969 F.3d 460, 494 n.1 (5th Cir. 2020) (Oldham, J., concurring) ("*jurisdiction* and a *cause of action* are two independent requirements to invoke the judicial power . . . ."). While the ADA's preemption clause does not contain a private right of action, *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 925 (5th Cir. 1997); *accord Air Transport Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 221 (2d Cir. 2008), the Fifth Circuit recognizes that a plaintiff has a cause of action *at equity* for a federal preemption claim and can seek declaratory and injunctive relief, regardless of whether the federal law provides a private right of action. *See Crown Castle Fiber*, 76 F.4th 433–35; *Green Valley*, 969 F.3d at 475 (concluding that "Green Valley has a cause of action against [the state officials] *at equity*, regardless of whether it can invoke § 1983"); *accord Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016) (preemption claim fell "squarely within federal equity jurisdiction" where plaintiffs sought to enjoin local laws on the ground that they were preempted by the Airport Noise and Capacity Act, which, like the ADA, lacks a private right of action).

This premise is open to debate. *See Green Valley*, 969 F.3d at 494–502 (Oldham, J., concurring) (acknowledging that Supreme Court and circuit precedent, including *Ex Parte Young*'s "implied cause of action sounding in equity," permit this cause of action but questioning whether this is consistent with "the limits of Article III"). But while Judge Oldham's concurrence in *Green Valley* "cast[s] doubt on whether a plaintiff could sue in equity without belonging to a particular class of citizens with a legislatively conferred cause of action," "that [view] is not the law of this circuit." *Crown Castle Fiber*, 76 F.4th at 435 n.13 (Smith, J.).

dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a). A plaintiff "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. Feb. 3, 2014) (citing *Patrick v. Wal–Mart, Inc.-Store No. 155,* 681 F.3d 614, 617 (5th Cir. 2012)); *see also Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("[T]he complaint must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain a recovery") (internal quotation marks and citations omitted).

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Ass'n.*, 987 F.2d 278, 284 (5th Cir. 1993). Still, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertions' devoid of 'further factual enhancement,'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (stating that the Court should neither "strain to find inferences

favorable to the plaintiffs" nor accept "conclusory allegations, unwarranted deductions, or legal conclusions.").

III.    **ADA Preemption**

The ADA contains a preemption provision prohibiting States and political subdivisions of States (such as the City) from enacting or enforcing a "provision having the force and effect of law" that is "related to a price, route, or service of an air carrier" governed by the ADA. 49 U.S.C. § 41713(B)(1).

SWA contends that the GAC—as used by the City in the procurement process to allocate gates in Terminal C—is preempted by the ADA because it has "the force and effect of law" and "relates to" the services and routes of air carriers that operate at SAT (including SWA). The City disagrees. This is a matter of first impression. The Court first lays out the scope of federal preemption, the relevant text of the ADA and applicable caselaw, before turning to the parties' arguments.

A.    **Existence and Reach of Preemption**

The doctrine of federal preemption is rooted in the Supremacy Clause of the United States Constitution, which provides that "the Laws of the United States . . . shall be the supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "In determining a federal statute's preemptive reach, congressional purpose is 'the ultimate touchstone.'" *United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489, 493 (5th Cir. 2017) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)); *see also Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992).

While there are three types of federal preemption—express, field, and conflict—express preemption is implicated here because the ADA contains an express preemption provision. *See*

*Morales*, 504 U.S. at 383. When determining the meaning of an express preemption provision, courts do not apply "any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Commonwealth of Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016); *see Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019) (following the "clear language of *Franklin*'s holding on this point" but collecting cases evincing circuit split); *Watson v. Air Methods Corp.*, 870 F.3d 812, 817 (8th Cir. 2017) (citing *Franklin* for the proposition that there is no presumption against preemption under the ADA).[14]

Accordingly, as with any question of statutory interpretation, "words are given their ordinary, plain meanings, and language must be enforced unless ambiguous." *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023). "[S]tatutes cannot be viewed in isolation," however, "and statutory interpretation requires considering the context and structure of the overall statutory scheme," *Kovac v. Wray*, 109 F.4th 331, 335 (5th Cir. 2024), which for preemption analysis requires courts to understand "the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic*, 518 U.S. at 486. Even so, the inquiry ends "if the text is unambiguous." *Kovac*, 109 F.4th at 335 (quoting *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004)).

"Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone*, 505 U.S. at 517. But even "[i]f a federal law contains an express pre-emption clause, it does not immediately end the inquiry

---

[14] Before *Franklin*, the Supreme Court had long held that even in express preemption cases, the analysis "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008).

### B. History and Text of the ADA

Before 1978, the airline industry was subject to a dual regulatory regime consisting of the federal Civil Aeronautics Board (CAB)—the predecessor entity to today's FAA—and state governments. *See Morales*, 504 U.S. at 378. Under this regime, "the [CAB] closely regulated air carriers, controlling, among other things, routes, rates, and services." *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 289 (2014). At the time, the governing federal legislation, the 1958 Federal Aviation Act, did not contain a preemption clause and in fact explicitly preserved pre-existing statutory and common-law remedies under state law in a saving provision. *Id.* at 280. Thus, before the ADA was enacted, state governments were able to regulate intrastate airfares (including those offered by interstate air carriers) and to enforce their own laws against airlines. *Morales*, 504 U.S. at 378.

Congress determined that this regime caused inefficiencies in the marketplace, resulted in excessive fares, and prevented innovative and low-cost services. *See* John W. Freeman, *State Regulation of Airlines and the Airline Deregulation Act of 1978*, 44 J. AIR. L. & COM. 747, 747–48 (1979). In 1978, Congress abandoned it and enacted the ADA, which removed economic restriction and largely deregulated domestic air transport to achieve a market-oriented approach to the commercial airline industry. *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 22 (1995).

The ADA sought to promote "'efficiency, innovation, and low prices' in the airline industry through 'maximum reliance on competitive market forces and on actual and potential competition.'" *Ginsberg*, 572 U.S. at 280 (quoting 49 U.S.C. §§ 40101(a)(6), (12)(A)); *see also Morales*, 504 U.S. at 378. Through the ADA, Congress also sought to "encourage efficient and well-managed air carriers to earn adequate profits and attract capital," 49 U.S.C. § 40101(a)(6)(A),

and improve the "variety and quality of . . . air transportation services, " *id.* § 40101(a)(12)(B). But "[t]o ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision, prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier." *Morales*, 504 U.S. at 378 (quoting 49 U.S.C. App. § 1305(a)(1)); *reenacted with no substantive change* at 49 U.S.C. § 41713(B)(1).

> The current preemption provision provides that:
>
> Except as provided by this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a [1] law, regulation, or other provision having the force and effect of law [2] related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(B)(1) (numeration added).[15] This provision "prevent[s] the States from undoing what the [ADA] was meant to accomplish," namely "eliminat[ing] federal regulation of rates, routes, and services in order to allow those aspects of air transportation to be set by market forces." *Ginsberg*, 572 U.S. at 283. In other words, it "stops States [and municipalities] from imposing their own substantive standards with respect to rates, routes, or services[.]" *Wolens*, 513 U.S. at 229. But Section 41713 of Title 49 also includes an exception allowing a government to "carry[] out its proprietary powers and rights." *Id.* § 41713(B)(3).

## C. "Force and Effect of Law" Provision

SWA concedes the standards in the GAC are not laws or regulations but insists that they are "other provisions having the force and effect of law" under the ADA. ECF No. 59 at 5. The Court "begin[s] with the text." *Lackey v. Stinnie*, 145 S. Ct. 659, 666 (2025). But it does not draw on a blank slate as the Supreme Court has provided two guideposts.

---

[15] The Supreme Court has explained that "[w]hen first enacted in 1978, this provision also applied to 'rules' and 'standard[s],'" but that "this omission is the result of a recodification that was not meant to affect the provision's meaning." *Ginsberg*, 572 U.S. at 282.

First, in *American Airlines, Inc. v. Wolens*, the Court explained that the phrase "force and effect of law" "connotes official, government-imposed policies" prescribing "binding standards of conduct that operate irrespective of any private agreement." 513 U.S. at 229 n.5 (internal quotation marks omitted). *Wolens* contrasted this "quintessential regulatory action" to "contractual commitment[s] voluntarily undertaken." *Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 649 (2013) (quoting *Wolens*, 513 U.S. at 229). In *American Trucking*, the Court characterized this distinction as "draw[ing] a rough line between a government's exercise of regulatory authority and its own contract-based participation in a market." *Id.* at 649 (relying on *Wolens* in analyzing "near-identical" language in the FAA Authorization Act of 1994 (FAAAA), 49 U.S.C. § 14501(c)(1)).[16]

Second, in *Northwest, Inc. v. Ginsberg*, the Court explained that what is "important . . . is the *effect* of a state law, regulation, or provision, not its form," as the "ADA's deregulatory aim can be undermined" in various ways. 572 U.S. 273, 284 (2014) (applying the provision to common-law rules, not merely positive law enactments); *see also Motor Coach Emps. v. Lockridge*, 403 U.S. 274, 292 (1971) (for purposes of preemption, "[i]t is the *conduct being regulated*, not the formal description of governing legal standards, that is the proper focus of concern" (emphasis added)).

In sum, the preemption inquiry requires the Court to distinguish between the exercise of regulatory authority and mere market participation, with a view to function rather than form. If the market participation exception applies, there is no federal preemption.

---

[16] In *American Trucking*, the Court noted that while the briefing occasionally framed the issue as "whether a freestanding 'market-participant exception'" limits the provision's express terms, this exception was "congruent with[] what is meant by Congress by the term 'force and effect of law.'" 569 U.S. at 649 n.4 (citations omitted). As the ADA contains the identical "force and effect of law" provision, the analysis here is the same.

### D.  Market Participation Exception

While the market participation doctrine has its origins in the dormant commerce clause,[17] the Supreme Court has applied it to affirmative federal legislation as well. *See Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 232 (1993) ("*Boston Harbor*"). In *Boston Harbor*, the Court upheld a Massachusetts labor procurement requirement that contractors working on the Boston Harbor cleanup project sign a prehire collective bargaining agreement (CBA) that recognized a specific union and compelled all employees to become union members. The Court concluded that CBA-requirement was exempt from National Labor Relations Act (NLRA) preemption under the market participation exception because private market participants could impose similar labor procurement requirements on their contractors without entering the regulatory thicket:

> When a State owns and manages property, . . . it must interact with private participants in the marketplace. In doing so, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation* . . . . To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same.

*Id.* at 227, 231.

While "commercial activities by the governments and their regulatory efforts [often] complement[] each other in some way . . . cases on market participation joined with regulation (the usual situation) prescribe exceptional treatment for this direct governmental activity in commercial markets for the public's benefit." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 347–48 (2008). The Supreme Court has explained that its "market participant cases are not limited to cases where the government supplies a uniquely public product," *id.* at 348 n.16, and that when a municipality

---

[17] *See, e.g.*, *White v. Mass. Council of Constr. Emps., Inc.*, 460 U.S. 204, 206 (1983) (explaining that the inquiry turns on "whether the challenged 'program constituted direct state participation in the market[]'" (quoting *Reeves, Inc. v. Stake*, 447 U.S. 429, 435 (1980)).

acts as a market participant and not a regulator, "contractual commitment[s] voluntarily undertaken" are proprietary actions. *Am. Trucking*, 569 U.S. at 649; *see id.* ("When a State acts as a purchaser of services, 'it does not "regulate" the workings of the market . . .; it exemplifies them.'" (quoting *Boston Harbor*, 507 U.S. at 233).

In *Cardinal Towing*, the Fifth Circuit drew on the line of Supreme Court market-participation cases and laid out a framework for distinguishing between regulatory and market participation.

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

180 F.3d at 692–93.[18]

At issue in *Cardinal Towing* was whether the City of Bedford's towing ordinance and contract specifications that non-consensual police tows be handled by the sole recipient of the contract with the City was preempted by the Section 14501(c) of the FAAAA. *Id.* at 689.[19] The plaintiff, a losing bidder, argued that the ordinance was preempted because it constituted regulation

---

[18] While *Cardinal Towing* analyzed both prongs, the Fifth Circuit has yet to explain whether the framework applies conjunctively or disjunctively. In the Sixth and Ninth Circuits, satisfying *either* prong of *Cardinal Towing* is sufficient. *See Johnson v. Rancho Santiago Cmty. College Dist.*, 623 F.3d 1011, 1024 (9th Cir. 2010) (explaining that *Cardinal Towing* "offers two alternative ways to show that a state action constitutes non-regulatory market participation" and interpreting the first prong as showing the "action is proprietary" and the second prong as showing "the action is *not* regulatory"); *Allied Constr. Indus. v. City of Cincinnati*, 879 F.3d 215, 221 (6th Cir. 2018); *but see Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206, 216 (3d Cir. 2004) (suggesting that both prongs of *Cardinal Towing* must be satisfied). The Court need not resolve the question here, as the City meets both prongs.

[19] Section 14501(c) of the FAA is the same provision interpreted in *American Trucking* and, as noted above, contains near-identical language to the ADA. Specifically, it states that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to price, route, or service of any motor carrier . . . with respect to the transportation of property." 180 F.3d at 690–91 (quoting 49 U.S.C. § 14501(c)(1)). In *Cardinal Towing*, it was uncontested that the ordinance "related to" routes and services of a motor carrier. *Id.* at 691.

of motor carrier transport of property. *Id.* at 690–691. The Fifth Circuit held that preemption should not apply. *Id.* at 693.

On the first prong, the Fifth Circuit concluded that the City of Bedford acted as a typical private actor would in procuring a towing service and that the "City's ordinance and contract specifications had an obvious connection to the City's narrow proprietary interest in its own efficient procurement of services," pointing to, among other issues, the "setting and easy supervision of a unitary quality standard for that particular work for the City." *Id.* The Fifth Circuit explained that because the "specifications in the contract were also obviously related to efficient towing," there was no indication that the City of Bedford was "doing anything else other than setting [contract] specifications[.]" *Id.* at 693. It distinguished situations involving "licensing" schemes and ordinances that have industry-wide scope or seek to encourage compliance with *other* goals (such as enforcing federal law, setting racial preferences, or "nebulous goals" such as community development): "[w]hile private parties might choose to take into account such factors, the ever present temptation to leverage the spending power and thus intrude on congressional design is such that the proprietary exception should be reserved for more archetypical market behavior." *See id.* at 693 & n.2. The Fifth Circuit added that the City of Bedford was the consumer of towing services—a requirement to be a market participant—as the driver is, by definition, not the customer in the context of a non-consensual tow. *Id.* at 696–97.[20]

On the second prong, the Fifth Circuit explained that the "limited scope [of the ordinance and contractual specifications at issue] decisively foreclose[d] an inference that the City sought to change the tow truck industry as a whole, let alone influence society at large." *Id.* at 694. Key to

---

[20] *Cf. Stucky v. City of San Antonio*, 260 F.3d 424, 436 (5th Cir. 2001), *abrogated on other grounds*, 536 U.S. 936 (2002) (distinguishing *Cardinal Towing* and rejecting the market participant exception for rules imposed on *consent* towing, in which the City is not a consumer).

this conclusion was that the specifications "looked only to the bidder's dealings *with the City*" and not with other parties, and that they "did not apply to all City contracts going forward, but only a single contract for police tows." *Id.*

True, this inquiry is sometimes murky as "the line between regulatory and proprietary conduct has soft edges." *Am. Trucking*, 569 U.S. at 651. *Cardinal Towing* cautioned that governments "have methods of influencing private conduct unrelated to the state's proprietary functions—and thus potentially disrupting a congressional plan—at their disposal that extend beyond traditional overt regulation," which include "deployment of a state's spending power in a manner calculated to encourage or discourage such private behavior." *Id.* at 691–92 (collecting cases where "courts have found preemption when governmental entities seek to advance general societal goals rather than narrow proprietary interests"). But *Cardinal Towing* also recognized that "[g]iven the volume of, and obvious need for, interaction between the government and the private sector, the application of preemption in a manner that hobbles state and local governments' purchasing efforts threatens severe disruption." *Id.* In these situations, "[c]ourts have similarly shielded contract specifications from preemption when they applied to a single discreet contract and were designed to insure efficient performance rather than advance abstract policy goals." *Id.* at 693 (collecting cases).

In an instructive case from the Ninth Circuit, a divided panel applied the *Cardinal Towing* framework to uphold a labor-contracting requirement at Los Angeles International Airport ("LAX") under the market participant exception. *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074 (9th Cir. 2017), *cert denied* 139 S. Ct. 2740 (2019). At issue was the City of Los Angeles' requirement that certain contractors at LAX "enter a 'labor peace agreement' with

any employee organization that requests one." *Id.* at 1077.[21] Affirming the Rule 12(b)(6) dismissal of the plaintiffs' preemption claims under the NLRA, the Railway Labor Act, and the ADA, the majority held that the City of Los Angeles "act[ed] as a market participant." *Id.* at 1077, 1086. Addressing the first prong of the *Cardinal Towing* test, the panel reasoned that

> the City is attempting to avoid disruption of its business: If a private entity operated LAX, that entity would have a pressing interest in avoiding strikes, picket lines, boycotts, and work stoppages. Those interests are not any less pressing simply because the City rather than a private business operates the airport, and labor peace agreements are one way to protect those interests.

*Id.* at 1080. The labor peace agreements were imposed on parties who did not directly contract with the City of Los Angeles. *Id.* at 1077. Still, the Ninth Circuit concluded that the City of Los Angeles was a *consumer* in the "market for goods and services" of airports, which are "commercial establishments . . . [that] must provide services attractive to the marketplace." *Id.* at 1081 (quoting *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 682 (1992)). The majority also held that the City's actions independently met *Cardinal Towing*'s second prong, as the decision to require "labor peace agreements" was "narrowly tied" to the "specific proprietary problem" of managing "service disruptions at LAX." *Id.* at 1082. While the Ninth Circuit did not separately analyze the ADA's "proprietary powers and rights" exception (nor the "related to" prong), it stated that its market participation conclusion was "bolstered by the inclusion of [this] express statutory carve-out in the ADA." *Id.* at 1085–86 & n.12.

In dissent, Judge Tallman expressed concern with allowing the "market participation exception to become too broad." *Id.* at 1094 (Tallman, J., dissenting). On the first prong of *Cardinal Towing*, Judge Tallman reasoned that the City of Los Angeles was "not directly procuring goods and services to execute a discrete project, but rather providing ongoing licenses," which

---

[21] A "labor peace agreement" includes "'binding and enforceable'" provisions that prohibit picketing, boycotting, stopping work, or 'any other economic interference.'" *Id.*

distinguished its "proprietary interest" in commercial licensing from cases like *Boston Harbor*, in which the government conduct was "specifically tailored to one particular job." *Id.* at 1090. And he explained that there was "no evidence that a private operator" of LAX would use the labor agreements to ensuring labor peace and preventing service disruptions, and thus that the labor agreements were an ill-fit to accomplish the Los Angeles' purported objective. *Id.* at 1090. On the second prong, Judge Tallman questioned whether the "real-world impacts" would be "sufficiently narrow" to quality for the exception. *Id.* at 1092.

### E.  Application of "Force and Effect of Law"

The City moves to dismiss SWA's preemption claim for two reasons. First, the City argues that it acted as a market participant in allocating gate space in Terminal C, and that the GAC is not an "other provision having the force and effect of law" under the ADA. ECF No. 58 at 4. Second, even if it is, the City's use of the GAC in its terminal gating decision falls within the ADA's "proprietary powers and rights" exception." *Id.*; *see id.* at 9–10 (arguing that the ADA "expressly allows" and "*preserves* the power of airport proprietors to take action [related to terminal gating that] relat[es] to airline prices, routes, or services").

SWA takes a different route. SWA contends that the City acted as a regulator, not a market participant. It argues that the GAC (as used by the City) reflects "state-imposed regulation of air carriers" and so has the "force and effect of law." ECF No. 59 at 6. According to SWA, "the ADA preempts the standards in Defendants' [GAC], which Defendants involuntarily imposed on [SWA.]" *Id.* In SWA's view, by allocating gate space in Terminal C based on whether airlines offered club space, first-class cabins, and certain routes, the City's primary goal was not to outfit Terminal C, but to impose its own policy preferences of what types of routes and services should (and will) be available in Terminal C. *See id.* (arguing that "[t]hese *standards* undermine the

ADA's deregulatory purpose" (emphasis added)).[22] SWA also rejects Defendants' reliance on the proprietary powers exception. *Id.* at 10–17.

### 1. The GAC are Not Government-Imposed Policies

The GAC is not an "official, government-imposed polic[y]" as it does not impose a "binding standards of conduct that operate irrespective of any private agreement." *Wolens*, 513 U.S. at 229 n.5. Such policies typically require governmental conduct that "employs tools in pursuit of compliance that no private actor could wield, such as the threat of civil fines, criminal fines and incarceration." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 157 (2d Cir. 2006). The GAC (and resulting AULAs) do not impose civil or criminal penalties on airlines that fail to provide certain routes or services (e.g., an airline club). Nor does SWA argue that being excluded from Terminal C is the equivalent of any penalty.

Moreover, the Supreme Court has explained that a "binding standard of conduct" refers to policies that "*prescribe*" conduct. *Am. Trucking*, 569 U.S. at 649 (emphasis added). Prescribe means to "dictate, ordain, or direct," or to "establish authoritatively (as a rule of guideline)." *Prescribe*, Black's Law Dictionary (12th ed. 2024). Thus, prescriptive policies necessarily regulate a party's *future* conduct. But the GAC is tied to SWA's *past* conduct, and governmental action that evaluates a party's past conduct to come to a market-based decision does not sensibly prescribe anything. The City has not mandated that SWA open an airline club in Terminal C (or in another SAT terminal, or any other airport for that matter) or that it offer first class cabin service or certain routes. Indeed, SWA is free to alter its conduct moving forward as it sees fit (or not). SWA has

---

[22] In its amended complaint, SWA alleged that the AULAs have the "force and effect of law" because the City "acted under color of legal authority to set the terms (including gate placement and financial costs) by which air carriers must abide in order to provide scheduled commercial passenger service at SAT." ECF No 57 ¶ 50. SWA pointed to the fact that (1) the AULAs were authorized by ordinance, *id.* ¶ 51, that they were promulgated by ordinance rather than separately authorized as a contract, *id.* ¶ 52, and (3) that Section 14.2(b) of the AULA makes violations of the AULA enforceable as a misdemeanor, *id.* ¶ 53. SWA represented at oral argument that it no longer relies on this theory.

not plausibly alleged that there is "direct substitution of [the City's] own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that [SWA] *will* provide." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 372 (2008) (emphasis added). Rather, the *market* decides who takes flight out of Terminal C "based on needs perceived by the contracting parties at the time." *Wolens*, 513 U.S. at 230 (quoting Brief for the United States as *Amicus Curiae* at 23).

This practical reality—that the GAC is tied to market factors rather than regulatory goals—is consistent with the ADA's deregulatory agenda. Not all municipalities are alike. Some may want airport lounges and intend to cater to certain passenger preferences, while others may decide to prioritize low-cost airfare or to promote home-grown or regional airlines or favor the carrier that serves the most passengers. But the purpose of the ADA's preemption provision prevents government from undermining deregulation by dictating the terms on which airlines operate. It does not disempower a municipal government from participating in the market to operate *its own airport* in which airlines compete to offer the best prices, routes, and services to passengers and the airports at which they operate. *See Ginsberg*, 572 U.S. at 288 ("The ADA is based on the view that the best interests of airline passengers are most effectively promoted, in the main, by allowing the free market to operate.').

### 2. The City Acted as Market Participant under Cardinal Towing

The Court next considers whether the City was acting as a market participant under *Cardinal Towing*. The Court takes each prong in turn.

*First*, as explained in the Court's Prior Order, the City's actions in allocating gate space in Terminal C reflect the City's "own interest in its efficient procurement of needed goods and services," *Cardinal Towing*, 180 F.3d at 693, namely specific airlines that meet its requirements

for Terminal C. While *Cardinal Towing* recognized that the distinction between a state's proprietary and regulatory action is "most readily apparent" when it "purchases goods and services its operations require on the open market," proprietary action is not so limited. *Id.* at 691. Instead, it extends to other contexts, including where a government "owns and manages property." *Boston Harbor*, 507 U.S. at 227; *see also Airline Serv. Providers*, 873 F.3d at 1081 (airports). Thus, the City's behavior lines up with "the typical behavior of private parties in similar circumstances[,]" *Cardinal Towing*, 180 F.3d at 692, given that an airport is a "commercial establishment[] funded by users fees and designed to make a regulated profit," *Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 682; *see id.* (noting that an airport owner "is operating a shopping mall as well as an airport") (O, Connor, J., concurring). It makes economic sense for a developer to seek certain amenities from airlines in airports that it believes will enhance passenger service and increase profits. And unlike *Airline Service Providers*, which is open to critique as the labor requirements were imposed on parties who did not directly contract with the City of Los Angeles, SWA directly contracts with the City in its operation at SAT. This direct link between SWA and the City places this case firmly in the market participant camp.

*Second*, the "narrow scope" of the gating decision supports the market participation exception. The GAC is "obviously related" to and directly advances the City's goals in constructing Terminal C. *Cardinal Towing*, 180 F.3d at 693. SWA does not contest that the City could decide to construct airline clubs in Terminal C, and, at oral argument, conceded that it does not take issue with the City's directive to Corgan to incorporate 30,000 square feet for airline clubs. Rather, it believes that the City cannot reward airlines who can fill that space. This position is nonsensical; if the City can determine the physical layout of Terminal C and what will be included, it must be able to fill it accordingly. SWA's position would require the City to potentially leave

unfilled space in Terminal C, which the ADA cannot sensibly be read to prohibit. It also portends a race-to-the-bottom that inverts the pro-competitive deregulatory agenda of the ADA: if municipalities cannot consider certain factors that it or its residents (or visitors) deem desirable, airlines may be less inclined to offer these services, which counteracts the ADA's aim of improving the "variety and quality of . . . air transportation services" and ensuring "adequate profits." 49 U.S.C. §§ 49101(a)(6)(A), (A)(12)(B).

Moreover, the GAC was used in a one-off project that was "specifically tailored to one particular job." *Boston Harbor*, 507 U.S. at 232. It "address[es] a specific proprietary problem[,]" *Cardinal Towing*, 180 F.3d at 693, namely how to fit four airlines—each with different requirements and offerings—into seventeen gates. Like the ordinance in *Cardinal Towing*, the GAC looks only to SWA's expected "dealings *with the City*." *Id.* It is concerned, for example, with airport clubs *at SAT* (not the carrier's presence in other airports) and each carrier's flights to international destinations and D.C. *from SAT* (not similar routes from other cities). It has no application beyond the physical assignment of space at Terminal C and does not affect any entities other than those leasing gates at SAT. This tight alignment between the GAC and the City's goals defeats any inference that the City's "primary goal" in adopting the GAC was to encourage (and punish) specific airline services or routes writ large. *Id.* at 693.[23]

Even if the City had a goal to encourage specific airline routes or services in the bidding process, "[t]hat a state or local governmental entity may have policy goals that it seeks to further through its participation in the market does not preclude the doctrine's application, so long as the action in question is the state's own market participation." *Engine Mfrs. Ass'n v. S. Coast Air*

---

[23] At oral argument, SWA relied heavily on this purported "primary goal," which did not appear in any briefing. At any rate, this theory disregards *Cardinal Towing*'s emphasis on *fit*. *Cardinal Towing* does not prohibit "primary goals," but considers the fitness of the conduct in serving that goal to get at whether there is impermissible regulation.

*Quality Mgmt. Dist.*, 498 F.3d 1031, 1045–46 (9th Cir. 2007) (applying the market participant exception to government procurement of vehicles meeting specified air pollution criteria, notwithstanding the Clean Air Act's wide preemptive scope that prevents a state from imposing emissions standards more stringent than or otherwise different from federal standards). It is not as if the City seeks to leverage its procurement power vis-à-vis the GAC to achieve regulatory goals *unrelated* to the gating allocation in Terminal C. *Cf. Wisc. Dep't of Indus., Lab. & Hum. Rels. v. Gould*, 475 U.S. 282, 283, 290 (1986) (striking down Wisconsin statute that forbade state procurement agents to hire any contractor deemed a repeat violator of federal law as tantamount to enforcing the requirements of the NLRA and outside the market participation exception).

The "manifest purpose and inevitable effect," *id.* at 291, of the GAC is not to undermine the ADA's deregulatory regime (or enforce some other law or achieve a purpose unrelated to Terminal C). Instead, it is to fill out Terminal C as the City deemed fit. Because the City "manage[s] the internal operation[s]" of Terminal C, *Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 896 (1961) (distinguishing this from the "power to regulate or license, as lawmaker, an entire trade or profession, or to control an entire branch of private business"), the GAC is a "legitimate response to state procurement constraints," *Gould*, 475 U.S. at 291.

### 3. SWA's Remaining Arguments are Unavailing

SWA tries to frame the issue as follows: If the City cannot pass an ordinance that requires airlines to offer certain services or routes as a condition of operating at Terminal C, it cannot circumvent this prohibition by using the GAC to indirectly require those same conditions of airlines in Terminal C. ECF No. 59 at 2. But this sleight of hand is misleading; it matters whether the City is allocating gates in a newly-built Terminal C that no airlines operate out of, rather than requiring airlines *already operating* out of Terminal C to offer certain services or routes, or else

lose access to it (or have some other penalty enforced against it). *Cf. Am. Trucking*, 569 U.S. 645,

650–651 (rejecting market participant argument when the Port of Los Angeles sought to impose

requirements on trucking companies operating at the Port to address environmental and safety

concerns under threat of criminal penalties). SWA's theory also misconstrues the GAC; it does not

require SWA to offer certain services or routes at all (indeed, it remains in Terminal A with its

services and routes unchanged). *See* Part III(E)(1).

Taking another approach, SWA seeks shelter in *Cardinal Towing*'s caution against

deployment of governmental power that is "calculated to encourage or discourage . . . private

behavior" and "advance general societal goals." 180 F.3d at 691. According to SWA, by rewarding

American and Delta's luxury services, the City punished airlines like SWA that lack these

offerings and sought to advance a general societal goal of having airports with luxury services.

SWA even argues that the City did not enact and apply the GAC "for [its] own use." ECF No. 71

at 4. But the City *owns* Terminal C (and SAT), and this argument collapses the general societal

goal with the City's proprietary interest in the design and layout of Terminal C. Neither SWA nor

the GAC identifies any downstream market effects that the City's decision may have; Terminal C

is the only new terminal that the City is building, and SWA does not allege that the GAC has

somehow regulated its routes or services in *other* airports (or at Terminal A in SAT). SWA does

not argue, for example, that by not being in Terminal C it cannot now fly certain routes or offer

services to passengers (or that it is compelled to do so).

SWA also contends that the City acted as a regulator because the GAC was not "voluntarily

undertaken," as the City did not disclose the criteria until after the decision was made. ECF No.

59 at 6. This misconstrues the inquiry. SWA has not yet contracted with the City (and to the extent

it will, it will do so voluntarily). Even assuming SWA undertook some form of contractual

commitment with the City when it bid for gate space in Terminal C, the City's *preferences* as a buyer when contracting with *sellers* (here, SWA) are not themselves contractual commitments imposed on SWA.

In a zero-sum allotment, there will always be winners and losers. But contrary to SWA's contention that the City is picking and choosing based on impermissible criteria, under the ADA's deregulatory regime the City's selection—based on its own preferences—is the flip side of the same "free-market" coin.

### F.  "Related To" Routes or Services Provision

Because the GAC does not have the "force and effect of law," there is no preemption. That said, assuming that the GAC does have the force and effect of law, the inquiry then turns on whether it is "related to a price, route, or service of an airline carrier that may provide air transportation." 49 U.S.C. § 41713(b)(1). SWA concedes the GAC does not relate to price, and only presses that it is "related to" routes or services. Because "everything is related to everything else," *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring), this provision itself, as others have noted, is "highly elastic and so of limited help." *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 85 (1st Cir. 2011) (internal citation omitted).[24]

Indeed, "[a]s the Supreme Court has observed, the term 'related to' under the ADA is broad and indeed 'much more broadly worded' than other preemption provisions." *Air Evac EMS, Inc. v. Sullivan*, 8 F.4th 346, 351 (5th Cir. 2021) (quoting *Ginsberg*, 572 U.S. at 283). A law "may

---

[24] In their motion to dismiss, Defendants dispute that the GAC relates to "routes and services" but do not offer any argument in support and instead contend that "the Court need not address that issue here." ECF No. 58 at 9; *but see* ECF No. 72 at 10–11 (arguing this point in response to SWA's motion for summary judgment in part). The Court addresses the "related to" provision in the alternative, as the Court "is required to discern statutory meaning regardless of party argument." *Stramaski v. Lawley*, 44 F.4th 318, 327 (5th Cir. 2022).

'relate to' a [price, route, or service], and thereby be pre-empted, even if the law is not specifically designed to affect such [route or service]." *Morales*, 504 U.S. at 386 (rejecting the argument that "relates to" only "pre-empts the States from actually prescribing rates, routes, or services," as this "reads the words 'relating to' out of the statute" and replaces it with "*regulating*"). But while the "ordinary meaning of [related to] is a broad one," *id.* at 383, "the breadth of the words 'related to' does not mean the sky is the limit," as read with "uncritical literalism . . . for all practical purposes pre-emption would never run its course,'" *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quoting *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Inc. Co.*, 514 U.S. 645, 655–56 (1995) (internal quotation marks omitted)).

Instead, a law "relates to" a route or service "so long as it has a '[1] connection with or [2] reference to' [a route or service] or [3] presents a 'significant effect' on the [routes or services of an airline]." *Air Evac EMS*, 8 F.4th at 351 (quoting *Morales*, 504 U.S. at 384) (numeration added).

The Ninth Circuit has adopted a test for "a connection with" that looks to whether "the law binds the air carrier to a particular price, route or service and thereby interferes with competitive market forces within the air carrier industry." *Air Transp. Ass'n*, 266 F.3d at 1071; *Air Transp. Ass'n of Am. v. The Wash. Dep't of Lab. & Indus.*, 859 F. App'x 181, 184 (9th Cir. 2021) (same, also looking to whether the law "regulate[s] the airline-customer relationship"). Other circuits focus on "whether the state or local rule frustrates the ADA's deregulatory purpose." *Delta Air Lines, Inc. v. N.Y. City Dep't of Consumer Affairs*, 564 F. Supp. 3d 109, 120–21 (E.D.N.Y. 2021) (declining to follow the Ninth Circuit as "[n]o other circuit, including the Second Circuit, has adopted such a narrow standard"); *accord Day v. SkyWest Airlines*, 45 F.4th 1181, 1186 (10th Cir. 2022).

On the other hand, there appears to be agreement that whether a law has a "reference to" routes or services turns on whether "a State's law acts immediately and exclusively upon [routes or services] . . . or where the existence of [a route or service] is *essential* to the law's operation." *Air Transp. Ass'n*, 266 F.3d at 1071 (quoting *Dillingham*, 519 U.S. at 235); *accord Day*, 45 F.4th at 1186 (same); *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996) (requiring the law to "expressly refer[]" to prices, routes, or services). As the Supreme Court explained in *Morales*, one "cannot avoid the conclusion" that aspects of the advertising guidelines at issue "relate[d] to" airline rates, as the terms of the guidelines "b[ore] a 'reference to' airfares." 504 U.S. at 388.

Of course, a law "relates to" routes or services if it has "the forbidden significant effect" on routes or services. *Id.* (concluding that the advertising guidelines were "related to" price as "compelling or restricting 'price advertising surely "relates to" price'" (citation omitted)). But there is no preemption if a law "has only a 'tenuous, remote, or peripheral' connection with [airline prices, routes, or services]." *Id.* (quoting *District of Columbia v. Greater Wash. Bd.*, 506 U.S. 125, 130 n.1 (1992)).

### G. Application of "Related To" Provision

SWA argues that the GAC is "related to" routes and services because it has an "obvious connection" with air carrier routes and services; the GAC expressly references international and city-pair routes (to Washington D.C.), first class cabins, and airline lounges. ECF No. 60 at 11. In support, SWA points to the Worksheets, which assigned points for these offerings. *Id.* The Court disagrees.

*First*, the GAC does not have a "connection with" routes or services.[25] Again, the GAC does not impose restrictions on SWA's routes or services. *See Am. Airlines, Inc. v. DOT*, 202 F.3d 788, 805 (5th Cir. 2000). The GAC does not bind SWA to any route or service nor does it affect its ability to offer any particular route or service. Nor does the GAC interfere with any competitive market forces. Instead, as explained above, the GAC fits neatly within the deregulatory agenda of the ADA by allowing the City to participate in the market in which airlines compete for space.

*Second*, while a closer call, the GAC does not have a "reference to" routes or services, as properly construed. True, SWA's theory has some intuitive appeal; after all, the GAC expressly refers to and sorts airlines based on what routes and services they offer. But it does not do so in reference to routes or services that SWA *offers to its own customers*. *See Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 646 (9th Cir. 2014) (explaining that "[l]aws are more likely to be preempted when they operate at the point where carriers provide services to customers," as opposed to those that "are several steps removed from prices, routes, or services.").[26] SWA's interpretation improperly ignores that the GAC has no effect on SWA's routes and services, which is paramount in evaluating whether federal preemption exists. *See Ginsberg*, 572 U.S. at 284; *Am. Trucking*

---

[25] An airline's cabin choice and route offerings are clearly "routes or services" of the airline. But it is unclear whether airline clubs are "services" of the airline, as whether a passenger has club access is not necessarily included with the passenger's ticket (or relationship with the airline, rather than, for example, with their credit card). *See Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc) (concluding that services "generally represent a bargained-for or anticipated provision of labor from one party to another," and that "[e]lements of air carrier service bargain include items such as the ticketing process, boarding procedures, the provision of food or drink inside the aircraft, baggage handling, and the actual flight," which "matters are all appurtenant and necessarily included with the contract of carriage between the passenger . . . and the airline"); *but see Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1261 (9th Cir. 1998) (en banc) (taking a narrower view and construing service to refer to "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail," but not to "include an airline's provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities"); *see generally Air Transp. Ass'n of Am. v. Cuomo*, 520 F.3d 218, 223 (2d Cir. 2008) (comparing approaches and siding with *Hodges*). The Court assumes without deciding that airline clubs are a service of airlines under the ADA.

[26] Under SWA's theory, many other decisions by the City would "relate to" services and routes, including the decision to cluster international carriers near the federal inspection facility. But even SWA conceded at oral argument that this would be permissible.

*Ass'ns, Inc. v. City of Los Angeles*, 660 F.3d 384 (9th Cir. 2011), *rev'd in part on other grounds*, 569 U.S. 641 (2013) ("In determining whether a provision has a connection to rates, routes, or services, [courts] must examine the actual or likely effect of a State's action.").

SWA's reliance on *Wolens*, therefore, is misplaced. *See* ECF No. 60 at 11. *Wolens* dealt with "*access* to flights and class-of-service *upgrades*" in the context of claims relating to frequent flyer milage credits, which passengers can exchange for these services. 513 U.S. at 226 (emphasis added). Here, the GAC does not refer to (or impact) what services or routes SWA offers to its *passengers*. A passenger's decision to use an airline club, to fly in a certain cabin, or to fly to a certain destination, is not affected by the GAC (or the City's gating decision). Instead, it is tied to the passenger's independent contract with the airline (or, with respect to airline clubs, potentially a third party, *see supra* note 25).

Further, the GAC does not act "exclusively" on routes and services, nor are they "essential" to the GAC. The routes and services are just a few of the factors considered in the GAC. Indeed, without accounting for the airline clubs, removing consideration of services or routes in the GAC would not have helped SWA, as American and Delta would still have led SWA in the Worksheets. *See supra* p. 10.

And even if the GAC "relates to" routes or services, it "affect[s] [them] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Morales*, 504 U.S. at 390 (quoting *Shaw*, 463 U.S. at 100 n.21). SWA's business model excludes certain services and routes, and nothing in the City's allocation process requires them to change their ways. Nor has SWA alleged any downstream effect of the GAC on SWA's routes and services. In any event, these "indirect economic effects . . . are not sufficient to cause preemption," as any incentive for SWA to alter its business model is not "tantamount to compulsion." *Air Transp. Ass'n of Am. v. City of San*

*Francisco*, 992 F. Supp. 1149, 1182 (N.D. Cal. 1988), *aff'd and remanded*, 266 F.3d 1064 (9th Cir. 2001).

### H. Proprietary Powers Exception

Even if the GAC has the "force and effect of law" *and* is "related to" routes or services, the City's conduct may still not be preempted so long as it "carrying out its proprietary powers and rights." 49 U.S.C. § 41713(b)(3).[27] The City argues that the proprietary powers exception covers its terminal gating decision, as the City owns Terminal C and retains the authority to make gate assignments, regardless of whether it considers routes or services (used the GAC) in doing so. ECF No. 58 at 9–13.[28] SWA insists that the proprietary powers exception is narrower and that accepting the City's position would swallow ADA preemption entirely. ECF No. 59 at 11.[29]

In enacting the ADA, Congress "recognized that airport proprietors—the majority of which are municipalities—were best equipped to handle local problems arising at and around their facilities." *Am. Airlines*, 202 F.3d at 805 (internal quotation marks and citation omitted). The term "proprietary powers" is undefined in the statute and the "precise scope of an airport owner's

---

[27] Given the Court's conclusion that the GAC does not have the "force and effect of law," the Court addresses the City's proprietary-powers argument in the alternative. Indeed, SWA conceded at oral argument that if the GAC's do not have the "force and effect of law," it is necessarily a "proprietary power." *Cf. Airline Serv. Providers*, 873 F.3d at 1085–86 & n.12 (after finding market participation exception applied, stating that the "proprietary powers" exception "bolster[s]" the conclusion that "Congress did not intend the ADA" to prohibit such conduct).

[28] The City carries the burden to establish this exception. *See EEOC v. E. Airlines*, 645 F.2d 69, 69 (5th Cir. 1981) ("The one claiming the benefits of an exception to a statutory prohibition has the burden of proving the applicability of that exception."); *see also Arapahoe Cnty. Pub. Airport Auth. V. F.A.A.*, 242 F.3d 1213, 1223 (10th Cir. 2001) (the burden to establish the proprietary powers exception before the FAA rests with the party asserting the justification).

[29] The parties both return to *Cardinal Towing* in addressing the proprietary powers exception. ECF No. 13 at 12–14; *see also* ECF No. 72 at 14 (arguing, on summary judgment, that "an airport action must fit within the definition of 'proprietary' under the *Cardinal Towing* test [to fall within the proprietary powers exception]"). To the extent these overlap, SWA's argument falls short for the reasons explained above. *See* Part III(E)(2); *but see Am. Airlines*, 202 F.3d at 805–06 (separately analyzing the proprietary powers exception even though the ordinance related to routes).

proprietary powers has not been clearly articulated by any court." *Id.* at 806. Two guideposts frame the inquiry.

*First*, Congress "grandfathered a series of court decisions granting local airport authorities control over their facilities (such as landing fees, hours of operation, etc.) that did touch upon rates, routes, and services." Christopher Scott Maravilla, *The Scope of the Proprietary Powers Exception to Federal Preemption under the Airline Deregulation Act*, 75 J. AIR. L. & COM. 549, 550 n.10 (2010); *id.* (noting that the Senate Report on the ADA states that the Act "should not be construed to affect or limit existing proprietary rights of airport operators to manage, operate, or regulate airports" (quoting S. Rep. No. 95-631, at 99 (1978))); *Am. Airlines*, 202 F.3d at 805 (stating that "Congress appears to have evinced an intent to codify the proprietary rights existing when the ADA was enacted").

So while "courts have recognized that local proprietors play an 'extremely limited' role in the regulation of aviation," *id.* at 806, they "have concluded that airports are exercising their proprietary powers when they issue noise regulations, restrict access based on airport capacity, and impose perimeter rules that redirect long-haul carriers to other airports," *Air Transp. Ass'n*, 992 F. Supp. At 1188 (collecting cases); *see also Am. Airlines, Inc.*, 202 F.3d at 806 (same, adding tempering environmental concerns and managing congestion); *Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 97 (2d Cir. 1986) (refusal to modify lease agreement entered into by the parties is a valid exercise of town's proprietary rights); *Delux Pub. Charter, LLC v. County of Westchester*, No. 22-CV-01930-PMH, 2024 WL 3252948, at *8 (S.D.N.Y. July 1, 2024) (concluding that law that applied equally to all airlines that "meant to regulate airport access so as to allocate sparce space and landing and takeoff slots" was "a matter wholly within" the

"proprietary rights and powers" exception), *aff'd in relevant part and rev'd in part on other grounds*, No. 24-1895, 2025 WL 2447834 (2d Cir. Aug. 26, 2025).

On the other hand, courts must be careful to not expand the proprietary powers exception so large that "virtually any regional regulation enacted by a proprietor would fall within the proprietary powers exception." *Am. Airlines*, 202 F.3d at 807. An airport proprietor cannot "restrict service [or routes] at a local airport without articulating a viable purpose for the restriction." *Id.* So, courts have rejected the proprietary power exception in cases dealing with naked route limitations. *See id.* at 808; *see also Arapahoe Cnty.*, 242 F.3d at 1223–24 (rejecting ban on scheduled service given "dearth of evidence" to support the claim that it was necessary due to ground congestion, operational safety, and environmental impact concerns). Courts have also rejected restrictions ranging from curfew requirements, *see San Diego Unified Port Dist. v. Gianturco*, 651 F.2d 1306, 1316 (9th Cir. 1981), to nondiscrimination policies, *see Air Transport Ass'n*, 992 F. Supp. at 1188, to monthly reporting requirements for air tour operators to file certain reports and disclosures, *see Helicopter Ass'n Int'l v. Hawai'i*, No. 23-CV-83-KJM, 2024 WL 3509769, at *1, 8 (D. Haw. July 22, 2024).

A key inquiry is whether the "restriction [is] targeted at alleviating an existing problem at the airport or in the surrounding neighborhood." *Am. Airlines*, 202 F.3d at 806. Further, the Fifth Circuit has explained that the "local interest articulated" and "scope of proprietary rights" is not limited "to those which have been previously recognized." *Id.* at 808.

*Second*, the proprietary powers exception permits an "airport proprietor [to] issue only 'reasonable, nonarbitrary, and nondiscriminatory rules that advance the local interest.'" *Id.* at 806 (quoting *W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 658 F. Supp. 952, 958 (S.D.N.Y. 1986)).[30]

---

[30] The City rejects this factor. *See* ECF No. 64 at 7–8 (arguing that the phrase arose from pre-ADA caselaw that was not incorporated into the ADA). The requirement was first raised by the Second Circuit in *British Airways*

I.    **Application of "Proprietary Powers" Exception**

Accounting for these considerations, the Court concludes that the City's terminal gating

decision (including its use of the GAC) falls within the City's proprietary powers.

First, the City is not seeking to prohibit or control any airline's routes or services. While

there is no case on point, the City's allocation of gate space in Terminal C is more like cases in

which governments exercised their "proprietary powers" to manage their airports by, for example,

restricting access based on capacity, managing congestion, and modifying lease agreements, rather

than those in which restrictions on routes or services were imposed (or other requirements that

related to routes or services) without any connection to the local proprietor's interest in the airport

itself. While SWA offers a slippery-slope rationale, it is unable to provide the Court with an

understanding of just *what* the City may do in allocating gates in Terminal C when exercising its

proprietary powers. So long as the City can consider routes or services (which the "proprietary

powers" exception presumes is permissible), it may do so in allocating gate space in Terminal C.

Second, the GAC is "reasonable, nonarbitrary, and nondiscriminatory" and advances the

local interest: outfitting Terminal C as its owner—the City—sees fit. SWA confuses the City's

"reasonable, nonarbitrary, and nondiscriminatory" criteria for what SWA believes are

---

*Board v. Port Authority of New York and New Jersey*, in the context of limiting the Port Authority's regulatory power as an airport proprietor under the Commerce Clause: "[i]t is clear to us that the Port Authority is vested only with the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations." 558 F.2d 75, 84 (2d Cir. 1977) (noting that "[a]ny other conduct by an airport proprietor would frustrate the statutory scheme and unconstitutionally burden the commerce Congress sought to foster"). True, *British Airways* identified these requirements as "arising from a compact entered into by the Defendant Port Authority with the Secretary of Transportation," and at least one court has critiqued this requirement as "blend[ing] Commerce clause and Supremacy Clause considerations into one convoluted inquiry." *Nat'l Bus. Aviation Ass'n, Inc. v. City of Naples*, 162 F. Supp. 2d 1343, 1352–53 (M.D. Fla. 2001); *but see Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100, 103 (9th Cir. 1981) (finding a "reasonable regulations" requirement in the legislative history of the ADA).

Still, the Fifth Circuit later endorsed the *British Airways* requirement in *American Airlines*, 202 F.3d at 806 (citing to *British Airways*), and the Court applies it here. While the City also argues that SWA's reliance on FAA regulations interpreting Section 40713(b)(3) "cannot override the plain language of the statute under any standard of deference," ECF No. 64 at 8 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024)), the Court need not address FAA interpretations, as *American Airlines* did not do so in adopting the factor from *British Airways*.

impermissible considerations under the ADA. *See* ECF No. 59 at 15–17. But these are not the same. Instead, the GAC reasonably accounted for a variety of factors that the City deemed to be important.

With respect to routes and services, it is reasonable to consider the needs of certain travelers who fly in and out of Terminal C, the profile of passengers (who deliver profits to the City) in operating an airport, and the benefits of airline clubs for travelers as well as a substantial long term financial commitment to SAT. But these were not the only factors either. It is clearly reasonable to also consider, as the City did, the amount of gates requested, enplaned passenger totals, and cost considerations. Together or apart, these factors were not arbitrary, but considered in an extended process for determining how to allocate gate space in Terminal C. *See Arbitrary*, Black's Law Dictionary (12 ed. 2024) (defining arbitrary to "depend[] on individual discretion," or to "relate[] to, or involv[e] a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures"). Indeed, the GAM explains the variety of considerations that went into the analysis. Even if the routes and services offered by each airline were outcome determinative, the dispositive weight assigned to these factors does not render the City's allocation arbitrary. Rather, it was reasonable to account for these factors, given the City's desire to operate a well-functioning and desirable airport. For the same reason, the GAC is not discriminatory, as it does not discriminate against SWA in any way, but accounts for its offerings in making a market-based decision. *Cf. infra* Part II(B)(2).

## II.   <u>Equal Protection Claim</u>

SWA argues that Defendants violated its right to equal protection under the Fourteenth Amendment because it is similarly situated to the other three airlines (American, Delta, and United), was treated differently, and that the City's reasons for doing so "do not pass the rational

basis test." ECF No. 59 at 18. Alternatively, SWA argues it was treated differently due to its status as a "low-cost carrier." *Id.* Defendants reject all these theories and move to dismiss this claim. ECF No. 58 at 16–19.

## A. Legal Standard

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall deny . . . to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. It "forbids state actors from treating similarly situated individuals differently *for a discriminatory purpose* and without a rational basis." *Gil Ramirez Grp., LLC v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 419 (5th Cir. 2015).[31] An equal protection claim requires either identification of a class or showing that the aggrieved party is a "class of one." *Id.* The "class-of-one rationale," however, "does not apply to 'forms of state action . . . which by their nature involve discretionary decision-making based on a vast array of subjective, individualized assessments." *Id.*

"Rational basis is a notoriously deferential standard[.]" *Reyes v. N. Tex. Tollway Auth.*, 861 F.3d 558, 561–62 (5th Cir. 2017). "Under this standard, a legislative classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Glass*, 900 F.3d at 244–45 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). "Parties attacking the presumption of validity extended to legislative classifications have the burden to negative every conceivable basis which might support it." *Id.* (internal quotation marks and citation omitted). "When applying rational basis doctrine to a dismissal for failure to state a claim, a legislative classification must be treated as valid 'if a court is able to hypothesize a legitimate purpose to support the action.'" *Id.* (citation

---

[31] The parties do not dispute that the rational basis test applies because SWA is not a member of a protected class nor does the alleged classification infringe a fundamental constitutional right. *See Glass v. Paxton*, 900 F.3d 233, 244 (5th Cir. 2018).

omitted). That said, "although rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013). "[A] hypothetical rationale, even post hoc, cannot be fantasy" and the governments' "chosen means must rationally relate to the state interests it articulates." *Id.*[32]

### B. Analysis

#### 1. SWA is Not Similarly Situated or in a "Class of One"

SWA argues that it was treated differently because of its status as "low-cost carrier that caters to value-minded individuals." ECF No. 59 at 18. Alternatively, it argues that it falls in a "class of one" because it is similarly situated to American, Delta, and United. *Id.* The Court disagrees.

First, SWA does not point to any other "low-cost carrier" that was placed in Terminal C (or received better treatment than SWA). This dooms any equal protection claim on this basis. Second, assuming that a "class of one" theory is proper here, SWA focuses on the wrong factors in classifying itself in a "class of one." "[T]he degree to which others are viewed as similarly situated necessarily will depend substantially on the facts and context of the case," and "the inquiry is case-specific and requires [the Court] to consider the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant in making the challenged decision." *Lindquist v. City of Pasadena*, 669 F.3d 225, 234 (5th Cir. 2012).

---

[32] In *St. Joseph Abbey*, the Fifth Circuit clarified that pure economic protectionism is not by itself a legitimate state interest. 712 F.3d at 222–23. While a law motivated by protectionism may have a rational basis, "naked economic preferences are impermissible to the extent they harm consumers." *Id.* at 223 (quoting *Greater Hous. Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235, 240 (5th Cir. 2011)). SWA does not allege that the City's gating decision was motivated by protectionism, much less naked economic preferences.

As Defendants point out, SWA goes to great lengths to distinguish itself from the other airlines at SAT. SWA highlights how it requested the largest number of gates and is the single largest air carrier at SAT. ECF No. 57 ¶¶ 3, 22. It explains that unlike American and Delta, it offers only "single cabin" service and a "leisure travel product more than business." *These* are the relevant facts that an objective decisionmaker—here, the City—would (and did) consider in allocating gate space.

SWA's reliance on *Big Tyme Investments, L.L.C. v. Edwards*, 9785 F.3d 456 (5th Cir. 2021) to argue that these differences are "minor" is misplaced. There, the Fifth Circuit concluded that bars and restaurants were similarly situated in the context of COVID-19 closure orders which classified businesses based on whether they had a "bar" or "restaurant" permit, even though both served alcohol. *Id.* at 468. Unlike *Big Tyme*, the differences between SWA and the other airlines place them in different buckets.

The similarities that SWA highlights—that "all [the airlines] were signatories to the previous lease, they all participated in the current AULA negotiations, and the City considered all of them for assignment to Terminal C"—are plainly immaterial to the gating decision. ECF No. 59 at 18. Indeed, this framing ignores all the *relevant* differentiating factors between the airlines as it relates to the City's terminal gating decision. While SWA is permitted to plead in the alternative, the Court cannot reasonably infer from the pleadings, which explicitly highlight SWA's distinguishing characteristics, that it was similarly situated to the other airlines for the purposes of gate allocation.

## 2. The City Has a Rational Basis

Even assuming that SWA is similarly situated to the other three airlines, its equal protection claim still fails as there are clearly valid purposes—hypothetical or not—that support the GAC and the City's decision to place SWA in Terminal A.

For starters, the City had a valid purpose in adopting the GAC (to outfit Terminal C). That the City could have slotted American and United in Terminal C and SWA in Terminal A for what SWA considered to be legitimate reasons—including load balancing and cost considerations—is enough to satisfy the rational basis test. Not to mention that the City *did* consider these reasons (and others), as detailed in the GAM. Further, Terminal C is a "commercial establishment[] funded by users fees and designed to make a regulated profit." *Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 682. The GAM explains that club investments "represent a fixed financial commitment by the airline" in the airport and cost several millions of dollars to construct. ECF No. 57-3 at 2. As Defendants point out, it is far from fantastical (and is instead, rational) to believe that an airline's infrastructure investment gives that airline greater incentive to maintain robust air service for the long term and gives the City greater assurances that the airline will do so.[33] ECF No. 58 at 18. Indeed, "a State's goal of bringing in new business is legitimate and often admirable." *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 880 (1985). These *actual* justifications support the City's decision to place American and Delta in Terminal C, which left SWA in Terminal A. The City decided it would prefer to allocate gate space in Terminal C to airlines who will provide lounge access, have first class cabins and who have direct flights to Washington D.C. Again, it is not fantasy to believe that this will likely bring in additional income and other benefits to SAT and the City broadly. *See*

---

[33] Conversely, a city might assume that a home-grown airline would be willing to maintain its local service without additional financial incentives based on its roots, reputation in the community, regional brand loyalty, and/or pre-existing investments and infrastructure. That a decision based on such an assumption might be perceived as unseemly or unfair would not render it "irrational."

*City of Houston v. FAA*, 679 F.2d 1184, 1186 (5th Cir. 1982) ("For the business traveler, Washington is Mecca.").

SWA does not seriously contest any of this. Instead, SWA raises two theories in response. First, it argues that the City is obfuscating its true purposes by pointing to "load-balancing concerns and other potentially objective justifications." ECF No. 59 at 19. But this is a straw man. So long as the City has a valid justification for its actions, the rational basis test is met. Second, SWA seeks to import what it alleges are unlawful considerations under the ADA as invalid reasons under the Equal Protection Clause. *See* ECF No. 57 ¶ 87; ECF No. 59 at 19 (arguing that the City's discrimination against SWA based on "its services and routes" is "not sufficient to survive rational basis scrutiny"). SWA cites no authority for this theory. *Cf. Livadas v. Bradshaw*, 512 U.S. 107, 119 (1994) (explaining that rational basis "mistakes a standard for validity under the Equal Protection and Due Process Clauses for what the Supremacy Clause requires," which "turns on the actual content of [government] policy and its real effect on federal rights"). The Court need not address this, given its conclusion that the City's actions here are *not* preempted.

## III.  Promissory Estoppel Claim

The Court now turns to SWA's final claim. SWA brings a state-law claim for promissory estoppel, contending that SWA reasonably and substantially relied on Defendants' repeated promise to SWA that it would be placed in Terminal C. ECF No. 57 ¶¶ 90–91. The City asserts that the claim must be dismissed based on governmental immunity. The Court agrees.

### A.  Sovereign Immunity under the Texas Tort Claims Act

"A municipality is a governmental entity entitled to sovereign immunity, but only for some of its functions." *Tex. Bay Cherry Hill, L.P. v. City of Fort Worth*, 257 S.W.3d 379, 389 (Tex. App.—Fort Worth 2008, no pet.). "A municipal corporation exercises two kinds of functions,

proprietary functions and governmental functions." *Id.* "The governmental/proprietary dichotomy recognizes that immunity protects a governmental unit from suits based on its performance of a governmental function but not a proprietary function." *Wasson Interests, Ltd. v. City of Jacksonville*, 559 S.W.3d 142, 146 (Tex. 2018). To clarify, whether an action is classified as governmental or proprietary for purposes of sovereign immunity is separate from whether it acts as a market participant (or is exercising its proprietary powers under the ADA).

Determining a municipality's immunity from suit is a two-step inquiry: (1) whether the claim arises out of governmental or proprietary functions and (2) if it is governmental, whether immunity is waived under the TTCA. *Tex. Bay Cherry Hill*, 257 S.W.3d at 389.

Section 101.0215 of the Texas Tort Claims Act contains a nonexclusive list of thirty-six functions the Legislature has specifically identified as governmental and three identified as proprietary. TEX. CIV. PRAC. & REM. CODE § 101.0215(a). The operation of "airports" is expressly identified as a governmental function. *Id.* § 101.0215(a)(10). *See Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC,* 565 S.W.3d 69, 73 (Tex. App.—Dallas, 2017), *aff'd in relevant part and rev'd in part on other grounds*, 576 S.W.3d 362 (Tex. 2019) (explaining that the operation of an airport is "expressly defined by statute as a governmental function that is exercised for a public purpose and is a matter of public necessity" and that "[a] plaintiff may not split various aspects of a city's operation into discrete functions and re-characterize certain of those functions as proprietary").

Accordingly, the City's operation of Terminal C, including its terminal gating allocation, is a governmental function and so sovereign immunity applies to bar SWA's promissory estoppel claim. *See id.* at 74 (concluding that a promissory estoppel claim by consultant hired by the Dallas/Fort Worth International Airport Board was barred by sovereign immunity).

### B.  Waiver by Conduct

SWA argues that this case is an "extraordinary factual circumstance" in which the City has *waived* immunity by conduct. "The so-called 'waiver-by-conduct' exception to immunity from suit originated in a footnote to the Texas Supreme Court's majority opinion in *Federal Sign v. Texas Southern Univ.*, 951 S.W.2d 401, 408 n.1 (Tex. 1997)." *Jefferson Cnty. v. Stines*, 523 S.W.3d 691, 723 (Tex. App.—Beaumont 2017), *rev'd in part on other grounds*, 550 S.W.3d 178 (Tex. 2018). "However, in the years since its decision in *Federal Sign*, the Texas Supreme Court has repeatedly declined requests to recognize a waiver-by-conduct exception in a breach-of-contract suit against a governmental entity, and has emphasized that waivers of immunity generally should be left to the Legislature." *Id.* (collecting cases and noting that the Texas Supreme Court "has never gone further than its suggestion in *Federal Sign* that such a waiver *might* conceivably occur under some set of facts it has not yet seen" (citation omitted)).

Fighting an uphill battle, SWA relies on *Texas Southern University v. State Street Bank and Trust Co.*, 212 S.W.3d 893, 908 (Tex. App—Houston [1st Dist.] 2007, pet. denied), a breach-of-contract case in which the university refused to pay for equipment that had already been installed on campus (to the tune of nearly $13M), claiming governmental immunity. *Id. at* 907–08. The Houston Court of Appeals highlighted how the "government officials lured [the plaintiff] into the [contract] with false promises that the contract would be valid and enforceable, then disclaimed any obligation on the contract by taking the position that the contract was not valid after all." *Id.* at 908. After walking through prior Texas Supreme Court precedent, *State Street* inferred that the Texas Supreme Court would "evaluate the waiver-by-conduct exception to sovereign immunity on the facts of each case, not as a categorical matter or bright-line rule." *Id.* at 907 (citing *Catalina Dev., Inc. v. County of El Paso*, 121 S.W.3d 704 (Tex. 2003)). *State Street*

found that the case fit within the circumstances suggested, but never applied, by the Texas Supreme Court, and so concluded the university waived sovereign immunity by conduct. *Id.*

*State Street* has been severely critiqued, however. *See, e.g.*, *Leach v. Tex. Tech Univ.*, 335 S.W.3d 386, 401 (Tex. App.—Amarillo 2011, pet. denied) (stating that *State Street* "contradicts the [Texas] Supreme Court's statements . . . about the only avenue for redress being through the Texas Legislature" and that "[i]f the highest civil court in Texas truly means what it said, then the holding in *State Street* simply is wrong"); *Hughes v. Tom Green County,* 553 S.W.3d 1, 9 (Tex. App.—Austin 2017) (noting that "*State Street* is the only case of which we are aware that has applied the waiver-by-conduct exception, and this Court has previously declined to follow *State Street*"), *rev'd on other grounds*, 573 S.W.3d 212 (Tex. 2019).

While the Texas Supreme Court has never addressed *State Street*, *Leach* pointed to the Texas Supreme Court's post-*State Street* decision in *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 414 (Tex. 2011), which rejected the waiver-by-conduct exception to the immunity of governmental entities from breach-of-contract suits. *See id.* (explaining that "[c]reating a waiver-by-conduct exception would force the State to expend its resources to litigate the waiver-by-conduct issue before enjoying sovereign immunity's protections—and this would defeat many of the doctrine's underlying policies." (citation omitted)); *see also Beaumont Indep. Sch. Dist. v. LRG-Loss Recovery Grp. LLC*, No. 09-23-00382-CV, 2025 WL 1710530, at *7 (Tex. App.—Beaumont June 19, 2025, no pet.) (memorandum op.) (rejecting an invitation to recognize a waiver-by-conduct under *Sharyland* and distinguishing *State Street*).

As best the Court can gather, "if the purported waiver is founded upon non-statutory grounds [i.e., conduct], then [the court] must search precedent to determine whether the factual situation has already been addressed by the Supreme Court." *Leach*, 335 S.W.3d at 393. Putting

aside the continued silence on this issue from the Texas Supreme Court, SWA has not pointed the Court to any similar case from the Texas Supreme Court. And *State Street* itself is distinguishable: SWA did not enter any contract with the City nor did SWA did confer any benefits to the City. SWA was not, for example, lured into investing in and building an airline club in Terminal C with the promise of operating out of it, only to have the City tell SWA it would remain in Terminal A while the City profited off the airline club SWA built.

Considering the shaky foundations of *State Street*, the Texas Supreme Court's more recent pronouncements rejecting waiver-by-conduct, and the distinguishing features of this case, the Court concludes that Defendants are entitled to sovereign immunity on the promissory estoppel claim..

## IV.    Summary Judgment and Leave to Amend

Given the Court's resolution of the City's motion to dismiss, SWA's motion for partial summary judgment is moot. SWA's factual allegations, even viewed in their best light, fail to state a plausible claim for relief, and the only factual disputes in the summary judgment record—e.g., whether the City directed Corgan to consider airline clubs and whether the GAC even played a role in the City's final decision—are immaterial.[34]

While SWA did not request leave to amend, such a request would be futile. The Court proceeded on the assumption that the City considered the commitments to airline clubs, first-class service, and certain routes in its terminal gating decision. No further factual allegations could alter the legal analysis at this stage. *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 851 F.3d 368, 378 (5th Cir. 2014). SWA has had nearly a year to search for evidence, the parties already

---

[34] Moreover, the disputed facts in the summary judgment record suggest that, even if the City had lost on its motion to dismiss the case entirely, SWA would not have prevailed on its motion for summary judgment.

conducted extensive discovery, and leave to amend is not required when plaintiffs have already pled their "best case." *See Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009) (per curiam).

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 58) is **GRANTED**. Plaintiff's Motion for Summary Judgment in Part (ECF No. 60) is **DENIED AS MOOT**. Plaintiff's claims against Defendants are **DISMISSED WITH PREJUDICE**.

A final judgment pursuant to Rule 58 will follow.

The Clerk of the Court is **DIRECTED** to close this case.

**IT IS SO ORDERED**.

**SIGNED** this 29th day of August, 2025.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE